IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DEBRA-ANN WELLMAN,                  )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )    Civil Action No. 05-278-SLR
                                    )
DUPONT DOW ELASTOMERS, LLC,         )
                                    )
        Defendant.                  )

**DEFENDANT'S OPENING BRIEF IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Barry M. Willoughby (I.D. No. 1016)
Teresa Cheek (I.D. No. 2657)
Margaret M. DiBianca (I.D. No. 4539)
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
Telephone: (302) 571-6666
Telecopier: (302) 576-3345
Email: bwilloughby@ycst.com;
Attorneys for Defendant

DATED:  August 10, 2007

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ...............................................4

SUMMARY OF ARGUMENT ...........................................................................4

I.   DDE SHOULD BE GRANTED SUMMARY JUDGMENT
     ON ALL COUNTS OF WELLMAN'S COMPLAINT
     BECAUSE SHE IS UNABLE TO ESTABLISH A
     GENUINE ISSUE FOR TRIAL. ................................................................4

II.  DDE IS ENTITLED TO SUMMARY JUDGMENT ON
     PLAINTIFF'S RETALIATION CLAIM BECAUSE SHE
     HAS NOT ESTABLISHED A PRIMA FACIE CASE NOR
     SHOWN THAT DDE'S LEGITIMATE, NON-
     DISCRIMINATORY REASON FOR ITS ACTIONS IS A
     PRETEXT. ................................................................................................4

III. DDE SHOULD BE GRANTED SUMMARY JUDGMENT
     ON WELLMAN'S "HOSTILE ENVIRONMENT"
     CLAIM BECAUSE  WELLMAN FAILED TO USE
     DDE'S SEXUAL HARASSMENT COMPLAINT
     PROCEDURE. ...........................................................................................4

IV.  DDE SHOULD BE GRANTED SUMMARY JUDGMENT
     BECAUSE WELLMAN'S ALLEGATIONS DO NOT
     MEET THE "SEVERE OR PERVASIVE"
     REQUIREMENT FOR AN ACTIONABLE HOSTILE
     ENVIRONMENT CLAIM. .........................................................................5

V.   DDE SHOULD BE GRANTED SUMMARY JUDGMENT
     ON WELLMAN'S DISABILITY CLAIM. ................................................6

STATEMENT OF FACTS ................................................................................7

A.  The Joint Venture And Wellman's Delusion That Former
    Dow Employees Thought She Was "A Spy For Dupont." .......................7

B.  Wellman's Psychological Condition ........................................................9

C.  Wellman's Complaints To DDE Did Not Include Alleged
    Sexual Harassment ................................................................................10

D.  Wellman Leaves Employment On Short-Term Disability ........................12

E.  Wellman Refuses To Return To Work. ....................................................13

F.  Wellman Abandons Employment At DDE. ..............................................15

i

G.  Wellman Files A Charge Of Discrimination. ...........................................16

H.  Wellman's Subsequent Employment At AstraZeneca..............................19

ARGUMENT ....................................................................................................20

I.  DDE SHOULD BE GRANTED SUMMARY JUDGMENT
ON ALL COUNTS OF WELLMAN'S COMPLAINT
BECAUSE THERE ARE NO GENUINE ISSUES FOR
TRIAL. .................................................................................................20

II.  SUMMARY JUDGMENT SHOULD BE GRANTED TO
DDE BECAUSE IT DID NOT ENGAGE IN UNLAWFUL
RETALIATION. ...................................................................................21

A.  Wellman Cannot Establish a Prima Facie Case of
Retaliation. ................................................................................21

B.  Wellman Cannot Establish that Her Termination for Job
Abandonment Was a Mere Pretext for Discrimination........................22

III.  SUMMARY JUDGMENT SHOULD BE GRANTED TO
DDE BECAUSE IT DID NOT ENGAGE IN UNLAWFUL
HARASSMENT. ...................................................................................25

A.  Wellman's Allegations Fail to Constitute "Severe or
Pervasive" Behavior as Defined By the Applicable
Standard of Law.........................................................................25

1.  The Severe or Pervasive Standard. ................................26

2.  Wellman's Allegations Do Not Satisfy the Severe
or Pervasive Standard. ...................................................27

B.  Wellman Unreasonably Failed to Utilize Any of the
Preventative and Corrective Measures Established by
DDE.  .......................................................................................30

IV.  SUMMARY JUDGMENT SHOULD BE GRANTED TO
DDE BECAUSE IT DID NOT ENGAGE IN DISABILITY
DISCRIMINATION. ............................................................................31

CONCLUSION..................................................................................................33

DB02:6168432.5                                                                                                    900002.0005

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)...........................................................................................20

*Andrews v. Philadelphia,*
895 F.2d 1469 (3rd Cir. 1990) ........................................................................26

*Breiland v. Advance Circuits, Inc.,*
976 F. Supp. 858 (D. Minn. 1997)..................................................................32

*Burlington Industries, Inc. v. Ellerth,*
524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633
(1998)...........................................................................................5, 25, 26, 30

*Carrasco v. Boeing Co.,*
190 Fed. Appx. 650 (10th Cir. 2006)..............................................................27

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).........................................................................................20

*Cody v. CIGNA Healthcare of St. Louis, Inc.,*
139 F.3d 595 (8th Cir. 1998) ..........................................................................32

*Cooper-Nicholas v. City of Chester,*
No. 95-6493, 1997 U.S. Dist. LEXIS 20810 (E.D.
Pa. Dec. 30, 1997)............................................................................................26

*Delli Santi v. CAN Ins. Cos.,*
88 F.3d 192 (3d Cir. 1996)..............................................................................24

*DiCenso v. Cisneros,*
96 F.3d 1004 (7th Cir. 1996) ..........................................................................28

*Faragher v. City of Boca Raton,*
524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662
(1998)...........................................................................................5, 25, 26, 30

*Ferguson v. E.I. DuPont de Nemours & Co.,*
560 F. Supp. 1172 (D. Del. 1983)...................................................................21

*Garone v. UPS,*
436 F. Supp. 2d 448 (E.D.N.Y. 2006) ...........................................................28

*Hall v. Pa. Dep't of Corrections,*
C.A. No. 03-02-1255, 2006 U.S. Dist. LEXIS
68670, *at 36 (M.D. Pa. Sept. 25, 2006) ......................................................25

*Harris v. Forklift Sys., Inc.,*
510 U.S. 17 (1993) ...................................................................................5, 26

*Harvill v. Westward Commc'n, LLC,*
311 F. Supp. 2d 573 (E.D. Tex. 2004) ...................................................25

*Hatfield v. Quantum Chem. Corp.,*
920 F. Supp. 108 (S.D. Tex. 1996) .......................................................32

*Hodson v. Alpine Manor, Inc.,*
C.A. No. 03-374-E, 2007 U.S. Dist. LEXIS
36870, at *52 (W.D. Pa. May 21, 2007) ...............................................23

*Hussein v. Genuardi's Family Mkts.,*
C.A. No. 00-CV-4905, 2002 U.S. Dist. LEXIS
430, at *21-22 (E.D. Pa. Jan. 15, 2002) ...............................................23

*Jackson v. Veterans Admin.,*
22 F.3d 277 (11th Cir. 1994) ................................................................23

*Kunin v. Sears Roebuck & Co.,*
175 F.3d 289 (3d Cir. 1998)..................................................................25

*LaResca v. AT&T,*
161 F. Supp. 2d 323 (D.N.J. 2001) .......................................................23

