# A70-77
# REDACTED


# ENTIRETY OF DOCUMENT
# CONFIDENTIAL

Investigation of Inappropriate Behavior and Harassment Complaint
Employees Involved – Paul R. Graves & Mary Ann Price
Investigation Summary prepared by Karen R. Cronin

The following report was prepared at the request of legal counsel and as such is privileged and confidential.

### Summary of the Allegation and Investigation

After receiving an email from Deborah Wellman on January 23, 2002 outlining serious allegations of harassment and inappropriate behavior by Paul Graves and Mary Ann Price, I immediately sent response to Deb letting her know that I would like to meet with her as soon as possible to discuss the situation. Due to schedule conflicts on both of our parts, we were not able to meet until 2/4/02. It was Deb's preference to meet in her office at DTP.

Due to the serious nature of the allegations, Catherine LaPenta, HR Director, was provided a copy of the email. Since Julia Shaw, Vice President, Administration and General Counsel, and Theo Krapels, President and CEO, were also copied as recipients of her email, Julia was also informed of the investigation.

Deb's complaint of hostile and harassing treatment involved more behavior-related incidents and, at no time, did she express concerns that were gender, race or sexual in nature. Multiple interviews were conducted in the months of January and February including with employees requested by Deb and three with Paul Graves, who repeatedly denied Deb's allegations and provided different recollections. After a thorough investigation, it was determined, however, that while Paul had not harassed Deb, he had demonstrated favoritism towards Mary Ann. A letter was provided to Paul for his file outlining this finding and confirming the key messages he had reviewed with Deb regarding needed performance improvement and his offers of assistance.

### Summary of Investigation

2/4/02 - Meeting with Deborah Wellman – Deb's office/DTP
- I started by telling Deb that I was concerned by the incidents she had outlined in her email and thanked her for bringing them to my attention. I explained my role, at this point, was to remain open-minded and to learn as much as I could about the situation in order to conduct a full and complete investigation. She said she understood, thanked me for taking the time to meet with her and said she would provide as many details as she could.
- I asked her to tell me about her DOC meeting with Paul on 1/16/02 and admitted that I had difficulty printing the scanned pages of her draft DOC she had attached to her email. She had the draft for me to look over and offered to make a copy for me to have. She said that after making casual conversation (including Paul discussing similarities between Enron and DuPont, the tough time DuPont has had the last 10 years and their lack of technology), Paul "throws his pen on the table, in a raised voice, and says "I hope you're not surprised there isn't much good news concerning your DOC." She said he pulled her chair next time him so she was facing the wall looking at the picture of a "large dragon". At this point, Deb asked me if I'm familiar with "mind reform tactics" or "subject influence tactics". When I said I hadn't, she said they are commonly used in the military to intimidate people. She said she had heard about them on an Oprah show and felt Paul was doing this by forcing her to stare at the dragon.
- She said he read the paragraph he had added to her DOC. Afterwards, she said he pushed back from the table and said he was "sent here to investigate Steve Metaxas and deal with her hatred of Steve and Mary Ann P." She said he asked her why she hated Steve and Mary

Privileged and Confidential
5/29/02
1

D89

A78

Ann to which she replied she didn't hate either of them. She said he went on to as "did you know what happened to Steve?" and "why did he leave?" She said he repeated the statements over and over, which she said is typical of mind reform tactics. She said she replied every time that she didn't know anything so he asked her "who else would know about this then?"

- She said Paul quickly moved to asking similar repeated questions as to why she didn't like Mary Ann P. and why she hated her. She again said she told him she didn't hate anyone and asked for further details, to which he responded, "you know what you've done." When she told him "this is hearsay if you don't provide examples," he just shrugged. She said she finally told him if he wanted to know about Steve, he would need to "talk to Don Faught or Theo Krapels."

- At this point, she said she asked for a 3rd party (ie. HR) to be present but she said he wouldn't allow it and even went so far as to "direct her not to bring in HR and to never mention to Mary Ann P. that she was mentioned." She said Paul described her as the "Chrysler corporation" – "you are bankrupt if you don't pull yourself up."

- She then told me that Mary Ann P. is out sick "constantly" and pointed out that she was out sick today. She said Mary Ann frequently "takes 2 – 3 hour lunches" and when she asked Paul if he felt that was acceptable, he "shrugged me off." Deb said she still signs for deliveries because Mary Ann won't let FedEx, UPS or the US Mail into the suite. She said they beg her not to make them deal with Mary Ann. I asked Deb if she could provide me with the names and phone numbers of these individuals, she said she would.

- I asked her about her use of the word "flogging" repeatedly in her email and she said it was because Paul would go back and repeat a statement.

- Deb said she still doesn't have a full understanding of her DOC but is making the changes requested by Paul. She said she would note that she disagrees and refuses to sign it. She said she was surprised by what he had to say about her performance given the amount of work she does for Mary Ann P.

- Deb said that Paul repeatedly mentioned having Mary Ann over to her house for dinner as a solution to their animosity. She said that she is a very private person and doesn't like people to know where she lived. She said she had a similar problem with Steve Metaxas who repeatedly asked where she lived and would drop it into casual conversations with other people to make it difficult for her not to respond. She said it made her very uncomfortable.

- Deb said that the entire DOC was a "very unpleasant experience." She said he wouldn't look at her but rather looked at the dragon picture on the wall. At this point, Deb said she just wanted to get out of there and "stood up a little afraid." As she said this, she stood up with her shoulders hunched and pretended to be inching out of a room. She asked me if she could demonstrate with me what he did to her and assured me she wouldn't "hurt me." She said as she stood up that Paul stood up too. She walked over to me and said that he was standing as close to her. She then leaned over demonstrating what he did, said that he whispered in her ear, "I know what you are since the first day." I admittedly felt a little uncomfortable and pulled away from her.

- Deb said he didn't want her to leave with the copy of her DOC that he had made changes. She said she repeatedly asked so she could make the requested changes and while everyone else received theirs electronically, he told her to make a copy and return it. As she left, he said, "I hope your response isn't 4 pages."

- She went on to discuss Mary Ann P. She said that her daughter and her baby are in the office "all the time." She began to cry as she asked if I knew how sick her granddaughter is. I replied that I did and acknowledge that it is a very unfortunate situation. Deb composed herself and said that while she understands, it is very disruptive."

  o She said that she was told by the "ladies over there" that DDE "can't use the conference rooms or access the other suites because Mary Ann P. was running back and forth yelling at them even though procedures were explained." I expressed by surprise and told her I had heard from DuPont that our access was limited due to the

findings of a security audit after 9/11. Deb said she didn't know anything about it and was only telling me what she had heard. I asked her who were the ladies referenced and she said that "Linda Lyons is the only person I've spoken with."

o   Deb said she is "afraid of Mary Ann P." as she is "angry." She said that Mary Ann hit her on the back of the leg with a box. The incident occurred on 10/19/01. Mary Ann came to the old visitor office where Deb was struggling with boxes and demanded, "I want you to move now." Next thing Deb knew she was in the fax/printer room "slamming things around." Then it became quiet. Deb said she was struggling with a dolly when she felt a box hit the back of her leg. She called out and heard footsteps going down the hall. I asked Deb if it could have been an accident and asked if she had done something like that accidentally, she would have apologized or at least said something when she heard her exclaim. Later in the ladies room by the elevator, she saw Linda and said she didn't "know why everyone hates me."

- On 12/19/01, the employees from Elkton were moving into DTP. Deb said the door alarm started going off and instead of shutting it off, she said Mary Ann came into her office and said "the least you can do is shut off the alarm" and then "stomped away." Later she said Mary Ann walked back by and said "you know I'm covering all the lines" then "stomped away."

- I asked her about the conversation with Mary Ann that she referenced in her email where they discussed the state of the joint venture. Deb said it occurred around the 2nd week of June. Mary Ann stopped by Deb's office and was "just chatting about Theo" and "how he runs DDE." Deb said Mary Ann made comments such as "you do know Steve didn't want to go to Europe and Torkel Rhenman didn't want to come here", "Bob Snyder got shafted", and "nobody respects Theo's business style." Deb said she took up for Theo ("have beliefs that I don't believe are corporate values") and that is when things got really "creepy." I asked her to tell me more and she replied that is difficult because "Paul is pretty careful." She did say there was a time when he told her "Mary Ann could be your boss" and "I can fire you anytime." She also said there was an incident involving BFGoodrich on 11/8/01 that also involved Nancy Harton so she might be able to give me some additional information.

- On 1/11/02, Deb was working in the literature room when Mary Ann wanted to enter. Deb said she said "if you give me 2 seconds I'll be out of your way" to which Mary Ann replied, "if you give me 1 second I'll have done what I need to do" and "stormed out."

- Deb said that Mary Ann is "very concerned with how" she does her job and what she does. Mary Ann and Paul now have access to the "goodie cabinet" so Deb felt there was now no inventory control and "things are flying out of here."

- She also said that Kathy Roberson and Leslie Bowers "spend hours in Mary Ann's office laughing it up." She said Kathy was in Mary Ann's office when she ran a test on the "bounce line" because Deb was afraid it wasn't working because it didn't appear any of the calls were going to Mary Ann because she "was receiving all the calls and wanted to check Mary Ann's phone to ensure it was working." When she went in to Mary Ann with her concern, she said Mary Ann said she wanted "dates, names and times" when it supposedly wasn't coming to her.

- I asked Deb to tell me about the meeting on 8/3/01 with Paul referenced in her email. She said it was intended to be a "one-on-one to learn what they do in Kalrez." She said she took in a Word document for his reference and told me it was the one she had prepared for Bruce Bedder and I when we revised her job description for re-evaluation. She said, "he pushed it back" to her and "appeared extremely nervous and angry". She said he was "pacing behind his desk glaring at her when taking phone calls" during the meeting. She said he said "I understand you talk about people" and when she expressed surprise, he said "you know what I mean." She said he make additional comments such as "I'll knock you back so far" and talked about Steve Metaxas inquiring about him similar to during her DOC. She said the discussion lasted about an hour. She said Paul never took her document or spoke with her about her role. She said he "speaks to me sub-human."

- Deb referenced pages of notes throughout our discussion and would frequently read directly from them. I asked her if it would be possible for me to have copies of her notes as it had been hard for me to capture the level of detail she was providing and felt it would be helpful for me to have them to ensure I was accurately representing the situations. She hesitated but then said she would provide copies to me but wanted to "clean them up first" to make them more readable. I assured her they were fine and asked her not to spend a lot of time rewriting or typing them to make them more readable. She said she wouldn't, but would read through them and add any additional notes she felt would make them clearer.
- I asked if she had provided any training for Mary Ann after she transferred to DTP. Deb said she only provided informal orientation of how things were done but said they were "not carved in stone."
- Deb said that Paul collected money at Christmas and everyone thought it was for she and Mary Ann but at the lunch, Paul gave it all to Mary Ann. She said when confronted by someone he said that Deb "didn't want to be known as an Admin" any more. I asked her if that wasn't true and reminded her that she had made that point with me on a number of occasions. She agreed that she had and still felt that way but said that it makes the group divisive and that others feel that way.
- At various points in our discussion, Deb would be become emotional and tell me that she "only wanted to do a good job", "only wanted to work", or that she is "a good employee". It was difficult to keep up with Deb at times because of how fast she spoke and would change subjects.
- After more than 2 hours, we concluded. I reviewed that she had agreed to send copies of the notes she referenced as well as the names of any outside people who had voiced concerns about working with Mary Ann. She agreed and became emotional again and repeated her desire to just work and do a good job. I told her we would probably need to have a follow up meeting to discuss anything I discovered as I progressed through my investigation or if I needed further clarification. She said she would make herself available at anytime and was just relieved to have someone looking into this.

2/6/02
Having not received the information and notes from Deb as agreed, I called & left a message letting her know I had a regularly scheduled meeting with Paul the following day and could pick up the copies of the notes she referenced as well as the names of any outside people who had voiced concerns about working with Mary Ann at that time. She returned my call later leaving a message that she would see me then.

2/7/02
After reviewing the notes from the previous meetings and conversations, I felt that I needed to meet with Kitty to ensure I was proceeding with the investigation properly and to help me make sense of the various allegations. I asked Mary Ann P. to reschedule my meeting with Paul for the following week. When she said Paul's schedule was very tight and asked that we meet the next week, I stressed with her the importance of meeting with Paul soon. She said she would speak with Paul to find an opening. I also called Deb and left a message that I had to reschedule my meeting with Paul for that afternoon and would not be able to pick up the information she had for me. A short time later she called me back and said she would put them in a P&C envelope and mail everything to me. At this time, she told me she didn't have phone numbers but could give me names of the UPS and FedEx personnel. I told her that was fine.

2/7/02 - Meeting with Catherine (Kitty) LaPenta, HR Director – Bellevue
Kitty and I met for approximately 2 hours reviewing the situation. We outlined a number of questions that we felt remained for Paul, Deb, and Mary Ann P. I also confirmed that other parties that I planned to interview (ie. Carrie Bowen, Nancy Harton). Kitty asked me to continue to keep her apprised of the situation and involve her, as I felt necessary.

Privileged and Confidential
5/29/02
4

D92

A81

<u>2/11/02 – phone call from Dr. Cameron, DuPont Medical – approximately 9:00 am</u>
He had seen Deb this morning with complaints that she was feeling shaky and her heart was racing. He said he examined her and found her having heart palpitations. He said he sent her home today with instructions to see her personal physician as soon as possible. H e also said he had asked that she return to see him the following week.

Approximately 9:10 am, I informed Kitty of Dr. Cameron's call. I then called Paul to ensure that he knew that Deb would be out that day. He called me back to let me know that Deb had called him very early that morning (approximately 6:30 am) and left a message that she would be out sick. I then called Deb at 11:10 am and again at 3:49 pm and reached her answering machine both times. I identified who I was, that I heard she was out sick, was very concerned about her and asked that she call me.

<u>2/12/02 – Meeting with Paul Graves – 7:30 am - DTP</u>
- Since Paul and I only had an hour before he had to leave, I started by telling him that it appeared he was dealing with two issues – one with Deb and one with Mary Ann – however, given the short amount of time we had, I wanted to focus on the complaints I had received concerning Mary Ann P. He didn't seem surprised and asked if they had come from Deb. I told him specifically who had made the complaints was not relevant but confirmed that they had come from employees within and outside DDE.
- I asked him what prompted him to call Mary Ann Sawyer and Linda Lyons concerning Mary Ann Price. He said that Dave Bartlett had mentioned to him ("what's up with Mary Ann?") at one point that he had heard that Mary Ann had been "throwing things at people." Paul suggested that I try to draw out of Mary Ann what had happened during some informal lunches with Mary Ann S., Linda and Deb. He said Mary Ann P. had voiced concerns about Deb raising things about Steve Metaxas.
- I asked Paul for a copy of Mary Ann's DOC that he said was not final. I told him that was okay. I asked why he had made reference to Deb's need to interact effectively with others but not included it in Mary Ann's. He said he felt that Mary Ann did just fine. I suggested that it also be included in Mary Ann's given her leadership role in the group as well as the on-going need to develop stronger working relationships with DuPont given the shared space. He questioned the need because he had personally not witnessed the behaviors himself. I said that in situations such as these, there is rarely a totally innocent person so it wouldn't hurt. He would consider it.
- I asked about Mary Ann's attendance and he said she had "one or two early outs in December" but is "rarely late." He said she "leaves her cell phone number on audix when she is out taking vacation or when out for ½ day or full day for appointments." He said he doesn't see her daughter or baby in the office often and could only recall one time. Given his travel schedule, I asked how he could be certain about Mary Ann's attendance and he said that they "talk several times a day" so "if she wasn't her, I'd know it."
- He also offered that Mary Ann had also spoken with Rick Bond about what was going on at DTP to make him aware of the problem she had been having with Deb.
- We ran out of time so I told him I would be meeting with Mary Ann next and he offered that I could use his office. I also told him that we needed to schedule a follow-up meeting very soon so we could discuss Deb's complaint. He questioned what was the problem and I told him that he had an employee very unhappy with the way her DOC was handled and the language used among other things. I explained that she had filed a complaint about him that needed to be investigated and when he expressed disbelief, I reminded him he was not to discuss the complaint or our conversation with anyone. He said he understood and was anxious to obtain resolution. As he left, he asked Mary Ann to find time for us to meet again within the week.

