


DEPOSITION
EXHIBIT
Wellman #13
A163

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DEBRA-ANN WELLMAN,                    )
                                      )
            Plaintiff                 )
                                      )    Civil Action
v.                                    )    No. 05-278-SLR
                                      )
DUPONT DOW ELASTOMERS, LLC.,          )
                                      )
            Defendant                 )

            Deposition of Debra-Ann Wellman taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, Esquires, 1000 West
Street, Wilmington, Delaware, beginning at 1:09 p.m.
on Thursday, October 12, 2006, before Christina M.
Vitale, Certified Shorthand Reporter and Notary
Public.


APPEARANCES:

        JOHN M. STULL, ESQ.
        1300 North Market Street, Suite 700
          Wilmington, Delaware  19801
          For the Plaintiff
        YOUNG, CONAWAY, STARGATT & TAYLOR, ESQS.
        BY:  BARRY M. WILLOUGHBY, ESQ.
          1000 West Street, 17th Floor
          Wilmington, Delaware  19801
          For the Defendant
ALSO PRESENT:
        MARK BUCKMASTER, Discovery Video Services, Inc.


                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

A164

```
 1    A.   Yes.

 2    Q.   In what context?

 3    A.   In a car accident.

 4    Q.   Car accident case?

 5    A.   Yeah.

 6    Q.   When was that?

 7    A.   It was on -- it was the first quarter of this

 8  year and it was, um, Gary Nitsche was my attorney.

 9  I'm thinking end of January, beginning of February.

10    Q.   When was the accident?

11    A.   The accident was in January 7th of 2004.

12    Q.   What happened in the accident?

13    A.   I went to go pick up my dry cleaning and this

14  individual -- do you need the person's name?

15    Q.   Yes.

16    A.   His name is Dominick DeStephano.  He hit my car

17  and then he proceeded to -- I don't know if you can

18  see this.  It was in the Greenville Shopping Center

19  and my dry cleaners is there and he got wedged in.

20  So, he went back and forth and back and forth and back

21  and forth ad nauseum.

22    Q.   And you were in the car?

23    A.   And I was in the car.  I finally got out of the

24  car asking him to stop and the individual had been
```



4

1    drinking.

2    Q.    What time of day was this?

3    A.    This was at my lunchtime.

4    Q.    And what happened to you?

5    A.    Upper neck and portions of my lower back

6    injuries.

7    Q.    Did you seek medical attention for that?

8    A.    Yes, I did.

9    Q.    From whom?

10    A.    I went to my family doctor, Dr. Dale Latony and

11    then he sent me on to a physical therapy group.  He

12    suggested several.  The group that could take me the

13    most quickly was a group called Dynamics Physical

14    Therapy Group.  Then, after that -- and I didn't know

15    this existed.  There is a whole life type of physical

16    therapy group and he eventually moved me on to

17    Delaware Back Pain.

18    Q.    Are you still treating with Delaware Back Pain?

19    A.    Well, no, I'm not in the area.  I was.

20    Q.    When did you last treat with Delaware Back

21    Pain?

22    A.    Probably about two or three months ago.

23    Q.    Is there a lawsuit filed?

24    A.    Yes.



A166

1   A.   Yes, today I came in from Houston.

2   Q.   Why are you in Houston?

3   A.   How much of this do you want me to go into?

4   Q.   It's all relevant to the case.

5   A.   Well, it wouldn't be relevant to the case.

6        MR. STULL:  I don't know why you are in

7   Houston either, but tell him whatever you want to tell

8   him.

9        MR. WILLOUGHBY:  She has to tell me the

10  truth.  She can't tell me whatever she wants to tell

11  me.

12  A.   I don't know where you are leading with this.

13  Q.   I'm entitled to ask questions and, you know,

14  you are required to answer.

15  A.   Okay, I can answer it this way.  Mr.

16  Willoughby, I'm in Houston and I'm staying with

17  relatives at various places for my safety.

18  Q.   And why do you feel unsafe?

19  A.   I received a very threatening letter at my

20  employment and --

21  Q.   Who was the letter from?

22  A.   I have no idea.

23  Q.   Tell me how you got it and what it said.

24  A.   Well, I haven't even produced it to them so I



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    don't think it's relevant for me to talk to you about

2    it.

3    Q.    You are claiming emotional stress damages in

4    this case and I think it is relevant for me to go into

5    it.

6    A.    Well, it was a death threat and I was told to

7    leave.

8    Q.    Who told you to leave?

9    A.    That letter told me to leave.

10    Q.    Did -- where are you working?

11    A.    I'm not working, Mr. Willoughby.

12    Q.    Where were you working at the time?

13    A.    I was working at Astra Zeneca.

14    Q.    What job did you have there?

15    A.    I was an administrative coordinator.

16    Q.    What department are you in?

17    A.    This last position was a place called Emerging

18    Brands and it was dealing with a diabetic drug that

19    never -- how do I say?  It's not going to go to the

20    marketplace.  It needs further tweaking or something.

21    I'm not sure, I never worked for a pharmaceutical

22    company before.

23    Q.    Who was your supervisor?

24    A.    Michael Avins.

18

1    Q.    Where was your office located before you left?

2    A.    In the Chesapeake building.

3    Q.    Which is located where?

4    A.    Oh, 1800 Concord Pike.

5    Q.    How long did you have that job?

6    A.    That particular job I came there in late

7    December, early January, of 2000 -- it would have been

8    2005 of late December, early January of 2006.

9    Q.    Why haven't you given the letter to Astra

10   Zeneca?

11   A.    How do you know I haven't?

12   Q.    You said that a moment ago.

13   A.    But how do you know I haven't since then?

14   Q.    You just said a moment ago that you haven't

15   even given the letter to Astra Zeneca, therefore, I

16   assume you haven't given the letter to Astra Zeneca.

17   A.    Because when I went to the mailbox a person

18   approached me and virtually repeated the same thing

19   and I was petrified, Mr. Willoughby.  I have had

20   nothing but terroristic attacks against me since I

21   started this stuff.  I don't stand a snowball's chance

22   unless I keep moving, Mr. Willoughby.

23   Q.    Who was that person that made the same comment

24   to you?



```
 1    A.    She is a Pitney Bowes person.  I do not know

 2    her -- she worked in the mail room.

 3    Q.    You don't know her name?

 4    A.    I know her first name.

 5    Q.    What is her first name?

 6    A.    Is Shanayda.

 7    Q.    And she worked in the mail room?

 8    A.    Right.

 9    Q.    Was she an employee of Astra Zeneca?

10    A.    Of Pitney Bowes.

11    Q.    And they're a contractor that works at the

12    site?

13    A.    I guess.

14    Q.    Why would she have reason to make a death

15    threat against you?

16    A.    She regurgitated what was in the letter, Mr.

17    Willoughby, and what was in the letter was that I had

18    to move and I had to leave now or I would suffer these

19    consequences.

20    Q.    What motive would she have to say that to you?

21    A.    Mr. Willoughby, when I first walked into Astra

22    Zeneca the whole situation with me accidently meeting

23    up with people that claimed that they used to work for

24    DuPont human resources occurred trying to pry out
```



1  information about my situation with this and I refused

2  to talk about it and it was, therefore, reported to

3  Laura Sellers, Cathy Lind, Kim Barrow.

4      Q.    Who are they?

5      A.    They're HR professionals that are supposed to

6  go through and find out why was this happening.

7      Q.    When you say it was therefore reported, are you

8  saying you reported it to them?

9      A.    Yes.

10     Q.    Let me come back to my earlier question.  Why

11 would this person from Pitney Bowes want to make a

12 death threat against you?

13     A.    She regurgitated what was in the letter.

14     Q.    I know that, but what would be her motive?  You

15 don't even know her last name.

16     A.    I don't know any of the people in the mail

17 room's last name.  I have no idea, Mr. Willoughby.  I

18 have not been safe.  Why is my ignition -- why are

19 chemicals put in my ignition and my steering column

20 catches on fire?  Why do I go through water pumps and

21 radiators and things happen to my car?  Why, Mr.

22 Willoughby?  Why?  Since I have moved away I have had

23 a few weeks of peace and quiet, huh, Mr. Willoughby?

24 I know what is going on, Delaware is not a safe state

1    to work in.

2    Q.    Why do you say that?

3    A.    I know it, I know it, because when I reported

4    what the other folks were talking about to me they

5    knew about this situation and it was not of public

6    record at that time.  This is like a small village,

7    the State of Delaware.  There is absolutely -- is

8    Sandy Willoughby a relative of yours?

9    Q.    No, she is not, but, anyway, my question is --

10    A.    I don't know.

11    Q.    -- are you accusing somebody of doing something

12    to your vehicles?

13    A.    Mr. Willoughby, you do not go through this many

14    things, you know?  You don't come out from a grocery

15    store and have all this stuff happen to you.

16    Q.    Like what stuff?

17    A.    Like the radiator is punctured, you know, like

18    the tires have not only nails, but some sort of metal

19    shards put in them.

20    Q.    What else?

21    A.    I can go on and on and on.

22    Q.    That's what I'm asking you to do.

23    A.    Most recently when I went to start the car, the

24    ignition, someone had put either a chemical or a



**WILCOX & FETZER LTD.**
Registered Professional Reporters

29

```
 1    Q.    What did they know about the allegations with

 2   the EEOC?

 3    A.    Dialogue with them.

 4    Q.    With EEOC?

 5    A.    Right.

 6    Q.    Anything else that they knew?

 7    A.    They just were curious why I was doing this in

 8   a very aggressive manner.

 9    Q.    When you say "aggressive", what do you mean by

10   that?

11    A.    They were just aggressive ladies.

12    Q.    I know what the word means, but --

13    A.    Do you want me to get up and show you what they

14   did to me?

15    Q.    Please, please.  Maybe Mr. Stull would be you.

16    A.    They would be in my face constantly, bumping my

17   chair.

18    Q.    Would they whisper in your ear?

19    A.    No, they were in my face.

20    Q.    Yelling?

21    A.    Very aggressive, yes.  Wanting to know more and

22   more details about this.

23    Q.    So, they would actually stand up and they would

24   kind of yell into your ear?
```



A173

1    A.    Yes, and there were areas for them to either

2    physically sit on the desk or rest on the desk, you

3    know, and they would just go at it and I would --

4    pardon me?

5    Q.    Both of them would do it?

6    A.    Yes.

7    Q.    One from one side and one from the other?

8    A.    Right.  No, they would come over and these

9    cubicles -- did you ever go into DCC II?  It's a very

10   antiquated building.  Sue and I shared this one semi-

11   large area, less than the size of the space of this

12   table, though, and then Irish was beyond this other

13   partition and she would come out and they would ask

14   about this.

15   Q.    Did anybody else at Astra Zeneca ask about that

16   besides the people you have identified?

17   A.    Yes.

18   Q.    Who else?

19   A.    Bonnie Callahan.

20   Q.    Who is Bonnie Callahan?

21   A.    She is another administrative coordinator.

22   Q.    What did she do as an administrative

23   coordinator, what was her job?

24   A.    Like clerical/secretarial duties.



WILCOX & FETZER LTD.
Registered Professional Reporters

31

1    Q.    Same position you had essentially?

2    A.    Yeah, and then supported other people.

3    Q.    What would she do?

4    A.    Well, Bonnie was very soft-spoken, but would

5    just stay with it.

6    Q.    What do you mean?

7    A.    Mr. Willoughby, I don't know if you have ever

8    had somebody repeat something, repeat something,

9    repeat something.  I'm trying to deal with this on a

10   very personal -- this is personal to me.  This is

11   private to me.  I don't run up and down and call the

12   news journal with this as you can see.

13   Q.    I was asking what did Bonnie do?

14   A.    Those same types of questioning.  Bonnie was

15   terminated.

16   Q.    But she did that before she was terminated?

17   A.    Well, yeah, because she wouldn't have been been

18   in the building.

19   Q.    She was also repeating dialogue that you had

20   with the EEOC that she wouldn't have known that?

21   A.    They were beyond curious about what I was doing

22   at my previous job and why was I doing this.

23   Q.    Did anybody else from Astra Zeneca make

24   comments to you about the lawsuit?



A175

36

1    Q.    When you were there, you mean?

2    A.    Yeah, if I was walking down the hall and he was

3    just either, you know, like lunging at you or just

4    aggressive with you.

5    Q.    Did you report that?

6    A.    Oh, yeah.

7    Q.    To the same people you identified?

8    A.    Right.

9    Q.    Did he do anything else physical besides that

10   which you mentioned, lunging at you and running by

11   your desk and putting his face towards you?

12   A.    No, that was pretty much it, but it was real

13   consistent.  It was real consistent.