*Lignore v. Hosp. of Univ. of Pa.,*
C.A. No. 04-5735, 2006 U.S. Dist. LEXIS 43996,
at *29 (E.D. Pa. June 27, 2006) ......................................................25, 26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986)...............................................................................20

*Mendoza v. Borden, Inc.,*
195 F.3d 248 (11th Cir. 1999) ..............................................................27

*Meritor Sav. Bank, FSB v. Vinson,*
477 U.S. 57 (1986).................................................................................26

*Olson v. Gen. Elec. Astrospace,*
101 F.3d 947 (3d Cir. 1996)..................................................................31

*Pa. State Police v. Suders,*
124 S. Ct. 2342 (2004)...........................................................................26

*Penry v. Federal Home Loan Bank of Topeka,*
155 F.3d 1257 (10th Cir. 1998) ............................................................29

*Powell v. United Ins. Co.,*
No. 04-0829, 2006 U.S. Dist. LEXIS 40644, at
*17 (E.D. Wis. June 16, 2006)..............................................................28

iv

*Quiroga v. Hasbro, Inc.*,
    934 F.2d 497 (3d Cir 1991)...........................................................................20

*Richards v. City of Wilmington*,
    C.A. No., 03-106-SLR, 2004 U.S. Dist. LEXIS
    4987, at *15 (D. Del. Mar. 24, 2004)...........................................................21

*Robinson v. City of Pittsburgh*,
    120 F.3d 1286 (3d Cir. 1997).........................................................................24

*Schwartz v. The COMEX*,
    C.A. No. 96-3386-LAP, 1997 U.S. Dist. LEXIS
    4658 (S.D.N.Y. 1997) ...................................................................................32

*Shaner v. Synthes (USA)*,
    204 F.3d 494 (3d Cir. 2000)...........................................................................21

*Sinclair v. ATE Mgm't & Serv. Co., Inc.*,
    C.A. No. 95-CV-76172-DT, 1996 U.S. Dist.
    LEXIS 19921, at *24 (E.D. Mich. Nov. 27, 1996)......................................24

*Soileau v. Guilford of Me., Inc.*,
    105 F.3d 12 (1st Cir. 1997)...........................................................................32

*Spain v. Gallegos*,
    26 F.3d 439 (3d Cir. 1994).......................................................................26, 28

*Stephenson v. City of Phila.*,
    C.A. No. 05-1550, 2006 U.S. Dist. LEXIS 43998,
    at *33-34 (E.D. Pa. June 27, 2006) ...........................................................27

*Taylor v. Procter & Gamble Dover Wipes Co.*,
    184 F. Supp. 2d 402 (D. Del. 2002),
    aff'd, 53 Fed. Appx. 649 (3d Cir. 2002) ................................................20, 25

*Teymer v. Kraft Foods North America*,
    37 Fed. Appx. 206 (7th Cir. 2002)...........................................................23, 24

*Walker v. Pepsi-Cola Bottling Co.*,
    C.A. Nos. 98-225-SLR, 99-748-JJF, 2000 U.S.
    Dist. LEXIS 12635, at *52 (D. Del. Aug. 10,
    2000) ..............................................................................................................22

*Willis v. Conopco, Inc.*,
    108 F.3d 282 (11th Cir. 1997) .................................................................22, 23

*Woodson v. Scott Paper*,
    109 F.3d 913 (3d Cir. 1997)...........................................................................21

*Zirpel v. Toshiba Am. Info. Sys., Inc.*,
    111 F.3d 80 (8th Cir. 1997) ...........................................................................32

v

**Statutes**

Fed. R. Civ. P. 56.............................................................................................................20


**Other Authorities**

Americans With Disabilities Act,
    42 U.S.C. §§ 12101-13 ("ADA")..............................................................................passim

Title VII of the Civil Rights Act of 1964, as
    amended,
    42 U.S.C. §§ 2000e-2000e17 ("Title VII")...............................................................passim

DB02:6168432.5                                                                    900002.0005

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Debra-Ann Wellman filed this action against DuPont Dow Elastomers, LLC, ("DDE") on May 9, 2005.  Discovery was completed on June 30, 2007.  This is DDE's Opening Brief in Support of its Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

**I.    DDE SHOULD BE GRANTED SUMMARY JUDGMENT ON ALL COUNTS OF WELLMAN'S COMPLAINT BECAUSE SHE IS UNABLE TO ESTABLISH A GENUINE ISSUE FOR TRIAL.**

Wellman asserts three distinct claims against DDE.  First, she alleges she was terminated in retaliation for her informal "complaints" of harassment made after she left employment with DDE on short term disability in February, 2002.  Second, she alleges she suffered a hostile work environment in violation of Title VII of the Civil Rights Act of 1964.  Third, her complaint and amended EEOC charge state a vague, undefined allegation of discrimination under the Americans with Disabilities Act ("ADA").  After completion of discovery Plaintiff is unable to establish specific facts showing a genuine issue for trial.

**II.    DDE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM BECAUSE SHE HAS NOT ESTABLISHED A *PRIMA FACIE* CASE NOR SHOWN THAT DDE'S LEGITIMATE, NON-DISCRIMINATORY REASON FOR ITS ACTIONS IS A PRETEXT.**

Plaintiffs claim of retaliatory discharge fails because she has not established a *prima facie* case of discrimination.  Further, DDE has established that Wellman was terminated for job abandonment after she refused to return to work when her doctors released her to do so.  Since Plaintiff cannot rebut DDE's legitimate and non-discriminatory reason for its action in terminating her, DDE is entitled to summary judgment.

**III.    DDE SHOULD BE GRANTED SUMMARY JUDGMENT ON WELLMAN'S "HOSTILE ENVIRONMENT" CLAIM BECAUSE WELLMAN FAILED TO USE DDE'S SEXUAL HARASSMENT COMPLAINT PROCEDURE.**

DDE maintains an anti-sexual harassment policy.  This policy is published on the company's intranet.  Although Wellman's Complaint based on her amended charge of discrimination with the EEOC alleges she suffered various forms of alleged sexual harassment

4

by her supervisor, Paul Graves, she never made use of the company's anti-harassment policy.

Indeed, it is not disputed that she never raised claims of alleged sexual harassment at all until

after she went on short-term disability leave. Her claim should therefore be dismissed as a

matter of law in accordance with the U.S. Supreme Court decisions in *Burlington Industries, Inc.*

*v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) and *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

## IV.    DDE SHOULD BE GRANTED SUMMARY JUDGMENT BECAUSE WELLMAN'S ALLEGATIONS DO NOT MEET THE "SEVERE OR PERVASIVE" REQUIREMENT FOR AN ACTIONABLE HOSTILE ENVIRONMENT CLAIM.

Wellman's hostile environment sexual harassment claim must be dismissed for a second

reason. The claims of sexual harassment that are raised in her Complaint do not, as a matter of

law, meet the "severe or pervasive" standard requires to establish a cognizable hostile

environment sexual harassment claim. See *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

Wellman's EEOC charge alleges hostility to her by her supervisor, Paul Graves, and a

female co-worker, Mary Anne Price, that she contends arise out of alleged antipathy directed

towards her by the former Dow employees employed at DDE. A review of her amended charge,

however, shows that her alleged sexual harassment claims do not meet the standard required by

*Harris,* 510 U.S. 23. Specifically, Wellman alleges that over a seven month period beginning in

July 2001 and ending in January 2002, Graves reportedly attempted to "look up her dress" on

two occasions while she was standing on a step stool that had only three steps. She next alleges

that Graves allegedly dropped his pen while talking to her and forced her to pick it up. She also

alleges that he stared at her chest at this time. Her other allegations include vague assertions that

he "touched" her in the coffee room and asked to her "fill his cup up too." On another occasion,

he reportedly "rubbed himself" against her. She also alleged that he "rocked back and forth"

while talking to her and, that finally he "contacted" her chest when he pulled her chair towards a table during a performance review meeting.