<u>2/12/02 – Meeting with Mary Ann Price - DTP</u>
- I started by telling Mary Ann that I had received a complaint concerning her and that I needed to ask her some questions. She became upset and defensive so I assured her that no decisions had been made concerning her and that my role was to remain open-minded as I

D93

A82

looked into the situation. She questioned who had complained and similar to Paul, I explained that the complaints had come from inside and outside DDE. Throughout the interview, Mary Ann vacillated between defensiveness and disbelief to angry and emotional.

- Mary Ann felt it was important to give me some background. She recalled when she first arrived at DTP, Deb said to her "they think you're so good but we'll see about that." She said she had took Deb and Renee to lunch in June as a "get-to-know you break the ice." She said that Deb's goal was to make Renee an LSE with DDE and knew she was brought in to replace Renee and wasn't going to let that happen.
- Mary Ann said she "just blew it all off until a couple incidents."
    1. John Huber told her that Deb was "mouthing off to Nancy Harton" that she wouldn't answer the bounce line and that it was being tracked by Darlene Williams (on her "shit list"). John told her "she [Deb] was vicious."
    2. She said she had heard that she supposedly gotten in someone's face at DuPont about some airline tickets. She recalled the situation and said she was waiting for a ticket for Paul who was leaving the next morning and since he was out of the office all day, she was to give it to Nesha who was traveling with Paul. She called Rosenbluth in the morning who confirmed delivery to Linda. This is when she found out that all tickets for the building would go to Linda. She said she left a message for Linda. Linda said (via an audix message) that she'd run into Deb on her way over to her office and gave them to her. Mary Ann said she asked Deb who said she'd given them to Dale Kane to take to Paul at Bellevue. She said she told Deb she should have said something as she and Nesha were both looking and waiting for them. She didn't remember Deb's response.
    3. She said she had heard Deb accused her of throwing a box at her. Mary Ann said Paul raised it with her "half joking" ("did you really throw that box at Deb?"). She denied having done so.
- Mary Ann said that during a lunch with Linda, she realized that she didn't want to interact with them personally anymore because of things Linda said Deb was saying about Steve Metaxas. She felt this was in June or July sometime. She said Linda said "I don't know why I'm telling you all of these things but you seem like someone I can open up to."
    o  Mary Ann said Linda is in Deb's office "all the time."
    o  Mary Ann recalled two things that stuck out in her mind because they were "so bizarre."
        ▪ Linda said she'd heard from Deb that Renee was moved across the hall because Steve M. "was acting weird" and "Renee and Deb were afraid for Renee's safety." Mary Ann said she told Linda that Renee was moved because she, Mary Ann, was coming to DTP, would be working for Steve and that was to be her assigned office . She said Linda replied "well that makes sense."
        ▪ She said Linda thought Deb was a manager because Deb represented herself as a manager to her to which Mary Ann said "oh no" and told her what she really does.
- When I asked Mary Ann if she had made statements or comments about Theo, Torkel, Steve or Bob Snyder, she denied it and stressed that she "never talked about anyone." She said Deb "would try" to get her to talk about people "but she wouldn't comment." She said Deb was "always in my office" to the point that Steve commented on how well they were getting along because she was always in there.
- She said after Paul's move to Kalrez was announced, Deb said to her "I've heard bad things about Paul."
- Mary Ann said she "truly believes she's [Deb] out to get me." She said she didn't know why because "I've never done anything to her." She said she is "now sorry" she didn't come to me sooner but "wanted to work it out" herself.
- I asked her if she could think of anything else and she again voiced her concern for not coming to me sooner. I told her we would follow up with her as soon as we had the

D94

A83

opportunity to speak with the UPS and FedEx employees. I told her I recognized how upsetting this is for her and stressed with her the importance of not speaking with other employees about the situation or our meeting – out of respect for her as well as those who made the complaints.

2/12/02 – phone call from Paul Graves - 3:30 p.m.
Paul called to inquire as to whether we had heard from Deb. He had not heard from her since receiving the message the day before (2/11/02). At 4:07 pm, I still hadn't heard from Deb and left a second message for Deb at Kitty's request. I repeated the same message on her answering machine and added that it was imperative that I speak with her today as we needed to know her expected return date so we could determine if coverage needed to be arranged for her work.

2/12/02 - audix message from Deb Wellman – 4:57 pm
"Karen, hi this is Deb Wellman. It's, ah, 4:58. It is Tuesday, the 12th of February. Umm, thanks for the calls yesterday referencing, you know, your concern. Thank you for that. I am not sure where to go with (pause) what you're talking about today. I guess that's your decision what you people have to do. Karen, you do know I am out on disability; you do know that I am *highly* stressed. Um, I am under a physician's care. I can't give you any guidance any further than that and really, I, you know, I've talked with medical and I don't need these types of phone calls and I don't know what to tell you. You know, I guess you just move forward with whatever you need to do."

Having missed Deb's call by only 5 minutes, Kitty and I decided I should call back to clarify her statement that I knew she was out on disability. At 5:07 pm, I called her home but the answering machine did not pick up as it had the other times. Kitty asked that I try again later which I did at 7:00 pm from home. Again, the phone rang and the answering machine, again, did not pick up.

2/12/02 – phone call with Rick Bond
I called Rick Bond to see if he could free some time in his schedule to meet with me. He said that he was leaving that night on vacation but explained that we didn't want to delay the investigation. I told him briefly what had been happening and asked him to tell me about a conversation he had had with Mary Ann P. He said Mary Ann had stopped by his office to say hi and asked if she could see him in the next couple days. He said he told her he would be happy to meet with her.

- He said their discussion was around her and Deb's ability to work together. Mary Ann said she had been hearing through 3rd parties that Deb had been saying negative things behind her back to DuPont employees at DTP but he couldn't get Mary Ann to say who she'd heard it from. When I asked what kind of things she, Mary Ann, had been hearing about herself, he said things like she had been yelling at people and exhibiting threatening behavior.
- Rick said he asked what she wanted him to do and did she want him to get HR involved. She said not at this time as she was hoping it would go away. He asked if she had spoken with Paul and she said she had.
- He said she told him it had been bothering her and felt someone else needed to know. Rick said he couldn't remember all the details but said the conversation with Mary Ann concerned him given Deb's previous trouble working with administrative staff.

I told Rick I would meet with him as soon as it was practical to discuss the outcome of the investigation and asked at this point that he allow us to proceed without becoming involved (ie. speaking with Paul). He said he would.

2/13/02
I attempted to reach Deb again at 10:49 am and was unable to leave a message because the answering machine again did not pick up. I reviewed the situation with Kitty who asked me to verify with Paul that he had not received word from Deb since Monday. He confirmed he had not. He later forwarded the audix message he had received from her on 2/11/02. Kitty & I agreed that a letter should be sent to Deb. I reviewed the letter with Kitty and Julia Shaw before having it sent receipt requested to Deb.

Privileged and Confidential
5/29/02
7

2/15/02 – Meeting with Paul Graves – JTP (KLP present)

Kitty explained that she was present due to a complaint being filed against me by Deb as well as the uncertainty of when my medical leave would begin and the need for continuity if the investigation was still on-going. I told Paul that I had some follow-up questions from our meeting on 2/12 and also wanted to talk with him about Deb. I reminded him that regardless how it looked or be perceived, he needed to be very open and honest in answering my questions. He said he had nothing to hide and would tell us everything. I reiterated this point at least two additional times during our conversation. I told Paul that he had an employee very upset with the way her DOC was handled and the language used and asked him to tell me about Deb's DOC. He said it was originally scheduled for early January. He said a message was sent in November outlining the preparation he expected including providing him with information at least 2 days prior to the meeting. He said he received the requested information from everyone but Deb. She arrived for the meeting at which time he told her to reschedule it and send the materials to him.

- o  The DOC was rescheduled for 1/6/02. He said he sat on one side of the table in his office approximately 18" apart on the same side facing the wall. He stressed that at no point did he move her chair closer to him or insist that she move closer to him.
- o  He said he had 6 key messages to review with her including developing a closer working relationship with the ASMs, increase her SAP expertise, listen before acting, and to leave Mary Ann alone (he said he had employees telling him "that Deb is purposefully causing problems for" her). He said "Deb became very emotional" when he discussed her need to work closer with the ASMs.
- o  He offered that he had received feedback from Steve Metaxas (as previous supervisor), Rick Bond (for continuity), Linda Lyons, Mary Ann Price, Nancy Harton (received it "somewhat unsolicited"), Krish Thondukolam, and "1 or 2 other ASMs" but he was rather uncomfortable about sharing the list with us due to his concerns about confidentiality but would if it was absolutely necessary.  I continued to press so he suggested that it might have been Gayron Scurlock or Tony Dorta. He said that Krish didn't provide nearly enough feedback so he had solicited additional information.
  - ▪  When asked about why he said Nancy's feedback was somewhat unsolicited, he said he had raised in one of his monthly sales conference calls that he was preparing for DOCs and asked them to send him feedback concerning anyone in the Sales group. He said he didn't specifically ask Nancy but rather she was on the call at the time.
- •  He said Deb became emotional saying that he, Paul, "hates her and likes Mary Ann better." He said he "listened more than talked to allow her time to vent."
- •  He stressed that at no time could he remember bringing Steve Metaxas' name up with her.
- •  He said that Deb never asked for HR or any 3rd party to be present and would not have denied her if she had.
- •  He commented that "her DOC lasted about 1 hour, 15 minutes" and "was the shortest DOC" he had.
- •  To him, "this is the most disruptive thing going on in my organization" referencing the Deb/Mary Ann interpersonal issues.
- •  He said he tried hard to differentiate the perceptions from things he knew as fact. He said during the DOC she was "more emotional concerning the perceptions" of her behavior than she was over the job-related feedback.
- •  He admitted using analogies but couldn't recall using the Chrysler statement. He said he tries "to only use ones that are on target with the message" being delivered. Since he worked in Detroit, he felt he could have used car analogies but was adamant that he "never used the word 'bankrupt'"
- •  He said "there are employees who feel she does a good job" but it is "balanced with other examples of the opposite".

Privileged and Confidential
5/29/02
8

D96

A85

- He said he wanted to end the DOC on a "positive note" so "offered her a variety of options" to obtain SAP training and explained, "how they could increase her chance for succeeding and improving her capabilities."
- He categorically denied whispering anything in her ear as she left.
- He said he "conveyed to her that her situation with Mary Ann is the most disruptive in his organization" and provided a "number of options to resolve." He said he told her he could "establish a pecking order" where Deb works for Mary Ann or "vice versa." I told him I recalled on another occasion him telling me that if things didn't improve, he would move Deb to reporting to Mary Ann so was he certain he actually gave both sides. He said he was "fairly certain" he used those words. He said he was "trying to get across it is a level playing field."
- He questioned the number of PA's and asked her to "make them concise and less a laundry list of day-to-day duties."
- He had not received her revised DOC and had sent her an email reminding her last week.
- He said he was "little surprised how short her DOC was given the difficult nature of the message."
- I asked him about the meeting last August with Deb. He said it was "a one-on-one to get to know her", to "understand Renee's role better", "share some perceptions" and "level set some expectations around interactions" with others.
  - o He didn't "remember specific words" but denied inquiring about Steve Metaxas and making any of the statements she said he had.
- I stressed that it would not serve him well to react emotionally or take any actions to follow-up on our conversation even if it was only to speak with Mary Ann. I reiterated that it was my role not to make judgments at this time. I, again, told him that it was better for him to tell me everything than for it to come out later and asked that he contact me if he thought of anything else. He said he understood.

2/15/02 – Meeting with Nancy Harton – DTP (KLP present)
- I introduced the purpose of the meeting and asked Nancy to be as open and detailed as she could to help us. Kitty explained to Nancy Kitty explained that she was present due to the uncertainty of when my medical leave would begin and the need for continuity if the investigation was still on-going. I started by asking Nancy to tell me about the situation involving BFGoodrich on 11/8/01 referenced by Deb as an example of Paul's mistreatment of others. Nancy said she that "didn't think it was that big" and I did not get the impression from her that she felt mistreated. She said she "saw two guys outside" the suite door and let them in. She showed them where Paul's office was located. The next day, Paul caught her and said "yesterday you let some people in and didn't walk them down. You should've walked them down. They walked in and I was talking about it." Nancy said his tone was "matter of fact" and she recalled feeling he was making a bigger deal than he should have about it.
- She then told us about the holiday lunch. She said that Paul and Kathy Roberson presented recognition and money to Mary Ann. Nancy said she "felt it was a bit overdone" and "felt uncomfortable for Deb" but never mentioned it to her. Nancy said she approached Russ Schnell who agreed with her. She said Russ went to Paul with concerns that in the past money had been gathered for all the OP's. He said Paul's response was "Deb does not want to be considered an OP."
  - o Nancy also said she asked Mark Heller who he thought he was giving money for and Russ told her, he, Mark, had mentioned it to Kathy Roberson and Don Pittenger who Mark said felt they were giving money for both Deb and Mary Ann.
- Nancy said this week in the CPI meeting, Keith Hamilton mentioned that Deb hadn't sent something to Mary Ann and "Paul reacted strongly." She said Keith replied that it only happened once but it struck Nancy that Paul's "reactions didn't seem to match" the incident.
- I asked Nancy if Paul had solicited feedback from her for Deb's DOC. She said she had sent feedback on John Legare to Paul and a "week or so later," he caught her in the hall and asked if she would provide feedback on Deb. Nancy said she "felt like he was looking for

problems" but admitted that may have been "because of conversations with Deb." She said she has her "antenna up."

- o  Nancy said she also heard from Krish Thondukulam that Paul had solicited feedback from him but he referred Paul to Nancy as he didn't feel he had had enough interaction with Deb.
- o  Nancy said she "tried to be very balanced" in her feedback but was "very careful." She said she even reviewed it with her husband to ensure there wasn't anything that could be misconstrued.
- o  Sometime in January, Deb came to her upset about her DOC. Nancy said she encouraged her to ask for more detail because she knew she had given Paul positive feedback which she said made Deb cry. She again encouraged Deb to get more examples and detail from Paul and "not to accept hearsay."
- o  Nancy said she heard from Russ that Paul had also asked him for feedback concerning what Deb does. She said Russ told her he felt Paul was looking for something negative too.

- Nancy offered that Deb used to work for her. She hired Deb in 1995 as her secretary from the pool. She said she "really appreciated her support and dedication." She felt she was "talented on the computer but when Cathy Branciaroli came in, things didn't work out." Deb was moved to work for Chuck Wardlaw. Nancy said two weeks ago she and Deb were talking about problems Deb had had in the past and including problems she had with Chuck Wardlaw. Nancy said she told Deb "I told you so" as she "she never thought Deb should work for him."
- Nancy said "Deb doesn't work well receiving direction." "She likes to just do it."
- I asked if she could remember anything else that would be helpful and she said she could not. I stressed with her the importance of keeping the topic of our conversation confidential and asked out of respect for all parties that she not speak with anyone about the situation. She agreed, said she understood and said she was worried about Deb.