14   Q.    How often did he do that?

15   A.    It was he and his boss and finally they --

16   Marge Cedar is our business planning manager and she

17   saw it and reported it and those two people were let

18   go.

19   Q.    Who was the boss?

20   A.    Gosh, Astra Zeneca can give you this.  It was a

21   David and, dear God, if you send him after me, this

22   man is like a -- that's when Bonnie Callahan came

23   after me.  She was having an affair with this man.

24   Q.    Which one, the boss or the maintenance man?



A176

1    A.    This David guy.

2    Q.    The boss?

3    A.    Yes.

4    Q.    So, Bonnie was having an affair with David?

5    A.    Yes.  Oh, and it's an easy last name.  I didn't

6    know why she was so mad at me except Sue Bard said

7    Bonnie is having an affair with him.

8    Q.    Is that how you know that?

9    A.    That's how I knew that, but I didn't know

10    because when I was sitting in Martin Tenlin's office

11    and Bonnie came after me and she said, They're

12    terminating David and I want to know why and you're

13    the reason why, and she tried to knock Martin Tenlin

14    down.

15    Q.    Physically tried to knock him down?

16    A.    Right, and Martin stood in the doorjamb and

17    just said, "Bonnie, you have to leave, you have to

18    leave."  Then, they reported that on a different

19    level.  It was just -- it was just turmoil after

20    turmoil, but it just flowed right in from that.

21    Q.    Was Sue Bard a friend of yours?

22    A.    I don't know these people.

23    Q.    Why would she tell you about Bonnie and David?

24    A.    I sat down at my desk, I said, Dear God, why is



1    Q.    When did that happen that you were moved?

2    A.    They investigated the other with the --

3    Q.    Your allegations?

4    A.    -- with the Cymbacort team.  They moved all

5    those people, terminated everybody else who they

6    thought was violating that, you know, their code of

7    standard and then it was after Christmas.

8    Q.    Of 2000 --

9    A.    Right, and it was really funny because in that

10   whole situation everything calmed down and people were

11   respectful, people did work.  I mean, I don't come to

12   work to ask you personal questions and all that

13   stopped and we were very driven and very focused.  So,

14   then we were called in and it was explained that

15   they're going to move a group of people and so they

16   did.

17   Q.    After you were moved did any of this conduct

18   happen again?

19   A.    No.

20   Q.    How about until you got the --

21   A.    Not until I got the letter.

22   Q.    So, there was nothing between January and when?

23   A.    No, there was.  There were two notes put on my

24   car, they're Post-It notes, and then there are -- one



40

1    day I came out, and I reported all this, there was a

2    puddle, but it had leached into the cement, I was in a

3    parking garage.  There was a long silver screw in that

4    puddle, it was a very shiny silver screw is why I say

5    that, and then there were wands of incense put around

6    my car.

7       Q.   Wands of incense were in the car?

8       A.   No, not in my car, like around the car.

9       Q.   Around the whole car?

10      A.   Right, and that was at various different times.

11   You know, that's if I chose to look down there they

12   were.

13      Q.   And they were all the way around the car?

14      A.   Sometimes they were like four and sometimes

15   they were just two in the front.

16      Q.   Were they lit?

17      A.   They were burnt through so they must have been

18   lit.

19      Q.   What does the silver screw have to do with

20   things?

21      A.   I don't know.  Mr. Willoughby, do you think I

22   know anything that has been going on, that has been

23   happening to me?  All this stuff is just like a bad

24   dream.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

A179

46

1          MR. STULL:  I have no objection.

2      Q.   I would encourage you to seek some treatment

3   because I think that the indications are that that

4   would be helpful to you.

5          MR. WILLOUGHBY:  Do you have anything to

6   add, John?

7          MR. STULL:  I have no further

8   recommendation about not being mentally aware.

9          MR. WILLOUGHBY:  Do you concur she should

10   seek treatment?

11          MR. STULL:  Yes, I think that would help.

12   I mean, can't hurt.

13          MR. WILLOUGHBY:  So, we're going to

14   terminate for today and come back at a later time.

15          THE WITNESS:  So, you are telling me to --

16   you are now a psychiatrist?

17          MR. WILLOUGHBY:  No, I'm not telling you.

18   I am telling you as my professional obligation I don't

19   feel I can continue and I am no psychiatrist and I'm

20   encourage you to see one respectfully.

21          THE WITNESS:  Okay, okay, I see what you

22   are saying.

23          MR. WILLOUGYBY:  Thank you for coming up.

24          THE VIDEOGRAPHER:  Going off the record at



WILCOX & FETZER LTD.
Registered Professional Reporters

1    2:15 p.m.

2

3

4                            I N D E X

5

6    DEPONENT:  Debra-Ann Wellman              PAGE

7

8       Examination by Mr. Willoughby              2

9

10                       E X H I B I T S

11

12    (There were no exhibits marked for identification.)

13

14    CERTIFICATE OF REPORTER              PAGE 48

15

16

17

18

19

20

21

22

23

24

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

# A182-189
# REDACTED

# ENTIRETY OF DOCUMENT
# CONFIDENTIAL

1

```
         IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE

DEBRA-ANN WELLMAN,                    )
                                      )
         Plaintiff                    )
                                      )  Civil Action
v.                                    )  No. 05-278-SLR
                                      )
DUPONT DOW ELASTOMERS, LLC,           )
                                      )
         Defendant                    )
```

          Deposition of Debra-Ann Wellman taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, Esquires, 1000 West
Street, Wilmington, Delaware, Wilmington, beginning at
10:02 a.m., on Monday, December 4, 2006, before
Christina M. Vitale, Certified Shorthand Reporter and
Notary Public.

APPEARANCES:

        JOHN M. STULL, ESQ.
          1300 North Market Street - Suite 700
          Wilmington, Delaware  19801
          For the Plaintiff
        BARRY M. WILLOUGHBY, ESQ.
        YOUNG, CONAWAY, STARGATT & TAYLOR, ESQS.
          1000 West Street - 17th Floor
          Wilmington, Delaware  19801
          For the Defendant

ALSO PRESENT:  Mark Buckmaster
               Discovery Video Services, Inc.

               WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                 (302) 655-0477
                 www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



A190

Debra-Ann Wellman

3

1    A.    No.

2    Q.    Are you currently under a doctor's care for any

3    reason?

4    A.    No.

5    Q.    You brought your sister-in-law, is it Doris?

6    A.    Fasati, F as in Frank, S-A-T-I.

7    Q.    Why is she here?

8    A.    We were traveling up here.  I came in from

9    Houston, Texas.

10    Q.    Are you staying with her and your brother at

11    present?

12    A.    Yes, I am.

13    Q.    When was the last time you saw a physician?

14    A.    A medical doctor?

15    Q.    Yes.

16          MR. STULL:  May I clarify, is it a

17    physical, medical problem, mental problem?

18          MR. WILLOUGHBY:  Well, either one.

19    Q.    When was the last time you saw a psychiatrist

20    or psychologist?

21    A.    Oh, okay, that would be with -- in 2002.

22    Q.    And have you ever been treated after 2002 by a

23    psychologist or psychiatrist?

24    A.    No.



A191

4

1    Q.   Are you seeing any other kind of health care

2  professional in the mental health field such as a

3  therapist, counselor, that sort of thing?

4    A.   No.

5    Q.   Are you being treated for any kind of physical

6  ailments?

7    A.   No.

8    Q.   And do you have any physical ailments?

9    A.   Not to my knowledge.  I'm healthy.  I feel

10  healthy.

11   Q.   Did you have any physical ailments in 2002?

12   A.   No.

13   Q.   When was the first time that you contacted a

14  lawyer in connection with your claims involving Dupont

15  Dow Elastomers?

16   A.   In 2002.

17   Q.   When in 2002?

18   A.   I'm going to say first quarter.

19   Q.   Who was the lawyer you contacted?

20   A.   Richard Weir.

21   Q.   And Mr. Weir no longer represents you?

22   A.   That's correct.

23   Q.   And Mr. Stull represents you now?

24   A.   That's correct.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Debra-Ann Wellman

11

1    Q.    Once you dealt with them in connection with

2  this you had several contacts with them, correct?

3    A.    Yes, and what they would do is they didn't want

4  any notes or crib notes.  They wanted everything put

5  on their forms and, in fact, if you look at my ADA

6  intake where they get specific on what I felt occurred

7  and how I was affected by it I put please see

8  attached.  Well, I had to -- I didn't have access to

9  scanning equipment and things.  I had to re-type all

10  of that and put my answers in there for them.

11    Q.    Once you re-typed it what did you do with the

12  buck slips that you had?

13    A.    I really don't know.  I really don't know.  I

14  mean, I really don't know.

15    Q.    When was the last time you saw them, the buck

16  slips?

17    A.    When I had to compile things for them and that

18  would have been in 2002 and I initially met with them

19  in March.  So, that would mean that I met with Mr.

20  Weir prior to that.

21    Q.    How long prior to the meeting with the EEOC was

22  your meeting with Mr. Weir?

23    A.    It couldn't have been more than two or three

24  weeks.



Debra-Ann Wellman

12

1    Q.    And the buck slips that you used to type up

2    your chronology of events you haven't seen them since

3    you typed that up for the EEOC?

4    A.    Uh-uh.

5    Q.    And you don't know what you did with them?

6    A.    No, I don't.

7    Q.    Did you throw them away?

8    A.    I don't know.  I don't know because if I saw

9    any redundancy I tried to compile things for Mr.

10   Stull, I tried to have everything in some sort of

11   order.  I could have, that wouldn't surprise me.

12   Q.    That you threw them away?

13   A.    That I could have thrown them away.

14   Q.    Did you at any point make any tape recordings

15   of any conversations with anyone at Dupont Dow

16   Elastomers or otherwise concerning the issues in this

17   case?

18   A.    No.

19   Q.    You have no tape recordings of any kind?

20   A.    No, I don't.

21   Q.    Have you had any discussions with anyone that

22   you regard as a witness to your allegations against

23   Dupont Dow Elastomers?

24   A.    No.



39

```
 1   position and I worked in marketing communications.
 2             MR. WILLOUGHBY:   The tape needs to be
 3   changed so we'll go off the record for a minute to
 4   allow that to happen.
 5             (Brief recess.)
 6     Q.   So, take me through sort of step-by-step the
 7   process that you used to become an employee of the
 8   joint venture and to leave Dupont.
 9     A.   What they -- how they started it off, we never
10   really had any contact with Dow executives or Dow HR.
11   They would do things like town halls and for lack of a
12   better word I want to say rah, rah sessions in talking
13   about all the good that this joint venture will do and
14   will be so beneficial to the Dupont Company and the
15   Dow Chemical Company and, you know, many of the
16   positive facets for the person as an employee to grow;
17   and, if everything gets up and running that they could
18   -- because they could come out of being, you know,
19   just a department and could be a business unit still
20   connected with both of the parents.
21             They could re-structure things like your
22   pay and things like that and really talked it up an
23   awful lot about, you know, the many positive aspects
24   of joining in the joint venture.
```



A195

Debra-Ann Wellman

40

```
 1    Q.    And town halls would be group meetings?
 2    A.    Yes, and a lot of brown bag lunches where maybe
 3  several conference rooms would be open and maybe you
 4  would lead one and John would lead one and whoever,
 5  whoever maybe you worked for or, you know, supported
 6  in that group you would take your lunch and sit in
 7  there and listen to another update and another update.
 8  So, it started in 1995, the prep work, to talk about
 9  the benefits and the positive attributes of forming
10  this joint venture.
11    Q.    And it actually began in April of 1996?
12    A.    The -- yes, for --
13    Q.    The venture formation date was April 1st?
14    A.    Yes, excuse me, yes.
15    Q.    And you were told that during this lead up to
16  the formation of the venture?
17    A.    They never knew when they would get it totally
18  together so it actually took a long time.  I guess we
19  all thought that it would take, you know, a less
20  amount of time and things were explained about how we
21  were going to share their technology and it was
22  hopefully going to be beneficial to Elastomers, core
23  Elastomers, the youngest product line, and core
24  Elastomers is Kalrez and it's probably now close to
```



Debra-Ann Wellman

51

1    Q.    Cut and pasted from where?

2    A.    I don't know.  I've never seen this document.

3    Q.    So, during your employment with Dupont or with

4   Dupont Dow Elastomers you are telling us that you were

5   never aware of any policy prohibiting sexual

6   harassment of employees?

7    A.    No, no.  Dupont was extremely specific on

8   respectful work atmosphere.  They were very

9   professional.  They were suits, coat and tie male

10   figures, they were ladies in dresses and, you know, it

11   was a very professional atmosphere.