Wellman's subjective reactions to these alleged incidents, whether or not driven by her documented personality traits that cause her to misperceive and exaggerate events, are irrelevant in determining whether the alleged harassment satisfies the severe or pervasive standard. Instead, as the U.S. Supreme Court and the Third Circuit have held, an objective "totality of the circumstances" test applies. Measuring against the standard, Wellman's claim falls far short of establishing a "hostile environment" based on sex.

## V.    DDE SHOULD BE GRANTED SUMMARY JUDGMENT ON WELLMAN'S DISABILITY CLAIM.

Wellman's vague, undefined ADA disability claim should likewise be dismissed. She has never stated the specific basis for the claim nor even identified the alleged disability from which she suffers. Regardless, the undisputed evidence shows that Wellman is unable to establish that she has a disability, let alone that any alleged adverse employment action was taken against her as a result of disability.

6

## STATEMENT OF FACTS

**A.    The Joint Venture And Wellman's Delusion That Former Dow Employees Thought She Was "A Spy For Dupont."**

DuPont Dow Elastomers L.L.C. ("DDE") was a Delaware limited liability company

formed by E.I. duPont de Nemours & Co. ("Dupont") and the Dow Chemical Company ("Dow")

on April 1, 1996.  At its formation, DDE was owned 50/50 by Dupont and Dow.  Effective

July 1, 2005 (A269; A23), Dupont purchased Dow's share.  (A268).  The company's name was

thereafter changed to Dupont Performance Elastomers, L.L.C. ("DPE").  (A268, A253).  DPE is

an independent solely owned subsidiary of Dupont.  (A139).

DPE, like its predecessor DDE, manufactures and sells general purpose and specialty

elastomer products such as Neoprene and Kalrez that are used in automotive systems,

semiconductor manufacture, wire and cable, construction, chemical processing, aircraft and

aerospace industry and all high performance parts with high-temperature, oil and chemical

resistance.  DPE also provides technical support for such products.  (A253-54; 251; 252; A23).

Plaintiff Debra-Ann Wellman ("Ms. Wellman") is a former employee of DDE who at the

time of the facts alleged in her Complaint worked at the company's facility at the Delaware

Technology Center in Newark, Delaware.  (A199).  She was employed in administrative and

clerical positions at DDE.  She left her position as Sales and Marketing Assistant and went on

short term disability on February 11, 2002.  (A38; A48; A224; A250).  Wellman's physicians

cleared her to return to work but she repeatedly refused to attend to "return to work" meetings

with DDE's Human Resources representatives.  (A112; A113; A234-237).  She terminated for

job abandonment on August 26, 2002.  (A113).  Unbeknownst to DDE, Wellman had decided

shortly after going on disability that she would not return to DDE, but instead would only accept

a position with DuPont.  (A183, 184, 185, 186, 189; A99; A117; A69).

7

Wellman's Complaint was filed pro-se and was. Based on the Amended Charge of Discrimination she filed with the EEOC in October, 2003. (A121). Her EEOC charge alleged that DDE discriminated against her based on sex (in the form of hostile environment sexual harassment), retaliated against her for the filing of the charge, in violation of Title VII , and discrimination against her based on disability. (A121). Ms. Wellman alleges that two supervisors, Paul Graves and his predecessor, Steve Metaxas, periodically "sexually harassed" her and that DDE forced her to leave her position and go on disability leave. The Charge does not specify the nature of Ms. Wellman's disability or the basis for her disability discrimination claim. (A121). DDE vigorously denies that it subjected Ms. Wellman to any harassment or discrimination whatsoever. (A128; A265). As discussed in greater detail below, Wellman did not assert that she was a victim of sexual harassment until several months after she voluntarily left work on short-term disability.

Notably, Wellman's workplace complaints focus on her delusional claim that former Dow employees who joined DDE thought that she was a "spy for DuPont." Her deposition testimony is replete with irrational claims that Graves and Metaxas, both former Dow employees, thought she was a spy for DuPont and constantly sought to get unknown "information" from her. For example, she claimed that both Metaxas and Graves would come up to her and say "spy," "Mata Hari," and make other remarks in an effort to information from her. (A202, 203, 204, 206, 214, 215, 241, 243, 244, 245; A187, 188).

Wellman also testified that, somehow, Dupont representatives influenced the co-workers at her subsequent employer, Astra-Zeneca, to threaten and harass her. For example, she testified that: (1) when left from work she would find that unknown persons had placed incense around her automobile and burned it (A179); (2) there was a strange significance to a "silver screw" she

8

found lying by her car (A179); (3) somehow her co-workers would "yell in her ear" factual

details of her charge that she had just made known only to the EEOC (A173-175); and (4) she

received a note with a "death threat" (that she has not been able to produce) (A167-169).  As a

result of these actions, she "fled" to Texas where her brother resides because "Delaware is not a

safe state."  (A171-172; A165).

**B.     Wellman's Psychological Condition.**

Wellman has been diagnosed with having a narcissistic personality disorder that causes

her to misperceive events and engage in histrionics and exaggeration. For example, as described

in greater detail below, a May 9, 2002, IME report to Wellman's EAP counselor ( a copy of this

report was not given to DDE until after Wellman filed her instant Charge of Discrimination with

the EEOC) concluded that "several factors raise substantial questions about her allegation" of

mistreatment by Paul Graves and Mary Ann Price.  (A62).  The report noted Wellman's

propensity for engaging in histrionics.  (A67-68).  The IME report also found that there were

discrepancies between the way Wellman described her allegations in the interview and the way

she described them in documents provided to them.  Id.  The IME physicians concluded:

> "Based on our evaluation, Ms. Wellman has traits of borderline,
> hysterical, and narcissistic personality. More specifically, she
> makes florid and theatrical allegations, describes herself in overly
> virtuous terms while projecting blame, and engages in splitting by
> portraying individuals and groups as either all evil or all good. Her
> personality traits lead her to misperceive social cues. For example,
> she often interprets routine mannerisms or comments at work as
> indicative of devious verbal or sexual harassment. These
> personality characteristics are clearly associated with her pattern of
> interpersonal conflicts. Despite her difficulties Ms. Wellman was
> not psychologically disabled at the time of this evaluation. She
> reported that she is not currently experiencing notable affective
> symptoms, and that she enjoys a full range of daily and leisure
> activities. She said that she is ready and eager to return to work as
> soon as possible, but that she would not go back to [DDE].

> If she were willing to return to [DDE], she might perform
> adequately, especially with continued therapy and efforts to
> alleviate workplace tensions. ..."

(A68-69).

DDE's forensic expert, Dr. Neil Blumberg, reached a similar conclusion. (A143).

The traits the medical experts observed are independently confirmed by Wellman's work history. For example, on November 1, 1996, shortly after Wellman joined the company, DDE was required to put Wellman on probation for one year and transfer her to a new position at a different work site because she had repeatedly engaged in disruptive conduct at work to the point where her co-workers refused to continue to work with her. (A21-22). Among other things, Wellman falsely accused her supervisor of having an illicit affair with an independent contractor. (A21-22). At her deposition in this case, she made similar claims against her co-workers at Astra-Zeneca. (A176-177).