2/18/02 – Phone call between Kitty LaPenta and Deb Wellman

2/19/02 – Phone call with Paul Graves (KLP present)
- Paul had been trying to reach me from the road throughout the day having left a message that he had had some additional reflections over the weekend concerning his DOC meeting with Deb and wanted to speak with me. He finally reached us later in the afternoon.
- He started by repeating that over the weekend he had "additional reflections" and had one additional piece from his conversation with Deb. He said during her DOC, "when talking with her about how perceptions affect us." He said "she talks about and possibly spreads rumors" and told her that he knew she "left Bellevue for spreading rumors about coworkers." Paul said she was "pretty emotional" and said that it had been "attributed to me when I'm totally innocent." He said she was "crying."
  - o  I asked Paul how he knew or heard that and he said he couldn't recall but "heard it from a couple" people. When questioned further how others could know given that I had been told only a few people knew the details behind Deb's transfer, he said he didn't know any specifics about her situation but this story "is all over DTP."
- Kitty then reviewed her conversation with Deb the previous day and Paul's inclusion in her claim of harassment.
- Paul said he felt John Huber or Don Pittenger might be able to provide additional information concerning Deb's treatment of Mary Ann.


Prompted by the phone call between Deb & Kitty on 2/18/02 where Deb alleged harassment by HR for calling to inquire about her absence, Kitty felt a follow-up conversation was needed with Dr. Cameron.

**2/20/02 – Follow-up call with Dr. Cameron (KLP present)**

- Kitty reviewed Deb's claim that he had put her on total disability and informed me. She asked him to clarify what he had actually said.
- Dr. Cameron said he wasn't "certain what terminology was used" but "it wouldn't surprise" him if he "had used the term 'total disability'" because "if someone cannot work then they are totally disabled." When Kitty questioned him further, he said that "they are disabled even if it is for a day." I questioned if he had used the phrase "total disability" with Deb and he said he did not recall stating that he used that phrase with Deb.
- His recollection was that Deb would be out 1 – 2 weeks and his intent was to give me the idea that this wasn't going to be an overnight thing. When I reminded him what he said, he said he was "sorry if I didn't make my intent clear." He said he "didn't want to stretch it out too long" so he "probably didn't stress the 2 weeks expected" but he believed he told me she would be out about a week.
- He said Deb saw him today and he expected her to be out one more week. She was having more tests and evaluations done so it "may take longer." We asked if she had provided him with the necessary releases for him to contact her doctors and review her files, he said he did have the releases except for this new doctor she was now seeing.
- Kitty told me not to be concerned that I had purposely misrepresented his call in that I had come to her immediately upon hanging up with him on 2/11/02 and informed her of my conversation. Kitty felt there was truly lack of clarity concerning the one-week. We also agreed that all further communications with him would be via email.

**2/22/02 – Meeting with Russ Schnell – DTP (KLP present)**

- I introduced the purpose of the meeting (we were investigating some concerns raised by Deb and that his name had been raised by Deb as well as others who felt he could provide additional insight). I asked Russ to be as open and detailed as he could to help us. Kitty explained to him that she was present due to the uncertainty of when my medical leave would begin and the need for continuity if the investigation was still on-going.
- I started by asking Russ if Paul had solicited feedback from him for Deb's DOC. He said he wondered if that was why I had wanted to meet with him and asked if he could go back to his office to get some notes he had taken.
- When he returned, he had a number of pages of handwritten notes that he referenced. Concerning Paul's request, he said on 1/7/01, he was finishing his DOC with Paul when Paul asked him for feedback about Deb ("let me ask you about her since you seem to be the only person who has anything good to say about Deb. Tell me a little about what she does."). Russ said he "felt he [Paul] was looking for negative information because of how he worded the request." I asked him about the notes and he said he kept them because the exchange "struck him enough that I wanted to have pretty good notes" to remind him of what happened.
- Russ said over the "past couple weeks", Deb had told him she was considering filing a complaint against Paul. I asked Russ if he knew why and he said he didn't know specifically because he only knew what Deb had said.
- I asked Russ if Paul had asked him "why do we need Deb" or said "Deb is of no value". He said he didn't have any recall of Paul saying or asking that but felt Paul hadn't "given Deb a chance since he arrived" at DTP. [Aside – Deb felt Russ would confirm Paul had said and/or asked this.] He also said Paul made "off-handed comments" at lunch or in small groups about Deb such as "not doing a good job" and "can't count on her to do that".
- Russ offered he "knew Deb was very unhappy with Steve Metaxas". He said he didn't know firsthand but only from what Deb had said to him, which he was reluctant to repeat because he didn't have firsthand knowledge himself. He repeated he felt Paul "had an impression of Deb coming in" due to predisposition from Steve.
- I asked Russ to tell me about the holiday lunch. He said he thought it was in mid-December, around 12/14/01. For years, they had always gotten a gift certificate for the support staff to show appreciation. He said Paul came around asking for contributions ("I want to get a gift

D99

A88

certificate for the support staff"). Russ assumed he meant Mary Ann and Deb. I ask him if Paul said, "support staff" or did he say Mary Ann. Russ insisted he did not specifically say Mary Ann. At lunch, there was only one for Mary Ann. After lunch, Russ said he confronted Paul why there wasn't something for Deb. He said he received a "very short, quick and curt response" from Paul of "Deb doesn't want to be a part of the support staff." I asked Russ if he knew whether Deb would agree and he concurred that she "probably doesn't want to oe a part of the support staff."

- He then asked if he could tell us about another incident in January. We asked him to please do so. Again referencing handwritten notes, he talked about a luncheon to celebrate Mary Ann's 25th service anniversary. He said it was "a very nice lunch." In addition to her service award, Paul had gotten Mary Ann a "special necklace with a stone she always wanted." I asked who paid for the necklace and Russ said he was not certain.
  - o A number of other Administrative Assistants from Bellevue were also present. After lunch, Russ offered to give them a tour of their facilities. He said later he mentioned to Paul how nice the lunch was and to have the opportunity to show them around. He said Paul said, "They're really good. I hope we can get them down here." Russ got the impression that Paul would like to have one of them rather than Deb.
- Russ said that Deb had come into his office "4-5 times very upset" with concerns but he was uncomfortable relating them to us since "there are two sides to the story" and he only knew what Deb had said.
- He said he had "never known the two to get along." He offered that "Deb isn't always the easiest to get along with" but felt Paul should have done more as the manager to make "overtures." Russ said we "expect more from our leaders."
- I asked if he could remember anything else that would be helpful and he said Deb showed him her DOC. He said he "found it to be very demotivating." He said he feels "DOCs should be motivating" and thought some of the statements in it "were very general" and "harsh." He said he "counseled Deb to get more concrete examples" but couldn't say if she tried to get examples from Paul. He repeated that he felt the statements were "extremely harsh" and "too much in generalities."
  - o Russ said he told Deb, "I've never seen a DOC written this way. I would rewrite it in a nicer way." He also told her to "pin Paul down on more concrete expectations."
  - o He said Deb told him she was considering leaving for another job and he told her to do what she felt she needed to do.
- I stressed the importance of keeping the topic of our conversation confidential and asked out of respect for all parties that he not speak with anyone about the situation. He agreed, said he understood and thanked us for speaking with him.

2/25/02 – meeting with Rick Bond – Tralee Park
During our regularly scheduled quarterly meeting, I brought Rick up to speed on the investigation into the complaint against Mary Ann, Deb's allegations against Paul and our concerns with Paul's favoritism, pettiness, and off-hand comments. I told him that the investigation did not reveal evidence to support Deb's claim of harassment. However, we did feel Paul had not demonstrated leadership behavior in a number of situations (ie. off-handed comments about Deb and favoritism towards Mary Ann)

- I asked him how Paul knew the circumstances behind Deb's move to Tralee Park five years ago. Rick said he didn't remember if Paul had asked him but when Mary Ann raised concerns with him about her interactions with Deb, Rick "told Paul there was some history." He said he wouldn't provide any details to Paul but said he told him "there were previous issues of problems with coworkers in the past."
- Rick stressed he didn't tell any details but said that Paul "networks with people."
- He said he didn't even know himself why Deb had transferred to Tralee Park until the Dusick incident (investigation of Deb's complaint of harassment against Tim Dusick). At that time,

Bruce shared with him that she had been transferred due to interpersonal problems Deb had with coworkers at Bellevue.

2/25/02 – Meeting with Paul Graves – DTP (KLP present)

- I started by telling Paul that at this point, we had no evidence that his behavior rose to the point of harassment but we were concerned that there was a perception of favoritism. I told him that he needed to review whether his preparation of Deb's and Mary Ann's DOCs was as fair and balanced as others. I stressed with him again his need to be very open and honest with me.
- I then asked him about his conversation with Russ about Deb in preparation for her DOC. He said that he "had heard so many negatives about Deb" so he was looking for "some positives to balance the trash stuff" and selected Russ because he believed Russ had a positive relationship with Deb. He said he asked about a week or so of her DOC. I referenced what Russ had said and Paul said he couldn't be certain what he had said to Russ but felt it wasn't worded that strongly. He said given his relationship with Russ, he "would have been more delicate in" his request.
- Paul said Nancy's feedback she provided for John Legare "was well written" so he asked for feedback on Deb too given the relationship between the them. He said her feedback was "extremely balanced."
- I asked him to tell me about the holiday luncheon. I asked him who solicited for the gift and he said that he had asked some and Kathy Roberson asked the others. He insisted that they made it very clear that the solicitation was for a gift for Mary Ann specifically. He confirmed that someone had raised a concern after the lunch. They inquired as to why Deb was not included to which Paul replied, "Deb has expressed that she wants to be separate from the admin box." He believed it was Russ. He said he wasn't certain if the group knew of Deb's wishes to be viewed as separate from the support staff.
- I then moved to the 25th anniversary luncheon for Mary Ann and asked him who paid for the necklace. He said that he had paid for it but expensed it to the company ($144). He said he had allowed her to invite 10 people from Bellevue to attend the luncheon with the rest of DTP. He confirmed the comment that Russ said he made but was adamant that it was an "innocent comment" concerning how much he "enjoys working at DTP" and his desire for "everyone to work here if there is ever an opening." I asked him if he had treated others similarly and he said that this was the first since arriving at DTP and seemed unconcerned that he had set a precedent within the group for the future. He did admit he probably goes "a bit overboard with Mary Ann."
- I asked Paul to remind me what support he offered Deb in her DOC to help her. He said he offered to provider her assistance in increasing her expertise with SAP both himself personally as well as setting her up with Ruby Payne to have her provide training for Deb. He said that he had even spoken with Ruby to let her know. He said he also offered to set her up with Chris Benke. To improve her communication and effectiveness with the ASM's, he told her he would begin bringing her into discussions and meetings with them.
- I then asked him why he choose to use a 5-year-old example about Deb's interpersonal skills during her DOC to illustrate a present concern. He said he had given another example but couldn't recall what and thought that the 5-year-old example was a good one to describe what he meant.
- Concerning the incentive trip, Paul said he told Deb there wouldn't be one this year because of poor business so he wanted her to focus on "SAP stuff." He said he also told her that they (the ASM group) were taking this opportunity to re-evaluate the trip concept.
- I concluded by reiterating to Paul that we did not have evidence of harassment but felt that there definitely was favoritism in his treatment of Mary Ann over Deb. Kitty and I both told him that while it is understandable that sometimes for a leader to prefer one employee to another, it can cause devisiveness within a group and can hurt morale and team spirit.
  - We summarized the following:

Privileged and Confidential
5/29/02
13

D101

A90

- He used poor judgment specifically with his decision to use of a 5-year-old incident that he did not have firsthand knowledge.
- We found in several instances, he had used a close-minded approach combined with petty, off-handed comments when interacting with Deb or speaking about her to others. While there was general acknowledgement that Deb could be difficult at times, people expect more from their leader than pettiness.

2/26/02 – phone call with Steve Metaxas
- After attempting to meet with Steve in person upon his arrival to the US, I had to speak with him via the telephone during a break in his meeting. I explained the purpose of my call was to clarify some statements Deb had made to him as a part of an investigation of a complaint. I told him that he, specifically was not the subject of the complaint, however, he had been mentioned in a number of incidents.
- I asked Steve to tell me about his experience with Deb. He started by saying "she's such a confusing person." He said he had done a "360" feedback assessment on her. He said she rated high in terms of External Focus and Sense of Urgency but there were comments about her tendency to "talk behind backs" and "gossip." He said her "communication could improve."
- He said her work on the incentive trip was "not perfect" but she "tried hard." He said she can be a "real pain." He felt she could be "very moody" but was "a workhorse" doing two jobs.
- He recalled a conversation with Deb when he first moved to DTP. She spoke of a personal tragedy where her family was killed in a car accident. He felt it was odd because it came up in a broader conversation. He said he "felt sympathetic" and wanted to work with her on her gaps gradually given "she has emotional problems." He said he "tended to treat her a little differently" because he felt sorry for her.
- He said "Deb drove the organization to hire an administrative assistant" for the group but he knew when Mary Ann came in, it would be a "real test" for Deb because "she [Deb] would have to relinquish some control."
- Steve said there is a "mean Deb" and a "good Deb." He said "mean Deb" has "surfaced" from what he had heard. I asked him what he meant and he said he couldn't be specific as she "never did things in front of" him but he regularly heard about things she had done or was doing to others.
- I asked him if he recalled ever having a conversation with Deb concerning Theo or his management ability and Steve said, "she would come in and we would talk about a lot of things. She was kind of like my assistant." He sat next to her for a year and said they talked about a lot of things but he couldn't recall anything specific about Theo.
  - He denied calling her a "mole."
- I asked him if there were any issues between he and Renee and he said he had no recollection of issues with Renee.
- I asked him if he pressured Deb to tell him where she lived. He said, "I think I said something" about it when he and his wife were talking about moving. He asked about neighborhoods, how far from places, etc. He said he knew she lived in Greenville because she had mentioned it before.
- I asked if there was anything else he could think to add. He said, "I know how Deb thinks. She sees things very differently than most people." He ended by saying he "tried to be a good supervisor to her" and he didn't feel he had ever "asked her to do anything inappropriately."
- I stressed the importance of keeping the topic of our conversation confidential and asked out of respect for all parties that he not speak with anyone, including Paul and Rick, about the situation. He agreed and said he understood.

D102

A91

3/4/02
I turned my files and notes over to Kitty LaPenta to continue the close out of the investigation in my
absence in terms of 1) the conclusions of the investigation with Paul and 2) subsecuent follow-up with
Deb.

Privileged and Confidential
5/29/02
15

**D103**

A92

Patricia D Bowhall  05/31/2002 08:51 AM

To:     Catherine A LaPenta/DDE/DuPont
cc:
Subject:  Re: Job Posting EP2002002

Kitty -- fyi.

-------------------- Forwarded by Patricia D Bowhall/DDE/DuPont on 05/31/2002 08:50 AM --------------------

From:   Marilyn McDaniels on 05/31/2002 08:40 AM

To:     Patricia D Bowhall/DDE/DuPont@DuPont
cc:
Subject:  Re: Job Posting EP2002002 

Pat, at this point, we are not accepting applications from non-DuPont employees. If that changes, I will
give you a call.
Thanks and best regards,
Marilyn
Patricia D Bowhall

Patricia D Bowhall  05/31/2002 06:16 AM

To:     Marilyn McDaniels/AE/DuPont@DuPont
cc:
Subject:  Re: Job Posting EP2002002

Hi Marilyn -- are you accepting applications from non-DuPont employees for this posting and if so, how
should Deb apply? Hope all is well with you. Have a good weekend.