12    Q.    My question is during your time at Dupont did

13   you become aware of at any point any policy --

14    A.    That said these words, no.

15    Q.    -- prohibiting sexual harassment, whether it

16   was this policy or any other policy?  Are you telling

17   us you were never aware of at any point of a policy

18   prohibiting sexual harassment?

19    A.    It was known to be respectful.  It was known to

20   -- you were busy, you had -- you were famously busy,

21   you know.  There was no opportunity for chitchat or

22   for unusual behavior.

23    Q.    My question is during your time at Dupont did

24   you ever become aware of any policy that prohibited



Debra-Ann Wellman

52

1   sexual harassment of employees?

2   A.   It was there, I'm sure, and it was treated as

3   people just did it.  They didn't need it written out

4   like this.

5   Q.   You were aware that Dupont policy prohibited

6   sexual harassment of employees by other employees?

7   A.   You know, Mr. Willoughby, I'm not necessarily

8   -- on paper, I don't have all these degrees.  I'm very

9   well-read.  I listen to current events and news and

10  things.  I've heard about sexual harassment.  What I'm

11  saying is I never saw a document come through the

12  Dupont Company that said sexual harassment.  These

13  things are extremely specific.  I've never seen this.

14  Q.   But you were aware --

15  A.   That it was not a good deal.

16  Q.   It's, in fact, illegal?

17  A.   It's very bad.

18  Q.   And you were aware when you were employed at

19  Dupont that there were avenues for an employee to seek

20  relief if they believed they were being harassed?

21  A.   To chat with somebody in HR, yeah.

22  Q.   And am I correct that essentially the Dupont

23  policies were carried over to Dupont Dow Elastomers to

24  your understanding for human resources?



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

126

1    Q.    What was the position you received when you

2    went to Delaware Technology Center?

3    A.    You supported the business manager.  You were

4    the overall office manager so you did everything, you

5    know, non-people related.  You did everything from

6    preparing the coffee to getting new computers for

7    everybody and, you know, buying them their cell phones

8    or their pagers or Palm Pilots.  You coordinated all

9    that effort for them.

10    Q.    What was the title of your position?

11    A.    For some reason I'm thinking it sales and

12    marketing associate instead of assistant.  I don't

13    know.  This is an HR document.

14    Q.    Was that the position you first held when you

15    went to the Delaware Technology Center?

16    A.    Yes.

17    Q.    Did you hold any other jobs while you were in

18    that position before you left?

19    A.    Yes, I was -- along with keeping many of these

20    tasks I also was the incentive program manager.

21    Q.    What did you do as the incentive program

22    manager?