Despite recommendations that Wellman continue to see her treating psychologist, Dr. Whitehill, and continue to take her medication, Wellman stopped going to treatment not long after leaving DDE. (A143). Wellman continues to refuse medical treatment to this day. (A191-192). Indeed, even after counsel for DDE terminated her first deposition because of her bizarre behavior, and encouraged her (with the support of her own lawyer) to seek assistance, she did not seek professional assistance. (A180-181).

**C.    Wellman's Complaints To DDE Did Not Include Alleged Sexual Harassment.**

Wellman joined DDE upon the formation of the company on April 1, 1996. (A195-196; A121). Wellman made a complaint on January 23, 2002 through an email message to DDE Human Resources consultant Karen Cronin, following her performance review meeting with her supervisor, Graves, on January 16, 2002. (A42; A246). Wellman claimed that Graves made her

10

look at a picture of a "dragon," which he held up on a poster. (A209, 220, 230). She claimed that Graves said that he had "no value" for her. (A44; A187). She admitted that a third of her job was being eliminated because the company was eliminating customer incentive trips and that she was concerned that she may not have a job. (A205, 206; A247-248; A106). Wellman's email to Cronin said nothing about "sexual harassment." (A42; A40; A78; A143; A44; A225).

Wellman's January 23, 2002 complaint consisted of allegations that Graves and Ms. Price were hostile, angry and abusive to her. (A227; A239-240; A212-213). She alleged that they mistreated her because Wellman was a former DuPont employee and Graves was a former Dow employee. (A42; A226; A202-204; A206; A214). Her EEOC charge subsequently repeated the same allegations although Ms. Price, like Ms. Wellman, is a former DuPont employee. (A121; A200-201).

In addition, not only did Wellman's January 23, 2002 e-mail omit any allegation of sexual harassment allegations against Graves or Metaxas, but also Wellman never initiated an internal sexual harassment complaint in accordance with DDE policy. (A42; A1; A5; A197-198). Instead, Ms. Wellman's January 23, 2002 complaint seemed to be precipitated by what she perceived as a threat to her continued employment as a result of a meeting she had with Mr. Graves on January 16, 2002 concerning her performance. (A210-211; A219; A125). The meeting is called a "Discussion of Contribution," or "DOC," DDE's terminology for a performance evaluation. (A207-208).

After meeting with Wellman to get a fuller description of her complaint, Cronin promptly investigated Wellman's claims based on DDE's "respectful workplace" guidelines; she noted, however, that Wellman never raised an issue of sexual harassment. (A78). Cronin's investigation included interviews (in some cases more than one interview) of the following

11

individuals: Debra Wellman; Richard Bond, DDE Kalrez Global Business Director; Paul Graves,

DDE Kalrez America Sales Manager; Mary Ann Price, DDE Kalrez Administrative Assistant;

Nancy Harton, DDE Communication Specialist; Russell Schnell, DDE Kalrez Senior

Applications Engineer; Steve Metaxas, former DDE Kalrez North American Sales Manager;

Bruce Bedder, DDE Human Resources Site Manager, and Nesha MacMurdo, DDE Kalrez

Senior Applications Engineer. (A78; A45; A50). Ms Catherine LaPenta was present for some of

the interviews. (A78; A45; A50). Ms. LaPenta also spoke to Ms. Wellman by telephone on

February 18, 2002 about her complaint. (A45; A228). Cronin concluded, and Ms. LaPenta

concurred, that Graves had not treated Wellman in a hostile, angry or abusive way, although he

had demonstrated some degree of favoritism toward the other administrative assistant, Price.

(A78). On February 22, 2002, Cronin and LaPenta met with Graves to explain their conclusions.

(A50). They cautioned him to be sensitive to Wellman's feelings and to make sure he took an

even-handed approach toward her and Price. (A90). By this time, Wellman had gone on a leave

of absence, but her medical status was unknown to DDE. (A78).

**D.    Wellman Leaves Employment On Short-Term Disability.**

While the "respectful workplace" investigation following Wellman's January 23, 2002 e-

mail was in progress, she confidentially consulted DDE's Employee Assistance Program

("EAP"). (A125; A221, 222, 223). Her EAP counselor was Michael Sherman, a licensed

clinical social worker.[1] Id. On February 11, 2002, she left work at DDE never to return. (A125;

A115; A270-271).

---

[1] For Wilmington area employees, DDE purchased EAP services from DuPont pursuant to a service agreement.

12

She advised Graves that she would be out ill that day (A264, 265). When her absence continued, DDE was told that her absence was for medical reasons and that she would be put on short term disability. (A270-271).

Wellman applied for and received short-term-disability leave. (A48). By April, Wellman was ready to return to work. Graves announced to her co-workers that she would be returning on Monday, April 22, 2002. (A54). However, on April 19, 2002, her EAP counselor advised DDE that Wellman's psychiatrist had written a letter saying she was too anxious and symptomatic to return to work on April 22 as planned. (A60). Her counselor suggested an independent medical evaluation. (A70; A61; A231).

**E.    Wellman Refuses To Return To Work.**

Wellman went to see Drs. Sol and Daniel Kadish on May 2, 2002. (A70). They concluded that she was fit to work, as noted above, but observed that she had stated she did not wish to return to DDE. (A77). Medical records and testimony from her treating doctors such as Dr. Glacken confirmed that she was steadfast that she would not return to work at DDE but would only work at DuPont. (A183-184; A185-186).

DDE policy and the formation agreement required it to consent to an employee's effort to apply for work with one of the parent companies. (A6). When Wellman began to apply for positions with DuPont, DDE cooperated by giving its consent. (A96; A100). Wellman tried on more than one occasion to apply for a job that had been posted internally by DuPont for bidding by DuPont employees using the internal on-line application procedure reserved for DuPont employees. (A55; A60; A93; A95; A232). As noted above and in this Court's opinion in Wellman's companion case against Dow,[2] DDE is a separate entity from Dow or Dupont. Its

---

[2] (A139).

13

employees were not eligible to apply as internal DuPont candidates. Instead, Wellman had to apply as an external candidate. DDE tried to assist her and gave its permission for her to apply to DDE in accordance with the Venture Formation Agreement. (A6). DDE's formation agreement provided that DDE employees were expected to make their careers with the joint venture and that there were "no strings back" to the parent company's. (A18; A23).

On May 31, 2002, Wellman's EAP Counselor advised DDE HR that Wellman was again ready to return to work at the earliest convenience of her department. DDE's HR representative, LaPenta, Wellman's supervisor, Graves, and her EAP Counselor, Sherman, scheduled Wellman's return-to-work meeting for June 5, 2002. (A94). On June 4, 2002, Sherman notified LaPenta that Ms. Wellman's return to work would have to be postponed because her condition had deteriorated. (A97).

During the month of June, Wellman stopped seeing Sherman as her Employee Assistance Program counselor and began seeing Ms. Sonya Barham ("Barham") instead. (A229). On July 1, 2002, Barham advised DDE that Barham had medical documentation supporting Wellman continuing to remain out of work. (A59; A98). According to Barham, Ms. Wellman was under the care of two health care providers and would be evaluated on July 1 by a third, who was to give a report by July 8 or 9, at which time they could reassess a path forward. DDE was not given a copy of any of this medical documentation but nevertheless retained Wellman on approved short-term disability leave.