From: Marilyn McDaniels on 05/30/2002 04:33 PM


From:   Marilyn McDaniels on 05/30/2002 04:33 PM

To:     Debra A Wellman/DDE/DuPont@DuPont
cc:     Patricia D Bowhall/DDE/DuPont@DuPont
Subject:  Job Posting EP2002002


Debra,

In reviewing the applicants for the Secretary position in DuPont Engineering Polymers, I noticed your
application came through DuPont Career Connections. Unfortunately, you MUST be a DuPont U.S.
Region full-service employee in order to submit a self-nomination through Career Connection. If you are
employed by a DuPont subsidiary, joint venture or contractor, or you work outside of the U.S. Region, you
may not self-nominate via Career Connection.

Good luck in your search.

Marilyn McDaniels
HR Specialist

**D104**

A93

 Michael E Sherman
05/3 /2002 10:57 AM

To:     Catherine A LaPenta/DDE/DuPont@DuPont
cc:
Subject:  Confidential

This note is to inform you that Debra-Ann Wellman ▮▮▮▮▮▮▮ is fully fit-for-duty and is able to
return to work at the earliest convenience of her department.
        It is recommended that in Ms. Wellman's "Return to Work Meeting", clear boundaries should be
established regarding her job duties, working hours and appropriate channels to voice complaints.
        If you have any further questions, feel free to call me at (302)451-0808.
                            Michael Sherman, LCSW, CEAP
                            Employee Assistance Consultant

D105

A94

From:    Marilyn McDaniels on 06/03/2002 03:49 PM

To:      Catherine A LaPenta/DDE/DuPont@DuPont
cc:      Patricia D Bowhall/DDE/DuPont@DuPont, Lynn Flaim/AE/DuPont@DuPont
Subject: Permission to Apply


Kitty:  Thank you for the note below giving Deb Wellman permission to apply.  In the event that we open this position up to joint-venture employees, I will notify Pat Bowhall.

Marilyn McDaniels
Lynn Flaim

    Lynn Flaim
                        06/03/2002 02:34 PM


──────────── Forwarded by Lynn Flaim/AE/DuPont on 06/03/2002 02:33 PM ────────────

            Catherine A LaPenta
            06/03/2002 02:19 PM


To:      Lynn Flaim/AE/DuPont@DuPont
cc:
Subject: Permission to Apply

Lynn: I'm the Director of HR for the joint-venture DuPont Dow. Under the joint-venture agreement, both DuPont and DuPont Dow HR must give a "non-object" when someone from either Company wishes to be employed by the other. This is to inform you that Deb Wellman has permission to apply for the EP2002002 position in the event DuPont does determine it will accept applications from non-DuPont employees for this role. Thank you.

Kitty LaPenta

**D107**

A95

DuPont Dow Elastomers L.L.C.
300 Bellevue Parkway
Wilmington, DE 19809



# DuPont Dow elastomers

Debra-Ann Wellman
PO Box 4395
Wilmington, Delaware
19807

June 3, 2002

Dear Debra:

I'm sending you a copy of an electronic mail from Marilyn McDaniels because you've informed me you don't have access to your DuPont Dow computer. My concern is that you will not see this message until your return to work.

As you requested, I advised DuPont that you have permission to apply for the secretarial role in Engineering Polymers. However, it appears DuPont is not accepting applications for job posting EP2002002 from nonDuPont employees at this time. However, if you are interested in this role, you might want to send a hard copy cover letter and resume to the attention of Lynn M. Flaim (rather than trying to post electronically via Career Connections). That way, if the restriction is simply that non-DuPont employees cannot apply via Career Connections, it may be that you can be considered if you apply through a different path.

However, if the restriction is truly that only DuPont incumbents can fill these roles, than it seems they will not accept an application from any external candidate via any process.

Sincerely,

Catherine LaPenta

**D108**

A96

    Michael E Sherman
06/04/2002 04:30 PM

To:      Catherine A LaPenta/DDE/DuPont@DuPont, Julia Shaw/DDE/DuPont@DuPont
cc:      Angela I Greenwald/AE/DuPont@DuPont, Gregory D Simmons/AE/DuPont@DuPont
Subject: Confidential



We are recommending that the June 5,2002  "Return to Work Meeting" for Debra-Ann Wellman be postponed until further notice. This is based upon a deterioration in her clinical condition and on the advice of DuPont Legal Counsel.
We will contact you shortly with further recommendations.
Michael Sherman, Employee Assistance Consultant

**D109**

A97

 Julia Shaw
07/01/2002 11:58 AM

To:        Catherine A LaPenta/DDE/DuPont@DuPont
cc:
Subject:   Confidential

------------------ Forwarded by Julia Shaw/DDE/DuPont on 07/01/2002 11:57 AM ------------------

Sonya D Barham
07/01/2002 11:30 AM

To:        Julia Shaw/DDE/DuPont@DuPont
cc:        Angela I Greenwald/AE/DuPont@DuPont
Subject:   Confidential

Julia, per our discussion this morning, I have clinical documentation dated June 27, 2002 that supports Debra being out of the workplace.  She is currently under the care of two providers and is currently getting an evualation on this date through a third provider.  The report from that evaluation will be complete by early next week.  At that time we will reassess a pathforward.

**D110**

A98

# A99
# REDACTED


# ENTIRETY OF DOCUMENT
# CONFIDENTIAL

DuPont Dow Elastomers L.L.C.
300 Bellevue Parkway
Wilmington, DE 19809

# DuPont Dow elastomers

July 12, 2002

Ms. Debra-Ann Wellman
PO Box 4395
Wilmington, Delaware
19807

Dear Deb:

Some weeks ago you expressed interest in pursuing employment with the DuPont Company. To date, I have assisted your efforts by advising DuPont Human Resources that DuPont Dow Elastomers has no objection to your applying for positions within DuPont. I also offered to forward your resume and job applications directly to DuPont in response to several open positions in which you expressed interest when you stated you did not have access to a laptop to submit your information electronically.

Today your EAP counselor, Sonya Barham, advised us of your request that DuPont Dow Elastomers obtain a job for you within DuPont. This letter is to advise you that DuPont Dow Elastomers is a separate legal entity from DuPont and, as such, is not in a position to obtain employment for you within DuPont.

When DuPont Dow Elastomers was formed, the parent companies provided that joint venture employees should expect to make their careers within DuPont Dow Elastomers and not transfer back to Dow or DuPont. Dow and DuPont agreed not to offer employment to DuPont Dow Elastomers employees without first consulting with joint venture management and specified that such transfers should be rare. DuPont does not accept applications from DuPont Dow Elastomers employees for positions posted on DuPont's Career Connection job posting system and DuPont Dow Elastomers does not accept applications from DuPont employees for positions on DuPont Dow Elastomers' Career Net job posting system.

In a limited number of cases DuPont Dow Elastomers has non-objected to our employees accepting employment with DuPont in cases where our employee has been offered a position by DuPont. However, we do not have the authority to either create a job for you or to unilaterally place you in a position within DuPont. At your request, we have communicated DuPont Dow Elastomers' non-objection to your applying for positions within DuPont. We are also prepared to release you immediately from your position with DuPont Dow Elastomers should you secure a position within DuPont. That assistance is the limit of our capabilities.

Please let me know if you have any questions regarding this issue.

Sincerely yours,

D111

A100

**MEMO**
**VIA FACSIMILE**

August 15, 2002

To:   Sonja Barham - EAP Consultant DuPont Company

From: Deb Wellman

RE:   Back To Work Meeting

In accordance with our meeting of August 13, 2002 in which we discussed my current employment status. I informed you that I would get back to you with on my decision regarding your offer by August 16, 2002, by 12:00 Noon.

Unfortunately, I will need an extension to relay my decision to you until on or about August 23, 2002, because my attorney is unavailable to consult with me.

Sincerely,

Debra-Ann Wellman

:daw


CC:   Kitty LaPenta
      Richard Wier

**D112**

SEP. 12 2002 12:36PM    302-792-4382    NO. 3468    P. 6

## CHARGE OF DISCRIMINATION

| | ENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA  ☒ EEOC | 170A201952 |

| DDOL Labor Law Enforcement Section | and EEOC |
|---|---|
| State or local Agency, if any | |

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Debra-Ann Wellman | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| P.O. Box 4395, Greenville, DE, 19807 | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| DuPont Dow Elastomers Joint Venture | Cat D (501 +) | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 300 Bellevue Parkway, Suite 300, Wilmington, DE 19898 | | 003 |

| NAME | | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN  ☐ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ OTHER (Specify) | EARLIEST: 07/01/2001   LATEST: 02/11/2002  ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I have been employed by the DuPont Company since 1986 as an Administrative Assistant. In or around 1996, Dow Chemical Company and DuPont Company established a Joint Venture called DuPont Dow Elastomers - Joint Venture. Upon establishing the Joint Venture, it was my understanding that each company would maintain the employment records of its own employees who volunteered to work for Joint Venture. It was further my understanding that an employee who volunteered for a position with the Joint Venture could always return to his/her parent company (the company from which he/she came). From the beginning of my employment with the Joint Venture, the supervisors and managers were employed by Dow and most of my co-workers were DuPont employees. I began working for the Joint Venture and from that time until February 9, 2002, I received no unsatisfactory performance evaluation and, in fact, was promoted one full level and went to work for the Sales and Marketing Team at Delaware Technology Park as an Administrative Assistant/Office Manager. From in or around July 2001 until February 11, 2002, when I was forced to go out on disability, I was subjected to periodic sexual harassment, a degrading environment, subjected to unwelcome sexual advances from my supervisors and harassment based on my sex, including the following incidents:

1) In or around the first week of July 2001, I received a telephone call from a manager from DuPont telling me to "watch out you have Mr.

** Text is Continued on Attached Sheet(s) **

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| 8/15/02    Debra-Ann Wellman | |
| Date    Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year) |

EEOC FORM 5 (Rev. 07/99)

**RESPONDENT'S COPY**

D00124

A102

Aug 15 10:28 2002  CP Initials *M(illegible)*  Chg # 170A201952, Attachment Page 1

------------------------------------------------------------------------

Equal Employment Opportunity Commission
Form 5 - Charge of Discrimination, Additional Text

------------------------------------------------------------------------

Sensitivity (Paul R. Graves, Dow employee) and Medusa (Mary Ann Price, DuPont employee)...because they are known trouble makers." Mr. Graves shook my hand so hard that I called out "Ouch, you are going to break the bones in my hand." He said, "Oh so you're Deb, I should have known."

2) On July 20, 2001, I was ordered by Mr. Graves and Ms. Price that I go out to lunch to celebrate Nesha MacMurdo's(DuPont employee) missed birthday. I indicated that I would normally cover the phone. Mr. Graves said, "Get your cell phone and go now!" Mr. Graves started asking me personal questions such as: "How many people are in your family? How many brothers and sisters do you have? Did your mother work? Where did your father work? Are your parents alive? Did they stay married? Were you ever married before? Are you dating? What do you do for entertainment? Where do your brothers and sister live? What are their professions? How many children do they have? Are you close to your nieces and nephews? How long have you work for DuPont? What departments at DuPont have you worked in? I finally said now wait a minute I thought this was a celebration for Nesha and you have been doing nothing but batting out the questions to me about my personal life. Why don't you ask the other's questions?" Mr. Graves glared at me and said, "I didn't know I was making you uncomfortable." I said, "You are not making me uncomfortable, but you're really firing out questions to me alone and not interacting with the rest of your luncheon guests, and I think you should give them a chance to answer some of your near and dear to the heart questions."

3) On July 30, 2001, I was told by Mr. Graves not to lock any of my cabinets or desk. I was the only employee asked to keep my desk, cabinets and filing cabinets open at all times, although this was not "site security rules".

4) On August 3, 2001 - Mr. Graves scheduled a meeting in his office with me on a one-on-one basis. Mr. Graves slammed the door very hard and walked behind his desk to look at his computer screen, and look through papers. I sat in a guess chair around the table in his room. Mr. Graves took a phone call and turned around to look at me while he was talking to caller stating, "I know what to do, she will understand when I am done with her. No, I am not afraid to do this. Thanks for the call, I will speak with you later." Mr. Graves walked around the table and sat down at the opposite side of the table from me. I handed him my job description to Mr. Graves and said, "Here is a copy of my job account abilities/responsibilities, and most of the duties that I perform here at Kalrez." Mr. Graves threw the papers back at me and said "I don't care what you do here." Mr. Graves then answered his cell phone and was

D00125

Aug 15 10:28 2002  CP Initials *Dans*  Chg # 170A201952, Attachment Page 2

staring/glaring at me very hard and stating to the caller. "Yes it is started and I did not have a chance to ask those questions yet. "Okay, call me back." Mr. Graves then states, "I understand that there are people here at Kalrez that talk about people, and I understand you are one of them. I know you are a gossip." I stated, "What are you talking about? I do not know what you mean. Please be more specific." Mr. Graves said, "If I ever hear you talking about anyone. I will knock you back so hard that you will not know what hit you." I said, "That is a threat Sir, and why are you speaking to me this way." Mr. Graves stated, "Because I can."

5) On August 13, 2001, I am in my office and Mr. Graves comes in and asks that I show him something in the Kalrez Literature Room. Mr. Graves states, "I want you to straighten it up in here. Tell me what all of this stuff is in here. I state, "In the back area here these binders, books, videos, documents, etc. are the Kalrez Applications Engineer's items. Mr. Graves states, "Well I want to move these binders f rom here to here." Here to here meant f rom a lower shelf to a much higher shelf. I said "Okay, I can do that, but not today." Mr. Graves said "Why" I said, "I am not dressed to move those items to that higher area in the Literature Room   today. I will do this an Friday. Mr. Graves states, "No, I can help you move them today." And he now moves the Kalrez Library Ladder toward me and extends his arm for me to climb up the 3 steps.  I could see Mr. Graves looking up my dress and smiling at me. I was wearing a blouse, skirt and pumps that day. I move about six (6) binders and said I had to go do something back in my office and I would move the rest of the binders later. Mr. Graves stated, "If you need anymore help just let me know," Mr. Graves was rocking back and forth and smiling from ear to ear. I left the room very disgusted.

6) On August 23, 2001 - Mr. Graves comes into my office to talk about distributor contracts. Mr. Graves never sits in my guess chair, but stands at the filing cabinet and looms over me. He has   a pen in his hand and is talking and waving it back and forth and it finally come out of his hand and goes under my desk. I have to crawl on my hands and knees under the desk because it has gone toward the back of the desk. His pen continues to come out of his hand four (4) more times. I am crawling under the desk each time to retrieve. Mr. Graves never looks at me when he talks to me just stares at my chest. I pick up the pen for the fourth time and hand it to him and he is now laughing/snickering. I said, "What is so   funny?" Mr. Graves states, " I am enjoying this." I ask him to put the pen down and ask his questions and Mr. Graves says, "That's okay, I'm done." And he leaves my office.

7) On September 26, 2001, I am in the kitchen are in the morning and Mr. Graves comes into this area. I am pouring my coffee in my cup and I now feel him behind me touching me with his body. Mr. Graves states "Here I need mine filled up." I pour the coffee, and leave the kitchen area, very disgusted.

D00126

Aug 15 10:28 2002  CP Initials *Dan*  Chg # 170A201952, Attachment Page 3

8) On November 2, 2001, it was Friday and normally I am dressed down, but I had a dinner to go to after work, so I was dressed in a dress and pumps. Mr. Graves stated that he was not busy at the time and he could help me move the boxes now. I said okay, and get the library ladder and started to pick up the boxes to hand to him and he said, "No you go up on the ladder." I knew what he was doing with looking up my dress again, and I told him that men have more upper arm strength to lift heavy items over their head, and would he mind standing on the ladder. Mr. Graves demanded that I climb the ladder while he stood below me and made the following statements: "Now that wasn't that bad was it? You need to lighten up, Deb. You are too uptight. You'll never get what you want if you don't give a little. I guess I've lost my opportunity to be with you, haven't I? You do not know how much you turn me on. Oh that's right you only date men from DuPont." I did not say one word, since any past interaction with Mr. Graves always-turned into anger and aggression by Mr. Graves.