23    A.    You would depending upon who was awarded trips

24    for their contribution to selling Kalrez -- these are



Debra-Ann Wellman

134

```
 1    previous manager, that Mr. Sensitivity was getting

 2    ready to come through.

 3        Q.   And that was a reference to Mr. Graves?

 4        A.   Yes, it was.

 5        Q.   And do you know Mary Ann Price?

 6        A.   Yes, I do.

 7        Q.   Who was she?

 8        A.   She was his assistant who followed him around.

 9        Q.   Mr. Graves' assistant?

10        A.   Yes, sir.

11        Q.   When did you first meet her?

12        A.   She came on because she took that front office

13    by the door.  You know, even though Paul was going to

14    move back here she took this and she kind of helped

15    service Mr. Metaxas.  She was an ex-Dupont employee

16    that was extremely close to the Dow employees because

17    she hated Dupont.

18        Q.   How do you know that?

19        A.   Because she said so.

20        Q.   She told you she was close to the Dow -- former

21    Dow employees because she hated Dupont?

22        A.   She said she got the shaft from Dupont.

23        Q.   Did she tell you she was close to the former

24    Dow employees because she hated Dupont?
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

135

1    A.    She said to me that the Dow managers know how

2    to treat employees.

3    Q.    How did you happen to have a conversation with

4    her?

5    A.    You don't have a conversation with Mary Ann.

6    Q.    How did you happen to have that discussion?

7    A.    You listen to Mary Ann.  Mary Ann's presence is

8    -- she comes in, she barrels in, she is very much of a

9    bully and I can see why she would enjoy those folks.

10    Q.    What folks?

11    A.    The Dow Chemical Company folks that I met that

12    were involved in the joint venture, Mr. Willoughby.

13    Q.    You didn't have a very good relationship with

14    Mary Ann Price?

15    A.    No, I don't like boxes thrown at me and no

16    help, you know, and her aggressive manner, no.

17    Q.    And you say she threw boxes at you, what does

18    that mean?

19    A.    She threw a box at me and hit me in the back of

20    my leg.

21    Q.    Tell me how that happened.

22    A.    I don't know.  I don't have eyes behind my

23    head, but I know that the box hit me and I could hear

24    her feet slapping on that carpet going up there and



A201

Debra-Ann Wellman

150

1    Q.   Are you saying that you believe because of that

2    that Dow was getting money?

3    A.   No.   They wanted it to be an even swap because

4    they wanted their money back, Mr. Willoughby.   They

5    apparently gave this huge amount of money.   I don't

6    know any of the particulars of how that joint venture

7    was --

8    Q.   You are saying they're trying to benefit Dow at

9    Dupont's expense?

10   A.   They were trying to move that money because

11   they felt that Dupont took all the credit and the

12   benefits from what came through on Kalrez, which was,

13   you know, it's just a phenomenal product.

14   Q.   My question is are you saying that by doing

15   that Dow was going to get money that they weren't

16   otherwise entitled to?

17   A.   Exactly.

18   Q.   So, you think that Mr. Metaxas and Mr. Graves

19   were trying to benefit their former company, Dow, by

20   asking you to complete that?

21   A.   Benefit?   They were livid, what do you think?

22   Are they ever going to buy this product line, Deb?

23   What do you know about it?   Are you a spy here?   All

24   the horrible accusations.   They were well past their


A202

Debra-Ann Wellman

151

1    time limit, they wanted to go home.

2      Q.    So, Mr. Metaxas and Mr. Graves were asking you

3    to spy for Dupont -- if you were a spy for Dupont?

4      A.    Steve was slick.  Maybe because he was so -- he

5    is not a tall person and he used to walk behind me and

6    call me Mata Hari, spy, mole.  Paul said he is getting

7    this under control and he did it right to your face

8    with anger and bitterness and he was very volatile.

9      Q.    Both of them would refer to you as a spy?

10     A.    Yeah, Mata Hari, spy, mole, plant, take my

11   jewelry, take my jewelry and admire it.  Say maybe you

12   have a beautiful pin or necklace, Oh, could I see it?

13   Metaxas used to do it all the time.  He used to just

14   hold it.  Then, if his phone rang a couple times he

15   wouldn't even give me my jewelry back and he would sit

16   there and go, They're making them really small, aren't

17   they?

18     Q.    I'm going back now to the idea that you were a

19   spy for Dupont.

20     A.    Right.

21     Q.    They're telling you that you're a Dupont spy?

22     A.    Right.

23     Q.    And what was it that you were supposedly spying

24   on?



Debra-Ann Wellman

152

1    A.    The Engage product line wasn't doing anything.

2    It cost more to make that stuff than you could to sell

3    it.  The Insight technology wouldn't work with an

4    ethylene-based.  Dow used another core chemical and it

5    wouldn't work.  We heard that from ethylene.  We heard

6    that from town halls or newsletters.  We couldn't

7    incorporate it.  The chemist would write we are still

8    working on it trying to see if we can get some sort of

9    benefit out of this patent.  I mean, for God's sake,

10    we're in Arizona and Theo is up there saying we can't

11    get this technology to work for any of our products

12    because he is answering a question from the audience.

13    Q.    My question is this is a joint venture of Dow

14    and Dupont.

15    A.    Right.

16    Q.    You are saying that the former Dow people

17    considered you to be a spy in the joint venture for

18    Dupont, is that correct?

19    A.    Right, and they didn't understand why they

20    weren't getting paid.

21    Q.    Who wasn't getting paid, Dow?

22    A.    Yes, why they weren't getting their money back

23    for this investment.

24    Q.    You are saying by filling out these 1099 R's



156

1    A.    He told me that the distributors were worthless

2    and that he can sell these things in bins in plants

3    and that we don't need the distributors or their

4    commissions.  So, yeah.

5    Q.    Was that a substantial part of your duties?

6    A.    No.  It was like a third of my job.

7    Q.    Third of your job was the incentive trip and

8    related activities, approximately?

9    A.    Yeah.

10   Q.    Were you concerned when you heard that the

11   incentive trip was going to be canceled?

12   A.    No, because I'm marketable and I can get a job

13   and I'm a good hard worker.

14   Q.    Did you have a belief that your job at Dupont

15   Dow could potentially be eliminated because the

16   incentive trip was being eliminated?

17   A.    And that fine too because --

18   Q.    And that was fine too because?  Your answer?

19   A.    Because I know how to hustle and I'll go out

20   and get a job and I know how to work.

21   Q.    So, you did have that concern?

22   A.    No, I don't have a concern of that.  I don't

23   like it thrown in my face as some sort of baiting

24   tactic.



Debra-Ann Wellman

157

1   Q.   You did understand your job could potentially

2   be eliminated because of the elimination of the

3   incentive trip, is that fair?

4   A.   Maybe.

5   Q.   When did Mr. Graves tell you that?

6   A.   He sarcastically said it probably all the time

7   because he wanted to give me the boot.  So, he was

8   pretty candid about that.

9   Q.   Why did he want to give you the boot?

10  A.   Who knows?  Who knows?  Why is he named Mr.

11  Sensitivity?  Who knows?

12  Q.   You know of no motivation -- do you know of any

13  reason why Mr. Graves would want to get rid of you

14  without speculation?

15  A.   Yes, he is all ticked off because Steve Metaxas

16  isn't the business manager there anymore and he wants

17  to know what is going on.

18  Q.   What does that have to do with getting rid of

19  you?

20  A.   Because I think he thinks that, like I said,

21  that I was a spy and Dupont wasn't buying their

22  technology and Dupont wasn't buying the Engage product

23  line and Dupont wasn't doing this and that.

24  Q.   Are you saying Mr. Graves' motivation in



Debra-Ann Wellman

158

1    wanting to get rid of you is because you were a former

2    Dupont employee?

3      A.    I think Mr. Graves has a huge chip on his

4    shoulder and those people were very uncomfortable in

5    the State of Delaware working here and they hated

6    Dupont from the day they walked in.  They made fun of

7    us from our steel-toed shoes to us wearing a shirt,

8    the fellows wearing a shirt and tie or me wearing a

9    suit to work, that we should be more casual, we should

10   be more this.

11     Q.    The answer to my question is, yes, his

12   motivation in wanting you to get rid of you is because

13   you were a former Dupont employee?

14     A.    Yes.

15           MR. WILLOUGHBY:   Let's take a quick break

16   while we are changing tape.

17           (Brief recess.)

18     Q.    Do you know what the term "discussion of

19   contribution" means?

20     A.    Yes.

21     Q.    What is that?

22     A.    Those are your annual reviews.

23     Q.    Your performance reviews?

24     A.    Yes, performance reviews.



Debra-Ann Wellman

159

1    Q.    The term "discussion of contribution" is the

2  Dupont Dow Elastomers term for a performance review?

3    A.    Yes.

4    Q.    And did you ever have a DOC with Steve Metaxas?

5    A.    Yes.

6    Q.    And how was your DOC with Mr. Metaxas?

7    A.    I think I was rated outstanding.  I received --

8  I can't remember if it was two cash awards for my

9  contribution from Mr. Metaxas and it went well.

10    Q.    Did you have a good working relationship with

11  Mr. Metaxas?

12    A.    It was pensive.

13    Q.    What does that mean?

14    A.    Pensive?

15    Q.    What do you mean when you say you had a pensive

16  relationship?  What do you mean?

17    A.    I mean that I wasn't there to cause any

18  problems and I was there to be helpful and to be

19  professional and I overlooked a lot of things and I

20  tried my best to keep everybody focused.  I think I

21  shared with you he was in extreme depression to go

22  home to Midland, Michigan and his family was totally

23  depressed too.

24    Q.    You are saying that he told you this, is that



A208

1    Q.    Now, how much of the tape did you listen to to

2    know what they were about?

3    A.    If he was standing there and he pushed the

4    button, it could be maybe three to five minutes.  It's

5    not like I stuck my fingers in my ear, but I would go

6    (gesturing).

7    Q.    What was being said on the tape during those

8    three to five minutes?

9    A.    It was talking about listening to your

10   superiors, Mr. Willoughby, doing what they say.

11   Q.    Did you ever accuse Mr. Graves of forcing you

12   to look at a dragon or something like that?

13   A.    When we went in on the 16th he has these

14   they're these very nice framed gargoyles that he and

15   his wife got in Paris, but right underneath of that he

16   had moved the large round conference table in his

17   suite.  Those suites for -- in this thing are huge and

18   he had moved it over and he had a poster there.

19   Q.    Of a gargoyle?

20   A.    No, no.  The gargoyles were above it.  No, it

21   was some sort of dragon kind of thing, just a poster

22   like something, I don't know, maybe you would get at a

23   -- I don't know.

24   Q.    Posters were different from the gargoyles?



Debra-Ann Wellman

175

1    A.    No.   He did that when I was on my disability.

2    Q.    Did you know about it before that?

3    A.    No.

4    Q.    You didn't know before that that he might

5    cancel the Kalrez trip?

6    A.    No, that he might take away my job, but he is

7    not going to take away the Kalrez trip.  He didn't say

8    that.  He may not have the Kalrez trip for that

9    upcoming year, right.

10    Q.    And that was approximately 30 per cent part of

11    your job?

12    A.    Yes.

13    Q.    So, you have this performance appraisal in his

14    office and he puts the poster up and pulls his chair

15    next to you and he has a red pen out or what does he

16    have?

17    A.    He is loaded for bear.  He has everything.  He

18    has his infamous steno pad and he has his pens lined

19    up, but he has already locked the chairs and he has

20    now gone under and picked up his poster and put it on

21    there.  He is all set up.  He is not going to get up

22    from there.

23    Q.    Let's look at -- do you have Exhibit 12 in

24    front of you there?



Debra-Ann Wellman

176

1    A.    I do.

2    Q.    It's an E-mail from you?

3    A.    Yup.

4    Q.    To Karen Cronin, correct?

5    A.    Yes.

6    Q.    And you did type this, correct?

7    A.    Well, if it isn't altered I did.  I can go get

8    mine.

9    Q.    Do you have another copy of this?

10   A.    I don't think so with me.  If John has one.

11   Q.    This E-mail you sent following your negative

12   DOC meeting with Mr. Graves on February 16, 2002?

13   A.    Right.

14   Q.    It's dated January 23, 2002?

15   A.    Right.

16   Q.    So, it's approximately a week later?

17   A.    Right.

18   Q.    And you sent it to Karen Cronin, correct?

19   A.    Yes.

20   Q.    And you copied Julia Shaw who was the general

21   counsel of the company?

22   A.    And she was vice-president of legal, slash, VP

23   of HR.

24   Q.    And also copy to Krapels who was president of



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A211

Debra-Ann Wellman

178

1   abused.

2   Q.   Is there anywhere where sexual harassment,

3   touching you inappropriately, touching your breasts

4   appears?

5   A.   No, but it was explained to Karen when she came

6   in.

7   Q.   And this was a week after the DOC?

8   A.   When I state up here, Hey, Karen, we have been

9   playing phone tag.

10  Q.   How long after this was it that you left on

11  disability from the company?

12  A.   It was the first week in February.

13  Q.   So, it was another two weeks later, ten days,

14  two weeks or less?

15  A.   No.   I mean, I stayed there up until that day

16  and then I went to see the EAP people and then they

17  put me on the disability.

18  Q.   Let's look at Exhibit 12.   I'm going to call

19  your attention to the third full paragraph says,

20  "Since Mary Ann Price and Paul Graves arrived at

21  Delaware Technology Park there has been a tag team

22  effort from them every chance they get to be abusive,

23  condescending, angry, hostile," et cetera.   Do you see

24  that?


A212

Debra-Ann Wellman

179

1   A.   Um-hum.

2   Q.   Tell me what you mean by that.

3   A.   I mean, there is numerous occasions where they

4   were that, abusive, condescending, angry, hostile.

5   They never made that a welcome atmosphere for me.

6   Q.   Did Mary Ann Price sexually harass you in any

7   way?  Did she touch you inappropriately?  Do anything

8   like that to you?

9   A.   No.  She threw the box.  She was in my comfort

10  zone because she ran without fear and must have very

11  high blood pressure because her face is always scarlet

12  red.

13  Q.   You are not accusing Mary Ann Price of engaging

14  in sexual harassment of you?

15  A.   No.

16  Q.   The conduct you are complaining of at least in

17  this paragraph, third full paragraph, was conduct

18  jointly undertaken by Mary Ann Price and Paul Graves,

19  is that correct?

20  A.   Um-hum.

21  Q.   Yes?  You have to say yes for the court

22  reporter.

23  A.   Excuse me, can I --

24  Q.   Sure.



A213

Debra-Ann Wellman