On July 12, 2002, Barham advised DDE HR that Wellman wanted DDE to get a job for her at DuPont. DDE advised Wellman that DDE was not able to force DuPont to employ her. All DDE could do (and had done already) was to tell DuPont that DDE had no objection to DuPont hiring Wellman if it choose to do so. (A100).

14

**F.    Wellman Abandons Employment At DDE.**

On August 13, 2002, DDE's HR representative, LaPenta, met with Barham and Wellman. (A101; A232-233; A118).  LaPenta advised Wellman her short-term-disability benefits had expired but that DDE would continue to pay her through August 16, 2002, at which time Wellman would be required to choose between DDE's offer to submit a case determination letter on her behalf to see if she would qualify for long-term-disability benefits with its insurance carrier or to attend a return-to-work meeting and come back to work.  (A109; A232-235).

On August 15, 2002, Wellman wrote to Barham that she would need an extension until August 23, 2002 to provide her decision regarding return to work because her attorney was not available any earlier to consult with her.  Wellman sent a copy of her letter to LaPenta.  (A101; A109).

On August 16, 2002, LaPenta wrote to Wellman to advise her that her paid leave had expired and had been converted to unpaid leave.  (A109).  LaPenta scheduled a return-to-work meeting with Wellman for a week later, on Friday, August 23, 2002 at 9:30 a.m.  (A109). Wellman was advised that if she did not attend the meeting, DDE would regard it as notice that Wellman did not intend to return to work and was abandoning her position.

Wellman did not attend the August 23 meeting.  (A112; A235-236; A237).  LaPenta wrote yet another letter to Wellman telling her that another return-to-work meeting was being scheduled for Monday, August 26, 2002.  (A112).  LaPenta again advised that if Wellman did not attend, DDE would regard it as notice that she did not intend to return to work and would act accordingly.  (A112; A236).

Wellman did not attend the August 26 meeting either.  Accordingly, she was notified that as a result of her failure to respond to their requests to verify her continued disability and her

failure to return to work, her employment was being terminated immediately for job abandonment. DDE had been advised that Wellman had cancelled her most recent therapy session and stopped communicating with Barham after telling Barham on August 24 that she was unwilling to return to work. (A113; A236-237).

**G.    Wellman Files A Charge Of Discrimination.**

On August 15, 2002, Wellman filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (A102; A238). She amended that charge on October 2, 2003. (A121). After an extensive investigation, the EEOC did not find cause to support Wellman's allegations. (A127).

As noted above, Wellman never filed an internal charge of sexual harassment with DDE. (A1-A4). She first began vague references to alleged sexual harassment months after she was on short term disability and that she planned to refuse to return to work and sue the company. (A73). Even when she filed her charge of discrimination with the assistance of her prior attorney and the EEOC, many of her allegations have nothing to do with alleged discrimination based on gender or disability. (A102; A193-194). As noted below, even accepting her allegations, they do not rise to the level of severe and pervasive treat so as to constitute actionable sexual harassment under Title VII. A summary of Wellman's claims follows.

1.    First Week of July 2001:

Ms. Wellman claimed to receive a phone call from a Manager at DuPont telling her that Paul Graves and Mary Anne Price would be coming to the Delaware Technology Center when she worked. She referred to Graves as "Mr. Sensitivity" and Mary Anne Price as "Medusa". (A103).

16

2.     July 20th, 2001:

Ms. Wellman claimed she was "ordered" by Mr. Graves and Ms. Price to celebrate a co-workers birthday.  She complains that Mr. Graves allegedly asked too many "personal" questions.  (A103).

3.     July 30th, 2001:

Graves orders her to not to lock her cabinets or desks.  (A103).

4.     August 3rd 2001:

Wellman alleges she had a one-on-one meeting with Graves.  She claims that she heard Graves say on the telephone:  "I know what to do, she will understand when I am done with her.  No, I am not afraid to do this."  According to Wellman, Graves then allegedly accused her of being a "gossip".  (A104).

5.     August 13th, 2001

Wellman claims Graves asked her to clean up the Literature Room and claims that Mr. Graves was "looking up her dress" while she was standing on a three step ladder.[3] (A104).

6.     August 23rd, 2001

Wellman alleges Graves came to her office and "stared at her chest" and made her pick up a pen he dropped.  (A104).

7.     September 26th, 2001

Wellman alleges that she was in the kitchen area getting coffee and Graves came in and "touched" her when we was standing behind her.  She was "disgusted" because Graves allegedly said "fill mine up too".  (A104).

---

[3] Photograph of ladder appears in the appendix at page A163.

17

8.      November 2nd, 2001

Wellman again alleges that Mr. Graves was "looking up her dress" while moving boxes in the Literature Room.  She claims to be standing on the same ladder identified previously.  (A105).

9.      December 7th, 2001

Wellman alleges that Mr. Graves questioned her about her request through HR for a "leveling up" of her job.  Graves allegedly says that she has not done a good enough job for re-leveling and "rocks back and forth." (A105).

10.     December 13th, 2001

Graves allegedly "rubs himself against" Ms. Wellman. (A105).

11.     January 3rd, 2002

Wellman has a discussion with Graves about her discussion of contribution, she claims that he is "grossly" adjusting his pants and trousers. (A105-106).

12.     January 16th, 2002

DOC meeting in which Mr. Graves criticizes Wellman's performance.   She claims in her deposition that Mr. Graves made her look at a poster of "a dragon" at the meeting.  Her only other allegation of sexual harassment at the meeting is a claim that when she tried to roll her chair back to leave, he reached across and grabbed the arm of her chair impacting her breasts.  (A106; A216-217).

13.     February 4th, 2002

Wellman refuses to sign her DOC.  (A106).

14.     February 7th, 2002

Wellman alleges that Graves told her was cancelling the incentive trip program and that after speaking with a superior "we don't have a place here for you." She alleges

18

that she responded that the incentive trip was only one third of her job but "did not say more because she knew was going out on EAP." (A106).

    15.    February 11th, 2002

Wellman leaves employment DDE and does not return. (A106-107).

    16.    August 26th, 2002

Wellman is discharged after refusing to return to work. (A126).

**H.**    **Wellman's Subsequent Employment At AstraZeneca.**

Following her employment at DDE, Ms. Wellman was employed at AstraZeneca, Inc. beginning in September, 2003. (A137; A168). She remained in that position until on or about September 15, 2006 when she voluntarily quit as a result of her belief that was being "threatened" as previously described above. (A133; A169-170). Wellman ceased medical treatment November of 2002 and has not sought medical treatment since then. (142; A191-192).

19

**ARGUMENT**

I.    **DDE SHOULD BE GRANTED SUMMARY JUDGMENT ON ALL COUNTS OF WELLMAN'S COMPLAINT BECAUSE THERE ARE NO GENUINE ISSUES FOR TRIAL.**

Wellman asserts three distinct claims against DDE.  First, she alleges that she was terminated in retaliation for her complaints of harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2000e17 ("Title VII").  Second, she alleges that she was subject to a hostile work environment.  Third, she seems to allege a claim under the Americans With Disabilities Act, 72 U.S.C. §§ 12101-13 ("ADA").