9) On December 7, 2001 - Mr. Graves comes into my office and starts asking me questions about, when I had Steve Metaxas(Dow employee) and Karen Cronin(unknown whether a Dow or DuPont employee) review my job for re-leveling. I explained that Karen Cronin come back and stated that my job is leveled properly. Then Steve Metaxas came to me and told me the very same thing and also expressed that I should not have gone to Human Resources(HR) to have this request done. I should have come to him. Mr. Graves states, "I am in agreement with Steve. I do not think you do a good enough job here to warrant a re-leveling." The entire time he is rocking his groin area back and forth asking me "Do you understand be Deb, you are not yet ready for a promotion?" I said "You know Paul, Steve Metaxas did the exact same thing to me when he told me I was not ready for a promotion yet, and did I understand what he meant also. I said, "Well, I get it loud and clear from both of you, and I am not stooping to that to get a promotion from you or anyone else." Mr. Graves states, "It would make it a lot simpler, Deb, do you understand?" I said, "Get out of my office now and I mean it."

10) On December 13, 2001, Mr. Graves comes up behind me in the Literature Room and rubs himself against me. I jump to the side and move away and look at him right in the eye and say, "Hey what are your doing?" Mr. Graves just smiles and leaves the room.

11) On January 3, 2002, I arrive in Mr. Graves' office to have my DOC he cancels the meeting, because he said he did not receive the document that I sent to him. I said, "I sent them to you via e-mail. And you knew I came back from Holiday vacation early to have this meeting with you." Mr. Graves states, "Well, isn't that a shame, now reschedule the meeting with Mary Ann. You wouldn't have wanted to have your DOC with me prior to your Christmas Holiday anyway, because you would have been very depressed. Make it for a few weeks from now. I told you to cooperate Deb, didn't I? When will you learn?" Mr. Graves stood up and was adjusting his trousers, grossly tucking in shirt in his pant, and

RECEIVED - EEOC
PHILADELPHIA, D.C.

D00127

SEP. 12 2002 12:37PM    302-792-4382    NO. 3468   P. 10

Aug 15 10:28 2002  CP Initials _[signature]_  Chg # 170A201952, Attachment Page 4

shaking his belt area and looking at his crotch and looking back at me. I exit Mr. Graves' office. The gross action of adjusting the pants and grabbing the belt area, and the groin movements were a Steve Metaxas tactics also.

12) On January 16, 2002, I was called into Mr. Graves' thinking that I was going to go over my DOC and all he could do was rant and rave about who I knew at DuPont and that there was nothing I could do to improve. I am becoming very upset and scared, because the atmosphere is horrible and unprofessional. I asked "Why are you doing this to me?" Mr. Graves stated, "Because I can. I am the boss and just sit there and stop interrupting me." I am now slowly pushing my chair back to get away from him, because I am really scared of his cruel behavior. As soon as he sees me moving back he jumps up and puts his right arm and grabs the opposite side of the chair and jerks it very hard and his arm is now across my chest area and he is pressing very hard, and I am pushing my chair back and he continues to rub his arm across my chest and this went on for a few minutes. Until I moved his fore arm up and put both my hands over my chest and said "Now wait a minute you have gone well over the line and get your arm off my breasts." Mr. Graves just smiled in my face and came even closer to me and I pulled my head away. I stood up quickly to move my chair back totally away from him. Mr. Graves stood up very quickly and jammed his nose in my left ear and said, "I knew what you were the first time I saw you." I said, "And what was that?" Mr. Graves said, "I know what you are, you're a spy for DuPont."

13) On February 4, 2002, Mr. Graves comes into my office and asks me about signing my DOC. I said, "I will not sign that document." Mr. Graves starts to walk out of my office and says "You will never learn will you Deb? Do what I tell you to do." I do not respond to Mr. Graves.

14) On February 7, 2002, Mr. Graves walks in to my office and states, "I was just talking to Rick Bond(Dow employee) about your job and we are canceling the Kalrez Incentive Trip, and we don't feel we have a place here for you at Kalrez." I said, "Paul, the Incentive Trip is just a third of my job, what do you mean you do not have a place for me at Kalrez, there is plenty of work here to do.' I do not say any more, because I know I am going to EAP at DuPont to report this situation. Michael Sherman(DuPont employee) calls me and states, "How are you doing?" I respond "Okay." Michael says, "Just okay?" I said, "Yes, just okay." Michael Sherman then says, "Well, I called to tell you that I am probably pulling you from your job, on Monday (February 11, 2002) you will call out sick on Monday morning and we will remove the victim from your boss. I said, "Okay is this normal procedure? Because I have never used the EAP system before." Michael Sherman states "Well, you don't want to stick your hand back in the meat grinder again do you?' I said, "No."

15) On February 11, 2002, I was forced to leave my position and go on

THE ROLE LAW, D.C.
RECEIVED - LEGA

SEP. 12 2002 12:38PM    302-792-4382                    NO. 3468   P. 11

Aug 15 10:28 2002   CP Initials *Kam* Chg # 170A201952, Attachment Page 5

disability.

I believe that I have been discriminated against by being sexually
harassed, given a poor evaluation, subjected to unwelcome advances,
forced to work in a hostile environment, harassed and forced to leave my
position because of my sex(female) in violation of Title VII of the
Civil Rights Act of 1964, as amended and Title I of the Americans with
Disabilities Act of 1990, as amended.

D00129

A107

## EEOC RULES AND REGULATIONS

Section 1601.15 of the Commission's Procedural Regulations provides that persons charged with employment discrimination, such as yourself, may submit a statement of position or evidence with respect to the allegations contained in this charge.

The Commission's Recordkeeping and Reporting Requirements are set forth at 29 CFR, Part 1602 (see particularly 1602.14(a) below) for Title VII of the Civil Rights Act; 29 CFR, Part 1627, for the Age Discrimination in Employment Act; and 29 CFR, Part 1620 for the Equal Pay Act. These Regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. They also prescribe record retention periods -- in most cases, three years for basic payroll records and one year for personnel records. Questions regarding retention periods and the types of records to be retained should be resolved by reference to the regulations.

1602.14 Preservation of records made or kept.

(1) . . . . . Where a charge of discrimination has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII, the respondent shall preserve all personnel records relevant to the charge or the action. The term "personnel records relevant to the charge," for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding position similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected. The date of "final disposition of the charge or the action" means the date of expiration of the statutory period within which the aggrieved person may bring an action in a U.S. District Court or, where an action is brought against either by the aggrieved person, the Commission, or by the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of the Civil Rights Act of 1964, as amended, and Section 4(d) of the Age Discrimination in Employment Act of 1967, as amended, states:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

The Equal Pay Act of 1963 contains similar provisions. Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although it is not necessary that you be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you are represented by an attorney, we request that you provide the Commission with your attorney's name, address, and telephone number, and that you ask your attorney to write to the Commission confirming such representation.

The Commission has found that it is more efficient, in dealing with an organization, to work through just one representative of the organization. Therefore, if you have an attorney, the Commission will make all its contacts with your management officials through him or her, unless the Commission makes some other arrangement with you and your attorney

D00130

DuPont Dow Elastomers L.L.C.
300 Bellevue Parkway
Wilmington, DE 19809



# DuPont Dow elastomers

August 16, 2002

Debra Ann Wellman
PO Box 4395
Wilmington, DE
19807-0395



Dear Deb:

I am in receipt of your fax dated Friday August 16, 2002 stating that you require an extension "until on or about August 23, 2002" before informing us of your decision regarding our offer to submit a case determination letter for an incapability pension for you. Our offer and an accurate pension calculation were provided to your attorney on July 19, 2002. We believe you have had ample time to consider this offer.

During our meeting on Tuesday August 13th I informed you that your short-term disability benefits had expired. I stated that DuPont Dow would continue to pay you through Friday August 16th. This extension was based on our expectation of either an acceptance of the offer referenced above or a return-to-work meeting on Friday August 16th. Since you have failed to do either, your paid leave expires Friday August 16th after which you are on unpaid leave.

Additionally, be advised that a return-to-work meeting with Sonya Barham, Paul Graves and myself has been scheduled for you at 9:30 am on Friday August 23rd. If you fail to attend this meeting we will regard this as notice that you do not intend to return to work and we will proceed accordingly.

Sincerely,

Catherine LaPenta
Director Human Resources

**D113**

A109

Stefanie M Cresto
08/16/2002 12:35 PM

To:       Tarice C Brown/AE/DuPont@DuPont, Stefanie M Cresto/DDE/DuPont@DuPont
cc:       Stefanie M Cresto/DDE/DuPont@DuPont
Subject:  Leave Request Form

**COMPENSATION & BENEFITS ADMINISTRATION**          **LEAVE OF ABSENCE FORM**
**WILMINGTON COMPENSATION CENTER**                          Rev. 7/1/98
**CONFIDENTIAL**

All Fields in **BOLD** are required entries. They must have valid data before sending the form.

**Employee Name:**Debra-Ann Wellman ▉▉▉▉▉
**Employee Business/Function & Site:** DuPont Dow/Comercial/DTP
Employee Phone No. (Including Area Code):        Home  Work

|  | START DATE (MM/DD/YYYY) | END DATE (MM/DD/YYYY) | PAY TYPE | If Part-Pay Hrs/Wk Worked |
|---|---|---|---|---|
| New Leave |  |  |  |  |
| Leave Extension | 08/19/2002 | 09/01/2002 | No Pay |  |
| Family Leave |  |  |  |  |
| Family Leave |  |  |  |  |
| Family Leave |  |  |  |  |
| Family Leave |  |  |  |  |

Reason for Leave: Exhausted 6 month disability benefit — excused leave continued WITHOUT PAY.
Occupational?:
Shift Employee:
        *If yes, current work-week schedule:
        (ie, if different from five 8-hr days)

*************************************************************************
                RETURN FROM LEAVE OF ABSENCE
First Day Back to Work (MM/DD/YYYY):
Is vacation being taken?:
                *If yes, from (MM/DD/YYYY)   to (MM/DD/YYYY)
*************************************************************************

Comments:
  Exhausted 6 month disability benefit — excused leave continued WITHOUT PAY.  End date of No-Pay Leave is an est

**Original Signatures Needed on Hard Copies**

**Print or Type Name of Authorizer:**        Date (MM/DD/YYYY):

**D114**

Approval:_____     Date: _____
          (Print and Sign Name)

**D115**

DuPont Dow Elastomers L.L.C.
300 Bellevue Parkway
Wilmington, DE 19809



## DuPont Dow elastomers

August 23, 2002

Debra Ann Wellman
5 Twaddell Mill Road
Wilmington, DE    19807

Dear Debra:

On August 16, 2002 I sent you communication regarding a return-to-work
meeting scheduled for Friday, August 23, 2002.  You failed to attend this
meeting.

A second meeting has been scheduled for Monday, August 26, 2002.  The time
is 8:30 a.m. and it will be held in Sonya Barham's office.

If you fail to attend this second scheduled meeting, we will regard this as notice
that you do not intend to return-to-work and we will proceed accordingly.

Sincerely,

Catherine A. LaPenta
Director Human Resources

**D116**

A112

DuPont Dow Elastomers L.L.C.
300 Bellevue Parkway
Wilmington, DE 19809



**DuPont Dow elastomers**

August 26, 2002



Ms. Debra-Ann Wellman
5 Twaddell Mill Road
Wilmington, DE 19807-1223

Dear Deb,

As a result of your failure to respond to our requests for verification of your continued disability and your failure to return to work, we are terminating your employment for job abandonment effective immediately.

In determining that you have chosen to abandon your job, we note that:

- you removed your personal effects from your office in February, 2002;
- an additional week of paid disability leave was provided to allow you more time to consult with your attorney concerning your options;
- during the pre-return to work meeting with the Employee Assistance Counselor and Human Resources Director on Tuesday, August 13, 2002, you confirmed your understanding of the options available to you and that the situation required immediate resolution. You were asked to appear for a return to work meeting scheduled for Friday, August 16, 2002 or you were to provide the Company with your desire to pursue an incapability pension (details including a pension calculation were provided to your attorney on July 19, 2002);
- in a fax from you received Friday, August 16, 2002, you stated you would make a decision on or before August 23, 2002;
- an additional week was provided after the conclusion of your paid disability leave to allow you time to, again, consult with your attorney concerning your options;
- you failed to appear for a return to work meeting on Friday, August 23, 2002 nor did you ask the Company to apply for an incapability pension on your behalf;
- your therapist has informed the Employee Assistance Counselor that you cancelled your most recent session;
- you have stopped making yourself available to the Employee Assistance Counselor;
- in a voice message left for the Employee Assistance Counselor on Saturday, August 24, 2002, you stated your unwillingness to return to work; and
- you failed to appear for a return to work meeting on Monday, August 26, 2002.

D117

A113

Debra-Ann Wellman
August 26, 2002
Page 2 of 2

You are asked to reconcile your American Express account within 30 days so that you receive all monies owed to you by the Company and DuPont Dow receives any reimbursements from you for personal expenses already paid by the Company.

You are also asked to return any company property, including computer, cell phone and/or any other tangible property that you have in your possession. You may make arrangements to do so by contacting me on 302.792.4211. If you have any remaining personal items in your office, you also make arrangements with me to obtain those items.

Within two weeks, you will receive information from DuPont Connection concerning your benefits including options for continuing your medical coverage under COBRA. Any accrued or banked vacation not taken as of today will be paid to you.

Deb, you are reminded that the proprietary information agreement you signed upon your employment with the Company remains in effect after termination. You are required to return all confidential information and all trade secret material you have obtained during your employment with DuPont Dow Elastomers and you are not to use or to divulge at any time any secret or confidential information of DuPont Dow Elastomers, without DuPont Dow Elastomers' consent.

Sincerely,

Karen R. Cronin
HR Consultant

**D118**

**A114**



DuPont Dow Elastomers L.L.C.
300 Bellevue Parkway
Wilmington, DE 19809

# DuPont Dow elastomers

August 26, 2002

Ms. Debra-Ann Wellman
5 Twaddell Mill Road
Wilmington, DE  19807-1223

Dear Deb,

As a result of your failure to respond to our requests for verification of your continued disability and your failure to return to work, we are terminating your employment for job abandonment effective immediately.

In determining that you have chosen to abandon your job, we note that:
- you removed your personal effects from your office in February, 2002;
- an additional week of paid disability leave was provided to allow you more time to consult with your attorney concerning your options;
- during the pre-return to work meeting with the Employee Assistance Counselor and Human Resources Director on Tuesday, August 13, 2002, you confirmed your understanding of the options available to you and that the situation required immediate resolution.  You were asked to appear for a return to work meeting scheduled for Friday, August 16, 2002 or you were to provide the Company with your desire to pursue an incapability pension (details including a pension calculation were provided to your attorney on July 19, 2002);
- in a fax from you received Friday, August 16, 2002, you stated you would make a decision on or before August 23, 2002;
- an additional week was provided after the conclusion of your paid disability leave to allow you time to, again, consult with your attorney concerning your options;
- you failed to appear for a return to work meeting on Friday, August 23, 2002 nor did you ask the Company to apply for an incapability pension on your behalf;
- your therapist has informed the Employee Assistance Counselor that you cancelled your most recent session;
- you have stopped making yourself available to the Employee Assistance Counselor;
- in a voice message left for the Employee Assistance Counselor on Saturday, August 24, 2002, you stated your unwillingness to return to work; and
- you failed to appear for a return to work meeting on Monday, August 26, 2002.