181

1    Q.    How would you know why Steve was sent overseas?

2    Why would Paul ask you?

3    A.    Remember, I'm the spy, I have all the insight.

4    I got all the -- I have all the --

5    Q.    He asked you that because he thought you were a

6    spy?

7    A.    Insightful, on the QT with somebody.

8    Q.    Did he tell you who he thought you were on the

9    QT with?

10    A.    No, but he was not trustful of the Dupont

11    employees.  I mean, it got so bad that we weren't even

12    -- they were permitted to have their CEO from Dow

13    Chemical send them newsletters, but they said they

14    couldn't control us and Chad Holliday was not

15    permitted -- we had to be taken off his mailing list.

16    We couldn't even get a newsletter from our parent

17    company, which it was just a parent company, joint

18    venture.

19    Q.    Am I correct that you now accuse Paul Graves of

20    engaging in some kind of improper contact with you

21    during the DOC on January 16, 2002?

22    A.    Yes.

23    Q.    And what is it that you allege that he did?

24    A.    He has his arm across my chest.  I'm moving



Debra-Ann Wellman

183

1    holders, they didn't feel that I had a good working

2    relationship.  Mainly it was the things about the

3    joint venture itself not being successful, that the

4    Dupont Company was treating the joint venture like

5    Enron.

6      Q.    Why would that be sent to you?  Because were

7    you the Dupont spy?

8      A.    Say if I walked out and I told ten people and

9    mainly those people -- he was the only Dow employee

10   there and I told ten people, well, then, you know,

11   then they tell ten people, you know, that this is

12   getting -- you know, the accusations were just off the

13   charts with, you know, give us our money back.  You

14   know, you are treating this like a holding company.

15   You know, I'm Mata Hari, I'm a spy, I'm a plant.

16     Q.    Why would he be saying that to you?

17     A.    I don't know, I'm not in his head and I don't

18   really take pride in saying things about people, but I

19   feel, you know, his ego was so off the charts that I

20   would say that he was a megalomaniac, he was that

21   bizarre in his behavior.

22     Q.    He was angry with you, you say?

23     A.    Um-hum.

24     Q.    Yes?



184

1   A.   Yes.

2   Q.   And you were backing up in your chair, right?

3   A.   Right, I'm scooting back.  There is no wheels

4   on this thing so I'm not getting very far.

5   Q.   Where is the exit to the room?  Is it behind

6   you?

7   A.   Yeah, it's behind me.

8   Q.   So, you allege that he engaged in something

9   that you allege is sexual harassment?

10  A.   I do.

11  Q.   And what is that?

12  A.   I don't think that you should grab a chair,

13  force somebody to sit in it, be as abusive as this

14  situation was, rub your arm and your elbow into my

15  breasts and sit there and have, you know, like the cat

16  swallowed the canary grin on your face.

17  Q.   Did you allege at some point that he reached

18  over and grabbed the arm of your chair?

19  A.   Right, he has the arm of my chair.

20  Q.   Can you demonstrate with Mr. Stull?  Let Mr.

21  Stull be you and can you show us what you allege Mr.

22  Graves did.

23  A.   Can you get back a little more?  He is standing

24  up.



185

1    Q.    He is standing up?

2    A.    Yes, he sees now that I've scooted away.  He

3    has come out of his zone so he is grabbing this chair,

4    where are you going, and just digging his elbow into

5    my breasts.

6    Q.    And you are saying he did that for some sexual

7    reason?

8    A.    He sure looked like he liked it.

9    Q.    Did he say anything?

10    A.    He sat there and smiled.

11    Q.    Did he make any comments of a sexual nature to

12    you?

13    A.    By that time I'm yelling, Now, wait a minute,

14    get your arms off my breasts, back off.

15    Q.    It was his elbow that was going into your

16    chest, is what you are saying?

17    A.    Yeah, in my breasts.  They had this thing -- it

18    was a big time joke so you know.  He probably was

19    digging that far to see if I had breast implants.

20    This was a big joke with the Dow people because they

21    all came from the breast implant division and they

22    could tell a real breast from a non-real breast.

23            Because there is no reason, you know, say

24    if he wanted to stop me, he is an athlete, he was in



**WILCOX & FETZER LTD.**
Registered Professional Reporters

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DEBRA-ANN WELLMAN,            )    VOLUME II
                          )
        Plaintiff       )
                          )    Civil Action
v.                    )    No. 05-278-SLR
                          )
DUPONT DOW ELASTOMERS, LLC,    )
                          )
        Defendant      )

        Deposition of Debra-Ann Wellman taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, Esquires, 1000 West
Street, Wilmington, Delaware, Wilmington, beginning at
9:02 a.m., on Tuesday, December 5, 2006, before
Christina M. Vitale, Certified Shorthand Reporter and
Notary Public.

APPEARANCES:

      JOHN M. STULL, ESQ.
        1300 North Market Street - Suite 700
        Wilmington, Delaware  19801
        For the Plaintiff
      BARRY M. WILLOUGHBY, ESQ.
      YOUNG, CONAWAY, STARGATT & TAYLOR, ESQS.
        1000 West Street - 17th Floor
        Wilmington, Delaware  19801
        For the Defendant
ALSO PRESENT:  Lindsay DuPhily
               Discovery Video Services, Inc.

              WILCOX & FETZER
  1330 King Street -  Wilmington, Delaware 19801
             (302) 655-0477
             www.wilfet.com



Debra-Ann Wellman

223

1    call and Karen would be there in 35, 40 minutes tops

2    and she would be sitting right in his office and

3    calming him down.  When it took this much time then I

4    wrote the letter.  So, when I wrote the letter --

5    Q.    Let me just interrupt you, I want to get the

6    sequence of events.  So, the DOC meeting with Mr.

7    Graves was on January 16th?

8    A.    Right.

9    Q.    At what time and date did you call Karen, when

10   did you first call Karen?

11   A.    It was the 17th, I believe.  Can I just look at

12   something, Mr. Willoughby?

13   Q.    Sure.

14   A.    Please, I don't want you to think I'm a

15   blubbering idiot.  Not that you ever said that.

16   Actually the time line is with my thing that your

17   staff has.

18            MR. WILLOUGHBY:  Let's mark this as the

19   next exhibit.

20            (Document marked for identification.)

21   A.    Am I allowed to have a copy of that?

22   Q.    Sure, that's yours.

23   A.    Okay.  So, the very next day and thereafter --

24   several times during the day I would call and --


A219

Debra-Ann Wellman

229

1    Q.   Tell me what you say occurred in that meeting.

2    A.   I went over in detail what I testified to that

3  happened in the DOC on the 16th with Paul Graves and

4  I, you know, I explained about, you know, the table

5  being put in an odd place.  I explained about the

6  poster.

7    Q.   Dragon?

8    A.   Right, and she said to me, "Do you mean the

9  gargoyles?"  I said, "No, not the things from his

10  vacation."  I said, "He had a poster there with a

11  dragon on it, you know, and I said this whole scenario

12  was very volatile."  And then I told her, you know, at

13  the end I find out a speaker phone is on the whole

14  time.  Mary Ann is sitting out in the office and

15  remember that purple thing that he used to carry

16  around to let me listen to those tapes, you know, or

17  to request me to listen to those tapes?  That is

18  sitting right there.  So, I was assuming that my

19  conversation was -- excuse me -- that meeting was

20  being broadcasted to whomever was on the phone or --

21  and Mary Ann was recording it.  I'm sure there is a

22  recording somewhere.

23    Q.   You are saying when you had the DOC meeting Mr.

24  Graves' speaker phone was on?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Debra-Ann Wellman

240

1    to know what was going on.  So, I told them.

2      Q.   Who did you speak with?

3      A.    I truly honestly, Mr. Willoughby, in my heart

4    of hearts I don't think that they can say this is

5    Suzie or this is Sammy.

6      Q.   You are saying you left a message, somebody

7    called you back?

8      A.   No, you call an 800 number and a body is there,

9    Dupont, EAP hotline, how can I help you?

10     Q.   You did that and you left the message you

11   described?

12     A.   No, I'm talking to somebody.  Now I say where

13   can I go for help?

14     Q.   So, what happens, what do they say when you say

15   where can I go for help?

16     A.    They say, Give me your location.  I say,

17   Delaware Technology Park, Suite 400, I have to tell

18   what unit I'm in.  I'm in Dupont Dow Elastomers.

19   Apparently they go to some sort of chart and they say

20   Michael Sherman is your counselor and Dr. Donald

21   Cameron is your medical doctor.  They're both located

22   at the Haskell labs and they gave me the phone number

23   there.

24     Q.   Did you contact either Dr. Cameron or Mr.



A221

Debra-Ann Wellman

241

1    Sherman?

2    A.    Mr. Sherman, yes.

3    Q.    When did you contact Mr. Sherman?

4    A.    Right after the EAP hotline call.

5    Q.    Were you in your office when you called him or

6    where were you?

7    A.    Oh, yeah.  Yeah, no, I stayed right there.

8    Q.    Had you ever met Mr. Sherman before that time?

9    Did you know who he was before you called him?

10   A.    No.  We had met Dr. Cameron because since the

11   plant is there in case there was a severe injury he

12   gave a medical overview and the nurse would come often

13   and you would get your flu shots and things from them.

14   You know, they would be the administrators of that

15   sort of thing, but, no, I had never seen Michael.

16   Q.    So, you called Mr. Sherman?

17   A.    Right.  Right.

18   Q.    And what did you say to Mr. Sherman?

19   A.    That I was in dire need to speak to somebody.

20   I believe that this service can help me and I need to

21   talk to somebody about what has just happened to me.

22   Q.    What did he say?

23   A.    We scheduled an appointment right away.

24   Q.    Where was the appointment?



A222

Debra-Ann Wellman

243

1   could she just get things on a calm level?

2     Q.   What did he say?

3     A.   He just takes notes.  He didn't offer anything

4   at that point in time.

5     Q.   How long did that meeting last?

6     A.   I don't know, I'm going to say possibly an

7   hour, but maybe less.  He has Chambers Works,

8   Deepwater, the whole huge Stine-Haskell, he fit me in.

9   A couple times he had to ask me to go sit in a waiting

10  area because he had other folks come in that had

11  scheduled appointments and he couldn't change them and

12  he was -- tried to see me as quick as possible.

13            MR. WILLOUGHBY:  I think we are getting

14  short on the tape so why don't we take a brief break

15  while the tape is being changed.

16            (Brief recess.)

17    Q.   You were taking me through, you had the meeting

18  with Mr. Sherman that you described.  So, then what

19  happens?

20    A.   So, then I am told by Michael Sherman to come

21  back there on February 11th, which I believe is the

22  Monday.  That was a Friday on the 8th and I'm told to

23  call out sick.

24    Q.   Who told you to call out sick?


A223

Debra-Ann Wellman

246

1    leave.

2            They did listen to my heart and take my

3    blood pressure and things like that on the 8th and

4    then, like I said, he gave me a medical exam and

5    talked to him.  Dr. Cameron and Michael Sherman was in

6    the room.

7    Q.    This is on the 11th or 8th?

8    A.    On the 11th.  On the 8th they took my blood

9    pressure.

10   Q.    On the 11th you saw Dr. Cameron?

11   A.    Yes.

12   Q.    Was Michael Sherman there?

13   A.    Yes, um-hum.

14   Q.    At that point you went on a medical disability?

15   A.    Yes.

16   Q.    And that was at Dr. Cameron's recommendation?

17   A.    Yes.

18   Q.    And you never went back to work after?

19   A.    I didn't.

20   Q.    Now, did you take any belongings with you when

21   you left on February 8th?

22   A.    No, because I thought it was just a --

23   Q.    You didn't take any personal belongings out of

24   your office on February 8th?



251

1    A.    Yes.

2    Q.    And it's from Dr. Whitehill to Mr. Sherman, the

3   EAP person --

4    A.    Right.

5    Q.    -- correct?  Now, is there anyplace in this

6   letter where there is any reference to sexual

7   harassment, inappropriate touching, any other conduct

8   by Mr. Graves or any other employee of Dupont Dow

9   Elastomers?

10   A.    Okay, I don't see any reference to that.

11   Q.    Let me mark this as the next exhibit.

12         (Document marked for identification.)

13   Q.    Do you have Exhibit 16?

14   A.    Yes.

15   Q.    Have you seen that before?

16   A.    No.

17   Q.    This is an investigation report done by Karen

18   Cronin, do you see that at the top?

19   A.    Yes.

20   Q.    Now, I'm going to review certain parts of this

21   with you to see if you agree with the accuracy of it.

22   It says, "Summary of the Allegation and Investiga-

23   tion".  She says she received E-mail from you on

24   January 23, 2002 outlining allegations of harassment,



A225

Debra-Ann Wellman

258

1    Q.    Let's go to the next burger dot.  Says, "At

2    this point, she," referring to you, "said she asked

3    for a third-party (ie. HR) to be present," et cetera,

4    can you read that burger dot?

5    A.    (Witness complies.)  I told her about the

6    Chrysler Corporation, but I had asked early on

7    because, as I stated, the very first day I met him I

8    thought my hand was broken when he shook it and I

9    didn't -- you know, I already had had to deal with

10   Steve and we had Rick Bond and Dan Haas and their

11   behaviors were so strange.

12   Q.    My question is did she tell you in this

13   meeting, that burger dot, is that an accurate

14   statement of what you said?

15   A.    No, I asked for -- I told her at an earlier

16   time, I said, you know, I want people in there when we

17   start to have these meetings.

18   Q.    You said that occurred at an earlier time

19   before the meetings recounted here?

20   A.    Yes.

21   Q.    Go to the next burger dot.  Can you read that

22   to yourself.  That's the third burger dot down.  Tell

23   me if that's an accurate statement of what you said in

24   the meeting.



A226

Debra-Ann Wellman

271

1    Q.    So, that happened earlier?

2    A.    Um-hum, yeah, that happened well earlier.

3    Q.    So, that's accurate, it just happened at a

4  different time?

5    A.    Oh, yes, yes, but this was -- this is to say

6  that Karen compiled all this information from our

7  January 31st meeting, which all this -- you know, she

8  was kept abreast.  You know, I would keep her abreast

9  and, you know, and these women wanted to know who in

10  HR they could contact because --

11    Q.    Looking at the next sub burger dot on Page D

12  91, "Deb says she is afraid of Mary Ann P as she is

13  angry."  Do you see that burger dot?

14    A.    Um-hum.

15    Q.    Can you read that over and tell me if that's

16  accurate.

17    A.    (Witness complies.)  And that was instantly

18  reported, I called Karen right up.

19    Q.    Is that an accurate statement of what was

20  discussed in the meeting?

21    A.    No.  I don't wait, I don't wait because --

22    Q.    That was at an earlier time?

23    A.    Right, that would have been either the day of