Summary judgment should be granted where the plaintiff fails to establish any essential element of her case.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Wellman must establish all essential elements using more than "mere allegations, general denials, or vague statements."  Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir 1991).  To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to:

> . . . do more than simply show that there is some metaphysical doubt as to the material facts . . . .. In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56).  And, a mere scintilla of evidence is insufficient.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Measured against this standard, Wellman's claims fail as a matter of law.  See Taylor v. Procter & Gamble Dover Wipes Co., 184 F. Supp. 2d 402, 408 (D. Del. 2002), aff'd, 53 Fed. Appx. 649 (3d Cir. 2002).

II.    **SUMMARY JUDGMENT SHOULD BE GRANTED TO DDE BECAUSE IT DID NOT ENGAGE IN UNLAWFUL RETALIATION.**

Wellman bears the burden of demonstrating a *prima facie* case of retaliation by proving that: (1) she engaged in a protected activity; (2) her employer took adverse action against her either after, or contemporaneously with, her protected activity; and (3) there is a causal connection between the protected activity and the employer's adverse action. Richards v. City of Wilmington, C.A. No., 03-106-SLR, 2004 U.S. Dist. LEXIS 4987, at *15 (D. Del. Mar. 24, 2004) (citing Woodson v. Scott Paper, 109 F.3d 913, 920 (3d Cir. 1997)). Once the plaintiff has established a *prima facie* case, the defendant can offer a legitimate, nondiscriminatory explanation for its actions. The plaintiff then must offer evidence showing that the defendant's rationale is merely a pretext for discriminatory motives. Id. However, "the plaintiff's 'ultimate burden in a retaliation case is to convince the fact finder that retaliatory intent had a 'determinative effect' on the employer's decision." Id. (quoting Shaner v. Synthes (USA), 204 F.3d 494, 501 (3d Cir. 2000)).

A.    **Wellman Cannot Establish a *Prima Facie* Case of Retaliation.**

Wellman cannot establish the causal connection required to sustain a viable claim of unlawful retaliation. "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." Richards, 2004 U.S. Dist. LEXIS 4987, at *15 (quoting Ferguson v. E .I. DuPont de Nemours & Co., 560 F. Supp. 1172, 1200 (D. Del. 1983)).

Wellman never filed an internal charge of sexual harassment with DDE. DDE did not become aware of any allegations of harassment until after Wellman had been out of work on disability leave for three months. Michael Sherman, Wellman's EAP counselor, received her

IME Report in May 2002. The IME Report contained "vague references" to alleged instances of sexual harassment. Subsequently, a DDE representative received a voice mail message from Wellman's prior counsel, Richard Wier.

Based on her proffered evidence, Wellman cannot establish that she engaged in a protected activity prior to or contemporaneously with the alleged adverse action. Wellman left the workplace in February 2002. She filed a charge of discrimination with the EEOC (the "Charge"), on August 15, 2002. She was terminated for job abandonment on August 26, 2002. The Charge was mailed to DDE on September 3, 2002. (A102) DDE did not receive the Charge until after Wellman's dismissal. Because the alleged adverse action (Wellman's termination) occurred before DDE first learned of the alleged protected activity (Wellman's Charge), her retaliation claim must fail. See Walker v. Pepsi-Cola Bottling Co., C.A. Nos. 98-225-SLR, 99-748-JJF, 2000 U.S. Dist. LEXIS 12635, at *52 (D. Del. Aug. 10, 2000) (no retaliation where management had no knowledge of EEOC complaint until after adverse employment action had occurred).

### B.     Wellman Cannot Establish that Her Termination for Job Abandonment Was a Mere Pretext for Discrimination.

Even if Wellman could establish the requisite protected activity, her retaliation claim still fails as a matter of law because she is unable to dispute that she was terminated for a legitimate, nondiscriminatory reason. The record shows that Wellman was terminated for job abandonment after she refused to attend several return-to-work meetings despite having received medical clearance to return to her job. There is no dispute that Wellman was warned repeatedly about the consequences of her refusal to attend the meetings and return to work.

It is well established that an employer may legitimately terminate an employee who abandons her job. See, e.g., Willis v. Conopco, Inc., 108 F.3d 282, 287 (11th Cir. 1997);

Hodson v. Alpine Manor, Inc., C.A. No. 03-374-E, 2007 U.S. Dist. LEXIS 36870, at *52 (W.D. Pa. May 21, 2007); Hussein v. Genuardi's Family Mkts., C.A. No. 00-CV-4905, 2002 U.S. Dist. LEXIS 430, at *21-22 (E.D. Pa. Jan. 15, 2002); LaResca v. AT&T, 161 F. Supp. 2d 323 (D.N.J. 2001). "When an employee refuses to show up for work after being informed that her failure to do so will result in the loss of her job, the employer has presented a valid, nonretaliatory reason for terminating that employee." Willis, 108 F.3d at 287 (internal citations omitted); see also Teymer v. Kraft Foods N. Am., 37 Fed. Appx. 206, 213 (7th Cir. 2002) ("That an employee refuses to return to work is a noninvidious reason for termination."). Here, the undisputed evidence demonstrates that Wellman was terminated only after she repeatedly refused to return to work. Wellman has not, and cannot, present any evidence that DDE's reasons for her termination were pretextual. See, e.g., Jackson v. Veterans Admin., 22 F.3d 277, 279 (11th Cir. 1994) (finding no pretext where plaintiff refused to return to work).

Wellman's proffered reasons for her failure to return to work will not save her claim from dismissal. Wellman first claims that she did not return to DDE because she wanted to go to work for DuPont. Her personal preference to be employed by a separate entity cannot justify job abandonment. To the contrary, this proffered reason demonstrates the absence of pretext.

For example, in Hodson v. Alpine Manor, Inc., the plaintiff-employee abandoned her job after being reassigned following a medical leave of absence. 2007 U.S. Dist. LEXIS 36870, at *52. The court dismissed her claims of sexual harassment and retaliation, holding that the fact that the plaintiff refused to return to work demonstrated that there were "[n]o issues of discrimination or harassment were even remotely involved in her termination." Id. See also Willis, 108 F.3d at 283 (finding that the employee's refusal to return to work unless placed in a different department was a legitimate, nonretaliatory reason for her termination).

Also tending to disprove pretext is Wellman's stated intention to never return to DDE. Months before she was terminated, Wellman told her treating physicians that she would not return to her job at DDE. It is difficult to conceive how Wellman's stated desires could constitute evidence of pretext by DDE.

Wellman claims that she did not want to return to work for Paul Graves, her previous supervisor. Again, this is insufficient to justify her abandonment of her job. In Teymer v. Kraft Foods North America, the plaintiff refused to return to work unless she was assigned to a new position in which she would not have contact with certain supervisors. 37 Fed. Appx. at 210. She claimed that the supervisors' "critical, threatening, [and] disrespectful comments" had caused her to take medical leave. Id. The Seventh Circuit declined to accept this proffered justification and held, instead, that her demand for a different supervisor actually precluded her from sustaining a viable cause of action for unlawful retaliation. Id. at 213. Wellman's unsubstantiated, self-serving attempts to justify her refusal to return to work therefore do not save her retaliation claim. See Sinclair v. ATE Mgm't & Serv. Co., Inc., C.A. No. 95-CV-76172-DT, 1996 U.S. Dist. LEXIS 19921, at *24 (E.D. Mich. Nov. 27, 1996) (holding that employee's job abandonment precluded him from establishing the requisite causal connection or from demonstrating any evidence of pretext).