P00084

Debra-Ann Wellman
August 26, 2002
Page 2 of 2

You are asked to reconcile your American Express account within 30 days so that you receive all monies owed to you by the Company and DuPont Dow receives any reimbursements from you for personal expenses already paid by the Company.

You are also asked to return any company property, including computer, cell phone and/or any other tangible property that you have in your possession. You may make arrangements to do so by contacting me on 302.792.4211. If you have any remaining personal items in your office, you also make arrangements with me to obtain those items.

Within two weeks, you will receive information from DuPont Connection concerning your benefits including options for continuing your medical coverage under COBRA. Any accrued or banked vacation not taken as of today will be paid to you.

Deb, you are reminded that the proprietary information agreement you signed upon your employment with the Company remains in effect after termination. You are required to return all confidential information and all trade secret material you have obtained during your employment with DuPont Dow Elastomers and you are not to use or to divulge at any time any secret or confidential information of DuPont Dow Elastomers, without DuPont Dow Elastomers' consent.

Sincerely,

Karen R. Cronin
HR Consultant

P00085

A116

# A117
# REDACTED


# ENTIRETY OF DOCUMENT
# CONFIDENTIAL

**Preliminary Back-To-Work Meeting - Debra-Ann Wellman**
**August 13, 2002 - 3:15PM - 4:50PM**

Attendees:  Sonja Barham (DuPont Company Employee Assistance Consultant), Pat Bowhall (DuPont Dow Elastomers Human Resource Specialist via telephone contact), Catherine (Kitty) LaPenta (DuPont Dow Elastomers - Director of Human Resources), Debra-Ann Wellman (Employee Out On Disability)

Location:  Chestnut Run Site - Sonja Barham's Office

This meeting started off with the discussion of the "Incapability Pension" benefits to employees, and how they calculated my monthly stipend for this benefit. I called benefits (DuPont Connections) twice to find out what was entailed in this procedure. I asked what was the percentage of the calculation as it was explained to me by (Bill the agent at DuPont Connections, who said it was 60% of my salary. Kitty LaPenta had Sonja call Pat Bowhall to read the recorded script over the phone to me and said that 27% of my pay was correct. And that the 60% was applicable, only when you receive T & P (total and permanent) disability. Kitty and Sonja asked if I would accept the offer of 27% of my pay and my health benefits. Kitty LaPenta said "You've had enough time to recover from this situation you were involved with Paul Graves. Deb, it has been 6 months now. Kitty then stated "Are you going to sign the "Incapability Disability Plan" or not, you and your lawyer have had enough time to look at this plan." I said, "Are the figures correct because I was told by Dr. Whitehill that it was all your health benefits and 60% of your pay. And you are requiring me to sign the General Terms and Conditions Release Contract for me not to proceed with legal proceedings, EEOC or DDOL in order to get it. Right?" Kitty said, "Yes, I need you to sign the release contract. AND WHO IS THIS DR. WHITEHILL OR MARY LOU OR WHATEVER YOU CALL HER." Sonja Barham interjects, "Dr. Whitehill is Deb's healthcare provider, and she has been treating employees from DuPont for over 10 years now." Kitty then states, "Well, our figures are correct and we are not offering you 60% of your annual income, we are offering you what the document states, ~$1,209.00 per month. Now do you want to sign it or not (while she is pushing the papers back toward me at the table). I said, "I will ask my attorney, Dick Wier, what he thinks. But I will tell you that this burden is all on me to go into my pension funds, and my Social Security Benefits to get this money monthly." Kitty then becomes very agitated and says, "Where's Julia's letter?" (And Kitty is now trying to look through my papers that I had brought with me to the meeting, without my permission, I pull the documents down onto my lap). And I said "What Julia do you mean?" Kitty said, "Julia Shaw. Julia writes all the legal letters for DuPont Dow Elastomers." I said, "The only letters that I do have are from Barry Willoughby (DDE's outside legal counsel)." Kitty states, "Well, Barry Willoughby is just there as a legal figurehead. I said, "Well, that's interesting, I thought this was turned over to outside legal counsel, since I was told by Michael Sherman to retain an attorney for myself. And now you're telling me this is Julia Shaw is ghost writing for Barry Willoughby? That is very strange to me that Julia Shaw has to write for Barry Willoughby or does Julia have a bone to pick with me?" Kitty does not respond at first and then she says, "You're very, very smart aren't you Deb." I just nodded my head up and down. Kitty went over my options, which were for me to go back to Paul R. Graves and to my same position, same location at the Joint Venture. The discussion went onto asking me again when was I coming back to work. Kitty stated that there are no other jobs at all at DuPont Dow Elastomers and I would have to come back to the same job, and report to Paul Graves (my sexual harassing supervisor). I was in shock. I said may I have a new supervisor. May I work at a different site, may I work from home, anything but go back to Paul Graves. May I report to a supervisor from the DuPont side of the business? I was told by Kitty LaPenta "Well I can't have you report to Rick Bond." I said, "No, I do not want report to any more Dow employees, they do not know how to manage people and are very aggressive renegade's. You see how they leave us and go back to Dow Chemical Company in Midland, Michigan, they do not care how they treat the DuPont employees or what they do to them while they

are here, because they are only here for a short time and then back to Midland and they leave us devastated. Kitty asked, "Who would you like to report to?" I said "Don Pittenger, John Legare, Russ Schnell, Mark Heller, I am presently drawing a blank right now on all of the other DuPont people I could suggest." Kitty LaPenta stated "Well Don Pittenger was one of my choices also and what about Kathy Robers on?" I said "No, I do not think that Kathy Roberson, is a very good fit, because she is very good friends with Mary Ann Price at work and outside of work, they socialize and shop together, etc., etc., and Kathy is struggling miserably with the pharmaceutical industry, because of all of the complexities in that industry, and I feel that she has much too much on her plate to be a supervisor. And Kitty please remember that Kathy is a close friend with the "box thrower" (Mary Ann Price.) Kitty LaPenta then stated "Well having a new supervisor is a business decision any way, and a request would have to be presented to the Kalrez® business and that would take many months. So for several months you'd have to report directly to Paul Graves. I said, "Kitty, how do you think he would treat me?" Kitty did not respond. Kitty stated that at the back-to-work meeting that Paul Graves and you would have multiple stipulations placed against each of you. And any employment concerns about me Paul would have to have an HR representative in the room or on the phone when he was disciplining me. I said, "What are these stipulations?" Kitty said I will let you know when Paul is in the room." I said, "I need to know what I am walking into, you are not portraying a very good scenario to me by forcing me to go back to the same person that harassed me. If I were to go back to the same job and the same sexual harassing supervisor, I would have to have a document drawn up that I would be out of DuPont Dow Elastomers in 30 days after I trained someone and go back to my parent company DuPont. Kitty LaPenta shot a look at Sonja Barham, Sonja said "Kitty, Deb has been in the JV since 1995 and it started in 1996 and she needs a change." I said, "I really need to just go back to my parent company ASAP, I was never abused there." I asked, "Well may I please be located at Chestnut Run, Experimental Station or at home." Kitty, then said "I could look into it as a possibility, but I do not even know if The DuPont Company wants you on their property." Sonja Barham immediately jumps in and says "Now Kitty, I think you mean that you'd have to pay for rental space for Deb." Kitty LaPenta and Sonja Barham exchange a long stare are one another. I said, "What do you mean by that statement that DuPont doesn't want me on their property. Delaware Technology Park is owned by the DuPont Company and the building we are in is owned by AG Chem of the DuPont Company." Kitty LaPenta did not answer me and went right into her next question, "Do you think you could do your job away from DTP?" I said, "Yes, the only task that require me to do anything is the literature room maintenance. And that can be stocked once or twice a month. All else could be done off site. Unless you just have me there to cover for Mary Ann Price when she is out of the office or sick."

I then asked, "Will I be permitted to bid on jobs within DuPont?" Kitty said, "Yes." Kitty LaPenta, then stated, "Deb, I did a through investigation of your complaint and Karen Cronin and I interviewed approximately 15 people in Kalrez®. And half of the people said you're a great employee and it was not your fault at all and it was Paul Graves's problem. And a few were neutral and the rest said it was 98% your fault. And I do not feel you are in a hostile work environment." I said, "Kitty you know what he did to me and it was very hostile environment, and you have my doctor's recommendations that I can work but not in that environment and you are now telling me that you are ignoring their medical recommendation's and sending me back to the same job and same situation. Do you have a medical background to be making such decisions for me? Nothing has changed; I know he (Paul Graves) will attack me again. DTP (Delaware Technology Park) is a satellite location with no other managers on site; I do not stand a chance. Kitty, you have to understand that what I said was done to me by Paul Graves he did to me. I really mean he did those things to me. I am a very dedicated employee and extremely loyal to my parent company DuPont, and when Paul stated that DuPont was treating the JV like Enron and the JV was just a hold company for DuPont. I felt he was totally out of line, and hounding me about being a spy for DuPont, and my personal life and who I knew at DuPont and dragging me around his office with his arms across me chest. If you are not going to protect me then

I will have to protect myself." Sonja Barham said, "Deb, you can do this I know you can do this, you have a new support team. You have Dr. Whitehill, Dr. Glacken, Kitty and myself." I said "I am really not physically nor emotionally able to do this, I will be a shell of a person if I go back there, but I will get back with you on my decision on Friday. You know Kitty I have met and filed a complaint with the EEOC and they said I have legal rights not to work in a hostile work environment, and I do not have to work for someone that has sexually harassed, abused and discriminated against me." And Kitty stated, "Where's this complaint, do you have a copy?" I said, "It is arriving soon, and you will have a copy." And Kitty LaPenta said, "Well, that is the only job and supervisor we have for you Deb and I do not think it is a hostile environment." and Kitty just smiled.

I said, "Was that all?" And Sonja and Kitty said, "Yes." I said "Thank you I will get back with you Sonja on Friday as to my decision."

Kitty said, "I am staying to speak with Sonja by herself." I exited the room.

*****************************************************************************************

On Friday - August 16, 2002 - I faxed a letter to Sonja and CC'd Kitty LaPenta and explained that I needed additional time to speak with my attorney about this situation.

*****************************************************************************************

On August 23, 2002 a Fed EX arrived with a letter in it stating that there was another meeting was scheduled for August 26, 2002. I called Sonja Barham and left her a voice mail on Saturday - August 24, 2002 and told her that I was not able to attend this meeting, because I cannot report back to Paul Graves and you have sent me to abuse counseling for 6 months and now you are sending me back to the same unsafe toxic work environment. I just am not physically nor emotionally able to do this, and it simply amazes me that you've totally ignored my doctor's recommendations. This is not reasonable work accommodation.

*****************************************************************************************

On August 26, 2002 a little after 10:00 AM, I received a Fed EX and there was a letter in there terminating me. In the letter were false and inaccurate statements that I was not going to my doctors and making myself available to my Employee Assistant Consultant, these are just a few of the false statements in this document. To this day 09/27/02 I still see these doctors for treatment.

: Daw
09/27/02

Oct-22-03  11:34am  From-EEOC LEGAL

T-071  P.002/007  F-005

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | AMENDMENT |
| ☒ EEOC | 170A201952 |

DDOL Labor Law Enforcement Section _____ and EEOC
*State or local Agency, if any*

| NAME (Indicate Mr. Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Debra-Ann Wellman | (302) 575-1565 |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| P.O. Box 4395, Greenville, DE 19807 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| DuPont Dow Elastomers Joint Venture | Cat D (501 +) | |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 300 Bellevue Parkway, Suite 300, Wilmington, DE 19898 | 003 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN  ☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ OTHER (Specify) | EARLIEST  LATEST  07/01/2001  08/26/2002  ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I have been employed by the DuPont Company since 1986 as an Administrative Assistant. In or around 1996, Dow Chemical Company and DuPont Company established a Joint Venture called DuPont Dow Elastomers - Joint Venture. Upon establishing the Joint Venture, it was my understanding that each company would maintain the employment records of its own employees who volunteered to work for Joint Venture. It was further my understanding that an employee who volunteered for a position with the Joint Venture could always return to his/her parent company(the company from which he/she came). From the beginning of my employment with the Joint Venture, the supervisors and managers were employed by Dow and most of my co-workers were DuPont employees. I began working for the Joint Venture and from that time until February 9, 2002, I received no unsatisfactory performance evaluation and, in fact, was promoted one full level and went to work for the Sales and Marketing Team at Delaware Technology Park as an Administrative Assistant/Office Manager. From in or around July 2001 until February 11, 2002, when I was forced to go out on disability, I was subjected to periodic sexual harassment, a degrading environment, subjected to unwelcome sexual advances from my supervisors and harassment based on my sex, including the following incidents:

1) In or around the first week of July 2001, I received a telephone call from a manager from DuPont telling me to "watch out you have Mr,

** Text is Continued on Attached Sheet(s) **

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| *[signature]* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year) |
| Date          Charging Party (Signature) | |

EEOC FORM 5 (Rev. 07/99)

D00136

A121

Oct-22-03  11:34am  From-EEOC LEGAL

T-071  P.003/007  F-006

Oct  2 16:46 2002  CP Initials _DAN_  Chg # 170A201952, Attachment Page 1
AMENDMENT

------------------------------------------------------------------------

Equal Employment Opportunity Commission
Form 5 - Charge of Discrimination, Additional Text

------------------------------------------------------------------------

Sensitivity (Paul R. Graves, Dow employee) and Medusa (Mary Ann Price,
DuPont employee)...because they are known trouble makers." Mr. Graves
shook my hand so hard that I called out "Ouch, you are going to break
the bones in my hand." He said, "Oh so you're Deb, I should have known."

2) On July 20, 2001, I was ordered by Mr. Graves and Ms. Price that I
go out to lunch to celebrate Nesha MacMurdo's(DuPont employee) missed
birthday.  I indicated that I would normally cover the phone.  Mr.
Graves said, "Get your cell phone and go now!" Mr. Graves started
asking me personal questions such as: "How many people are in your
family? How many brothers and sisters do you have? Did your mother work?
Where did your father work? Are your parents alive? Did they stay
married? Were you ever married before? Are you dating? What do you do
for entertainment? Where do your brothers and sister live? What are
their professions? How many children do they have? Are you close to your
nieces and nephews? How long have you work for DuPont? What departments
at DuPont have you worked in? I finally said now wait a minute I thought
this was a celebration for Nesha and you have been doing nothing but
batting out the questions to me about my personal life.  Why don't you
ask the other's questions?" Mr. Graves glared at me and said, "I didn't
know I was making you uncomfortable." I said, "You are not making me
uncomfortable, but you're really firing out questions to me alone and
not interacting with the rest of your luncheon guests, and I think you
should give them a chance to answer some of your near and dear to the
heart questions."

3) On July 30, 2001, I was told by Mr. Graves not to lock any of my
cabinets or desk.  I was the only employee asked to keep my desk,
cabinets and filing cabinets open at all times, although this was not
"site security rules".

4) On August 3, 2001 - Mr. Graves scheduled a meeting in his office with
me on a one-on-one basis. Mr. Graves slammed the door very hard and
walked behind his desk to look at his computer screen, and look through
papers. I sat in a guess chair around the table in his room. Mr. Graves
took a phone call and turned around to look at me while he was talking
to caller stating, "I know what to do, she will understand when I am
done with her. No, I am not afraid to do this. Thanks for the call, I
will speak with you later." Mr. Graves walked around the table and sat
down at the opposite side of the table from me. I handed him my job
description to Mr. Graves and said, "Here is a copy of my job account
abilities/responsibilities, and most of the duties that I perform here
at Kalrez." Mr. Graves threw the papers back at me and said "I don't
care what you do here." Mr. Graves then answered his cell phone and was

D00137

Oct  2 16:46 2002  CP Initials _____  Chg # 170A201952, Attachment Page 2
AMENDMENT

staring/glaring at me very hard and stating to the caller. "Yes it is
started and I did not have a chance to ask those questions yet. "Okay,
call me back." Mr. Graves then states, "I understand that there are
people here at Kalrez that talk about people, and I understand you are
one of them. I know you are a gossip." I stated, "What are you talking
about? I do not know what you mean. Please be more specific." Mr. Graves
said, "If I ever hear you talking about anyone. I will knock you back so
hard that you will not know what hit you." I said, "That is a threat
Sir, and why are you speaking to me this way." Mr. Graves stated,
"Because I can."