24  the 19th or that next day.



A227

Debra-Ann Wellman

288

1    Q.    Did you ever accuse Karen of harassing you

2    while you were out in a phone call with Kitty LaPenta?

3    A.    I don't believe I ever said that she was

4    harassing me, but I asked her to work through the

5    proper channels.  I'm positive I stated yesterday that

6    -- you know, I can't give the medical diagnosis on why

7    I was out and they wanted me to give that information

8    and not interact with Dr. Cameron and Michael Sherman

9    even though Dupont Dow Elastomers had no other EAP

10   system or avenue for me to take other than for me to

11   go there.  So, no.

12   Q.    Did you ever complain that she shouldn't be

13   attempting to contact you directly?

14   A.    For medical questions, yes, to call the doctor

15   and ask those questions.

16   Q.    And, as you know from yesterday, when you

17   signed on with the joint venture you signed that

18   document saying that the benefits would be provided by

19   Dupont?

20   A.    Right.

21        MR. WILLOUGHBY:  Let's mark this as the

22   next exhibit.

23        (Document marked for identification.)

24   Q.    I'm handing you Exhibit 19.



Debra-Ann Wellman

300

1    Q.   So, this didn't happen?

2    A.   No.  The doctors were still trying to

3  coordinate testing and to kind of get to the root of

4  the problem on how I would have reasonable work

5  accommodations and either just before this or right

6  after this Michael Sherman was no longer my EAP

7  person.  I was given to Sonja Barham.  So, I don't

8  know.

9    Q.   You were never informed that you were cleared

10  to return to work?

11    A.   Never.  Dr. Whitehill was just the opposite

12  with that.

13    Q.   So, no, no one ever said you could work at

14  Dupont Dow?

15    A.   I wasn't cleared for work yet, no.

16         MR. WILLOUGHBY:  Let's mark this the next

17  exhibit.

18         (Document marked for identification.)

19    Q.   This letter is addressed to you, correct?

20    A.   Yes.

21    Q.   And it's to your PO box?

22    A.   Yes.

23    Q.   Properly addressed, dated June 3rd?

24    A.   Um-hum.



Debra-Ann Wellman

329

1   remarked that he kept trying to bully her into

2   focusing on a picture on the wall, ostensibly in an

3   effort to manipulate her."  Is that accurate?

4      A.    That's the dragon picture that he is looking

5   at, yes.

6      Q.    That's different than the gargoyle photographs

7   on the wall?

8      A.    They're up high and they're small.

9      Q.    You are not referring to the gargoyles in this

10  paragraph?

11     A.    No.  I mean the dragon.

12     Q.    Separate poster of a dragon?

13     A.    Right.

14     Q.    Looking at the next page, D 77, says, "Ms.

15  Wellman stated that she would not return to her

16  position at Dow."  Dow meaning Dupont Dow.  "She said

17  that returning to her previous position would be like

18  asking the Jews to get on another train to the

19  concentration camps.  She said that she has had enough

20  of the Dow bullshit and being worked like a dog and

21  deserves a change of scenery.  She complained that she

22  often had to do the work that should have been done by

23  others."  Did you tell the Kadishes that?

24     A.    I don't remember this statement where this is



334

1   history, marital history, that sort of thing?

2   A.   No.

3   Q.   So, you don't remember them doing that?

4   A.   No.

5   Q.   Do you remember them administering any tests of

6   any kind?

7   A.   Yes.

8   Q.   What did they administer?

9   A.   They first gave me a test and it was a booklet

10  and I had to read and because I'm left-handed and I'm

11  very hook-handed it was taking longer than he thought,

12  the younger Dr. Kadish, and then they switched it over

13  and they had me sit somewhere and I could then come

14  back into that room and go on a computer.  They were

15  multiple tests besides that MM3, they were multiple

16  tests.

17  Q.   So, you recall him administering those tests?

18  A.   Yes.

19           MR. WILLOUGHBY:   Mark this as the next

20  exhibit.

21           (Document marked for identification.)

22  Q.   Do you recall ever seeing this letter dated

23  July 12, 2002?

24  A.   No, I don't.



336

1    people did within the joint venture did go back to

2    their parent company, Dupont, and every one of the Dow

3    people, every one of the Dow people, virtually went

4    back to the Dow Chemical Company.  Why was I being

5    targeted?

6        Q.    It says you were previously told, weren't you,

7    that Dupont Dow did not object if you went to Dupont?

8        A.    Right, and they would try to help me and now

9    they're telling me that these situations are rare or

10   in this letter I'm reading.

11       Q.    Aren't they just telling you it's also up to

12   the parent company, Dupont, to decide?

13       A.    You know, I don't know that to be true either.

14   Why on my computer would I have Career Connections

15   where I can go in and log into Career Connections if

16   I'm not allowed to use it?

17       Q.    You were advised that Dupont does not accept

18   applications throught that, we went through the letter

19   earlier, correct?

20       A.    Right.

21              MR. WILLOUGHBY:   Let's mark this as the

22   next exhibit.

23              (Document marked for identification.)

24       Q.    You have been handed Exhibit 30, do you



337

1    recognize that?

2    A.    Yes.

3    Q.    It's a fax you sent to Sonja Barham?

4    A.    Yes, I think that's how you pronounce it,

5    Barham.

6    Q.    Basically it refers to a back to work meeting

7    that was attempted to be scheduled for you with Dupont

8    Dow?

9    A.    Right.

10   Q.    And you asked for an extension?

11   A.    Right.   Mr. Weir was on vacation.

12   Q.    So, the reason you asked for that was that you

13   were consulting with your attorney and he was away?

14   A.    Yes.

15   Q.    Attached to that is a letter to you from

16   Catherine LaPenta?

17   A.    Um-hum, Kitty.

18   Q.    It signed Catherine, she goes by Kitty?

19   A.    Yes.

20   Q.    And it's dated August 16, 2002 in response to

21   your fax, do you see that?

22   A.    Yes.

23   Q.    That's properly addressed?

24   A.    Yes.



Debra-Ann Wellman

338

1    Q.    Did you receive that?

2    A.    Can I ask a question?  How long is a short-term

3    disability benefit?

4    Q.    I don't know.  My question is did you receive

5    the -- this letter referred to?

6    A.    Yes.

7    Q.    And --

8    A.    But I think short-term disability is six months

9    and I was --

10    Q.    You were out since February?

11    A.    But it wasn't disability for the first two

12    months.  So, they only gave me like two months of

13    disability.

14    Q.    In any event, it tells you your paid leave

15    expires on August 16th?

16    A.    Right.

17    Q.    And it says that a return to work meeting has

18    been scheduled for 9:30, Friday, August 23, do you see

19    that?

20    A.    Um-hum.

21    Q.    And they advise you that if you don't attend

22    the meeting this will be considered notice from you

23    that you do not intend to return to work?

24    A.    Okay.



Debra-Ann Wellman

339

1    Q.   Is that correct?

2    A.   Yes.

3    Q.   You received that notice?

4    A.   Yes.

5           MR. WILLOUGHBY:  Please mark this.

6           (Document marked for identification.)

7    Q.   Do you recognize Exhibit 31?

8    A.   So now they're physically coming to the house

9  on this and no --

10    Q.   The address?

11    A.   Yeah, they're changing up the address.

12    Q.   Is that the accurate address for your

13  residence?

14    A.   Yeah, it was.

15    Q.   So, did you receive this letter?

16    A.   I can't remember it because I was --

17    Q.   Do you remember there being a second meeting

18  scheduled for August 26th, 2002?

19    A.   No, I don't, uh-uh.

20    Q.   You don't remember receiving this letter?

21    A.   No, I don't remember being told that it was

22  August 26, 2002.  That doesn't make sense.

23    Q.   Do you have your chronology, you are looking at

24  your chronology?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A235

Debra-Ann Wellman

340

1    A.    Yeah, I was looking at that because I was

2    terminated on that day and I don't -- that doesn't

3    make sense.

4    Q.    So, it says, "August 23 FedX arrives at home

5    asking for another meeting."

6    A.    Right.

7    Q.    So, that was a Federal Express that came from

8    Dupont Dow asking for another back to work meeting?

9    A.    Right.

10    Q.    "I called Sonja Barham and left an audix

11    message on Saturday, October 24th, and said I was not

12    able to come to this meeting."  Correct?

13    A.    Correct.

14            MR. WILLOUGHBY:  Please mark this.

15            (Document marked for identification.)

16            MR. WILLOUGHBY:  We'll take a break and

17    change the tape.

18    Q.    You have had Exhibit 32 placed in front of you.

19    A.    Yes.

20    Q.    That letter is properly addressed?

21    A.    Yes.

22    Q.    And you received it?

23    A.    Yes.  This came FedX.

24    Q.    And you were told that you were being



Debra-Ann Wellman

341

1    terminated?

2    A.   Yes.

3    Q.   Is it correct that you did not appear for the

4    return to work meeting on August 23rd?  And that's

5    what your time line says, doesn't it?

6    A.   Let me see something, though.  Because Kitty

7    requested another meeting and Whitehill and Sonja are

8    trying to get everything completed with Langan's.

9    Q.   My question simply is did you appear?

10   A.   No, no, no.

11   Q.   And after you failed to appear that's when your

12   employment was terminated with Dupont Dow, correct?

13   A.   Yes.  They were given notification that I was

14   not going to come.

15   Q.   And you knew if you didn't come you were going

16   to be terminated?

17   A.   Well, it was terminated or go back to Paul.

18   Q.   And you did not want to go back to Paul?

19   A.   That's correct.

20           MR. WILLOUGHBY:  Mark this as Exhibit 33.

21           (Document marked for identification.)

22   Q.   Do you know who Dr. Langan is?

23   A.   Yes.

24   Q.   How do you know him?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Debra-Ann Wellman

343

1    Q.    Let me hand you back Wellman Exhibit 2.    That's

2    the charge that you filed with the EEOC?

3    A.    Yes.

4    Q.    And that is where you outlined all your

5    allegations against Dupont Dow?

6    A.    Well, you know, you submit the document that

7    you have, the 29 pages, they shrink it down and they

8    pull it together and then you go up and you read it

9    and, you know, they also tell you they can't put

10   everything in there, but it needs to somehow get

11   started.    Yes, this is a really close synopsis on the

12   situation.

13   Q.    All right.    Let's -- this is the allegation you

14   filed against the company, we'll review it with you to

15   make sure I understand what you are alleging.    I'm

16   going to skip over that initial paragraph and

17   Paragraph One says, "In or around the first week of

18   July 2001, I received a telephone call from a manager

19   from Dupont telling me to, quote, Watch out, you have

20   Mr. Sensitivity (Paul R. Graves, Dow employee) and

21   Medusa (Mary Ann Price, Dupont employee) because they

22   are known troublemakers.    Mr. Graves shook my hand so

23   hard that I called out, Ouch, you are going to break

24   the bones in my hand.    He said, Oh, so you're Deb, I

1    should have known."  Is that accurate?  Did you --

2    A.    Yes.

3    Q.    You did say that all occurred, correct?

4    A.    Yes.

5    Q.    And who was the manager from Dupont that you

6    were referring to?

7    A.    Oh, in that that's Alex Bonfante.

8    Q.    The second item, Number Two there, says you

9    were ordered by Mr. Graves and Ms. Price to go out to

10   lunch to celebrate Nesha MacMurdo's (Dupont employee)

11   missed birthday.  Is that correct?

12   A.    Yes.  Just to let you know because they -- not

13   that they felt that this was confusing, but they

14   wanted to see from the joint venture side who came

15   from where.  They put in the parentheses with, you

16   know, meaning Dupont employee or Dow employee.

17   Q.    So, what is it that in this paragraph you are

18   alleging was improper conduct by Mr. Graves or Ms.

19   Price?

20   A.    Well, in here where, you know, it's a very

21   hostile, angry, bitter time.  You are forced to go to

22   lunch.  When he told me to get my phone when I

23   explained to him, you know, I was trained by Doris

24   Stewart to know how that office ran.  Most of those



Debra-Ann Wellman

345

1    people stayed there.  You know, they liked out that

2    ran.  I brought more skills and talents that naturally

3    came from me, but, you know, one person was supposed

4    to stay there and watch the phones and with us all of

5    a sudden now everybody walks away.

6            You know, they have a hotline thing at

7    Kalrez where you have to be available 24/7.  There was

8    nobody in there and, you know, here is Paul giving me

9    the thumb to get myself up out of my chair and to go

10   and to grab my phone.  Now, he doesn't want to have an

11   enjoyable lunch.  He is inquiring and batting out

12   questions that have absolutely -- that are personal

13   and have absolutely no value to anyone.

14           I really don't know Mary Ann Price.  Nesha

15   MacMurdo is a brand-new technical engineer that came

16   with the group.  Nobody is talking to them and, you

17   know, he is totally empowered with his agitated

18   personna on how he can intimidate people.  Again, I

19   don't mind answering questions, but, you know, I don't

20   know him very well and, you know, Are your parents

21   alive?  You know, how long were they married?  Were

22   you ever married before?  That's how it was spoken to

23   me.

24           You know, why didn't we sit in the building



380

1    same thing with that gesture with the trousers you

2    talked about?

3    A.    Yeah, with the shaking of the trousers, putting

4    their hands down in there as if they're adjusting

5    something.

6    Q.    Basically the identical movement, though?

7    A.    Steve is much shorter than Paul.  So, I mean,

8    they're two different people, but, yeah, putting their

9    hands down in there.

10    Q.    How tall is Mr. Metaxas?

11    A.    Mr. Metaxas was shorter than I was so that's

12    why it was so easy for him to follow behind me and put

13    his head on my shoulder and say, "Mata Hari, spy," and

14    just -- and hurt me and go right around and several

15    times he has virtually knocked me down in front of

16    Russ Schnell when I was in there handing him documents

17    because he, you know, you know, another ego trip.

18    Q.    So, Mr. Metaxas would follow you around and

19    bump his face on your shoulders just like you

20    demonstrated?  Do you want to demonstrate again?

21    A.    Spy, mole, you know, just dig his chin.

22    Q.    And would he say something when he put his chin

23    on your shoulder?

24    A.    Spy, mole, Mata Hari.



Debra-Ann Wellman

381

 1    Q.    Would he whisper it in your ear?

 2    A.    No.  It's like spy, mole, like I am to be

 3  scared.  Like, Woomph.  Like walk past me.  Paul was

 4  notorious for this.  Billy King said the same thing.

 5  What is this guy doing?  He is blurting out stuff when

 6  you are there working and you are concentrating on

 7  stuff and they're going -- they're walking by your

 8  office and he thought they were saying hey.  I said,