DDE's proffered a legitimate, nondiscriminatory reason for terminating Wellman is well-supported by a vast body of case law. Wellman has failed to adduce any evidence suggesting that this reason is a pretext. As the plaintiff, Wellman has "the burden of presenting evidence from which a reasonable jury could conclude either that 'the articulated reason is a pretext for retaliation or that a discriminatory reason more likely motivated the employer.'" Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997) (quoting Delli Santi v. CAN Ins. Cos., 88

24

F.3d 192, 199 (3d Cir. 1996)); Taylor, 184 F. Supp. 2d at 418 ("Plaintiff must cast sufficient

doubt on these reasons in order to establish that they are a pretext for retaliation."). Since she is

unable to establish that DDE's legitimate, nondiscriminatory reason for terminating her is a

pretext, DDE is entitled to summary judgment on Wellman's retaliatory discharge claim.

### III.   SUMMARY JUDGMENT SHOULD BE GRANTED TO DDE BECAUSE IT DID NOT ENGAGE IN UNLAWFUL HARASSMENT.

Wellman's second claim is that she was the victim of a hostile work environment in

violation of Title VII.  In general, an employer is not strictly liable for a hostile work

environment.  Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1998).  Instead,

liability may be imposed only if the plaintiff is able to prove that the employer "knew or should

have known of the harassment and failed to take remedial action."  Hall v. Pa. Dep't of

Corrections, C.A. No. 03-02-1255, 2006 U.S. Dist. LEXIS 68670, *at 36 (M.D. Pa. Sept. 25,

2006) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca

Raton, 524 U.S. 775 (1998)).  Here, Wellman cannot establish that she was subject to any

conduct sufficiently severe or pervasive as to constitute unlawful sexual harassment.  Nor can

Wellman show that DDE knew or should have known of any inappropriate behavior.

### A.   Wellman's Allegations Fail to Constitute "Severe or Pervasive" Behavior as Defined By the Applicable Standard of Law.

"Courts have set a high standard for what constitutes severe and pervasive harassment."

Harvill v. Westward Commc'n, LLC, 311 F. Supp. 2d 573, 581 (E.D. Tex. 2004).  Wellman has

failed to satisfy the "rigorous" and "stringent" standard required to establish the severe and

pervasive conduct.  Id.  Instead, she makes vague, broad-sweeping claims about behavior that, at

the worst, could be seen as unprofessional.  "Employment discrimination law does not provide a

remedy for every unsavory interaction occurring in the course of one's employment" Lignore v.

Hosp. of Univ. of Pa., C.A. No. 04-5735, 2006 U.S. Dist. LEXIS 43996, at *29 (E.D. Pa. June

27, 2006). Even if the behavior alleged by Wellman could be described as "distasteful, vulgar

and unprofessional," it does not amount to an objectively hostile work environment and is,

therefore, insufficient to withstand the present motion for summary judgment. See id.

### 1.    The Severe or Pervasive Standard.

To establish a claim of hostile-environment sexual harassment, Wellman must

demonstrate that the workplace was so permeated with severe or pervasive discrimination, abuse,

ridicule, or insults, that an abusive working environment was created. Harris v. Forklift Sys.,

Inc., 510 U.S. 17, 21 (1993). The severity element requires the alleged conduct to be so extreme

that it amounts "to a change in the terms and conditions of employment." Faragher, 524 U.S. at

783; Burlington Indus., 524 U.S. at 752; Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67

(1986); see also Pa. State Police v. Suders, 124 S. Ct. 2342, 2347 (2004) (harassment must be

"sufficiently severe or pervasive to alter the conditions of employment"). The pervasiveness

element requires the offensive conduct to occur regularly and frequently. Sporadic or isolated

incidents will not withstand summary judgment. See Cooper-Nicholas v. City of Chester, No.

95-6493, 1997 U.S. Dist. LEXIS 20810 (E.D. Pa. Dec. 30, 1997) (supervisor's comments over

nineteen months not frequent enough to create hostile work environment).

Wellman's subjective interpretation and observations are not dispositive of the severe and

pervasive inquiry. The alleged conduct also must be objectively harmful before harassment can

be found. Spain v. Gallegos, 26 F.3d 439, 447 (3d Cir. 1994). Wellman must demonstrate that

her allegations would have caused harm to "a reasonable person in the same position." Andrews,

895 F.2d at 1482.

2.    **Wellman's Allegations Do Not Satisfy the Severe or Pervasive
Standard.**

Wellman's Charge contains a myriad of incidents that she claims constitute mistreatment
by her supervisor and a female coworker, Graves and Price.  Putting aside her medically-
documented personality disorder, which causes her to misperceive and exaggerate events, an
objective review of her Charge demonstrates that Wellman's allegations cannot satisfy the severe
and pervasive standard.

a.    Wellman alleges that, on August 13, 2001, and November 2, 2001, Graves
purportedly attempted to "look up her dress."  At the time of the alleged incident, Wellman was
standing on ladder that had only three steps.  A photograph of the ladder (A163), demonstrates
the objective impossibility of her claim.  Despite Wellman's subjective perceptions, merely
standing on a three-step ladder with your supervisor nearby does not constitute the "severe"
behavior required to establish sexual harassment.  See Carrasco v. Boeing Co., 190 Fed. Appx.
650 (10th Cir. 2006) (finding no hostile environment where the plaintiff contended her
supervisor asker her "on at least five occasions what type of underwear she was wearing");

b.    Wellman alleges that, on August 23, 2001, while in her office, Graves dropped his
pen and made her pick it up.  She also claims that he stared at her chest.  Again, from an
objective standpoint, her allegations cannot be considered objectively serious enough to
constitute sexual harassment.  See Mendoza v. Borden, Inc., 195 F.3d 248-49 (11th Cir. 1999)
(finding no harassment where, in an eleven-month period, harasser made inappropriate physical
comment, one offensive statement, and several times made disgusting noises while staring
impertinently at the plaintiff); Stephenson v. City of Phila., C.A. No. 05-1550, 2006 U.S. Dist.
LEXIS 43998, at *33-34 (E.D. Pa. June 27, 2006) (holding that the absence of physical threats
weighs strongly against a finding of severe or pervasive conduct);

27

c.      Wellman alleges that, on September 26, 2001, Graves "touched" her when he was standing behind her in the coffee room and asked her to "fill his cup up, too." She makes a similar claim that, on December 13, 2001, Graves "rubbed himself" against her. Although Wellman claims that she interpreted these incidents as being sexual in nature, they are not objectively sexual at all, let alone so overtly sexual as to constitute a hostile environment. Powell v. United Ins. Co., No. 04-0829, 2006 U.S. Dist. LEXIS 40644, at *20 (E.D. Wis. June 16, 2006) (finding that the claimed physical contact, touching the inside of the plaintiff's knee after asking if she wanted to "mess around," rubbing his legs against hers during lunch at a restaurant with coworkers, and rubbing her shoulders and poking her in the ribs when she objected, constituted only "minor" physical contact because it "did not involve intimate body parts."); Further reducing the severity of her claims is the notable absence of any allegation involving physical contact or touching of an intimate body part. See DiCenso v. Cisneros, 96 F.3d 1004, 1009 (7th Cir. 1996) (finding no hostile environment when physical contact did not involve an intimate body part);

d.      Wellman alleges that, on December 7, 2001, Graves "rocked back and forth" and, on January 3, 2002, he "grossly" adjusted his trousers while tucking in his shirt. Again, from an objective standpoint, these claims do not establish or suggest any overtly sexual conduct. Her subjective reaction, whether due to her histrionic personality traits or other causes, is insufficient to make her claim cognizable. See, e.g., Spain v. Gallegos, 26 F.3f 439, 447 (3d Cir. 1994) (objectivity requirement). See Garone v. UPS, 436 F. Supp. 2d 448, 466 (E.D.N.Y. 2006) ("The allegations are trivial [because] there is not a trace of either maliciousness, lewdness, or inequity"); Powell, 2006 U.S. Dist. LEXIS 40644, at *17 (finding the alleged actions were not

28

"objectively threatening, harsh, or abusive and arguably cannot even be characterized as vulgar"); and

      e.      During her deposition, Wellman made clear that her final allegation also lacks any underlying sexual inference or innuendo.  Wellman claims Graves "contacted" her chest during her performance evaluation on January 16, 2002.  According to Wellman's testimony,  she was sliding her chair back, preparing to leave the meeting despite the fact that Graves had not yet completed his review.  Graves remained seated and grabbed the arm of her chair and allegedly made contact with her chest.