5) On August 13,2001, I am in my office and Mr. Graves comes in and asks
that I show him something in the Kalrez Literature Room. Mr. Graves
states, "I want you to straighten it up in here. Tell me what all of
this stuff is in here. I state, "In the back area here these binders,
books, videos, documents, etc. are the Kalrez Applications Engineer's
items. Mr. Graves states, "Well I want to move these binders f rom here
to here." Here to here meant f rom a lower shelf to a much higher shelf.
I said "Okay, I can do that, but not today." Mr. Graves said "Why" I
said, "I am not dressed to move those items to that higher area in the
Literature Room  today. I will do this an Friday. Mr. Graves states,
"No, I can help you move them today." And he now moves the Kalrez
Library Ladder toward me and extends his arm for me to climb up the 3
steps.  I could see Mr. Graves looking up my dress and smiling at me. I
was wearing a blouse, skirt and pumps that day. I move about six (6)
binders and said I had to go do something back in my office and I would
move the rest of the binders later. Mr. Graves stated, "If you need
anymore help just let me know." Mr. Graves was rocking back and forth
and smiling from ear to ear. I left the room very disgusted.

6) On August 23, 2001 - Mr. Graves comes into my office to talk about
distributor contracts. Mr. Graves never sits in my guess chair, but
stands at the filing cabinet and looms over me. He has  a pen in his
hand and is talking and waving it back and forth and it finally come out
of his hand and goes under my desk. I have to crawl on my hands and
knees under the desk because it has gone toward the back of desk.
His pen continues to come out of his hand four (4) more times. I am
crawling under the desk each time to retrieve.  Mr. Graves never looks
at me when he talks to me just stares at my chest. I pick up the pen for
the fourth time and hand it to him and he is now laughing/snickering. I
said, "What is so  funny?" Mr. Graves states, " I am enjoying this." I
ask him to put the pen down and ask his questions and Mr. Graves says,
"That's okay, I'm done." And he leaves my office.

7) On September 26, 2001, I am in the kitchen area in the morning and Mr.
Graves comes into this area. I am pouring my coffee in my cup and I now
feel him behind me touching me with his body. Mr. Graves states "Here I
need mine filled up." I pour the coffee, and leave the kitchen area,
very disgusted.

D00138

Oct  2 16:46 2002  CP Initials _____  Chg # 170A201952, Attachment Page 3
AMENDMENT

8) On November 2, 2001, it was Friday and normally I am dressed down,
but I had a dinner to go to after work, so I was dressed in a dress and
pumps. Mr. Graves stated that he was not busy at the time and he could
help me move the boxes now. I said okay, and get the library ladder and
started to pick up the boxes to hand to him and he said, "No you go up
on the ladder." I knew what he was doing with looking up my dress again,
and I told him that men have more upper arm strength to lift heavy items
over their head, and would he mind standing on the ladder. Mr. Graves
demanded that I climb the ladder while he stood below me and made the
following statements: "Now that wasn't that bad was it? You need to
lighten up, Deb. You are too uptight. You'll never get what you want if
you don't give a little. I guess I've lost my opportunity to be with
you, haven't I? You do not know how much you turn me on. Oh that's right
you only date men from DuPont." I did not say one word, since any past
interaction with Mr. Graves always-turned into anger and aggression by
Mr. Graves.

9) On December 7, 2001 – Mr.  Graves comes into my office and starts
asking me questions about, when I had Steve Metaxas(Dow employee) and
Karen Cronin(unknown whether a Dow or DuPont employee) review my job for
re-leveling.  I explained that Karen Cronin come back and stated that my
job is leveled properly.  Then Steve Metaxas came to me and told me the
very same thing and also expressed that I should not have gone to Human
Resources(HR) to have this request done.  I should have come to him.
Mr.  Graves states, "I am in agreement with Steve.  I do not think you
do a good enough job here to warrant a re-leveling." The entire time he
is rocking his groin area back and forth asking me "Do you understand be
Deb, you are not yet ready for a promotion?" I said "You know Paul,
Steve Metaxas did the exact same thing to me when he told me I was not
ready for a promotion yet, and did I understand what he meant also.  I
said, "Well, I get it loud and clear from both of you, and I am not
stooping to that to get a promotion from you or anyone else." Mr.
Graves states, "It would make it a lot simpler, Deb, do you understand?"
I said, "Get out of my office now and I mean it."

10) On December 13, 2001, Mr. Graves comes up behind me in the
Literature Room and rubs himself against me. I jump to the side and move
away and look at him right in the eye and say, "Hey what are your
doing?" Mr. Graves just smiles and leaves the room.

11) On January 3, 2002, I arrive in Mr. Graves' office to have my DOC he
cancels the meeting, because he said he did not receive the document
that I sent to him. I said, "I sent them to you via e-mail. And you knew
I came back from Holiday vacation early to have this meeting with you."
Mr. Graves states, "Well, isn't that a shame, now reschedule the meeting
with Mary Ann. You wouldn't have wanted to have your DOC with me prior
to your Christmas Holiday anyway, because you would have been very
depressed. Make it for a few weeks from now. I told you to cooperate
Deb, didn't I? When will you learn?" Mr. Graves stood up and was
adjusting his trousers, grossly tucking in shirt in his pant, and

Oct-22-03   11:36am   From-EEOC LEGAL ~'T                                    T-071  P.006/007  F-006

Oct  2 16:46 2002  CP Initials _Cavi_  Chg # 170A201952, Attachment Page 4
                                        AMENDMENT

shaking his belt area and looking at his crotch and looking back at me.
I exit Mr. Graves' office. The gross action of adjusting the pants and
grabbing the belt area, and the groin movements were a Steve Metaxas
tactics also.

12) On January 16, 2002, I was called into Mr. Graves' thinking that I
was going to go over my DOC and all he could do was rant and rave about
who I knew at DuPont and that there was nothing I could do to improve.
I am becoming very upset and scared, because the atmosphere is horrible
and unprofessional. I asked "Why are you doing this to me?" Mr. Graves
stated, "Because I can. I am the boss and just sit there and stop
interrupting me." I am now slowly pushing my chair back to get away
from him, because I am really scared of his cruel behavior. As soon as
he sees me moving back he jumps up and puts his right arm and grabs the
opposite side of the chair and jerks it very hard and his arm is now
across my chest area and he is pressing very hard, and I am pushing my
chair back and he continues to rub his arm across my chest and this went
on for a few minutes. Until I moved his fore arm up and put both my
hands over my chest and said "Now wait a minute you have gone well over
the line and get your arm off my breasts." Mr. Graves just smiled in my
face and came even closer to me and I pulled my head away. I stood up
quickly to move my chair back totally away from him. Mr. Graves stood up
very quickly and jammed his nose in my left ear and said, "I knew what
you were the first time I saw you." I said, "And what was that?" Mr.
Graves said, "I know what you are, you're a spy for DuPont."

13) On February 4, 2002, Mr. Graves comes into my office and asks me
about signing my DOC. I said, "I will not sign that document." Mr.
Graves starts to walk out of my office and says "You will never learn
will you Deb? Do what I tell you to do." I do not respond to Mr. Graves.

14) On February 7, 2002, Mr. Graves walks in to my office and states,
"I was just talking to Rick Bond(Dow employee) about your job and we are
canceling the Kalrez Incentive Trip, and we don't feel we have a place
here for you at Kalrez." I said, "Paul, the Incentive Trip is just a
third of my job, what do you mean you do not have a place for me at
Kalrez, there is plenty of work here to do.' I do not say any more,
because I know I am going to EAP at DuPont to report this situation.
Michael Sherman(DuPont employee) calls me and states, "How are you
doing?" I respond "Okay." Michael says, "Just okay?" I said, "Yes, just
okay." Michael Sherman then says, "Well, I called to tell you that I am
probably pulling you from your job, on Monday (February 11, 2002) you
will call out sick on Monday morning and we will remove the victim from
your boss. I said, "Okay is this normal procedure? Because I have never
used the EAP system before." Michael Sherman states "Well, you don't
want to stick your hand back in the meat grinder again do you?' I said,
"No."

15) On February 11, 2002, I was forced to leave my position and go on

D00140

A125

Oct-22-03   11:36am   From-EEOC LEGAl   'IT                                    T-071   P.007/007   F-005

Oct  2 16:46 2002  CP Initials _____ Chg # 170A201952, Attachment Page 5

AMENDMENT

disability.

16) On August 26, 2002, I was discharged.

I believe that I have been discriminated against by being sexually
harassed, given a poor evaluation, subjected to unwelcome advances,
forced to work in a hostile environment, harassed, forced to leave my
position on disability and retaliated against by being discharged all
because of my sex(female) and disability, in violation of Title VII of
the Civil Rights Act of 1964, as amended and Title I of the Americans
with Disabilities Act of 1990, as amended.

D00141

A126

EEOC Form 161 (10/96)    **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To: Ms. Debra-Ann Wellman
P.O. Box 4395
Greenville, DE 19807

From: Equal Employment Opportunity Commission
Philadelphia District Office
The Bourse
21 S. Fifth Street, Suite 400
Philadelphia, PA  19106-2515

[ ]    *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 170-2002-01953 (formerly 170A201953) | Legal Unit | (215) 440-2828 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]    The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]    Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[ ]    The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[ ]    We cannot investigate your charge because it was not filed within the time limit required by law.

[ ]    Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available
for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ]    While reasonable efforts were made to locate you, we were not able to do so.

[ ]    You had 30 days to accept a reasonable settlement offer that afford full relief for the harm you alleged.

[ x ]    The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude
that the information obtained establishes violations of the statutes. This does not certify that the respondent is in
compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised
by this charge.

[ ]    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]    Other *(briefly state)*

**- NOTICE OF SUIT RIGHTS -**
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of
your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state
court. Your lawsuit **must be filed WITHIN 90 DAYS from your receipt of this Notice**; otherwise, your right to sue based on this charge will be
lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA under-
payment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Marie M. Tomasso, District Director

*February 22, 2005*
*(Date Mailed)*

Enclosure(s)

cc:    Michael Clarke, Corporate Counsel (For Respondent DuPont Co.)

D00123

A127

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DEBRA-ANN WELLMAN,                              )
                                               )
          Plaintiff,                           )
                                               )
     v.                                        )    Civil Action No. 05-278-SLR
                                               )
DUPONT DOW ELASTOMERS L.L.C.,                  )    JURY TRIAL DEMANDED
                                               )
          Defendant.                           )
                                               )

## ANSWER TO COMPLAINT UNDER
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

1.      Admitted that Plaintiff purports to bring this action pursuant to Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §2000e-5 and that this Court has jurisdiction over

Plaintiff's claims. It is denied that Defendant committed any wrongful acts and that any equitable or

other relief is due Plaintiff.

2.      Defendant is without knowledge sufficient to form a belief as to the truth or falsity of

this allegation.

3.      Admitted that Defendant's headquarters is located at the address set forth in this

paragraph of the Complaint.

4.      Denied that Plaintiff was the victim of any discriminatory conduct at any time during

her employment with Defendant. As set forth in paragraph 3, Defendant's headquarters is located at

300 Bellevue Parkway, Suite 300, Wilmington, Delaware. It is also admitted that Plaintiff was

employed at Defendant's business location at 1 Innovation Way, Suite 400, Delaware Technology

Park, Newark, Delaware 19711.

5.      Denied that any discriminatory conduct occurred at any time during Plaintiff's

employment with Defendant, including without limitation the alleged "incidents" described in the

EEOC documents attached to the Complaint.

A128

6.     Admitted that the alleged discriminatory conduct is not continuing. By way of further answer, it is denied that any discriminatory or harassing conduct occurred at any time during Plaintiff's employment with Defendant.

7.     Admitted that Plaintiff filed charges of discrimination with the Delaware Department of Labor. By way of further answer, it is denied that any discriminatory or harassing conduct occurred at any time during Plaintiff's employment with Defendant.

8.     Admitted that Plaintiff filed charges of discrimination with the Equal Opportunity Commission. Defendant is without knowledge sufficient to form a belief as to the date Plaintiff filed such charges. By way of further answer, it is denied that any discriminatory or harassing conduct occurred at any time during Plaintiff's employment with Defendant.

9.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 9 and therefore denies them.

10.    Denied.

11.    Admitted that Plaintiff claims that Defendant engaged in conduct that was discriminatory based on her sex. By way of further answer, it is denied that any discriminatory or harassing conduct occurred at any time during Plaintiff's employment with Defendant.

12.    Admitted that Plaintiff attached to her Complaint some of the documents she submitted to the EEOC in connection with her charge of discrimination. By way of further answer, it is denied that any discriminatory or harassing conduct occurred at any time during Plaintiff's employment with Defendant.

13.    Denied.

14.    Denied.

### FIRST AFFIRMATIVE DEFENSE

15.    Plaintiff's claims fail to state a claim upon which relief can be granted.

2

A129

### SECOND AFFIRMATIVE DEFENSE

16.    Plaintiff's claims are barred in whole or in part by her failure to exhaust administrative remedies and/or other applicable federal or state statutes of limitation, jurisdictional and/or administrative requirements.

### THIRD AFFIRMATIVE DEFENSE

17.    Plaintiff's claims fail in whole or in part because at all times Defendant made a good faith effort to comply with applicable law, acted lawfully and with legitimate non-discriminatory business reasons that were not a pretext for unlawful discrimination.

### FOURTH AFFIRMATIVE DEFENSE

18.    Plaintiff's claims are barred in whole or in part by her failure to mitigate damages.

### FIFTH AFFIRMATIVE DEFENSE

19.    Plaintiff has waived or is estopped from asserting her claims.

### SIXTH AFFIRMATIVE DEFENSE

20.    Plaintiff's Complaint may be denied in whole or in part with the doctrine of after-acquired evidence.

### SEVENTH AFFIRMATIVE DEFENSE

21.    Plaintiff's claims are barred in whole or in part by her voluntary leave and/or refusal to return to employment.

### EIGHTH AFFIRMATIVE DEFENSE

22.    Plaintiff's claims are barred in whole or in part because Defendant had in effect at all relevant times a procedure for employees to address claims of harassment or other discriminatory or retaliatory treatment and Defendant exercised reasonable care to prevent and properly correct any discriminatory or retaliatory treatment, but Plaintiff unreasonably failed to take advantage of these preventative and corrective opportunities or to avoid harm otherwise.

3

A130

## NINTH AFFIRMATIVE DEFENSE

23.     Plaintiff was employed by DuPont Dow Elastomers, LLC, a joint venture of E.I.

duPont de Nemours Company ("DuPont") and The Dow Chemical Company ("Dow"). Plaintiff was

not employed at any time by Dupont High Performance Elastomers, LLC.

## TENTH AFFIRMATIVE DEFENSE

24.     Defendant would have made the same decisions and taken the same actions toward

Plaintiff absent any alleged consideration of any impermissible motivating factor.

## ELEVENTH AFFIRMATIVE DEFENSE

25.     Any damages sustained by Plaintiff were caused or contributed to by Plaintiff's own

actions or the actions of others over whom Defendant had no control.