 9  "No, they're calling me a spy."

10    Q.    Who told you that he thought they were saying

11  hey?

12    A.    Bill King.

13    Q.    Did he work in the office there?

14    A.    He sat right across the hall from me.

15    Q.    Did you have a conversation with Mr. King about

16  what they were saying?

17    A.    No.  He said, "What is going on here?"  He was

18  from the Viton group.  And I said, "You will not

19  believe it."  He said, "Is he yelling at you, yelling

20  at me?  What is he doing?"  I said, "He is calling me

21  a spy."  He is walking by the door, "Hah."

22    Q.    And Mr. King told you he thought that --

23    A.    He asked to shut his door.  I begged him,

24  "Don't you shut the door, Bill, this guy is coming



Debra-Ann Wellman

382

1  right after me."

2  Q.  This is Mr. Metaxas now?

3  A.  This is Paul Graves when Bill King is there.

4  Q.  Let's go back, let's get this straight now.

5  A.  You asked me how tall Paul was.

6  Q.  I know, I just want to make sure.

7  A.  So, figure if he could jump up and hang his

8  chin on my shoulder, that's how tall he was.  So, he

9  was not very tall.  I'm not very tall.  What did this

10  doctors say?  Five-four, 150-some pounds.

11  Q.  Let's go back.  Who was taller, Mr. Metaxas or

12  Mr. Graves?

13  A.  Mr. Metaxas is the shorter person.

14  Q.  Now, we started out when we were asking this

15  line of questioning when you were bumping your chin on

16  Mr. Stull's shoulder to demonstrate that Mr. Metaxas

17  was doing that?

18  A.  Yes.

19  Q.  And he was shouting the words, "Spy, mole, Mata

20  Hari," like you said?

21  A.  Yeah.

22  Q.  When was this happening?

23  A.  When he was there.

24  Q.  What time frame?  Throughout the whole time?



A243

Debra-Ann Wellman

385

1    regular basis.  They could just pop that antagonistic

2    behavior in constantly.

3        Q.    Let me be specific.  Let me get the question

4    out, okay?

5        A.    All right.

6        Q.    You demonstrated how Mr. Metaxas was bumping

7    his chin on your shoulder and saying, "Spy, Mata

8    Hari," et cetera?

9        A.    Right, to show you how tall he was.

10       Q.    Right, I know.  Now, my understanding is that

11   you are saying that Mr. Graves did the same thing?

12       A.    Yes.

13       Q.    And how long after Mr. Graves arrived was it

14   that he started to do the same thing?

15       A.    It was -- you know --

16       Q.    Immediately?

17       A.    Immediately.

18       Q.    And that continued throughout the whole time

19   that Mr. Graves was there?

20       A.    Oh, yeah, they were all -- the Dow people all

21   rallied together because they felt that they were

22   going to be mistreated or were being mistreated by --

23       Q.    Was there any difference in the way that Mr.

24   Graves bumped his chin on your shoulder --


A244

Debra-Ann Wellman

390

1   A.    I'm over here or, John, can you get over here?

2   I'm not going to be able to do it.  Maybe I would be

3   able to do it to Doris easier.

4   Q.    Okay, if that would be easier.

5   A.    Huh?

6   Q.    Well, let John do it.

7   A.    Because -- or can you kneel on the chair

8   because he can go in my ear easier than I can go in

9   his ear.  The door is here and he gives me that and he

10  is right like that now and he has bumped me and he

11  says, "I knew what you were the first time I met you."

12  Q.    He was saying that in your ear when he did

13  that?

14  A.    Yeah, "I knew what you were the first time I

15  met you."

16  Q.    So, he wasn't whispering, he was loud?

17  A.    Oh, yeah.

18  Q.    And you said, "What was that?"

19  A.    Yes.

20  Q.    Then, he said, "You're a spy for Dupont."

21  A.    Yes.

22  Q.    Let's go on to the next incident, the February

23  4, 2002.  What happened that with?  Number 13.

24  A.    Well, there is a bunch of these.  This is just



Debra-Ann Wellman

391

1   him skipping down the hall and he wants --

2   Q.   You say skipping down the hall, what do you

3   mean?

4   A.   I mean he thinks he's -- do you know anybody

5   that is egotistical?  Do you know anybody that

6   saunters that has got it together?  You know, they're

7   the big shot, they're the big shot, you know?  He

8   praises himself on having his Italian loafers and he

9   is just a big deal, he is just a big deal.  So, he has

10  come in and put his arm on the doorjamb and he wants

11  me to sign the document, but this happens numerous

12  times and I don't want to sign the document until

13  Karen and I can meet so I can have -- you know, I need

14  a path forward for the year coming forward so I'm not,

15  you know, not going into this thing again.

16  Q.   In between Items 12 and 13 you had sent Karen

17  the E-mail that we looked at earlier dated --

18  A.   No, probably closer.

19  Q.   It was dated January 23rd, we looked at that

20  document?

21  A.   Yes, in between January 16th.

22  Q.   Right, it's Exhibit 12, and it's dated January

23  23rd?

24  A.   You're right.



Debra-Ann Wellman

392

1    Q.    Okay.  So, he says, "You will never learn."

2    A.    Yeah.

3    Q.    "Do what I tell you to do."

4    A.    Yeah, "Do what I tell you to do."

5    Q.    What was the problem with that?

6    A.    Well, the "do what I tell you to do" goes with

7    the rocking groin and -- or, even better yet the steno

8    pad slapping the upper part of your thigh for you to

9    look into the groin area to see what he is doing and

10   that he means business.

11   Q.    Okay.  Next item is Item 14.  What happened on

12   February 7, 2002?

13   A.    He told me he ran over and spoke with Rick

14   Bond, a Dow employee, and, you know --

15   Q.    Well, your charge --

16   A.    And he doesn't feel that I have a place here at

17   Kalrez.

18   Q.    The charge says, quote, this is quoting Mr.

19   Graves, I was just talking to Rick Bond (Dow employee)

20   about your job and we are cancelling the Kalrez

21   incentive trip.  We don't feel we have a place here

22   for you at Kalrez, period, end quote.  He said that to

23   you?

24   A.    Yes.  So, now I don't have a job even though



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Debra-Ann Wellman

393

1    that's just a third of my job.

2      Q.   So, that's February 7th?

3      A.   Right.

4      Q.   And you say, "Paul, the incentive trip is just

5    a third of my job, what do you mean you do not have a

6    place for me at Kalrez?  There is plenty of work to

7    do.  I do not say any more because I know I am going

8    to EAP at Dupont to report this situation."

9      A.   Yup.

10     Q.   So, that's accurate as to what you said and

11   what you were thinking?

12     A.   Yes.  He is also throwing in here that I need

13   to sign his DOC.

14     Q.   And then Michael Sherman calls and says, "How

15   are you doing?"

16     A.   Yes.

17     Q.   And you respond, "Okay"?

18     A.   Um-hum.

19     Q.   And he says, "Just okay?"

20     A.   Yup.  He then says, "I called to tell you that

21   I am probably pulling you from your job on Monday,

22   February 11th, 2002."

23     A.   Um-hum.

24     Q.   "You will call out sick on Monday morning and



1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


DEBRA-ANN WELLMAN,                    )
                                      )
            Plaintiff,                )
                                      )    Civil Action
v.                                    )    No. 05-278-SLR
                                      )
DUPONT DOW ELASTOMERS, LLC.,          )
                                      )
            Defendant.                )


            Deposition of PAUL R. GRAVES taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, 1000 West Street, 17th
Floor, Wilmington, Delaware, beginning at 1:40 p.m. on
Friday, March 23, 2007, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.

APPEARANCES:


        JOHN M. STULL, ESQUIRE
          1300 North Market Street, Suite 700
          Wilmington, Delaware  19801
          For the Plaintiff


        BARRY M. WILLOUGHBY, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR
          1000 West Street, 17th floor
          Wilmington, Delaware  19801
          For the Defendant


                WILCOX & FETZER

    1330 King Street -  Wilmington, Delaware 19801

                (302) 655-0477

                www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



A249

Paul R. Graves

11

1    Q.    Was Debra Wellman part of that sales group?

2    A.    Yes.

3    Q.    What were her duties if you recall?

4    A.    She had a number of responsibilities.  She had

5    responsibility to support our area managers that were

6    out in the field.  She had responsibility to organize

7    and facilitate an incentive trip that we did for our

8    distributors.  She had responsibilities for reporting

9    sales activity, primarily customers, things like that.

10   She had additional responsibilities really pertaining

11   to just the overall functioning of the sales group,

12   communication activities, some activities relative to

13   documentation when we had incentive trips.  She had

14   responsibility for the government regulatory forms

15   that were required to go to distributors when we did

16   those trips.

17   Q.    So, she was an administrative assistant in a

18   sense of orchestrating the travel activities of the

19   sales group?  I mean, I'm not trying to pin you down

20   there, I'm just generalizing.

21   A.    That was not really one of her activities,

22   travel for the sales group.

23   Q.    She was an in-house coordinator for

24   information, let's say?

**W&F**

Paul R. Graves

12

1    A.    Yes.

2    Q.    Is that something that she had to be on-site to

3    do?

4    A.    Most of her activities would need to be done

5    on-site.

6    Q.    Is that because of the salespeople would

7    interface with her personally or just file reports?

8    A.    It would be -- most of her communication with

9    the sales group would be by telephone because they

10   were not at that site.  They were home office'd across

11   the Country.

12   Q.    Did they use various offices across the Country

13   that were DuPont or Dow or what was that -- what were

14   those offices?

15   A.    No, they worked from their homes and let's say

16   the home office for the Kalrez sales group was in

17   Delaware Technology Park.

18   Q.    Tralee Park was -- what was that?

19   A.    That's the Kalrez manufacturing site that's

20   across the street from the Delaware Technology Park.

21   Q.    That actually manufactured fibers or plastic or

22   whatever it was that was the product?

23   A.    The product.

24   Q.    There was some reference here to Insight

Paul R. Graves

14

1    and utilize Insight Technology and then send it back

2    out?

3      A.   No, sir.

4              MR. WILLOUGHBY:  The Insight was not used

5    in products like Kalrez.  That was a whole different

6    technology.  As I understand it, and the witness can

7    correct me, it was a whole different technology.  The

8    DuPont Dow location at Tralee Park manufactured Kalrez

9    and as I understand it Insight was not involved with

10   Kalrez.

11             THE WITNESS:  That's correct.

12   BY MR. STULL:

13     Q.   It was involved with three or four other

14   products that were manufactured at other sites?

15     A.   That's right.

16     Q.   And those are Pontchartrain and all the other

17   sites, is that a general statement?

18     A.   Not all the other sites.  Specific sites were

19   utilizing Insight Technology to make DuPont Dow

20   Elastomers products.

21     Q.   But those sites did use the Dow technology you

22   are telling me?

23     A.   Those sites that used Insight Technology to

24   make their products used the Dow technology, that's

Paul R. Graves

32

1    BY MR. STULL:

2      Q.   Well, you knew Steve Metaxas.

3      A.   Yes, I know Steve Metaxas.

4      Q.   And you still know him?

5      A.   Yes.

6      Q.   And he is still in a managerial position?

7      A.   He went from one managerial position to another

8    managerial position when he left Delaware Technology

9    Park.

10     Q.   So, he is not at DDE anymore?

11     A.   He is at DPE.

12     Q.   So, he left DDE and he is now at DPE?

13          MR. WILLOUGHBY:   DDE is the former company,

14   DPE is the current company.

15          MR. STULL:   Right, it's a name change.

16          MR. WILLOUGHBY:   So, he did not leave

17   anywhere.

18          MR. STULL:   He didn't leave anywhere, okay.

19   BY MR. STULL:

20     Q.   Were you involved with Neoprene and Viton

21   personnel?

22     A.   In what time frame?

23     Q.   Well, any time.

24     A.   Yes.



Paul R. Graves

33

1    Q.    When?

2    A.    In the 1999, 2000 time frame was involved with

3    Viton and beginning in mid-2000 I was -- to mid-2001 I

4    was involved in Neoprene and I'm involved in Neoprene

5    today.

6    Q.    Does that mean Louisville?

7    A.    That is a manufacturing facility.

8    Q.    For?

9    A.    For Neoprene.

10    Q.    So, Neoprene is one of the DPE products?

11    A.    That's correct.

12    Q.    This exhibit I referred you to that has the

13    50/50 thing in it was that something you were aware of

14    initially when you came on-board at DDE in --

15              MR. WILLOUGHBY:    1996.

16    BY MR. STULL:

17    Q.    So, you were aware of that?

18    A.    The announcement to the markedplace when that

19    venture was formed is that it was a 50/50 venture.

20    So, it was very well-known.

21    Q.    I don't know if you are aware of this, but I

22    presume you are, you are aware that Debra Wellman had

23    to seek psychological treatment with several doctors

24    in the EAP program that was a DuPont Medical program,

Paul R. Graves

44

1   complete the transfer?

2   A.   No, not to my recollection.

3   Q.   She wouldn't refer it to you, it was an HR

4   decision probably?

5   A.   I can just say there were no instances where I

6   was asked for input.

7   Q.   Was there a key card access to the Kalrez

8   plant?  Was that something --

9   A.   Kalrez plant?

10  Q.   Well, to the Kalrez DDE site at Tralee Park.

11  A.   At Tralee Park, yes, there was a key card

12  entry.

13  Q.   Was there one at Technical Park?

14  A.   Yes.

15  Q.   Did you require cards to be returned so that

16  people wouldn't have access to the sites at any time?

17  A.   We did a re-keying of the system because we

18  learned that we really didn't have an understanding of

19  who had keys and who did not have keys.

20  Q.   So, it's an inventory thing?

21  A.   It was an inventory thing where we pulled back

22  keys and gave people new keys so we could start from a

23  fresh start knowing exactly who had keys and who did

24  not.



Paul R. Graves

45

1    Q.    Have you ever been on a leave of absence due to

2    a disability yourself?

3    A.    No.

4    Q.    Are you married?

5    A.    Yes.

6    Q.    I may have asked you this, have you ever had a

7    sexual harassment charge lodged against you?

8            MR. WILLOUGHBY:  He already answered.  He

9    said no.

10   BY MR. STULL:

11   Q.    You said no as to a sexual harassment charge?

12           MR. WILLOUGHBY:  He never had one filed

13   against him at all.

14   BY MR. STULL:

15   Q.    Is that true?

16   A.    That's correct.

17   Q.    Ms. Wellman insists that this particular

18   statement was written in bold red ink and you had her

19   read it over and over again during her DOC in 2002.

20   Do you recall that?

21   A.    Do I recall it was in red ink?  Yes.

22   Q.    Then, you had her read it over and over again

23   more than once?

24   A.    I do not have that recollection.