      A compellingly similar set of allegations can be found in <u>Penry v. Federal Home Loan Bank of Topeka</u>, 155 F.3d 1257 (10th Cir. 1998).  In that case, the court held that the plaintiff failed to allege the requisitely severe or pervasive conduct by her supervisor necessary to impose liability. The plaintiff alleged, that during business trips, her supervisor asked her about her sexual dreams and insisted that she work in his hotel room despite her repeated protests.  <u>Id.</u> at 1260.  He allegedly also commented about her bra strap and followed her to the bathroom.  <u>Id.</u> At least twice a week, the plaintiff claimed that he stood and stared at her while she was working, that he leaned against her repeatedly while he tried to look down her blouse, that he needlessly touched her on numerous occasions, and often snuck up and grabbed her from behind.  <u>Id.</u> at 1261.  Even when compared in the light most favorable to her, Wellman's allegations are trivial when compared to the <u>Penry</u> facts.  Application of the requisite objective standard makes clear that the alleged incidents, individually or in total, do not rise to the level of severe and pervasive conduct required to establish cognizable claim for hostile environment.

DB02:6168432.5

900002.0005

**B.    Wellman Unreasonably Failed to Utilize Any of the Preventative and Corrective Measures Established by DDE.**

The Supreme Court has held that an employer is not vicariously liable under Title VII for the sexual harassment of an employee by her supervisor, so long as there was no tangible employment action and the employer can establish the following: "(a) that the employer exercised reasonable care to prevent and correct any sexually harassing behavior; and (b) that the plaintiff-employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., 524 U.S. at 765; Faragher, 524 U.S. at 807 (together, the "Elleth-Faragher Defense"). In the present case, DDE exercised reasonable care to prevent and correct any sexually harassing behavior. DDE had written policies and procedures in place designed to prevent and remedy sexual harassment. (A1-A4). Wellman, however, failed to take advantage of the policies and procedures available to her. As a result, DDE did not have knowledge of any allegedly inappropriate behavior until after Wellman went out on disability leave from which she refused to return.

DDE published its policies on its intranet, where they were readily accessible by all employees. DDE's harassment policies direct employees who believe they are being harassed to report the offensive conduct to their supervisor or, if they prefer, to Human Resources. Wellman was aware of the process.

In January 2002, Wellman utilized DDE's Respectful Workplace complaint procedure to complain about Graves and Price, yet she made no allegation about sexually inappropriate conduct. (A5). In her January 23, 2002 e-mail, Wellman focused on alleged mistreatment by a female co-worker, Price, as well as her supervisor, Graves. Wellman's e-mail made no mention of any of the sexually suggestive or aggressive behaviors that she later alleged in the Charge.

30

Instead, she complained that Graves and Price treated her in an angry and aggressive manner. She believed that their hostility stemmed from a comment she made to Price about the quality of former DuPont managers compared to former Dow managers. Based on the sparse information Wellman provided, there is no evidence to show that DDE knew or should have known that Wellman believed she was being harassed by Graves or anyone else.

DDE did not know or have reason to know of Wellman's allegations until long after she left the workplace. Her unreasonable failure to report these allegations satisfies DDE's burden as to the Ellerth-Faragher defense, thereby requiring dismissal of the hostile environment sexual harassment claim.

## IV.    SUMMARY JUDGMENT SHOULD BE GRANTED TO DDE BECAUSE IT DID NOT ENGAGE IN DISABILITY DISCRIMINATION.

Although Wellman's EEOC Charge and her Complaint in this Court allege that she has been a victim of discrimination or retaliation based on a "disability," she has never identified the nature of the alleged disability nor any specific basis for her claim. Despite the uncertainty surrounding her ADA claim, it is clear that her vague allegation is a non-starter.

To present a *prima facie* case of discrimination under the ADA, Wellman must demonstrate that: (1) she has a "disability" within the meaning of the ADA; (2) she is otherwise qualified for her position, meaning that she can perform the essential functions of her job with or without reasonable accommodations; and (3) she has suffered an adverse employment decision as a result of discrimination based on her disability. Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996). The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of an individual's major life activities." 42 U.S.C. §12102(2)(A). Wellman cannot establish that she is an individual with a disability or that she was subject to an adverse employment decision based on a disability.

31

Wellman has failed to allege any evidence that would qualify her for the protections of the ADA. Presumably, Wellman contends that she suffered from a mental impairment, yet she has failed to provide any medical documentation to support that contention. The medical documentation that is available establishes that Wellman misperceives and exaggerates events due to certain personality traits. It does not, however, establish that she has psychological disability. The courts have repeatedly held that personality disorders and other mental impairments that do not substantially limit participation in a major life activity do not qualify as a disability. See, e.g., Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 598 (8th Cir. 1998) (employee with schizotypal personality disorder and depression was not disabled because she was not substantially limited in any major life activity); Zirpel v. Toshiba Am. Info. Sys., Inc., 111 F.3d 80 (8th Cir. 1997) (employee with panic disorder was not disabled because not substantially limited in any major life activity); Soileau v. Guilford of Me., Inc., 105 F.3d 12, 14-16 (1st Cir. 1997) (same result where employee had dysthymia; "ability to get along with others" is not a major life activity); Breiland v. Advance Circuits, Inc., 976 F. Supp. 858, 863-864 (D. Minn. 1997) (same result where employee had schizoid personality disorder, depression and anxiety, resulting in misperception of social cues, reclusive behavior and inappropriate expressions of anger); Schwartz v. The COMEX, C.A. No. 96-3386-LAP, 1997 U.S. Dist. LEXIS 4658 (S.D.N.Y. 1997) (same result where employee had paranoid thought disorder); Hatfield v. Quantum Chem. Corp., 920 F. Supp. 108 (S.D. Tex. 1996) (same result where employee with borderline personality disorder, depression and post-traumatic stress disorder claimed that supervisor had sexually harassed him and that people generally were harassing him at work).

The undisputed record shows that Wellman was medically cleared to return to work in August 2002. She believed herself to be fully capable of working. She simply refused to return to work at DDE because she wanted to work at DuPont instead. In no way does this evidence establish a claim of disability discrimination. Accordingly, Wellman's vague ADA claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court grant summary judgment on all counts of Plaintiff's Complaint.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Barry M. Willoughby (I.D. No. 1016)
Teresa A. Cheek (I.D. No. 2657)
Margaret M. DiBianca (I.D. No. 4539)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
Telephone: (302) 571-6666
Telecopier: (302) 576-3345
E-mail: bwilloughby@ycst.com
Attorneys for Defendant

DATED: August 10, 2007