WHEREFORE, Defendant respectfully requests that this action be dismissed with prejudice,

with costs and attorneys' fees assessed against Plaintiff.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Barry M. Willoughby (I.D. No. 1016)
Teresa A. Cheek (I.D. No. 2657)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, DE 19801
Telephone: (302) 571-6666
Facsimile: (302) 576-3345
Attorneys for Defendant

Date: May 25, 2005

4

A131

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2005, I electronically filed a true and correct copy of the foregoing Answer to Complaint Under Title VII of the Civil Rights Act of 1964 with the Clerk of the Court using CM/ECF. A copy of such Answer to Complaint Under Title VII of the Civil Rights Act of 1964 was mailed, First Class Mail, postage prepaid to the following person:

>Debra-Ann Wellman
>P.O. Box 4395
>Greenville, DE 19807


>YOUNG CONAWAY STARGATT & TAYLOR, LLP


>Barry M. Willoughby (ID 1016)
>Teresa A. Cheek, Esquire (ID 2657)
>The Brandywine Building
>1000 West Street, 17th Floor
>P.O. Box 391
>Wilmington, DE 19899-0391
>Telephone: (302) 571-6676
>Facsimile: (302) 576-3345
>Email: tcheek@ycst.com
>Attorneys for Defendant

Dated: May 25, 2005

**Brooks, Lisa K**

From:          MSS Support
Sent:          Thursday, September 28, 2006 9:51 PM
To:            Brooks, Lisa K
Subject:       PeopleSoft Routing Notification - Termination Request Corrected - Data Management -
               Brooks,Lisa K

This e-mail is being sent to notify you that the followiong termination request was
changed by the user.  The information listed below is the latest information.  If you have
any questions concerning this request please contact the HR Call Center.

        Service Request #: 000255701
        SR Correction Sequence: 002

        Salary Roll #: 82762
        AstraZeneca ID: 40059058
        Employee Name: Wellman,Debra-Ann
        Territory Number:
        Territory Name:
        Employee Department: Marketing Administration
        Employee work location: Fairfax
        Employee Tax Location Code: FFX
        Person Submitting Request: Abens,Michael R

        Termination Action: TER
        Termination Reason: S06 - Separation 6 Mo
        Termination Effective Date: 21-SEP-2006
        Last Date Worked: 15-SEP-2006
        Resignation Notice Turned in: 26-SEP-2006
        If Employee is asked to leave prior to resignation date given in notice, number of
days pay due:      0.00
        Vacation Payout Information
                Vacation Carry Over:    0.00
                Vacation Earned YTD:    9.00
                Vacation Taken YTD:    0.00
                California Float Days Not Used:     0.00
                Vacation Payout Balance:    9.00

                Vacation Service Date:  01-SEP-2003
                Vacation Exception:
                Vacation Exception End Date:
                Vacation Exception Days:    0.00

        Prior Merger Company:
        Service Years:    3.00
        Age:  54.00
        FLSA Status:  N

        Additional Comments: Paid leave 9/18-9/21

**PROCESSED**

OCT 0 2 2006

**HRDRM**

Please notify the HR Call Center (6-2200) if you have any questions or concerns regarding
this termination.

This message is an automated e-mail sent from the PeopleSoft system.  Please do not reply
to the sender of this message.  This message has been brought to you by PeopleSoft
Workflow Technology.

1

D00638

A133

**Brooks, Lisa K**

| | |
|---|---|
| From: | Abens, Michael |
| Sent: | Thursday, September 28, 2006 2:29 PM |
| To: | Barrow, Kim; Keeling, Janet |
| Cc: | Davidson, Debbie; Brooks, Lisa K |
| Subject: | RE: PeopleSoft Routing Notification - Termination of Employee Notification - Debra-Ann Wellman |

Sorry, I've been off site all morning.  I'll go ahead and make the changes right now.

Michael R. Abens
Brand Director, Managed Markets
office   (302) 885-5447
mobile (610) 322-5192


-----Original Message-----
From: Barrow, Kim
Sent: Thursday, September 28, 2006 11:03 AM
To: Keeling, Janet
Cc: Davidson, Debbie; Brooks, Lisa K; Abens, Michael
Subject: RE: PeopleSoft Routing Notification - Termination of Employee
Notification - Debra-Ann Wellman
Importance: High


Janet,

could you please process an ECF asap indicating a paid leave for Deb Wellman from 918-
9/21.

Thanks,

Kim

-----Original Message-----
From: Brooks, Lisa K
Sent: Thursday, September 28, 2006 10:51 AM
To: Barrow, Kim; Abens, Michael
Cc: Keeling, Janet; Davidson, Debbie
Subject: RE: PeopleSoft Routing Notification - Termination of Employee
Notification - Debra-Ann Wellman


Kim,

I would recommend the paid leave. Using excused absences is like using vacation.  I would
need an ECF to record the leave.

Mike,

Unfortunately, you will need to go in to the smartform again and change the term date back
to 9/21.  Please change comments to a paid leave 9/18-9/21.

Thanks,

Lisa K. Brooks
Sr HR Data Records Mgmt Analyst
(302) 886-7579
(302) 886-5975 (fax)

1

D00639

-----Original Message-----
From: Barrow, Kim
Sent: Thursday, September 28, 2006 10:04 AM
To: Abens, Michael; Brooks, Lisa K
Cc: Keeling, Janet; Davidson, Debbie
Subject: RE: PeopleSoft Routing Notification - Termination of Employee
Notification - Debra-Ann Wellman
Importance: High


We need to make sure that her effective term date indicates 9/21/06.  So can we indicate
that 9/18-9/21 were "excused absences"?  The other option per Legal would be to put her on
a paid administrative leave for these dates.


Kim

-----Original Message-----
From: Abens, Michael
Sent: Wednesday, September 27, 2006 9:31 AM
To: Brooks, Lisa K; Barrow, Kim
Cc: Keeling, Janet; Davidson, Debbie
Subject: RE: PeopleSoft Routing Notification - Termination of Employee
Notification - Debra-Ann Wellman


Yes, Kim and I know that but weren't sure how else to handle it.  I will do that but it
will be out of sync with the affective date in her letter of resignation.

Michael R. Abens
Brand Director, Managed Markets
office    (302) 885-5447
mobile (610) 322-5192


-----Original Message-----
From: Brooks, Lisa K
Sent: Wednesday, September 27, 2006 7:59 AM
To: Abens, Michael
Cc: Keeling, Janet; Davidson, Debbie
Subject: FW: PeopleSoft Routing Notification - Termination of Employee
Notification - Debra-Ann Wellman


Michael,

A termination date cannot be extended by vacation.  Please change the termination date to
match last day worked (9/15), update the vacation, and resubmit.  Debra-Ann will be paid
out for any unused vacation.

Thanks,


Lisa K. Brooks
Sr HR Data Records Mgmt Analyst
(302) 886-7579
(302) 886-5975 (fax)


-----Original Message-----
From: MSS Support
Sent: Tuesday, September 26, 2006 9:50 PM
To: Brooks, Lisa K
Subject: PeopleSoft Routing Notification - Termination of Employee
Notification - Data Management - Brooks,Lisa K

2

D00640

This message is to inform you that HR was notified of the following employee termination:

        Service Request #: 000255701
        SR Correction Sequence: 000

        Salary Roll #: 82762
        AstraZeneca ID: 40059058
        Employee Name: Wellman,Debra-Ann
        Territory Number:
        Territory Name:
        Employee Dept ID: AZ15581021
        Employee Department: Marketing Administration
        Employee work location: Fairfax
        Employee Tax Location Code: FFX
        Person Submitting Request: Abens,Michael R

        Termination Action: TER
        Termination Reason: S06 - Separation 6 Mo
        Termination Effective Date: 21-SEP-2006
        Last Date Worked: 15-SEP-2006
        Resignation Notice Turned in:
        If Employee is asked to leave prior to resignation date given in notice, number of
days pay due:    0.00
        Vacation Payout Information
                Vacation Carry Over:    0.00
                Vacation Earned YTD:    9.00
                Vacation Taken YTD:    4.00
                California Float Days Not Used:    0.00
                Vacation Payout Balance:    5.00

                Vacation Service Date:  01-SEP-2003
                Vacation Exception:
                Vacation Exception End Date:
                Vacation Exception End Days:    0.00

        Prior Merger Company:
        Service Years:    3.00
        Age:  54.00
        FLSA Status:  N

        Additional Comments: Used vacation through interim period.


Please notify the HR Call Center (6-2200) if you have any questions or concerns regarding
this termination.

This message is an automated e-mail sent from the PeopleSoft system.  Please do not reply
to the sender of this message.  This message has been brought to you by PeopleSoft
Workflow Technology.

3

D00641

A136

## Internal Memorandum

DATE:  February 3, 2006

FROM:  Sonya E. Cordone

  TO:  Debra-Ann Wellman
      SR#82762

Human Resources
Wilmington, DE  19850-5437
Telephone (302) 886-5742
FAX No. (302) 886-3453

CC:


SUBJ:    <u>ADJUSTED SERVICE DATE</u>

This letter is to inform you that your service date has been adjusted to give you credit for your prior part-time service from September 29, 2003 through December 31, 2005 with AstraZeneca.

Your adjusted service date is September 1, 2003.

Your vacation eligibility will be based upon this adjusted service date and the vacation policy guidelines shown in the attached schedule.

If you have any questions regarding this new service date or your vacation eligibility, please call me on extension 65742.


Attachment (1)

SEC

ASDPTFT.doc

D00642

# AstraZeneca Vacation Program Schedule

### Regular Part-Time 1 Annual Vacation Schedule

| Vacation Service | Vacation Eligibility |
|---|---|
| Years 0 - 6 | 12 days |
| Years 7 - 14 | 16 days |
| Years 15 - 23 | 20 days |
| Years 24 + | 24 days |

Employees earn vacation for which they are eligible in the same year it is used as follows*:

| If the employee is eligible for annual vacation of | The employee will earn for each month worked | Not to exceed an annual maximum of |
|---|---|---|
| 12 days | 1 day | 12 days |
| 16 days | 1.5 day | 16 days |
| 20 days | 2 days | 20 days |
| 24 days | 2.5 days | 24 days |

### *First Year of Hire*

During the first calendar year of employment, vacation eligibility is based on full months of employment.  Vacation is earned in accordance with the above schedule.

D00643

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DEBRA-ANN WELLMAN,             )
                               )
            Plaintiff,         )
                               )
      v.                       )  Civ. No. 05-280-SLR
                               )
THE DOW CHEMICAL COMPANY,      )
                               )
            Defendant.         )

## MEMORANDUM ORDER

At Wilmington this 20th day of March, 2007, having reviewed defendant's motion to dismiss, and the papers submitted in connection therewith;

IT IS ORDERED that said motion (D.I. 15) is granted, for the reasons that follow:

1. **Introduction.** On May 9, 2005, plaintiff Debra-Ann Wellman ("plaintiff") filed a complaint, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, against defendant The Dow Chemical Company ("Dow"). In her pro se complaint, plaintiff asserted that Dow discriminated against, retaliated against, and harassed her because of her sex and disability. As a filing prerequisite and statement of the facts of her claim, plaintiff relied on the charge of discrimination she filed with the Equal Employment Opportunity Commission against Dow. (D.I. 1) Dow has filed a motion to dismiss, asserting that plaintiff's complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). The court has jurisdiction to consider the pending motion pursuant to 28 U.S.C. § 1331.

A139

2.  In its motion to dismiss, Dow asserts that plaintiff was never a Dow employee,

a contention consistent with plaintiff's pleadings.  (D.I. 1, ¶ 4)[1]  Dow further argues that,

as a matter of law, only an employer may be liable under Title VII and, "absent

extraordinary circumstances, an employee may not pierce the corporate veil to hold a

parent company responsible for the employment decisions of [a] subsidiary."  (D.I. 17 at

1)  According to Dow, plaintiff has not alleged in her complaint the kind of "extraordinary

circumstances" contemplated by the Third Circuit and, therefore, the complaint is legally

insufficient and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

3.  **Standard of Review.**[2]  In analyzing a motion to dismiss pursuant to Rule

12(b)(6), the court must accept as true all material allegations of the complaint and it

must construe the complaint in favor of the plaintiff.  See Trump Hotels & Casino

Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998).  "A complaint

should be dismissed only if, after accepting as true all of the facts alleged in the

complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could

be granted under any set of facts consistent with the allegations of the complaint."  Id.

Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot

---

[1]On May 9, 2005, plaintiff filed two other complaints relating to the same conduct as that at issue.  In all three complaints, plaintiff has consistently listed "DuPont Dow Elastomers Joint Venture" as her employer.  See  Wellman v. DuPont Dow Elastomers LLC, Civ. No. 05-278-SLR (D.I. 1, ¶ 4); Wellman v. The DuPont Company, Civ. No. 05-279-SLR (D.I. 1, ¶ 4).

[2]The court notes that, in support of its motion to dismiss, Dow has relied on documents outside the pleadings.  (D.I. 17, 25)  Given the nature of the documents and the fact that plaintiff has neither contested their authenticity nor requested follow-up discovery, the court will treat the motion as a motion to dismiss, rather than as a motion for summary judgment.

A140

demonstrate any set of facts that would entitle her to relief. See Conley v. Gibson, 355

U.S. 41, 45-46 (1957).

4. **Facts.** DuPont Dow Elastomers LLC. ("DDE") was formed on April 1, 1996

pursuant to the Delaware Limited Liability Company Act as a joint venture between E.I.

DuPont de Nemours & Company ("DuPont") and Dow. (D.I. 25 at A 14, A 20) Upon its

formation, DDE had its own employees and its own Human Resources Department;

was responsible for its own labor relations; had its own separate offices, buildings,

plants, and facilities; and produced its own products. (Id. at A 22-32) DDE was

considered by the N.L.R.B. as a "successor employer" to DuPont and Dow. See

DuPont Dow Elastomers L.L.C., 332 N.L.R.B. 1071 (2000).[3]

5. Plaintiff was employed by DuPont before accepting an offer of employment

with DDE. Effective April 1, 1996, plaintiff became an employee of DDE, was paid by

DDE, was supervised by DDE employees, and was terminated from employment by

DDE. (Id. at A 14 - A 117; D.I. 1, ¶ 4)

6. **Analysis.** Plaintiff does not dispute the above recited facts in either her

complaint or in her responsive papers. Her request that Dow be held responsible for

the conduct at issue was given a legal characterization by appointed counsel (i.e.,

"pierce the corporate veil"), but plaintiff has not alleged any facts in support of this

extraordinary remedy. Under Delaware law, a limited liability company formed under

the Delaware Limited Liability Company Act is treated for liability purposes like a

---

[3]The court notes that the N.L.R.B. declined to pierce the corporate veil in the
context of the labor dispute at issue in DuPont Dow Elastomers L.L.C., 332 N.L.R.B. at
1083-84.

3

A141

corporation. 6 Del. C. § 18-303. The United States Court of Appeals for the Third Circuit has held that, where the employee of a subsidiary corporation has filed suit under Title VII against a parent corporation, the parent corporation should be deemed an "employer[] only in extraordinary circumstances," e.g., where the parent company dominates its subsidiary. Marzano v. Computer Science Corp., Inc., 91 F.3d 497, 513-14 (3d Cir. 1996). The record indicates that plaintiff was employed by DDE at all relevant times; there is no record support for the proposition that Dow was involved in the operations of DDE to any extent, let alone the extent necessary to justify piercing the corporate veil.

7. **Conclusion.** Given plaintiff's failure to allege any facts inconsistent with her employment status with DDE, an independent corporation under Delaware law, her complaint against Dow is legally insufficient and, therefore, is dismissed.


_____
United States District Judge

4

A142

# A143-162
# REDACTED

# ENTIRETY OF DOCUMENT
# CONFIDENTIAL