Paul R. Graves

46

1    Q.   You don't recall having required her to read

2  it?

3    A.   That's correct.

4    Q.   Did you feel that at any time Ms. Wellman had

5  done some wrong activity or done some work activity

6  erroneously or have some objection to her work?

7              MR. WILLOUGHBY:  During the DOC?

8              MR. STULL:  Yes, focusing on the DOC.

9  BY MR. STULL:

10   Q.   Was she a bad employee?

11             MR. WILLOUGHBY:  That's a different

12  question.

13             MR. STULL:  All right, I'll repeat it.

14  BY MR. STULL:

15   Q.   Did you ever consider her work activity

16  erroneous or wrong or have some other basis to object

17  to it?

18   A.   There were several cases where she could have

19  done better.

20   Q.   And what were they if you recall?

21   A.   I think they're spelled out in the documents.

22  Part of it is communication.  Part of it relates to

23  the working more closely with the managers.  Part of

24  it was with her relationships with other employees.

Paul R. Graves

47

1    Q.    At Tralee -- I mean, the Delaware Technical

2    Park?

3    A.    And other sites that had interaction.

4    Q.    They would call in and communicate by phone?

5    A.    Yes, or visit face-to-face.

6    Q.    These are other references that she claims were

7    made to her that she was a spy.

8              MR. WILLOUGHBY:  Did he ever --

9    BY MR. STULL:

10   Q.    Did you ever call her a spy?

11   A.    No.

12   Q.    That she was a DuPont mole that was going to

13   steal Insight Technology?

14   A.    No.

15   Q.    And the Engage is another product of this

16   operation, DDE?

17   A.    It was another product of DuPont Dow

18   Elastomers.

19   Q.    Did you ever make sexual advances to Ms.

20   Wellman?

21   A.    No.

22   Q.    Did you ever gyrate in front of her as in close

23   proximity to Ms. Wellman?

24   A.    No.



Paul R. Graves

48

1   Q.   In some sexual way, forum?  No?

2   A.   No.

3   Q.   While she was on disability did you request

4   that she come back to her job still reporting to you?

5   A.   I do not remember ever having made that

6   request.

7   Q.   In other words, she was on disability and that

8   was acceptable from a job standpoint?

9          MR. WILLOUGHBY:  What do you mean

10  "acceptable from a job standpoint"?

11  BY MR. STULL:

12  Q.   I mean, she wasn't there and you accommodated

13  it apparently?

14         MR. WILLOUGHBY:  He already testified that

15  the duties were divvied up with other people.

16  BY MR. STULL:

17  Q.   Let me just ask a personal -- most of this is

18  personal, but has your career been affected by any of

19  this allegation of sexual abuse of Ms. Wellman as far

20  as you know?

21         MR. WILLOUGHBY:  As far as he knows?

22         MR. STULL:  Yes.

23  BY MR. STULL:

24  A.   I have no knowledge that it has.

Paul R. Graves

49

1            MR. STULL:  Do you want to take a break?

2            MR. WILLOUGHBY:  If you are not done, we'll

3    take about a ten-minute break.

4            (Brief recess.)

5    BY MR. STULL:

6    Q.   I've got to ask you some questions that emanate

7    from Ms. Wellman and if you are not in agreement just

8    let me know, let the record show it.  At one point

9    during the DOC matter, which is the discussion of

10   contribution in 2002, January time frame, the review

11   occurred in a room where there were two chairs and she

12   claims you pulled your chair up real close to her and

13   had physical contact with her.  Is that true or you

14   deny that?

15   A.   Well, there were more than two chairs in that

16   room.

17   Q.   But you were in one and she was in the other?

18   A.   Yeah, I was in a chair and she was in a chair,

19   but it was not a room with two chairs in it.

20   Q.   Skipping over that you were next to her closer

21   than you are to Counsel there?

22   A.   Probably not.

23   Q.   Probably not?

24   A.   We were not closer than this.

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

A260

Paul R. Graves

50

1    Q.   That's, what, roughly a foot?

2              MR. WILLOUGHBY:   I'd say more like 18

3    inches.

4    BY MR. STULL:

5    A.   I think the question was was I closer and the

6    answer is no.

7    Q.   Did you drag your chair close to hers and force

8    yourself into her personal space --

9    A.   No.

10   Q.   -- by being in a chair next to hers?

11   A.   No.

12   Q.   Now, did you say I hope you are not suprised

13   during the DOC in a loud voice because you said I do

14   not have anything good to report to you -- report for

15   your DOC this year, Steve Metaxas told me all about

16   you?  Are those words that you recall?

17   A.   No.

18   Q.   He then brought his chair over and -- I'm

19   asking you did you say the following, "We are going to

20   be really close today, really close," during the DOC?

21   A.   No.

22   Q.   Did you put the arm of his chair on the top --

23   of your chair on the top of her chair to interlock the

24   chairs?

Paul R. Graves

51

1    A.    No.

2    Q.    This was a long DOC according to Ms. Wellman,

3    it was over two hours, do you recall that?

4    A.    No.

5    Q.    Did you say the following, "Because we are

6    getting to the bottom of this today and you are not

7    leaving this office until you tell me who you know at

8    DuPont."  Were you accusing her of being a spy for

9    DuPont --

10   A.    I don't have any recollection.

11   Q.    -- of that?

12   A.    Of that.

13   Q.    Did you body slam her?

14   A.    No.

15   Q.    Did you say the following to her, "Who sent

16   you," meaning Debra Wellman, "Who sent you here from

17   DuPont, you are a spy for DuPont"?

18   A.    I have no recollection of that.

19   Q.    Of that statement?  "I can fire you."

20   A.    I have no recollection of that.

21   Q.    The following was attributed to your

22   statements, "No one in the entire group knows what you

23   do here.  No one thinks you are of any value or

24   helpful.  Rick Bond and Steve Metaxas feel the same

Paul R. Graves

52

1    way as I do."

2    A.    I have no recollection of that.

3    Q.    Did you ever claim that you did not want HR

4    involved in a work situation at the Delaware Technical

5    Park to involve Ms. Wellman?

6    A.    No.

7    Q.    Did you ever make a statement to her of that

8    sort?

9    Q.    Did you ever hear of the fact that Alex

10   Bonfante called you Mr. Sensitivity?

11   A.    No.

12   Q.    Did you ever have Ms. Wellman stand on a ladder

13   and stack boxes up on a set of shelves?  Do you recall

14   that situation?

15   A.    I had her clean the area where we kept a number

16   of different things, including boxes, and I had her

17   straighten up that room, which involved putting boxes

18   on the shelf.

19   Q.    And you were in the room?

20   A.    I remember on one occasion being in the room

21   while she was attempting to try to organize it.

22   Q.    Did any other female ever accuse you of being

23   abusive --

24   A.    No.



Paul R. Graves

53

1    Q.    -- that was within your management control?

2    A.    No.

3    Q.    Were you ever in a meeting with Karen Cronin

4    and Ms. Wellman regarding the discussion of

5    contributions discussion?

6              MR. WILLOUGHBY:  Was he ever in a meeting

7    where the three of them were together?

8              MR. STULL:  Three of them were together.

9    BY MR. STULL:

10   A.    Where the three of us were together discussing

11   a discussion of contribution?

12   Q.    Yes.

13   A.    Not to my recollection.

14   Q.    Was there any dispute or discussion or argument

15   with Ms. Wellman while Karen Cronin was in the room?

16   A.    Not to my recollection.

17   Q.    Did you dialogue with Ms. Cronin on HR matters

18   every week or periodically?

19   A.    Approximately once per month.

20   Q.    Did you ever realize that Ms. Wellman resorted

21   through HR to resolve some emotional problems that she

22   had while she was under your management influence?

23   Are you aware she went through the DuPont EAP to

24   resolve these issues?



Paul R. Graves

54

1    A.    Not before she left.

2    Q.    Your first recollection was that she is not

3    here and why isn't she here?  What was your awareness?

4    A.    I got a voicemail from her on the morning --

5    first morning when she didn't come in to say that she

6    was ill and she would not be in that day.

7    Q.    Were you aware that she was advised at some

8    point not to come back to that job because of her

9    psychiatric imbalances?

10              MR. WILLOUGHBY:  I object, that has been

11   asked and answered already several times.

12              MR. STULL:  He said he didn't know anything

13   about it.

14              MR. WILLOUGHBY:  He already answered it.

15   It's on the record.

16   BY MR. STULL:

17   Q.    Do you know Michael Sherman?

18   A.    No.

19   Q.    Do you know Dr. Cameron at Haskell lab?

20   A.    No.

21   Q.    Were you ever aware of any other employees

22   touching Ms. Wellman's breasts?

23   A.    No.

24   Q.    Did you ever squeeze Ms. Wellman's hand so hard

Paul R. Graves

55

1    that it hurt her that you are aware that it hurt her?

2    A.    No, not to my awareness.

3    Q.    Did you ever tell her or threaten her by

4    saying, I will knock you back so hard that you will

5    not know what hit you?

6    A.    No.

7    Q.    You deny that?

8    A.    I deny that.

9    Q.    You didn't say it at least three times during

10   this meeting?

11             MR. WILLOUGHBY:   The DOC meeting?

12             MR. STULL:   This was August 2001, which was

13   prior to the DOC meeting.

14   BY MR. STULL:

15   Q.    "He said that threatening phrase three times

16   during that meeting."

17   A.    No.

18   Q.    You didn't ever move your physical frame next

19   to her so that you would be touching her body with

20   your physical frame?

21   A.    No.

22   Q.    Your physical body, you never did that is what

23   you are saying?

24   A.    No.



1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DEBRA-ANN WELLMAN,                    )
                                      )
             Plaintiff,               )
                                      )   Civil Action
v.                                    )   No. 05-278-SLR
                                      )
DUPONT DOW ELASTOMERS, LLC.,          )
                                      )
             Defendant.               )


          Deposition of KAREN R. CRONIN taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, 1000 West Street, 17th
Floor, Wilmington, Delaware, beginning at 10:00 a.m.
on Friday, March 23, 2007, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.

APPEARANCES:


      JOHN M. STULL, ESQUIRE
        1300 North Market Street, Suite 700
        Wilmington, Delaware  19801
        For the Plaintiff


      BARRY M. WILLOUGHBY, ESQUIRE
      YOUNG, CONAWAY, STARGATT & TAYLOR
        1000 West Street, 17th floor
        Wilmington, Delaware  19801
        For the Defendant


            WILCOX & FETZER

   1330 King Street -  Wilmington, Delaware 19801

            (302) 655-0477

            www.wilfet.com



Karen R. Cronin

4

1   Q.   You have been employed at DuPont for how many

2  years?

3   A.   I've been with the DuPont Company since October

4  of 2006.

5   Q.   Prior to that what was your employment?  Who

6  were your -- who have been your employers, I would

7  like to know that?

8   A.   I worked for Hercules, Incorporated from 1988

9  to 1996.  I worked for Zeneca Pharmaceuticals, 1996 to

10  1999, and then DuPont Dow Elastomers, which is now

11  DuPont Performance Elastomers from 1999 to 2006.

12   Q.   DDE or DuPont Dow Elastomers was still in

13  existence in 1999 and '06?

14   A.   It was '99 to July of 2005 and then it became

15  DuPont Performance Elastomers.

16   Q.   What was your subject matter in Creighton, I

17  mean, what was your college training?

18   A.   I have a bachelor of science in business

19  administration.

20   Q.   Was the DDE, DuPont Dow Elastomers, involved

21  with any specific product that you are remembering

22  when you were there, for instance, Kalrez?

23   A.   There were a number of products that DuPont Dow

24  Elastomers sold.  Kalrez was one of them.

Karen R. Cronin

15

1  A.   I don't have specific knowledge about the

2  agreement, but I do know it was a 50/50 joint venture.

3  There was 50 percent ownership by DuPont and 50

4  percent ownership by Dow.

5  Q.   Were you familiar with the accounting processes

6  that the two companies used to operate their joint

7  venture?  Do you have any contact --

8  A.   Specifically, no.

9  Q.   Did you ever see this particular document here

10  that I'm just going to make that an exhibit, I guess,

11  as Exhibit 1?

12          MR. STULL:  This Exhibit 1 is described as

13  a set of material relations and descriptions and

14  definitions dealing with the accounting definition.

15          MR. WILLOUGHBY:  I'm looking at a letter to

16  John Stull from Deb Wellman regarding a document

17  request from Potter Anderson presumably in connection

18  with a different lawsuit.

19          MR. STULL:  Well, it has the same

20  relationship as to this lawsuit that we have --

21          MR. WILLOUGHBY:  If you have a question

22  about the document we can --

23          MR. STULL:  Yes, I do.

24          (Cronin Deposition Exhibit No. 1 was marked

Karen R. Cronin

31

1    A.    What I recall telling her is that because she

2    had raised some allegations I needed to go ahead and

3    speak with Kitty.  I needed to go ahead and start the

4    investigation by speaking with Paul and some of the

5    other people that she had raised and that I would want

6    to get back with her at another time to continue the

7    investigation with her.

8    Q.    Did you contact Kitty and Paul you said?

9    A.    Yes.

10    Q.    You contacted her again, I take it, you said?

11    A.    I tried.

12    Q.    What was the reason you couldn't get to her?

13    A.    She stopped coming to work.

14    Q.    Do you recall the reason she stopped coming to

15    work in 2002 I guess?  Is that the time frame?

16    A.    Yes.

17              MR. WILLOUGHBY:  The reason Ms. Wellman

18    gave for not coming to work?

19    BY MR. STULL:

20    Q.    Were you familiar with any specific reason that

21    she stopped coming to work?

22    A.    We eventually heard from DuPont Medical that

23    Deb had stopped in to see them, I believe it was a

24    Monday, and that she was having some medical issues

Karen R. Cronin

32

1  that day and that DuPont Medical had recommended that

2  she go see her personal physician at her earliest

3  opportunity and that she would not be at work that

4  day.

5  Q.   Did she come back to work?

6  A.   No.

7  Q.   That was the end of it, I mean, her DDE

8  employment ended by her stopping coming to work

9  according to what you recall?

10  A.   What I recall is that eventually there was

11  enough medical documentation that supported her being

12  put on short-term disability.  She was on short-term

13  disability for six months plus an extension and upon

14  being cleared for work she would not return.

15  Q.   Did she try to come back?

16  A.   Not that I'm aware of.

17  Q.   So, I take it after her short-term disability

18  she is now a candidate for long-term disability?

19  A.   If she applied and was approved for long-term

20  disability that is the standard for any employee who

21  has exhausted their short-term disability benefits.

22  Q.   So, she should have requested an application?

23  A.   I can't say she didn't.

24  Q.   The process required her to make an