IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DEBRA-ANN WELLMAN,   )
           )
   Plaintiff,    )
           )
 v.        )  Civil Action No. 05-278-SLR
           )
DUPONT DOW ELASTOMERS, LLC, )
           )
   Defendant.   )

# REDACTED

## APPENDIX TO
## DEFENDANT'S OPENING BRIEF IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Barry M. Willoughby (I.D. No. 1016)
Teresa Cheek (I.D. No. 2657)
Margaret M. DiBianca (I.D. No. 4539)
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
Telephone: (302) 571-6666
Telecopier: (302) 576-3345
Email: bwilloughby@ycst.com;
Attorneys for Defendant

DATED: August 10, 2007

# TABLE OF CONTENTS
## DEFENDANT'S APPENDIX DOCUMENTS

DuPont Dow Elastomers LLC Sexual Harassment Policy ...............................................A1

DuPont Dow Elastomers LLC Harassment Policy .........................................................A3

DuPont Dow Elastomers LLC Employee Conduct and Work Rules Policy ...................A5

Formation Agreement dated April 1, 1996 ......................................................................A6

Excerpts from Formation Agreement dated April 1, 1996 ...........................................A18

Krapels Memo to Wellman dated November 1, 1996 ...................................................A21

DuPont Dow Elastomers, LLC v. Chem. Workers Assoc., Inc.,
332 NLRB 98 (Oct. 31, 2000) ......................................................................................A23

Wellman Job Profile dated May 1, 2001 ......................................................................A38

Wellman Email to Cronin dated January 23, 2002 ......................................................A40

Wellman Email to Cronin dated January 23, 2002 ......................................................A42

REDACTED ...............................................................A44

LaPenta Memo to Shaw dated February 20, 2002 .......................................................A45

LaPenta Letter to Wellman dated March 6, 2002 .........................................................A48

LaPenta Memo to Graves regarding Wellman Allegations dated April 18, 2002 ..........A50

Graves Email regarding Return of Wellman dated April 18, 2002 ...............................A54

Whatley Email to Wellman dated April 23, 2002 (*Partially Redacted*)........................A55

REDACTED .................................................................A59

LaPenta Letter to Wellman dated May 8, 2002 ............................................................A60

REDACTED .................................................................A61

REDACTED .................................................................A62

| | |
|---|---|
| REDACTED .................................................... | A70 |
| Cronin Report on Investigation dated May 29, 2002 .................................................... | A78 |
| LaPenta, McDaniels, Bowman and Wellman Emails dated May 30, 2002 ................... | A93 |
| Sherman Email to LaPenta Re: Wellman's Return to Work dated May 31, 2002 (***Partially Redacted***) .................................................... | A94 |
| LaPenta, Flaim and McDaniels Emails dated June 3, 2002 ............................................ | A95 |
| LaPenta Letter to Wellman dated June 3, 2002 .................................................... | A96 |
| Sherman Email to LaPenta and Shaw dated June 4, 2002 .............................................. | A97 |
| Barham Email to Shaw dated July 1, 2002 .................................................... | A98 |
| REDACTED .................................................... | A99 |
| LaPenta Letter to Wellman dated July 12, 2002 .................................................... | A100 |
| Wellman Letter to Barham dated August 15, 2002 .................................................... | A101 |
| Charge of Discrimination dated August 15, 2002 (***Partially Redacted***) ...................... | A102 |
| LaPenta Letter to Wellman dated August 16, 2002 .................................................... | A109 |
| Cresto Email to Brown dated August 16, 2002 (***Partially Redacted***) ......................... | A110 |
| LaPenta Letter to Wellman dated August 23, 2002 .................................................... | A112 |
| LaPenta Letter to Wellman dated August 26, 2002 .................................................... | A113 |
| LaPenta Letter to Wellman dated August 26, 2002 .................................................... | A115 |
| REDACTED .................................................... | A117 |
| Wellman Notes Re: Preliminary Back-to-Work Meeting dated September 27, 2002 .................................................... | A118 |
| Amended Charge of Discrimination dated October 2, 2003 (***Partially Redacted***) ....... | A121 |
| EEOC Dismissal and Notice of Rights dated February 22, 2005 ................................. | A127 |
| DuPont Dow Elastomers LLC Answer to Complaint dated May 5, 2005 .................... | A128 |
| Astra Zeneca Email dated September 28, 2006 .................................................... | A133 |

Astra Zeneca Internal Memo dated February 3, 2006 ...................................................A137

Wellman v. Dow Chem. Co., C.A. 05-280, Order
dismissing Compl. against Dow, March 20, 2007 ......................................................A139

REDACTED ........................................................A143

Photograph of ladder Wellman Deposition Ex. 13 .......................................................A163

Excerpts from the Deposition Transcript of Debra-Ann Wellman
dated October 12, 2006 ..................................................................................................A164

REDACTED ........................A182

Excerpts from the Deposition Transcript of Debra-Ann Wellman
dated December 4, 2006 .................................................................................................A190

Excerpts from the Deposition Transcript of Debra-Ann Wellman
dated December 5, 2006 .................................................................................................A218

Excerpts from the Deposition Transcript of Paul R. Graves
dated March 23, 2007 .....................................................................................................A249

Excerpts from the Deposition Transcript of Karen Cronin
dated March 23 2007 ......................................................................................................A267







DEPOSITION
EXHIBIT
WELLMAN-6 for
id. cmv-13/4/12

# DUPONT DOW ELASTOMERS L.L.C.

## 2.1 Sexual Harassment

Our employees' personal safety and dignity and their ability to perform their jobs effectively, without distractions and interference, are of prime concern to DuPont Dow. The company considers it essential to provide a safe, professional, productive and non-threatening work environment. It is DuPont Dow's policy that all employees have a right to work in an environment free of sexual harassment. The company will not tolerate sexual harassment of its employees in any form. All employees must avoid offensive or inappropriate sexual and/or sexually harassing behavior at work. Line management is responsible for ensuring that the workplace is free from sexual harassment.

Specifically, the company prohibits the following:

- Unwelcome sexual advances;

- Requests for sexual favors, whether or not accompanied by promises or threats with regard to the employment relationship;

- Other verbal or physical conduct of a sexual nature made to any employee that may threaten or insinuate that any employee's submission to or rejection of sexual advances will in any way influence any personnel decision regarding that person's employment, evaluation, wages, advancement, assigned duties, shifts or any other condition of employment or career development;

- Any verbal or physical conduct that has the purpose or effect of substantially interfering with the employee's ability to do his or her job; and

- Any verbal or physical conduct that has the purpose or effect of creating an intimidating, hostile or offensive working environment.

Such conduct may result in disciplinary action up to and including dismissal.

Other sexually harassing conduct in the workplace, whether physical or verbal, committed by supervisors or non-supervisory personnel is also prohibited. This behavior can include but is not limited to: commentary about an individual's body; the use of sexually degrading words to describe an individual; offensive comments; off-color language or jokes; innuendoes; and sexually suggestive objects, books, magazines, photographs, cartoons or pictures.

Employees who have complaints of sexual harassment by anyone at work, including any supervisor, co-employee, customer, client, or other business associate, should act immediately and report such conduct to their supervisor so that the company may investigate and resolve the problem. If the complaint involves the employee's supervisor or

investigate and resolve the problem. If the complaint involves the employee's supervisor or someone in the direct line of supervision, or if the employee for any reason is uncomfortable in dealing with his or her immediate supervisor, the employee may go to any another supervisor or directly to Human Resources.

The company will endeavor to investigate all complaints as expeditiously and as professionally as possible. Where investigations confirm the allegations, appropriate corrective action will be taken.

The company will make every attempt to keep the information provided to it in the complaint and investigation process confidential to the fullest extent permitted by the circumstances.

Retaliation against employees for reporting sexual harassment or assisting the company in the investigation of a complaint is against the law and will not be permitted. Retaliation can include but is not limited to such acts as: refusing to recommend an employee for a benefit for which he or she qualifies; spreading rumors about the employee; encouraging hostility from co-workers; and escalating the harassment.

---

Content Editor: Pat Bowhall                          Last Update: 01/27/2000 15:53:40
URL of this page: http://www1.dupont-dow.com/policies/HR/2-1_sexualharassment.html

**DuPont Dow elastomers**





# DUPONT DOW ELASTOMERS L.L.C.

## 2.2 Harassment

**PRINCIPLE:**

Our company will not tolerate the harassment of any employee--whether the initiator is another DuPont Dow Elastomers employee, customer, client, or other business associate. Our employees' personal safety and dignity and their ability to perform their jobs effectively, without distractions and interference, are of prime concern. Therefore, it is essential to provide a safe, professional, productive and non-threatening work environment.

**GUIDELINES:**

- It is the responsibility of the employee to immediately report suspected cases of harassment to their local line organization or site and/or Company Human Resources.

- All instances of harassment will be handled with a strict "need to know" confidentiality, and the privacy of all parties involved will be respected, to the extent possible.

- All harassment complaints will be investigated thoroughly and promptly by line supervision or site and/or Company Human Resources, and appropriate action will be taken.

- Harassment can include but is not limited to:

    1. Racially oriented jokes, slurs or remarks
    2. Mimicking mannerisms in a demeaning manner.
    3. Demeaning behavior or use of overly familiar labels.
    4. Pranks.
    5. Overt discriminatory practices.
    6. Exclusion or isolation.
    7. Repeated flirtation, advances, or propositions.
    8. Offensive or inappropriate touching or behavior.
    9. Physically intimidating or threatening behavior.
    10. Obscene letters and calls.
    11. Obscene, offensive jokes, gestures, or suggestions.
    12. Ignoring, or not taking seriously, an employee who complains about harrassment.

Content Editor: Pat Bowhall                                    Last Update: 01/27/2000 15:55:54
        URL of this page: http://www1.dupont-dow.com/policies/HR/2-2_harassment.html

**DuPont Dow elastomers**

Dupont Dow Elastomers/Policies, Procedures & Manuals - Globa...: Flexible Work Practice  Page 1 of 2





# Policies, Procedures, & Manuals

### GLOBAL HR PROCEDURES & INFO

## DUPONT DOW ELASTOMERS L.L.C.

## 2.3 Employee Conduct and Work Rules

### 2.3 PRINCIPLE:

To ensure orderly operations and provide the best possible work environment for all employees, it is expected that employees will follow rules of conduct that will protect the interests and safety of all employees and the organization.

### 2.3 POLICY:

As it is not possible to list all forms of behavior that are considered unacceptable in the workplace, the following are examples of misconduct that may result in disciplinary action, up to and including termination of employment.

1. Violations of safety rules, practices or policies.
2. Dishonesty.
3. Engaging in hostile, abusive, threatening, or disrespectful behavior or gestures while engaged in activities on behalf of the Company, including physical or mental intimidation, threats, or other forms of harassment.
4. Falsification of timekeeping or any company records, including the giving of false information when hired.
5. Engaging in a fight in the workplace or on site property or in activity that could provoke fighting.
6. Reporting to work under the influence of drugs or alcohol.
7. Use or possession of weapons, ammunition, explosives, intoxicants, alcohol, illicit drugs or narcotics on site property.
8. Insubordination, including deliberate refusal to comply with reasonable requests or instructions.
9. Unauthorized absence from work.
10. Conduct which violates common decency or morality.
11. Horseplay, or malicious mischief on site property.
12. Theft, unauthorized possession/removal, or attempted removal of company property, or property belonging to employees, contractors, vendors, or visitors.
13. Misuse of company proprietary information.
14. Sleeping during working hours.
15. Intentional damage to Company, employee, contractor, or vendor property.
16. Bringing "strike anywhere" matches on a manufacturing site, or having any type of match, cigarette lighter or flame-producing device in restricted areas.
17. Smoking except in designated "smoking" areas.
18. Use of Company electronic communications resources (email, internet access, desktop/laptop/mainframe computers, servers, networks, plant and laboratory automation and process control equipment) which violates DuPont Dow's core values and policies, including such things as sexual, racial or other types of harassment and discrimination, and access to sexually-oriented and other inappropriate material.

Content Editor: Pat Bowhall                    Last Update: 09/17/2000 16:05:59
URL of this page: http://www1.dupont-dow.com/policies/HR/2-3_empconduct.html

# FORMATION AGREEMENT

This Formation Agreement is made and entered into as of this first day of April, 1996, among The Dow Chemical Company, a corporation organized and existing under the laws of the State of Delaware ("Dow"); E. I. du Pont de Nemours and Company, a corporation organized and existing under the laws of the State of Delaware ("DuPont"); Wenben Inc., a corporation organized and existing under the laws of the State of Delaware ("Wenben"); and DuPont Elastomers, Inc., a corporation organized and existing under the laws of the State of Delaware ("DEI").

## WITNESSETH:

WHEREAS, Dow and DuPont executed a Letter of Understanding dated January 16, 1995, setting forth the intention of Dow and DuPont to conduct good faith negotiations to form a joint enterprise for the design, research, development, manufacture, distribution, marketing and sale of Elastomers (as defined below);

WHEREAS, Dow and DuPont, through Wenben and DEI, organized DuPont Dow Elastomers L.L.C., a limited liability company organized under the laws of the State of Delaware and in accordance with the Delaware Limited Liability Company Act ("DD Elastomers"), as the vehicle for establishing the joint enterprise envisioned in the Letter of Understanding; and

WHEREAS, Dow and DuPont desire to transfer certain tangible and intangible assets to DD Elastomers currently used by Dow and DuPont and their respective Affiliates (as defined below) for the design, research, development,

KJ/Project Mayflower Confidential                    -1-                         Rev 9/D
March 8, 1996                                                                    FINAL

D00456

A6

ARTICLE XIII

HUMAN RESOURCES MATTERS

Section 13.01.    <u>Human Resources Philosophy</u>.    Dow and DuPont recognize that the success of the Venture will depend largely on the quality of the employees that they will transfer to the Venture and the careful selection of persons to fill key positions. Dow and DuPont will endeavor to balance the selection of persons for key positions equally between Dow and DuPont employees, recognizing that these persons must have the capability to establish a new entrepreneurial culture for the Venture. The DD Elastomers management team shall be responsible for filling other management positions in DD Elastomers and the Venture.

Dow and DuPont anticipate that most of the personnel presently involved in the Dow Elastomer Business or the DuPont Elastomer Business will become employees of the Venture. The parties, however, recognize that there may be overlaps or that it may be more efficient to have employees in certain functions remain with their current employers and provide services to the Venture on a contract basis. Dow and DuPont will work together to identify these overlaps and efficiencies prior to Closing, with a bias toward (a) having the optimum number of employees become employed by the Venture and (b) ensuring that Venture management has control over those services or functions that are unique to the Combined Elastomer Business. Dow and DuPont shall be responsible for any of their respective employees who provide services to the Venture on a contract basis in accordance with Section 13.06.

D00457

A7

Section 13.02.    <u>Transfer of Employees to the Venture.</u>    (a)    Except as provided in Section 8.13, the Venture shall offer employment effective as of the Closing Date to substantially all of the following persons ("Elastomer Employees"):

    (i)    Employees of Dow and its Affiliates principally dedicated to the design, development, manufacture, marketing, distribution and sale of Dow Products in the Dow Elastomers Business; and

    (ii)    Employees of DuPont and its Affiliates principally dedicated to the design, development, manufacture, marketing, distribution, and sale of DuPont Products in the DuPont Elastomers Business.

Dow and DuPont will use their best efforts to cause such Elastomer Employees to accept such employment, and shall provide the Venture with information as to the title and current compensation levels of such employees and assist the Venture in effecting the change of employment in an orderly fashion.

    (b)    The offers of employment to the Elastomer Employees shall include compensation and benefits substantially equivalent in the aggregate to the DuPont Plans or Dow Plans in which they participated immediately prior to the Closing Date. Dow and DuPont shall be responsible for the salary and benefits of their respective Transferred Employees for the period up to and including the Closing Date; the Venture shall be responsible for the salary and benefits of the Transferred Employees after the Closing Date; <u>provided, however,</u> that Dow and DuPont in accordance with the respective terms and conditions of their variable compensation plans will select certain Transferred Employees and be responsible for a proportional share of the 1996 variable compensation award. Such shares shall be determined by multiplying the award by a fraction, the numerator of which shall be

D00458

A8

the number of months of employment in 1996 with Dow or DuPont, as applicable, and the denominator of which shall be twelve. Transferred Employees selected for an award will receive the prorated award when each of Dow and DuPont pays all other awards under their respective variable compensation plans.

(c)     Dow and DuPont recognize that it may be necessary from time to time to provide employees to the Venture on a non-permanent basis. This practice, however, will be on an exception basis; Venture employees should expect to make their careers within the Venture and not transfer back to Dow or DuPont. Dow and DuPont will not offer employment to Venture employees without first consulting with Venture management.

Section 13.03.     Credit for Prior Service.     The Venture shall recognize the past service of the Transferred Employees with Dow or DuPont under the respective benefit plans and where applicable, their respective Affiliates on and prior to the Closing Date for the purposes of eligibility, vesting and benefit accrual in the comparable employee benefit plans, programs or policies adopted by the Venture; provided, however, that credit for accrual in qualified pension plans will be subject to the transfer of assets from the qualified plans of Dow or DuPont to the corresponding qualified plans of the Venture. Transferred Employees who retire under the Dow or DuPont qualified pension plan will receive service credit only for the purpose of vesting and limited eligibility.

Section 13.04.     Establishment of Pension, Benefit and Other Programs.

(a)     Effective as of the Closing Date, the Venture shall adopt the DuPont Plans listed in Schedule 13.04 and DuPont shall allow the Venture to participate in the DuPont Plans until such time as the Venture establishes other

D00459

A9

plans and programs; provided, however, Transferred Employees of Dow, on a site-by-site basis, may continue in the Dow medical and dental plans until December 31, 1996. DD Elastomers shall withhold applicable premiums for the Transferred Employees of Dow who continue in the Dow medical and dental plans and reimburse Dow for the cost of such benefits for such employees. Dow and DuPont will work with Venture management to develop plans and programs that are competitive and consistent with industry standards and that facilitate the development of a unique culture for the Venture, and in accordance with applicable law. Effective as of the Closing Date, the Venture shall adopt a defined benefit Pension Plan ("Venture Pension Plan") qualified under Section 401(a) of the Code substantially comparable in all material respects to DuPont's Pension and Retirement Plan, except as necessary to preserve accrued benefits of Transferred Employees from Dow, and shall take any action necessary or appropriate to participate in the DuPont Master Trust and to appoint the DuPont Vice-President Pension Fund Investment as the named fiduciary of the Venture Pension Plan.

(b)    Upon retirement from the Venture, an employee will receive post-retirement benefit coverage in effect at the time of their retirement (medical, dental and life insurance), subject to the rights of Dow, DuPont, or the Venture to amend, modify, or terminate any of their respective post-retirement benefit coverage at any time. The Venture and either Dow or DuPont will be responsible for their proportional share of any medical and life insurance benefits paid based on the employee's service. DuPont will be responsible for its proportionate share of any dental benefits paid based on the employee's service but Dow will not be responsible for its share of dental benefits.

(i)    Dow and DuPont shall reimburse the Venture for its proportionate share of any benefits paid under a post-

KJ/Project Mayflower Confidential
March 8, 1996

-136-

Rev 9/D
FINAL

D00460

A10

retirement benefit plan on behalf of a Transferred Employee who has not elected to retire under the Dow or DuPont retirement plan or his or her survivor. Such proportionate reimbursement shall be in an amount equal to the DuPont actual claims cost or the Dow "average cost" of medical benefits for a retiree (and dependents) or a survivor (and dependents), multiplied by a fraction equal to the employee's service with either Dow or DuPont divided by career service. The reimbursement for benefits shall be the lesser of the cost under the plan of Dow or DuPont or the Venture's plan, taking into account any applicable reduction factors or service schedule (the "Retiree Reimbursement Formula"). The Venture will incur the additional cost of any plan amendments or any changes in benefit plans which affect the expected allocation of the cost to the Venture. Dow and DuPont will assist the Venture in adopting a mutually agreeable procedure for administering reimbursement under this paragraph.

(ii) An employee who retires from either Dow or DuPont shall receive benefits from the Venture while an active employee of the Venture. Upon retirement from the Venture, the participant may choose to receive coverage from the Venture's plan or the plan of Dow or DuPont. Service at the Venture will not be credited to service accrued at DuPont for retiree medical purposes.

D00461

A11

However, service accrued at the Venture will be credited to service accrued at Dow for purposes of the retiree medical support schedule, provided that the Venture reimburses Dow for the proportional cost of such benefits according to the Retiree Reimbursement Formula. If the Venture provides post-retirement coverage, then Dow or DuPont shall reimburse the Venture a proportional share, based on service, of the cost of the participant's benefits according to the Retiree Reimbursement Formula. The Venture will incur the additional cost of any plan amendments or any changes in benefit plans which affect the expected allocation of the cost to the Venture.

(iii) The parties shall draft a series of examples illustrating this Section 13.04 as guidance for the plan administrators.

Section 13.05. <u>Transfer of Pension and Other Assets.</u> (a) After the receipt of an opinion of counsel stating that the Venture's Pension Plan is qualified under Section 401(a) of the Code and that the trust established under the Venture's Pension Plan is exempt from taxation under Section 501(a) of the Code or after the expiration of thirty (30) days waiting prescribed by Section 6058(a) of the Code, whichever is later, Dow and DuPont will cause the trustees of their respective pension plans to transfer to the Venture Pension Plan an amount in cash equal to the Projected Benefit Obligation ("PBO") under the Venture's Pension Plan of the Transferred Employees as of the Closing Date who do not retire prior to the Closing Date using all of the funding assumptions disclosed on the Schedule B attachment to the 1994 Form 5500 for Title I of the DuPont Pension and Retirement Plan except that

D00462

A12

the discount rate shall be 8.5% and the mortality table shall be the 1983 Group Annuity Mortality Table for healthy males and females, set back six years for females. Dow will cause its Trustee to transfer an amount to assure that at the assumed dates of termination of employment (consistent with the assumptions set forth in the 1994 Form 5500 for the DuPont Pension and Retirement Plan), sufficient assets are transferred to provide for the payment of the accrued benefit under the Dow Employees' Pension Plan as of the Closing Date. Interest at such rate from the Closing Date to the date of the transfer shall be included in the transfer amount.

In no event will the PBO of the Transferred Employees be less than the amount necessary to satisfy Section 414(l) of the Code. For the purpose of Section 414(l), the liabilities shall be calculated on a termination basis and shall be determined to equal the ABO using a discount rate determined using a bond immunization strategy similar to the strategy used by DuPont in determining its FAS 87 discount rate for pensions. All other assumptions for the purpose of 414(l) are the funding assumptions based on the 1994 Schedule B Form 5500 for Title 1 of the DuPont Pension and Retirement Plan.

If a Transferred Employee is terminated for lack of work during 1996 or 1997 for any reason other than the disposition of the business, then Dow and DuPont shall pay the Venture the value of the post-termination ABO less the value of the amount transferred pursuant to the first paragraph of this Section 13.05(a) determined as of the Closing Date. The ABO shall be determined as of the Transferred Employee's date of termination. Interest will accrue on such differential to the date of payment using the interest rate used to discount the obligations. If the amount to be paid is a negative value, then it shall be paid by the Venture to Dow and DuPont. The amount shall be determined at the end of the two-year period. For

D00463

A13

this purpose, any amounts owed shall be determined in accordance with the actuarial assumptions and protocol described above.

(b)    To the extent permitted by law, the DuPont Savings and Investment Plan will accept a direct rollover within the meaning of Section 401(a)(31) of the Code from The Dow Chemical Company Salaried Employees' Savings Plan and a transfer of promissory notes or other document evidencing loans to Transferred Employees.

(c)    As soon as practicable following the Closing Date, Dow and DuPont will transfer to the Venture promissory notes or other documents evidencing housing purchase assistance loans, loan guarantees, equity advances, equity loans, advances for closing and new hire loans of Transferred Employees, as listed in Schedule 13.05(c).  Upon the transfer of such notes, the Venture shall assume such loans and pay Dow and DuPont for the outstanding principal of the loans at the Closing Date.

Section 13.06.    <u>Leased or Temporary Employees.</u>    (a)    The employees listed in Schedule 13.06 shall provide services to or on behalf of the Venture in accordance with a seconding agreement between the Venture and Dow or DuPont and their respective Affiliates, as applicable.  Thereafter, the employee shall return to his or her respective employer; absent agreement to the contrary, the Venture shall have no further obligation to any such employee.

(b)    The Venture may establish a policy with Dow and DuPont after the Closing to allow movement of personnel between Dow or DuPont and their respective Affiliates and the Venture and to encourage the most qualified persons to work for the Venture.  The parties to any such arrangement specifically will agree on

D00464

A14

the terms and conditions of any such employment. The Members Committee shall approve the movement of personnel between the Venture and Dow or DuPont.

(c)     Dow and DuPont and their respective Affiliates may lease certain employees to the Venture for a period after the Closing Date and from time to time thereafter. Any such leased employees shall remain employees of their respective employers and shall provide services to the Venture in accordance with a seconding agreement between the Venture and the employer.

Section 13.07.     Relocation.     Certain Transferred Employees may need to relocate physically in order to perform their employment responsibilities for the Venture. The Venture shall develop a policy to cover the relocation costs of Transferred Employees whose travel to their principal place of work would increase more than thirty (30) miles due to the formation of the Venture. The Venture shall bear the costs of any and all such relocations.

Section 13.08.     Severance.     If any Elastomer Employee does not accept the employment offer from the Venture, then the employer of the Elastomer Employee immediately prior to the Closing Date shall remain responsible for such Elastomer Employee, including any severance payments. Each prior employer shall be responsible for any severance payments mandated by law as a result of transferring employees to the Venture.

Section 13.09.     Vacation.     Dow and DuPont shall permit Transferred Employees to request either a cash-out of the unused portion of their 1996 vacation entitlement which accrued up to the Closing Date or a transfer of the unused 1996 vacation entitlement to the Venture. Upon payment to the Venture by Dow and

D00465

A15

DuPont of the amount equal to the unused 1996 vacation liability attributable to the Transferred Employees who elected to transfer their unused vacation liability to the Venture, the Venture shall assume the liability for such vacation.

Section 13.10.    <u>Foreign Benefit Plans.</u>    Separate agreement will be entered into covering compensation, benefits, and severance payments to employees employed by foreign Affiliates of DuPont or Dow which shall be in conformance with applicable local laws and the principles set forth above.  Any bias toward adopting the benefit programs of a prior employer shall be based on simplicity and the relative number of employees covered by the plans.

Section 13.11.    <u>Offers of Employment in Europe.</u>    (a)    Dow and DuPont agree that the transfer of the Dow Elastomer Business and the DuPont Elastomer Business, insofar as such transfers are effected by Affiliates of Dow and DuPont, as appropriate, within any of the Member States of the European Union, constitute relevant transfers under the Directive, or under any enactment thereof in such of the Member States as the Directive is applicable.

(b)    Notwithstanding the other provisions of this Article XIII and of the Directive, the Venture has, or shall have prior to Closing, offered to all Elastomer Employees to whom the provisions of the Directive apply, employment on terms and conditions, including pension benefits, which the parties believe to be no less favorable to those applicable to their employment by the relevant Affiliate of Dow or DuPont, as appropriate.

Section 13.12.    <u>Future Transferred Employees.</u>    In the event that the employees at the Dedicated Facilities located on the Beaumont, Texas Integrated

D00466

The undersigned, DuPont Dow Elastomers L.L.C., as of this __1st__ day of April, 1996, hereby agrees to become a party to this Agreement, accepts the rights and obligations under this Agreement, and agrees to perform and abide by all of the provisions of this Agreement to be performed by or which are applicable to it.

DUPONT DOW ELASTOMERS L.L.C.

By _D. K. Duncan_

Name:  Donald K. Duncan

Title:  President and Chief Executive Officer

D00467

A17

ARTICLE XIII

HUMAN RESOURCES MATTERS

Section 13.01.    Human Resources Philosophy.    Dow and DuPont recognize that the success of the Venture will depend largely on the quality of the employees that they will transfer to the Venture and the careful selection of persons to fill key positions. Dow and DuPont will endeavor to balance the selection of persons for key positions equally between Dow and DuPont employees, recognizing that these persons must have the capability to establish a new entrepreneurial culture for the Venture. The DD Elastomers management team shall be responsible for filling other management positions in DD Elastomers and the Venture.

Dow and DuPont anticipate that most of the personnel presently involved in the Dow Elastomer Business or the DuPont Elastomer Business will become employees of the Venture. The parties, however, recognize that there may be overlaps or that it may be more efficient to have employees in certain functions remain with their current employers and provide services to the Venture on a contract basis. Dow and DuPont will work together to identify these overlaps and efficiencies prior to Closing, with a bias toward (a) having the optimum number of employees become employed by the Venture and (b) ensuring that Venture management has control over those services or functions that are unique to the Combined Elastomer Business. Dow and DuPont shall be responsible for any of their respective employees who provide services to the Venture on a contract basis in accordance with Section 13.06.

D00540

A18

Section 13.02.    <u>Transfer of Employees to the Venture.</u>    (a)    Except as provided in Section 8.13, the Venture shall offer employment effective as of the Closing Date to substantially all of the following persons ("Elastomer Employees"):

      (i)    Employees of Dow and its Affiliates principally dedicated to the design, development, manufacture, marketing, distribution and sale of Dow Products in the Dow Elastomers Business; and

      (ii)    Employees of DuPont and its Affiliates principally dedicated to the design, development, manufacture, marketing, distribution, and sale of DuPont Products in the DuPont Elastomers Business.

Dow and DuPont will use their best efforts to cause such Elastomer Employees to accept such employment, and shall provide the Venture with information as to the title and current compensation levels of such employees and assist the Venture in effecting the change of employment in an orderly fashion.

(b)    The offers of employment to the Elastomer Employees shall include compensation and benefits substantially equivalent in the aggregate to the DuPont Plans or Dow Plans in which they participated immediately prior to the Closing Date. Dow and DuPont shall be responsible for the salary and benefits of their respective Transferred Employees for the period up to and including the Closing Date; the Venture shall be responsible for the salary and benefits of the Transferred Employees after the Closing Date; <u>provided, however,</u> that Dow and DuPont in accordance with the respective terms and conditions of their variable compensation plans will select certain Transferred Employees and be responsible for a proportional share of the 1996 variable compensation award. Such shares shall be determined by multiplying the award by a fraction, the numerator of which shall be

D00541

the number of months of employment in 1996 with Dow or DuPont, as applicable, and the denominator of which shall be twelve. Transferred Employees selected for an award will receive the prorated award when each of Dow and DuPont pays all other awards under their respective variable compensation plans.

(c)    Dow and DuPont recognize that it may be necessary from time to time to provide employees to the Venture on a non-permanent basis. This practice, however, will be on an exception basis; Venture employees should expect to make their careers within the Venture and not transfer back to Dow or DuPont. Dow and DuPont will not offer employment to Venture employees without first consulting with Venture management.

Section 13.03.    <u>Credit for Prior Service</u>.    The Venture shall recognize the past service of the Transferred Employees with Dow or DuPont under the respective benefit plans and where applicable, their respective Affiliates on and prior to the Closing Date for the purposes of eligibility, vesting and benefit accrual in the comparable employee benefit plans, programs or policies adopted by the Venture; provided, however, that credit for accrual in qualified pension plans will be subject to the transfer of assets from the qualified plans of Dow or DuPont to the corresponding qualified plans of the Venture. Transferred Employees who retire under the Dow or DuPont qualified pension plan will receive service credit only for the purpose of vesting and limited eligibility.

Section 13.04.    <u>Establishment of Pension, Benefit and Other Programs.</u>

(a)    Effective as of the Closing Date, the Venture shall adopt the DuPont Plans listed in Schedule 13.04 and DuPont shall allow the Venture to participate in the DuPont Plans until such time as the Venture establishes other

D00542

A20

November 1, 1996

Personal and Confidential

To:      Debra-Ann Wellman

From:    T. G. Krapels

Subject:  Probation

In late October you reported to Susan Moran in Human Resources that: 1) your supervisor and a DuPont contractor were having an affair, 2) your supervisor and the contractor were acting unprofessionally and 3) that three business managers had told you that your supervisor was not vigorously negotiating raw material supply contract prices on behalf of the Company. A thorough investigation has been conducted to determine the truth of your allegations.

The investigation failed to substantiate any of the allegations you made about the behavior of your supervisor, your supervisor's wife or the contractor. Your statements regarding your interactions and conversations with your supervisor, the contractor and other co-workers - including the three business managers - have been denied by each of them without exception.

In recent months you have had difficulty interacting with another co-worker in your group. That situation arose from unsubstantiated allegations you made about the co-worker's involvement with your former husband, which were categorically denied by the co-worker. At that time you were counseled at length by Human Resources and you were encouraged to examine your role in the negative situation which your statements had created.

This summer you had difficulty working with a temporary secretary assigned to your group. In addition, the Company has received complaints about your unprofessional behavior from two outside vendors. These instances, all of which have occurred in the last six months, demonstrate a pattern of behavior which undermines teamwork and severely limits your productivity and the productivity of your work group.

Your unsubstantiated allegations about your supervisor and the contractor are very serious in nature, have been very disruptive and divisive in your work group and have caused severe anguish in their personal and work lives. Your actions have undermined your ability to interact with your colleagues and to perform your duties. The groundless allegations and speculation you have engaged in with respect to your co-workers' personal lives and conduct of Company business is unacceptable and will not be tolerated.

**D16**

A21

2

This letter will serve as formal notice that effective immediately, you are on probation for one year. If your performance, including your ability to interact with co-workers in a professional manner, does not improve or if you continue to make derogatory and unsubstantiated statements about the personal lives of any DuPont Dow Elastomers employees or contractors or their spouses, it will constitute grounds for immediate termination. Effective November 4, 1996, you will be moved to a position of equal level and pay at DuPont Dow's Tralee Park site, reporting to M. Kathleen Phillips.

Your performance will be closely supervised. The following are the specific measures you must take to maintain employment with the Company:

1) You will refrain from making statements about the personal lives or behavior of fellow employees, contractors or customers and their spouses;

2) You will work only during the "core" hours established by site management and will not work outside the core hours without Kathy Phillips' prior approval;

3) In the event you believe a co-workers' actions are not in compliance with the Company's Business Ethics Policy, you will report your beliefs directly to Kathy Phillips, Susan Moran, the General Counsel or the Chief Financial Officer, as provided in the Policy;

4) To the extent required by your job duties, you will interact with outside vendors in a considerate, professional manner and will report any problems or concerns you have about the vendors directly to Kathy Phillips;

5) You will carry out the instructions from your supervision;

6) You will not discuss with any employee of the Company other than Susan Moran or Kathy Phillips any element of the investigation, your allegations which led to the investigation or any of the participants in the investigation.

Deb, your disruptive behavior and allegations about your co-workers significantly limit your contribution due to the unwillingness of other employees to work with you. Kathy Phillips and I will work with you to improve your performance and monitor your progress against the above action plan. We hope you will be successful in improving your performance so you will be a productive contributor to your work group. Kathy will meet with you on a monthly basis to assess your performance and discuss your progress.

I have read and understand the conditions of my probation and that probationary period does not change the status of my at-will employment.

_C. Debra-Ann M. Wellman_

Debra-Ann Wellman                          November 1, 1996

2

D17

A22

1

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Dupont Dow Elastomers L.L.C., an alter ego of E. I. du Pont de Nemours and Company** *and* **Chemical Workers Association, Inc., Affiliate of International Brotherhood of Dupont Workers and Neoprene Craftsmen Union Local 788 and Dow Chemical Company.** Cases 9–CA–34028 and 9–CA–33536

October 31, 2000

DECISION AND ORDER

BY CHAIRMAN TRUESDALE AND MEMBERS FOX AND LIEBMAN

On December 17, 1997, Administrative Law Judge Irwin H. Socoloff issued the attached decision. The General Counsel, Charging Party Chemical Workers Association, and Charging Party Neoprene Craftsmen Union Local 788 each filed exceptions and supporting briefs. The Respondents each filed answering briefs. Charging Party Chemical Workers Association filed a reply brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings, and conclusions only to the extent consistent with this Decision and Order.

The issues presented in this case arise from the formation of a joint venture by Respondent E. I. DuPont De Nemours and Company (DuPont) and Party in Interest Dow Chemical Company (Dow). The complaint alleges that the Respondents, DuPont and joint venture DuPont Dow Elastomers L.L.C. (DDE), are alter ego companies or, alternatively, that DDE is a successor to DuPont at production plant sites in Deepwater, New Jersey and in Louisville, Kentucky. The complaint further alleges that the Respondents violated Section 8(a)(5) and (1) of the Act by unilaterally changing certain terms and conditions of employment for employees in bargaining units separately represented by the Charging Parties at these plants and by failing to provide the Charging Party Neoprene Craftsmen Union Local 788 with requested bargaining information about the DDE joint venture.

The judge found, and we agree, that DDE was not an alter ego of DuPont.[1] He noted that DDE was undisput-

edly a successor to DuPont within the meaning of *NLRB v. Burns Security Services*, 406 U.S. 272 (1972), and was therefore bound to recognize and bargain with the Unions. He further found, however, that DDE was not a "perfectly clear" successor, as that term from *Burns* was interpreted by the Board majority in *Spruce Up Corp.*, 209 NLRB 194 (1974), enfd. per curiam 529 F.2d 516 (4th Cir. 1975). Accordingly, the judge found that DDE was privileged under *Burns* to set initial terms and conditions of employment for unit employees and that it did not act unlawfully by establishing terms and conditions different from those enjoyed by unit employees while working for predecessor DuPont.

For the reasons set forth below, we disagree with the judge on this issue. We find that DDE was a "perfectly clear" successor and that it violated Section 8(a)(5) and (1) of the Act by failing to bargain prior to setting unit employees' initial terms and conditions of employment.

FACTS

For over 45 years, DuPont recognized the Neoprene Craftsmen Union Local 788 (NCU) as the exclusive collective-bargaining representative of production and maintenance employees at DuPont's Louisville, Kentucky facility. For approximately the same amount of time, DuPont recognized the Chemical Workers Association, Inc. (CWA) as the exclusive collective-bargaining representative of separate units of production and maintenance employees and clerical employees at DuPont's Chamber Works facility in Deepwater, New Jersey. DuPont's recognition of both unions was embodied in separate successive collective-bargaining agreements.

On January 31, 1995, DuPont informed the Unions that it had signed a letter of intent with Dow to form a joint venture to produce and market elastomer products. DuPont stated further that the joint venture, subsequently named DDE, would take over the production of neoprene at Louisville and the production of viton and FMDL at Chamber Works. DuPont assured the Unions, however, that the formation of DDE would not result in personnel reductions at either facility.

Prior to the formation of DDE, NCU represented approximately 415 production and maintenance employees at Louisville in a single unit. Approximately 310 of these employees worked on neoprene products. The CWA represented approximately 1700 production and maintenance employees and 150 clerical employees in separate bargaining units at Chamber Works. Approximately 81 production and maintenance employees and an

---

[1] The judge found, and we agree, that there is insufficient evidence of common ownership and control or that DDE was formed to aid DuPont in avoiding its obligations under the Act to conclude that DDE and DuPont are alter egos. In determining whether an alter ego relationship exists between two apparently separate entities, the Board considers whether the two have substantially identical management, business purposes, operations, equipment, customers, supervision and ownership. *Advance Electric*, 268 NLRB 1001, 1002 (1984). The Board also considers whether the second company was created in order to allow the old employer to evade responsibility under the Act. *Cofab, Inc.*,

322 NLRB 162 (1996); *Fugazy Continental Corp.*, 265 NLRB 1301, 1301–1302 (1982), enfd. 725 F.2d 1416 (D.C. Cir. 1984). However, unlawful motivation is not a necessary element of an alter ego finding. *Johnstown Corp. and/or Stardyne, Inc.*, 313 NLRB 170 (1993), enf. denied and remanded 41 F.3d 141 (3rd Cir. 1994), sup. dec. 322 NLRB 818 (1997). In this regard, we disavow the judge's suggestion that the lack of antiunion motivation "generally militates" against finding an alter ego relationship.

D00500

A23

undisclosed number of clerical employees worked on FMDL and viton products.

In a meeting on January 31, 1995, DuPont officials at Louisville assured employees that they did not anticipate that any employees would lose their jobs as a result of DDE taking over the production of neoprene. An October 18, 1995, electronic mail message to Louisville employees from DDE management representative Haven Harrington confirmed that DDE would offer employment to all employees working in neoprene. Concurrently, Louisville employees were informed that DuPont and Dow were still negotiating the terms and conditions of employment that DDE would offer its employees.

DuPont officials at Chamber Works initially advised the CWA that DDE would most likely contract employees from DuPont rather than hire its own work force. On November 15, 1995, however, DDE advised the CWA that it would offer employment to all employees working on the viton and FMDL product lines, under terms and conditions to be announced on November 30, 1995.

On November 30, 1995, DDE told both the NCU and the CWA that it planned to extend offers of employment to all incumbent employees in January 1996, and that it would offer its employees the same pay and benefits as they enjoyed under the Unions' respective contracts with DuPont. DDE stated further that employees would retain their seniority, but they would not have bidding and bumping rights back to DuPont. Additionally, DDE announced that it would offer a bonus program, called success sharing. Under this program, DDE committed to pay employees a lump sum equal to 4 percent of their base yearly pay upon the successful start up of the company and another 4.3 percent if the company met its first year performance goals. Success sharing was not available to DuPont employees.

DDE did not offer to bargain prior to announcing initial terms and conditions of employment, although the Unions had made clear their view that DDE should recognize them and honor their contracts with DuPont.[2] On November 30, 1995, DDE advised the Unions that it would not recognize or bargain with them until the hiring process was substantially complete and more than 50 percent of the needed work force was composed of former DuPont employees represented by the Unions.

In mid-December 1995, DDE held a series of meetings with Chamber Works and Louisville employees at which it described in detail its pay policies and benefits. DDE confirmed that employees would continue to receive the same pay and benefits as they enjoyed with DuPont, with the addition of success sharing. DDE also reiterated that it would not recognize or bargain with the Unions until more than 50 percent of the needed work force was composed of former DuPont employees represented by the Unions. DDE concedes that it hoped to retain all incumbent employees at Chamber Works and Louisville and that it considered its ability to retain these employees to be of fundamental importance to the success of the enterprise.

On January 2, 1996, DDE offered employment to all incumbent employees at Louisville and Chamber Works. The written job offers stated that employees would continue to receive the same pay and benefits as they had received from DuPont, plus success sharing. Employees were required to accept or reject the offers within approximately 30 days.

On January 10, 1996, DuPont announced a reduction in force at Chamber Works of 486 positions in business units not included in the joint venture. Responding in part to the exclusion of DDE employees from the planned reduction,[3] CWA filed a charge on January 12 alleging that DDE and DuPont were alter ego companies, and that they failed to apply the terms of the CWA's collective-bargaining agreements with DuPont to DDE employees in violation of Section 8(a)(5) and (1) of the Act.[4]

On January 19, 1996, DDE announced three changes in initial terms and conditions of employment at Chamber Works. In addition to the previously announced success sharing program, DDE would implement an enhanced severance program, abolish the practice of paying for scheduled overtime not actually worked, and reduce the number of maintenance crafts for seniority purposes from six to two. CWA president Corliss Sheppard testified without contradiction that, at a meeting on January 19, he inquired whether DDE intended to bargain over the issues. DDE's Chamber Works management representative Michael Foley responded negatively.

The offer process was completed in early February 1996. At Louisville, approximately 97 percent of production and maintenance employees who received offers of employment accepted. At Chamber Works, approximately 98 percent of production and maintenance em-

---

[2] NCU, by letter of September 22, 1995, to DDE president-designate Donald Duncan, demanded recognition as the exclusive collective-bargaining representative of DDE's work force. It further stated that DDE appeared to be an alter ego of DuPont and, as such, was required to abide by the substantive terms of NCU's contract with DuPont. NCU subsequently repeated its request for recognition and its alter ego claim orally to DDE's designated representatives. CWA, by letter of November 16, 1995, to DDE management designee Mike Foley, advised DDE of its view that DDE and DuPont were alter ego companies. The letter also expressed the belief that DDE had "the obligation to bargain any and all changes to wages, benefits, compensation, and conditions of employment with the CWA before there is any communication to or dealing with covered employees." The letter concluded with a proposal to meet "in the very near future to discuss this issue."

[3] CWA objected to the exclusion of DDE employees from the reduction because relatively senior DuPont employees would be laid off or downgraded while DDE employees with less seniority would be unaffected.

[4] NCU filed a similar charge on January 25. This charge alleged, as an alternative legal theory, that DDE was a "perfectly clear" successor, and that it had violated Sec. 8(a)(5) by refusing to recognize and bargain with the NCU.

D00501

ployees and clerical employees who received offers of employment accepted.

In mid-February 1996, DDE notified the Unions of its desire to begin negotiating collective-bargaining agreements. After several sessions, however, the CWA, by letter dated March 12, 1996, withdrew from negotiations based on its position that DDE was bound as DuPont's alter ego to honor CWA's collective-bargaining agreements with DuPont. NCU withdrew from negotiations shortly thereafter. The Unions refused to continue negotiating despite DDE's offer to bargain without prejudice to their alter ego claims.

DDE began operating on April 1, 1996. As originally planned, DDE's terms and conditions of employment at Louisville were equivalent to DuPont's, with the addition of success sharing. At Chamber Works, DDE implemented the equivalent of former DuPont contract terms and conditions of employment, with the exception of success sharing and the changes announced on January 19, 1996.

### ANALYSIS

Relying on *NLRB v. Burns Security Services*, 406 U.S. 272 (1972), as interpreted by the Board majority in *Spruce Up Corp.*, 209 NLRB 194 (1974), enfd. per curiam 529 F.2d 516 (4th Cir. 1975), the judge found that DDE was a successor, but not a "perfectly clear" successor, to DuPont at Louisville and Chamber Works. Accordingly, he dismissed the complaint allegations that DDE violated Section 8(a)(5) by failing and refusing to bargain with the Unions about initial terms and conditions of employment and by unilaterally changing terms and conditions of employment.

As noted by the judge, the Supreme Court articulated in *Burns* an exception to the general rule that a successor employer may set initial terms and conditions of employment unilaterally. Specifically, the Supreme Court stated

> Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms.[5]

This exception has become known as the *Burns* "perfectly clear" caveat. In *Spruce Up*, the Board interpreted the "perfectly clear" language of *Burns* as requiring both a manifestation of intent on the part of the employer to retain all or substantially all of its predecessor's employees and also a substantial likelihood that those offered employment will accept it. The Board therefore held that "[w]hen an employer who has not yet commenced opera-

tions announces new terms prior to or simultaneously with his invitation to the previous work force . . . we do not think it can fairly be said that the new employer 'plans to retain all of the employees in the unit,' as that phrase was intended by the Supreme Court," because of the possibility that those offered employment will not be willing to work under the new terms. 209 NLRB at 195. Applying those principles in *Spruce Up*, the Board found that the new employer did not have a perfectly clear plan to retain all of its predecessor's employees because it announced that it would offer less favorable commission rates simultaneously with its expression of intent to retain the employees. Thus, the Board found that there was a very real possibility, as illustrated by the facts of that case, that former unit employees would refuse to work under the new rates, and that the union's majority status would therefore not continue in the new work force.

We note that events involving the Louisville plant in this case arise within the jurisdiction of the Sixth Circuit, which has taken a more restrictive view of the *Burns* "perfectly clear" caveat than the Board in *Spruce Up* and its progeny. The Sixth Circuit, in *Peters v. NLRB*, 153 F.3d 289 (6th Cir. 1998), considered the application of the "perfectly clear" exception where a successor announced significant changes in terms and conditions after it expressed an intention to retain former unit employees but before it began operations. The court held that an employer may set initial terms, "(1) if it has not, by 'tacit inference' misled the employees into believing that prior working conditions will remain stable, or (2) if it has affirmatively announced its intention to retain the employees under new employment conditions before or immediately after commencing operations." 153 F.3d at 298.

The judge here concluded that the requirements of the "perfectly clear" caveat were not met in this case because DDE communicated its intention to establish new terms and conditions on November 30, 1995, shortly after it announced its intention to retain former DuPont employees at Louisville and Chambers Works. In effect, the judge found that DDE's November 30, 1995, announcement that it intended to implement success sharing put employees on notice that terms and conditions of employment would be different under DDE. We disagree.

Although we adhere to the Board's interpretation of the *Burns* caveat, we find that the facts in this case are sufficient to establish a "perfectly clear" successorship even under the Sixth Circuit's more restrictive view of the *Burns* exception. As a starting point for analysis under either standard, it is certainly clear that DDE planned, and announced its intent, to retain the incumbent DuPont unit employees at Louisville and Chamber Works. On November 15, 1995, DDE announced to the Unions that it intended to offer employment to all incumbent employees at both plants under terms and conditions to be announced on November 30.

---

[5] 406 U.S. at 294–295.

On November 30, DDE notified the Unions that, although it declined to honor their contracts with DuPont, DDE would maintain the employees' wages and benefits under those contracts, adding only the hiring incentive bonus of success sharing. DDE did not indicate that there would be any other changes in current terms and conditions of employment. In mid-December 1995, DDE held a series of meetings with incumbent employees at which it explained, in detail, the terms of its offer. Once again, there was no indication of changes in terms and conditions of employment other than the addition of the success sharing plan. On or about January 2, 1996, DDE tendered unconditional offers of hire under the terms previously discussed.

In sum, up to and beyond the time of making formal offers of employment to all affected DuPont employees, DDE manifested a clear desire to retain all those employees under existing working conditions. It announced no new terms and conditions of employment other than the success sharing bonus plan. In fact, DDE *never* announced or implemented any other changes prior to beginning operations at Louisville. At Chambers Works, DDE waited until 17 days after it had formally tendered unconditional offers of hire before announcing significant changes. By that date, a number of Chamber Works employees had already accepted DDE's offer of employment.[6]

Under the Board's interpretation of the *Burns'* caveat, it was perfectly clear no later than November 30 that DDE intended to retain its predecessor's employees at both Louisville and Chambers Works. Indeed, the success of the new joint venture depended on the continuing employment of this work force. The Respondent had announced its clear intent to hire the DuPont unit employees on November 15, while at the same time stating that it would disclose the terms and conditions of employment on November 30. On that later date, the Respondent did not announce any new terms and conditions of employment other than success sharing, thus leading employees to believe that they would be employed on substantially the same basis as before. Further, there was nothing inherent in the announcement of success sharing by DDE on November 30, 1995, and conveyed in the offers of hire on January 2, which would diminish the likelihood that employees would accept DDE's offer of employment. To the contrary, if anything, the addition of success sharing—the only announced change—would have enhanced, not diminished, the likelihood that employees would accept the offers. The subsequent announcement of changes at Chambers Works on January 19 were made after the formal hiring process had commenced and the obligation to bargain with the Unions about initial terms and ~~conditions of employment had already~~ attached. The

[6] As of January 19, 1996, 45 of 101 incumbent production and maintenance and clerical employees had accepted offers of employment.

already attached. The Board has consistently found that an announcement of new terms will not justify a refusal to bargain if, as in this case, the employer has earlier expressed an intent to retain its predecessor's employees without indicating that employment is conditioned on acceptance of new terms.[7]

As indicated, we would find a violation even under the Sixth Circuit's more restrictive view of the "perfectly clear" caveat. The facts of this case are sufficient to establish that the incumbent employees at Louisville and Chambers Works were actively led or misled by "tacit inference" into believing that they would be retained without significant changes in their terms and conditions of employment. The only change announced to employees at either facility prior to the formal tender of employment offers was the *addition* of a success sharing plan. This plan was not inconsistent with or a substitute for any of those terms and conditions of employment that unit employees had under their DuPont contracts and that DDE had indicated they would continue to receive if, as DDE planned, they accepted the offers to work for the new joint venture. Consequently, viewed from the perspective of the affected employees,[8] the terms announced by DDE on November 30, 1995, and conveyed in the offers of hire on January 2, "by tacit inference misled the employees into believing that prior working conditions will remain stable."

Although DDE did not agree to honor DuPont's contracts with the Unions, it announced no plan to implement any specific significant changes, aside from the addition of success sharing. DDE remained silent and withheld any notice of changes in preexisting terms and conditions until the announcement of changes at Chambers Works on January 19, when the hiring and acceptance process was already well underway. By then, many employees had already accepted job offers. They, and others still considering DDE's offer, may have foregone employment opportunities in reliance on DDE's earlier promises of continued employment under essentially unchanged terms.[9] Thus, even under the Sixth Circuit's view of the *Burns* "perfectly clear" caveat, we find that DDE's notice of changed terms and conditions of employment came too late to justify its refusal to recognize and bargain with the CWA over initial terms of employment.[10]

---

[7] *Canteen Co.*, 317 NLRB 1052 (1995), enfd. 103 F.3d 1355 (7th Cir. 1997); *Fremont Ford*, 289 NLRB 1290 (1988); *Roman Catholic Diocese of Brooklyn*, 222 NLRB 1052 (1976), enf. denied in relevant part sub nom. *Nazareth Regional High School v. NLRB*, 549 F.2d 873 (2d Cir. 1977).

[8] See *Fall River Dyeing Corp. v. NLRB*, 482 U.S. 27, 43 (1987).

[9] See *International Ass'n of Machinists & Aerospace Workers v. NLRB*, 595 F.2d 664, 674–675 (DC Cir. 1978).

[10] In our view, moreover, the Sixth Circuit's holding in *Peters v. NLRB* cannot be divorced from the "unique circumstances surrounding Peters' succession of Western," including that Peters replaced Western as a result of bankruptcy proceedings and the transition from one em-

D00503

Based on the foregoing

Based on the foregoing, we find that it was "perfectly clear" on November 30, 1995, that the Unions' majority status would continue in the work forces at Louisville and Chamber Works. Accordingly, DDE was obligated on and after that date to recognize the Unions and to bargain with them prior to setting new terms and conditions of employment. Instead, it withheld recognition from the Unions until February 1996 and, without bargaining, it announced its decision to implement certain changes upon the commencement of operations.

Our finding that the Respondent had an obligation to bargain in the circumstances of this case imposes no great burden on the general right of a successor employer under *Burns* to set the initial terms and conditions of employment for its new workforce. As the Seventh Circuit has observed,

> The approach of the Board is compatible with the practical reality expressed by the Supreme Court in *Fall River*, 482 U.S. at 40–41: "[T]o a substantial extent, the applicability of *Burns* rests in the hands of the successor." It may explore all options with respect to the composition of its workforce. However, when it determines that it will retain the workforce of its predecessor, it cannot ignore the Union those employees have chosen when it comes time to determine the conditions of employment.[11]

The judge found that, even assuming DDE is a perfectly clear successor, the Unions effectively waived statutory bargaining rights by their insistence that DDE, as an alter ego, was bound to assume its predecessor's contracts, and by their March 1996 withdrawal from negotiations. We disagree. Preliminarily, we find that NCU's letter of September 22, 1995, and CWA's letter of November 16, 1995,[12] constituted valid and continuing demands for bargaining. The Unions' communications with DDE, although based on their alter ego claims, reasonably informed DDE that they sought to represent DDE's employees and to bargain about any changes in their terms and conditions of employment. It is well established that a "valid request to bargain need not be made in any particular form, or in haec verba."[13] Accordingly, these letters were sufficient to create an obligation to bargain.

We find further that the Unions' March 1996 withdrawal from negotiations did not constitute a waiver of bargaining rights because the damage to the bargaining

relationships was already accomplished by that date. The bargaining obligation arose no later than November 30, 1995. Consequently, long before the Unions withdrew from negotiations, DDE had damaged the bargaining relationships by expressly refusing to recognize and bargain with the Unions on and after November 30, 1995, and by announcing its intent to implement success sharing at both plants and to make additional unilateral changes in terms and conditions of employment at Chamber Works.[14] We further find that DDE failed to provide the Unions with a reasonable opportunity to bargain about the changes which it announced. It is well established that "a union is entitled to the opportunity to bargain when that bargaining could be productive—that is, when the change is under consideration."[15] In the present case, however, DDE's announcement of unilateral changes created the appearance, if not the reality, that DDE had no intention of bargaining with an open mind and that bargaining would therefore be futile.

Consistent with the above discussion, we find that DDE violated Section 8(a)(5) and (1) by refusing to recognize and bargain with the Unions from November 30, 1995 until after the Unions' majority status was established through the hiring process, and by announcing and implementing unilateral changes in employment conditions of bargaining unit employees represented by those Unions.[16]

AMENDED CONCLUSIONS OF LAW

"3. The following employees constitute units appropriate for collective bargaining within the meaning of Section 9(b) of the Act:

A.

All employees of DuPont Dow Elastomers L.L.C. at its Louisville Works, Louisville, Kentucky, including powerhouse and refrigeration plant employees, chief operators, shift leaders, fire department employees, cafeteria employees, and counter attendants, but excluding all office and clerical employees, chemical supervisors, technical engineers, assistant technical engineers, draftsmen, chemists, nurses and hospital technicians, general foremen, foremen, fire chief, guards, and all other supervisors and professional employees as defined in the National Labor Relations Act as amended.

B.

All production, engineering, environmental resources, and laboratory employees employed by DuPont Dow

---

ployer to another was effectively accomplished in a single day. Hence, the court found that Peters' action of recalling his predecessor's employees to work within hours of his appointment as a receiver without first informing them of his intention to establish new terms was entirely reasonable because anything else would have resulted in additional lost workdays for the employees. 153 F.3d at 298.

[11] *Canteen Corp. v. NLRB*, 103 F.3d 1355, 1364–1365 (1997).

[12] See fn. 2, *infra*.

[13] *Yolo Transport*, 286 NLRB 1087 fn. 1 (1987).

[14] *Famous-Barr Co. v. NLRB*, 326 U.S. 376, 384–386 (1945); *NLRB v. Katz*, 369 U.S. 736, 743 fn. 11 (1962).

[15] *ABC Trans-National Transport*, 247 NLRB 240, 242 (1980), modified on other grounds, 642 F.2d 675 (3rd Cir. 1981).

[16] We find no violation with respect to the Respondent's unilateral implementation of the success sharing program announced on November 30.

6                                   DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Elastomers L.L.C. at the plant known as Chamber Works and Associated Units but excluding office and clerical employees, chemists, planners and schedulers, draftsmen, engineers, librarians, technologists, all employees of the Control and Human Resources Units, all salary roll employees exempt under the Fair Labor Standards Act, team managers, and all other supervisory employees with the authority to hire, promote, discharge, transfer or otherwise effect changes in the status of employees, or effectively recommend such action.

C.

All office and clerical employees of the Chamber Works and associated units of DuPont Dow Elastomers L.L.C., but excluding those clerks, stenographers, and secretaries specified by the Company as doing confidential work, chemist, engineers, physicians, nurses, medical technicians, safety engineers, procedure analyst, news editors, all salaried role employees exempt under the Fair Labor Standards Act, directors, assistant directors, managers, assistant managers, unit managers, supervisors, division heads and all other supervisory employees with the authority to hire, discharge, promote, transfer, or affect changes in the status of employees, or effectively recommend such action.

4. Respondent DuPont Dow Elastomers L.L.C. is a "perfectly clear" successor to E.I. DuPont De Nemours and Company with respect to the obligations to bargain with the Unions representing employees in the above units.

5. By refusing, on and after November 30, 1995, to recognize and bargain with the Neoprene Craftsmen Union Local 758, as the exclusive collective-bargaining representative for employees in Unit A above, or with Chemical Workers Association, Inc., Affiliate of International Brotherhood of DuPont Workers, as the exclusive collective-bargaining representative of employees in Units B and C above, and by announcing and implementing unilateral changes in unit employees' existing terms and conditions of employment, DDE has violated Section 8(a)(5) and (1) of the Act.

6. The violation found is an unfair labor practice affecting commerce within the meaning of Section 2(6) and (7) of the Act."

REMEDY

Having found that Respondent DuPont Dow Elastomers L.L.C. (DDE) has engaged in unfair labor practices in violation of Section 8(a)(5) and (1) of the Act, we shall order it to cease and desist and to take certain affirmative action to effectuate the policies of the Act. Specifically, we shall order DDE, on request by the Unions for the bargaining units they separately represent, to rescind the changes in employment terms made on April 1, 1996. As to those employment terms for which rescission is

requested, DDE shall be ordered to make whole all unit employees for any loss of wages and other benefits suffered, as calculated in accordance with *Ogle Protection Service*, 183 NLRB 682, 683 (1970), with interest computed in the manner prescribed in *New Horizons for the Retarded*, 283 NLRB 1173 (1987).[17]

ORDER

The National Labor Relations Board orders that the Respondent, DuPont Dow Elastomers L. L. C., Louisville, Kentucky, and Deepwater, New Jersey, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Refusing to recognize and bargain in good faith with the Neoprene Craftsmen Union Local 788 as the exclusive collective-bargaining representative of employees in the following appropriate unit:

All employees of DuPont Dow Elastomers L.L.C. at its Louisville Works, Louisville, Kentucky, including powerhouse and refrigeration plant employees, chief operators, shift leaders, fire department employees, cafeteria employees, and counter attendants, but excluding all office and clerical employees, chemical supervisors, technical engineers, assistant technical engineers, draftsmen, chemists, nurses and hospital technicians, general foremen, foremen, fire chief, guards, and all other supervisors and professional employees as defined in the National Labor Relations Act as amended.

(b) Refusing to recognize and bargain in good faith with the Chemical Workers Association, Inc., as the exclusive collective-bargaining representatives of employees in the following appropriate units:

All production, engineering, environmental resources, and laboratory employees employed by DuPont Dow Elastomers L.L.C. at the plant known as Chamber Works and Associated Units but excluding office and clerical employees, chemists, planners and schedulers, draftsmen, engineers, librarians, technologists, all employees of the Control and Human Resources Units, all salary roll employees exempt under the Fair Labor Standards Act, team managers, and all other supervisory employees with the authority to hire, promote, discharge, transfer or otherwise effect changes in the status of employees, or effectively recommend such action.

All office and clerical employees of the Chamber Works and associated units of DuPont Dow Elastomers L.L.C., but excluding those clerks, stenographers, and secretaries specified by the Company as doing confidential work, chemist, engineers, physicians, nurses, medical technicians, safety engineers, procedure ana-

---

[17] We decline to order the reimbursement of litigation expenses as requested by NCU.

DUPONT DOW ELASTOMERS LLC                                    7

lyst, news editors, all salaried role employees exempt under the Fair Labor Standards Act, directors, assistant directors, managers, assistant managers, unit managers, supervisors, division heads and all other supervisory employees with the authority to hire, discharge, promote, transfer, or affect changes in the status of employees, or effectively recommend such action.

(c) Announcing and implementing unilateral changes in wages, hours, and other conditions of employment of employees in the aforementioned units without bargaining about these changes with Neoprene Craftsmen Union Local 788 or the Chemical Workers Association, Inc.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) On request of the Neoprene Craftsmen Union Local 788 or the Chemical Workers Association, with respect to the bargaining units they separately represent, rescind the unilateral changes in terms and conditions of employment found unlawful and make the employees whole for any loss of earnings and other benefits attributable to its unlawful conduct, in the manner set forth in the remedy section of this Decision.

(b) Preserve and, within 14 days of a request, make available to the Board or its agents for examination and copying, all payroll records, social security payment records, timecards, personnel records and reports, and all other records necessary to analyze the amount of backpay due under the terms of this Order.

(c) On request, bargain collectively and in good faith concerning wages, hours, and other terms and conditions of employment with the Unions as the exclusive representative of employees in the above-described units, and embody any understanding reached in a signed agreement.

(d) Within 14 days after service by the Region, post at its Louisville, Kentucky, and Deepwater, New Jersey facilities copies of the attached notice marked "Appendix."[18] Copies of the notice, on forms provided by the Regional Director for Region 9, after being signed by the Respondent DuPont Dow Elastomer's authorized representative, shall be posted by DuPont Dow Elastomers and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by DuPont Dow Elastomers to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings,

DuPont Dow Elastomers has gone out of business or closed the facility involved in these proceedings, DuPont Dow Elastomers shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by it or by its predecessor DuPont De Nemours and Company at any time since November 30, 1995, at Louisville Works, Louisville, Kentucky, and at the Chamber Works, Deepwater, New Jersey.

(e) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps DuPont Dow Elastomers has taken to comply.

Dated, Washington, D.C. October 31, 2000

| | |
|---|---|
| John C. Truesdale, | Chairman |
| Sarah M. Fox, | Member |
| Wilma B. Liebman, | Member |

(SEAL)         NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated the National Labor Relations Act and has ordered us to post and abide by this notice.

Section 7 of the Act gives employees these rights.

> To organize
> To form, join, or assist any union
> To bargain collectively through representatives of their own choice
> To act together for other mutual aid or protection
> To choose not to engage in any of these protected concerted activities.

WE WILL NOT refuse to recognize and bargain in good faith with the Neoprene Craftsmen Union Local 788 as the exclusive collective-bargaining representative of employees in the following appropriate unit.

All employees of DuPont Dow Elastomers L.L.C. at its Louisville Works, Louisville, Kentucky, including powerhouse and refrigeration plant employees, chief operators, shift leaders, fire department employees, cafeteria employees, and counter attendants, but ex-

---

[18] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted pursuant to a Judgment of the United States Court of Appeals enforcing an Order of the National Labor Relations Board."

8                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

cluding all office and clerical employees, chemical su-
pervisors, technical engineers, assistant technical engi-
neers, draftsmen, chemists, nurses and hospital techni-
cians, general foremen, foremen, fire chief, guards, and
all other supervisors and professional employees as de-
fined in the National Labor Relations Act as amended.

WE WILL NOT refuse to recognize and bargain in good
faith with the Chemical Workers Association, Inc. as the
exclusive collective-bargaining representative of em-
ployees in the following appropriate units.

> All production, engineering, environmental resources,
> and laboratory employees employed by DuPont Dow
> Elastomers, L.L.C. at the plant known as Chamber
> Works and Associated Units but excluding office and
> clerical employees, chemists, planners and schedulers,
> draftsmen, engineers, librarians, technologists, all em-
> ployees of the Control and Human Resources Units, all
> salary roll employees exempt under the Fair Labor
> Standards Act, team managers, and all other supervi-
> sory employees with the authority to hire, promote, dis-
> charge, transfer or otherwise effect changes in the
> status of employees, or effectively recommend such ac-
> tion.

> All office and clerical employees of the Chamber
> Works and associated units of DuPont Dow Elastomers
> L.L.C., but excluding those clerks, stenographers, and
> secretaries specified by the Company as doing confi-
> dential work, chemist, engineers, physicians, nurses,
> medical technicians, safety engineers, procedure ana-
> lyst, news editors, all salaried role employees exempt
> under the Fair Labor Standards Act, directors, assistant
> directors, managers, assistant managers, unit managers,
> supervisors, division heads and all other supervisory
> employees with the authority to hire, discharge, pro-
> mote, transfer, or affect changes in the status of em-
> ployees, or effectively recommend such action.

WE WILL, on request of either the Neoprene Craftsmen
Union Local 788 or the Chemical Workers Association,
Inc., on behalf of the bargaining units they separately
represent, rescind our unlawful unilateral changes that
we made in the terms and conditions of employment of
employees in the above units, and WE WILL make em-
ployees whole for any loss of earnings and other benefits
attributable to our unlawful conduct, with interest.

WE WILL, on request, bargain collectively and in good
faith concerning wages, hours, and other terms and con-
ditions of employment with the Unions as the exclusive
representative of employees in the above-described units,
and embody any understanding reached in a signed
agreement.

                                    DUPONT DOW ELASTOMERS LLC

*Andrew L. Lang, Esq.,* for the General Counsel.

*Barry M. Willoughby, Esq.,* of Wilmington, Delaware, for the
    Respondent.
*Alan Burton, Esq.,* of Wilmington, Delaware, for the Respon-
    dent.
*Howard S. Simonoff, Esq.,* of Haddonfield, New Jersey, for the
    Chemical Workers Association.
*Max J. Goldsmith, Esq.,* of Louisville, Kentucky, for the Neo-
    prene Craftsmen Union.

                                    DECISION

                            STATEMENT OF THE CASE

IRWIN H. SOCOLOFF, Administrative Law Judge. Upon
charges filed on January 12, and 25, 1996, by, respectively, the
Chemical Workers Association, Inc. (CWA) and the Neoprene
Craftsmen Union Local 788 (NCU), herein referred to as the
Unions, against E. I. Dupont De Nemours and Company (Du-
pont) and its alleged alter ego, Dupont Dow Elastomers L.L.C.
(DDE), (the Respondents), the General Counsel of the National
Labor Relations Board, by the Regional Director for Region 9,
issued an Order Consolidating Cases and an Amended Consoli-
dated Complaint dated October 29, 1996, alleging violations by
Respondents of Section 8(a)(5) and (1) and Section 2(6) and (7)
of the National Labor Relations Act, as amended, herein called
the Act. Respondents, by their Answers, denied the commis-
sion of any unfair labor practices.

Pursuant to notice, trial was held before me in Louisville,
Kentucky, on January 7, 8 and 9, 1997, and in Wilmington,
Delaware, on January 27, 28, 29, and 30, 1997, at which all
parties were represented by counsel and were afforded full
opportunity to be heard, to examine and cross-examine wit-
nesses and to introduce evidence. Thereafter, the parties filed
briefs which have been duly considered.

Upon the entire record in these cases, and from my observa-
tions of the witnesses, I make the following:

                            FINDINGS OF FACT

                            I. JURISDICTION

Respondent, Dupont, a corporation, is engaged in the pro-
duction of chemical and related products at its Chambers
Works, Deepwater, New Jersey, and Louisville, Kentucky,
facilities. During the year preceding issuance of the Complaint,
Dupont, in conducting its operations at the above-referenced
places of business, sold and shipped from those facilities goods
valued in excess of $50,000, directly to points outside the
States of New Jersey and Kentucky. I find that Respondent,
Dupont, is an employer engaged in commerce within the mean-
ing of Section 2(2), (6), and (7) of the Act.

Respondent, DDE, a limited liability company, is engaged in
the manufacture of elastomer products at its Chambers Works,
Deepwater, New Jersey, and Louisville, Kentucky, facilities.
Based upon projections, DDE will, annually, sell and ship from
those facilities goods valued in excess of $50,000, directly to
points outside the States of New Jersey and Kentucky. I find
that Respondent, DDE, is an employer engaged in commerce
within the meaning of Section 2(2), (6), and (7) of the Act.

                            II. LABOR ORGANIZATIONS

The Unions are, each, labor organizations within the mean-
ing of Section 2(5) of the Act.

### III. THE UNFAIR LABOR PRACTICES

#### A. Background

For some 45 years prior to the April 1, 1996, formation of DDE, Dupont recognized and dealt with the NCU as the exclusive collective-bargaining representative of its production and maintenance employees in Louisville, Kentucky, and with the CWA as such representative of separate units of its production and maintenance employees, and its clerical employees, at the Chambers Works, facility, in Deepwater, New Jersey. The most recent contract between Dupont and NCU, at Louisville Works, is effective May 25, 1994, until March 21, 1996, and from year-to-year thereafter unless terminated by either party. At Chambers Works, the latest contracts between Dupont and CWA run from July 18, 1991, until terminated by one party or the other.

DDE is a joint venture formed by two of the world's largest chemical companies, the Dow Chemical Company and Dupont. The venture was formed, on a global scale, to produce and market elastomer (synthetic rubber) products, bringing together, essentially, Dupont's established position as a manufacturer of elastomers, including its production facilities and highly trained work forces, and Dow's patented "Insite" technology. Among the contributions to the venture made by Dupont were its elastomers businesses at Louisville Works, where neoprene is produced, and at Chambers Works, engaged in the production of viton and PMDL. The venture also includes former Dupont facilities located at Beaumont, Texas, Elkton, Maryland, Newark, Delaware and Ponchartrain, Louisiana, and smaller sites contributed by Dow in Freeport, Texas, Plaquemine, Louisiana and Stodd, Germany.

In the instant cases, the General Counsel contends that, at Louisville, and at Chambers Works, DDE is the alter ego of Dupont and, thus, violated Section 8(a)(5) of the Act by failing to honor the existing contract between Dupont and NCU and the contracts of Dupont and CWA. Alternatively, the General Counsel urges, DDE, as the "perfectly clear" successor to Dupont at those sites, failed to fulfill its bargaining obligations under the Act when it unilaterally implemented initial terms and conditions of employment. DDE argues that, as a global enterprise, 50 per cent owned and controlled by the Dow Chemical Company and formed, concededly, for legitimate business reasons, it is not the alter ego of Dupont at the above-referenced locations and, thus, was not obligated to honor the Dupont contracts at those sites. While acknowledging that, at Louisville and at Chambers Works, it is the successor to Dupont, obligated to recognize and bargain with the incumbent unions, DDE denies that it is the "perfectly clear" type of successor, required to bargain about initial terms. Also at issue is whether Respondents, at Louisville, violated the Act by failing timely to provide the NCU with a copy of the venture's formation agreement, as requested.

#### B. Facts[1]

##### 1. An Overview

In January 1995, Dupont and Dow announced that they had signed a letter of intent to form DDE. There ensued, over the next 15 months, a complicated process of valuation, negotia-

tion, formation and asset designation leading to the April 1, 1996, start-up of the venture, a limited liability company under Delaware law,[2] with $1 billion in assets and facilities located throughout the world. During the course of the January 1995, to April 1996, period, Dupont, concededly, kept the Unions and the Louisville and Chambers Works employees informed of major developments by various means of communication, including many electronic mail announcements.

As finally agreed to, Dupont and Dow are 50–50 co-owners of DDE and share equally in its profits. The venture is governed, globally, by a members committee, the equivalent of a corporate board of directors, composed of 2 representatives from Dow and 2 from Dupont. As there is no tie-breaker, the owners must agree upon the direction of DDE. The senior management team of the venture is made up of 4 former Dow officials and 7 individuals who came to DDE from Dupont. Under terms of the formation agreement, DDE has an initial life of 30 years, and, for the first 10 years, neither Dow nor Dupont can leave the venture, except by mutual agreement. After 10 years, if one party decides to leave, the other has the right of first refusal to buy the departing party's assets. The agreement provides for the recapture of assets contributed by the parents in the event of termination or dissolution.

Preceding the start-up of DDE, and once full accord of the parents was reached, Dow and Dupont went about performance of a massive number of required tasks, including the separation from the parents of assets, equipment, facilities and work forces. Effective with the formation, Dow and Dupont agreed to place their elastomers businesses in the venture,[3] including the patented Dow technology and physical and other assets at the effected sites. At the new DDE locations, its buildings and equipment were titled in its name, but the lands on which its facilities rest were leased from the parent companies at nominal sum, rather than placed in the venture, in order to protect DDE from possible environmental liability stemming from past use. At the various sites, environmental permits and other business licenses were transferred to the venture and DDE set up its own bank accounts and internal accounting functions. Centrally, DDE purchased workers' compensation and other insurance policies, and obtained a federal employer identification number. The venture set up its own headquarters, in Wilmington, Delaware, as well as headquarters abroad in Geneva, Switzerland, and Singapore.

Under the DDE structure, the members committee must approve capital expenditures at any facility in excess of 5 million dollars, and it decides whether existing facilities will continue to operate and if new ones will be built. Senior management works out of the Wilmington headquarters and, globally, DDE has its own finance, operations, marketing, legal, human resources, customer service, and other departments. While DDE purchases its own raw materials, and markets its own products, Dupont extends to DDE the advantages of the parent's third party contracts with suppliers. Raw materials bought directly from either parent are at market price, and DDE must purchase from Dupont needed raw materials produced by Dupont so long as they are made available to DDE at competitive prices.

---

[1] The fact-findings contained herein are based upon a composite of the documentary and testimonial evidence introduced at trial. The record is generally free of significant testimonial conflict.

[2] Such companies are taxed like a partnership but enjoy the liability protection of a corporation.

[3] Accordingly, concurrent with venture start-up, the parents left this business and neither produces or sells the type products manufactured and marketed by DDE.

D00508

Most or nearly all of the DDE manufacturing facilities are located on sites shared with one of the parents where, formerly, Dow or Dupont conducted elastomers and non-elastomers operations. At those locations, and despite the separate ownership of equipment, buildings and other facilities that accompanied the advent of DDE, many systems, for reasons of economy and efficiency, have remained sitewide and are shared by the parent and DDE. At a global level, and to account for services provided at integrated sites, Dow and Dupont, during the formation process, negotiated service agreements covering, generally, payment for services rendered to DDE by a parent, or by DDE to a parent, at shared locations. Such services are provided at market price, that is, at cost plus a profit, and DDE is not required to buy needed services from a parent. Likewise, both the parent and DDE are free to discontinue the provision of any services no longer desired. At the site level, the specific charges, service by service, were negotiated during the months preceding the venture start-up. Such negotiations, at Louisville and at Chambers Works, were by and between Dupont representative and DDE "designees," that is, individuals still employed by Dupont who had been designated to become Dupont as on-site management officials of the new venture. These "designees" were without independent basis to assess the cost of services. However, the results of those negotiations were reviewed centrally, by Dow as well as Dupont, for fairness to both parties at the site. In practice, there is a net billing, and a transfer of funds from DDE to Dupont, at the central level, on a monthly basis to cover provision of services. DDE has set up a monitoring committee to review the site agreements and, in the Fall of 1996, hired outside auditors to examine their operation.

While, generally, and prior to start-up, DDE's designated top management officials decided to leave for decision at the local level such matters as the wages and working conditions to be offered to DDE employees, certain labor relation issues were centrally decided. In this latter category, the designees, with the approval of the members committee, instituted a benefit program, "success sharing," providing for the payment each year, to every DDE employee, of 8.3 per cent of salary if certain company-wide goals were achieved for that year. In other respects, it was decided to maintain benefit coverage at "Dupont levels," by continued participation in existing plans, and to establish a new pension plan to "duplicate" the provisions of the Dupont plan.[4] Dow, Dupont and the DDE designees globally adopted a hiring philosophy, that is, the development of strategies designed to keep the skilled and experienced Dow and Dupont elastomer employees at their then current jobs. Left for local decision was whether to offer those employees positions with DDE, or to contract with the parent for their services.

At formation, 95 per cent of the DDE rank-and-file workers were from Dupont, and some 5 per cent were from Dow. Those who became DDE employees were required to sever their relationship with the parent, that is, to resign or retire, "with no strings back." Resigning employees had their pension benefits transferred to the venture. At the Dow sites at Freeport, Texas, Placquemine, Louisiana and Stodd, Germany, it was decided that DDE would contract for, or lease, the total of

120 employees, out of some 10,000 working at those sites, who were, thereafter, to perform their services for DDE. Those 120 individuals remained Dow employees and work for the venture under site service agreements. Similarly, at the Dupont site at Beaumont, Texas, those performing services for the venture do so under contract with Dupont, and not as DDE employees.

### 2. At Louisville Works

When NCU and Dupont entered into their most recent contract, in the Spring of 1994, it covered some 415 production and maintenance employees at Louisville Works, who worked in 2 separate Dupont business units, producing neoprene, in a elastomer, and fluoro products. The contract was locally bargained and has been locally administered. Under the agreement, employees have bidding and bumping rights between business units.

In the Fall of 1995, the venture leadership at Louisville determined that it would make offers of employment to all of the Dupont elastomers employees, and NCU was so informed. On November 30, the Union was advised that those individuals would be offered positions with DDE at the same rate of pay they were receiving from Dupont, with a carryover of their Dupont seniority, continued coverage under the Dupont benefit plans and coverage under a pension plan that duplicated Dupont's plan. At or about this time, the Union was also told that "success sharing" would be part of the offer package. Despite NCU's continuing demand for recognition, and, based upon its alter ego claim, the Union's demands that its contract with Dupont be applied to the venture operations, DDE did not bargain with NCU concerning the initial terms of employment to be offered employees, nor would it adopt the Dupont contract. It advised the Union, only, that, at a future point, it wanted to negotiate a new contract.

At the beginning of January 1996, all of Dupont's elastomer employees received job offers from DDE, and were afforded a period of 30 days to decide whether or not to accept employment. Under terms of the offer, wages and benefits remained the same as they were at Dupont, augmented by the introduction of "success sharing;" pension-eligible employees were given the option to retire from Dupont or to transfer pension credits to the DDE plan; "banked" vacation was to be paid in cash; employees who accepted the offer had to resign or retire from Dupont and were to start at DDE with clean disciplinary records.

The pressures upon the neoprene manufacturing employees to accept the DDE offers were great, as, concurrent with the start-up of DDE, Dupont was leaving the elastomers business. Indeed, there is record evidence that Dupont officials, during the offer period, stressed to these employees that, if they declined offers, they risked being without employment. By the close of the initial offer period, in early February, some 300 of the neoprene employees had accepted offers, and only 9 had declined employment with DDE. The 9 unfilled positions were them offered to suitably skilled fluoro products employees, and 6 of the jobs were filled in that way. At the conclusion of the offer process, the almost 310 new DDE employees constituted a far larger group than the remaining Dupont fluoro products group, which numbered about 80. In addition to the bargaining unit employees, all of the neoprene management people accepted positions with DDE. Effectively, at start-up, DDE became the primary employer at the Louisville, facility, the largest of the DDE production plants. As DDE decided generally to honor the terms of the NCU-Dupont contract, but not the

---

[4] DDE became a participant in Dupont's multiple employer benefit plans for employees, administered by Dupont. The DDE pension plan, while the same as Dupont's, is independent of it and separately funded. The Dupont pension fund investment group administers the DDE plan, but Dupont bears no liability for the obligations of that plan.

D00509

contract itself, the new DDE employees began work with the same terms and conditions of employment as previously enjoyed, plus "success sharing," and minus bidding and bumping rights in fluoro products positions.

At start-up, DDE, at Louisville, engaged in the very same business operation theretofore run by Dupont, producing neoprene in the identical manner, using the same technology. The same rank-and-file work force, working at the same plant, utilized the same equipment and processes to manufacture a product which was shipped to the same customers.[5] Indeed, until the end of 1996, the product was shipped in bags bearing the Dupont name. DDE utilizes the same suppliers who previously serviced Dupont. It is undisputed that Dow's "Insite" technology, its primary contribution to the venture, is not in use at Louisville, nor is there any plan to introduce it. It is not applicable.

With the single exception of the plant manager,[6] the Louisville employees work under the same plant supervisors and managers and, as noted, receive the same compensation and benefits as previously, and, their seniority, earned at Dupont, is recognized. When, during 1996, Dupont and NCU negotiated a wage increase, the results of those negotiations were honored and applied by DDE. The new DDE employees kept the same employee identification numbers and passes and they park in the same lots and enter through the same gates, as before. They use the same change houses and lockers, the same work clothes distribution system and laundry services, the same cafeteria, medical facilities, telephone system and computer system, and the same tool room. Under service agreement, DDE employees perform for Dupont, and Dupont employees perform for DDE, certain specialized mechanical and maintenance functions, but, never, production work. DDE employees serve in the same fire and emergency brigade with Dupont employees and otherwise cross paths with the Dupont people in the course of daily activities. Dupont and DDE have a common safety awards program. By virtue of the service agreements, DDE pays to Dupont, monthly, a net amount of approximately $4,000,000, due, principally, to utility charges. That amount will, presumably, decrease somewhat as beginning January 1, 1997, Dupont no longer provides site accounting services for DDE.

As indicated, DDE's decision, at Louisville, to offer employment to all of Dupont's neoprene employees, and to staff entirely from that group, was made by November 1995. In that month, and after being advised by the NCU that it considered DDE bound by the contract in effect with Dupont, the DDE designees told the Union that the venture leadership knew DDE would, most likely, be a successor to Dupont. However, until more than 50 per cent of the Dupont elastomers work force accepted employment with DDE, the Union was advised, the venture would not recognize or bargain with it. Thus, as set forth above, DDE set initial terms and conditions of employment (the contract terms, plus "success sharing" and minus bidding and bumping rights to fluoro products positions) without negotiations. The decision, reached at the local level, to use the contract provisions as initial terms, but not to honor the contract as such, was made, primarily, to prevent inter-

company bumping. When, late in November 1995, and prior to the offer process begun in January 1996, the Union was told that "success sharing" would be part of the offer package, it voiced no objection.

After NCU filed its charge on January 25, 1996, in Case 9–CA–33536, claiming that DDE at Louisville was the alter ego of Dupont, the venture, in February, after tallying the results of the offer process, offered to bargain a contract with NCU, the negotiations to occur without prejudice to the Union's alter ego position. The Union, maintaining that it already had a contract with DDE, refused to engage in that process. Thus, negotiations did not occur. The venture, since start-up, has, in fact, applied the terms of the Dupont-NCU contract, and grievances have been filed and processed pursuant to contractual provisions.

On January 7, 1996, the president of NCU, Carl Goodman, sent the following letter to Haven Harrington, then Dupont's human resources manager at Louisville, and the DDE designate human resources manager:

> Please provide me within five working days a copy of the contract that has been entered into by Dupont and the Dow Chemical Company to form their new venture/merger that may impact Louisville Works employees.

At trial, Goodman testified that he also verbally requested that information which the Union needed in order to assess what "this thing" was all about.

Ten days later, on January 17, Harrington wrote to Goodman:

> There is currently no signed agreement between the two parent companies, however, we expect there should be an agreement signed in late February. When this agreement is available we will share a copy with you.

The venture formation agreement was, in fact, signed thereafter, on March 12, 1996, was held in escrow until April 1, and was furnished to the Union on April 11. There is no record evidence showing that Goodman, after receiving Harrington's January 17, letter, sought provision of an unexecuted copy, or working draft, of the formation agreement. At trial, Goodman acknowledged that Respondents timely provided NCU with all requested information, except this document.

### 3. At Chambers Works

The Chambers Works, facility, is much larger than Louisville Works and, prior to the advent of DDE, it comprised some 8 Dupont business units, including the elastomers unit, called polymer products or "PPD." PPD produced viton, FMDL and hytrel, the latter also referred to as engineering polymers. At venture start-up, the viton and FMDL portions of the polymers business passed to DDE, while hytrel remained with Dupont. CWA's contracts with Dupont originally covered some 1,700 production and maintenance employees and about 150 clerical workers at the facility. Of those, only 80, and 9, respectively, became employees of DDE, and some 150 workers remained in the Dupont hytrel operation. Thus, as urged by CWA, as of the April 1, 1996, formation of DDE, "a portion of the former Dupont elastomers unit now operates as a virtual island within a sea of the remaining Dupont operation at the Chambers Works facility," the mirror opposite of the situation in Louisville.

At Chambers Works, serious consideration was given to contracting with Dupont for the necessary labor force, rather than hiring individuals to work as DDE employees. However, in

---

[5] All of Dupont's back orders were transferred to DDE. Customers were notified in advance of the venture formation and the intended transfer of orders.

[6] Dupont plant manager Don Johnson had been designated DDE plant manager at Louisville, but he died prior to the April 1, 1996, start-up. He was replaced by Mike Sticklen, a Dow official.

D00510

12                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

mid-November, the DDE management designees advised the Union that the venture would offer employment to all of Dupont's viton and FMDL employees. At that time, as it had, previously, the Union insisted that its contracts with Dupont would continue to apply to those people, as DDE was the alter ego of Dupont. The designees took the position that the venture would be a successor employer, and it would recognize the Union once it had hired a workforce more than 50 per cent of whom were the union represented elastomers employees.

At the end of November, and following, the venture management told CWA that existing viton and FMDL employees would receive job offers during the first week in January, at then current wage rates and benefit levels, plus "success sharing" and minus bidding and bumping rights to positions in the hytrel portion of PPD and the other business units. As at Louisville, there would be a carryover of Dupont seniority, continued coverage under the Dupont benefit plans and coverage under a duplicate pension plan. CWA, thereafter, voiced no objection to "success sharing," per se, although, earlier, it stated opposition to that or any other change in contractual terms. Subsequently, the venture leadership announced certain additional changes to existing terms and conditions of employment, as part of its initial offer package, namely: an enhanced severance program, a reduction in the number of crafts for seniority purposes from 6 to 2 and abolition of the practice requiring payment for scheduled overtime not actually worked. The DDE designees refused to bargain with the Union concerning initial terms.

The elastomers employees at Chambers Works were faced not only with the fact that Dupont was leaving the elastomers business but, also, concurrent reductions-in-force at the facility which would impact upon Dupont employees but not upon the new employees of the venture. Thus, the incentives to accept venture employment were great and, by mid-February, 1996, some 98 per cent of the PPD employees offered jobs with DDE had accepted. At that time, the venture designees agreed to recognize CWA and bargain a contract with it. The Union, having re-asserted its alter ego claim in its January 12, 1996, charges filed with the NLRB, giving rise to the instant case, adhered to that position, stating that the new DDE employees were covered by the contract between CWA and Dupont. When the venture designees refused to negotiate without prejudice to the charges, limited discussions, on a few issues, occurred. However, the Union refused to negotiate a new contract and, by late March, it had limited the number of items it would talk about at all to three, dues deduction authorization cards, discharge for cause and grievance/arbitration.

At start-up, and since, as at Louisville, DDE has applied the terms of the Dupont contracts, with the noted changes, and grievances may be filed and processed. Primarily to avoid the possibility of inter-company bidding and bumping, DDE has refused to adopt the contracts, as such.

As at Louisville, Dow's "Insite" technology is not in use at Chambers Works, and is inapplicable. At formation, the new DDE employees stayed in the same physical facilities occupied while employed by Dupont, worked under the same supervisors and managers and used the same equipment and technology to produce the same products for the same customers. By virtue of the service agreements, DDE and Dupont facilities are protected by the same security force theretofore utilized by Dupont, and DDE and Dupont employees have continued to use

the same tool room, medical facility, change house, laundry and lunchrooms and serve together on the same emergency unit or fire brigade. The two sets of employees use the same electronic time keeping system as before April 1, 1996, receive their paychecks from the same payroll firm,[7] utilize a single telephone and paging system and the same computer system. There is, at Chambers Works, a joint safety committee and Dupont and DDE employees attend joint safety meetings and operate under the same Dupont generated safety manual. Indeed, Dupont's hytrel operations and DDE's elastomer operations have been simultaneously audited for safety and occupational health. Joint training of employees has also occurred.

As noted, most of the site service agreements were negotiated prior to start-up by and between Dupont officials and DDE "designees" who were, still, Dupont employees. These "designees" bargained agreements based upon cost figures brought to the table by Dupont, and they lacked access to independent accountants and calculations. Since start-up, Dupont and DDE have continued to discover areas of service provision not covered by agreement, necessitating the negotiation of further service agreements and calculations and payments for past services rendered. For accounting purposes, under the service agreements, the cost codes assigned by Dupont to DDE, and used by DDE since the joint venture commenced operations, are the same cost codes previously used by Dupont's PPD business unit. The difference, however, is that now more than an accounting allocation function is involved. On a monthly basis, actual dollars, in payment for services, changes hands, including a profit for the service provider. The services provided, as at Louisville, range from utilities, to performance of specialized mechanical and maintenance functions.

As at Louisville, Dupont transferred its back orders to DDE at start-up. Customers were advised, with considerable fanfare, of the intended creation and purposes of DDE well in advance of formation, and were also told that orders would be so transferred.

C. Conclusions

1. Alter Ego

The Board will find an alter ego relationship to exist between two nominally separate entities if the two employers concerned have substantially identical management, business purpose, operations, equipment, customers and supervision, as well as ownership.[8] In the absence of an identity of ownership, or an ownership interest demonstrated by the holdings of one company in the other, the Board will examine whether the degree of control exercised by the first entity in the affairs of the second is such "as to obliterate any separation between them."[9] Additionally, the Board assesses whether the new or second company was created so as to allow the old employer to evade responsibilities under the Act, and whether the two entities deal with each other, if at all, at arm's length, with due regard for separateness.[10] However, unlawful motivation is not a neces-

---

[7] DDE contracts with Dupont to provide payroll and other accounting services. Employees are paid on DDE checks.
[8] *Advance Electric, Inc.*, 268 NLRB 1001 (1984).
[9] *American Pacific Concrete Pipe Co.*, 262 NLRB 1223 (1982).
[10] *Fugazy Continental Corp.*, 265 NLRB 1301 (1982), enfd. 725 F. 2d 1416 (D.C. Cir. 1984).

D00511

sary element of an alter ego finding.[11] Indeed, the Board has consistently held that no one factor, taken alone, is determinative, a substance-over-form approach approved by the courts. Thus, in *Omnitest Inspection Services*,[12] the Court, in enforcing the Board's order, stated:

> [The Employer's] challenge to the Board's reliance on actual control suggests that an alter ego finding should turn upon formal ownership alone. This argument ignores the Board's decisions that the substantial identity of formal ownership is not the *sine qua non* of an alter ego relationship .... We are satisfied that the Board's multi-factor test is a reasonable construction of the Act, and that depending on the facts of the case, actual control can be more significant than formal ownership.

Once a finding of alter ego relationship is made, it follows that the collective-bargaining agreement of the one employer is binding upon the second entity.[13]

In applying the above criteria, Board case law also instructs that, in the absence of common ownership, the older company must exercise very substantial control over the new one, in order to support an alter ego finding. Further, the lack of anti-union motivation in the creation of the second entity generally militates against finding a "disguised continuance" of the original organization.

In this case, the General Counsel and the Charging Parties urge that the alter ego analysis be undertaken without regard to the global status of DDE, that is, that the Louisville and Chambers Works arms of the joint venture be examined in this regard absent consideration of the status of the other DDE sites, worldwide. As there is no controlling authority to the contrary, I am quite willing to take this approach, based upon its inherent logic, and in light of record evidence showing the considerable degree of local autonomy exercised at those sites. The difficulty I have with the arguments of the General Counsel and the Charging Parties lies in the failure of the record evidence to show, at Louisville and at Chambers Works, sufficient commonality of ownership and, or, control, vis-a-vis Dupont and DDE, and the lack of any evidence indicating either an anti-union motivation in the creation of DDE, or questionable dealings between Dupont and the venture.

It is beyond legitimate dispute that, at both of the sites in question, the former Dupont elastomers business units, and the current DDE operations, have had substantially identical management, business purpose, equipment, customers, and supervision. But DDE is 50 per cent owned by the Dow Chemical Company, and Dow wields 50 per cent control over centrally made decisions, including such significant business matters as major capital expenditures, and such important labor relations issues as "success sharing" and other benefit programs. Also, there is no evidence whatsoever, indeed, nary a contention, that Dow agreed with Dupont to form this global joint venture in order to aid Dupont in avoiding its collective-bargaining responsibilities at Louisville and at Chambers Works, rather than for bona fide business reasons.

At the local level, at the locations at issue, the remaining Dupont businesses, and DDE, share common sites and facilities and, through the service agreements, perform considerable work for each other, but never production work. Yet, despite the integrated nature of the sites, and the common systems, the businesses are structured as distinct entities, including separate ownership of buildings, equipment and production facilities. Services between the companies are paid for, and performed at a profit. The two entities, Dupont and DDE, do not share common management, nor do they engage in the same business. While, at the site level, the service agreements, initially, were negotiated between Dupont and DDE "designees," who were, still, employed by Dupont, those agreements were subject to review by Dow to insure their fairness to the venture as well as adherence to the standards centrally negotiated between Dow and Dupont. Indeed, this record is replete with evidence of arm's length and hard negotiations between the 2 parents, leading to the venture's formation.

In light of the evidence showing separate ownership and control, and the lack of evidence to suggest that DDE was formed for other than legitimate business reasons, or that there have been inappropriate dealings between Dupont and the venture, I conclude that, at Louisville and at Chambers Works, Dupont and DDE are separate entities. Simply put, too many of the critical factors traditionally relied upon by the Board to support alter ego findings are absent here.

### 2. "Perfectly Clear" Successor

In the instant cases, the fact of successorship at the subject locations is not at issue. It is conceded. What is in dispute is whether, at Louisville and at Chambers Works, DDE's successorship to the former Dupont operations was "perfectly clear" from the outset, obligating it to bargain with the Unions concerning initial terms and conditions of employment. Thus, in *NLRB v. Burns Security Services*,[14] the Supreme Court stated:

> Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms. In other situations, however, it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit ....

Interpreting the *Burns* "perfectly clear" caveat, the Board, in *Spruce Up Corporation*,[15] ruled that when an employer who has not yet commenced operations announces new terms before or at the same time he invites the previous work force to accept employment under those terms, it cannot be said that the new employer plans to retain all of the employees in the unit, as referred to in *Burns*, since the old employees may choose not to accept employment in that situation. The Board held:

> We believe the caveat in *Burns*, therefore, should be restricted to circumstances in which the new employer has either actively or, by tacit inference, misled employees into believing they would all be retained without change in

---

[11] *Johnstown Corporation and/or Stardyne, Inc.*, 313 NLRB 170 (1993), enf. denied and remanded 41 F. 3d 141 (3rd Cir. 1994), mem. dec. 322 NLRB No. 141 (1997).

[12] 297 NLRB 752 (1990), enf'd. 937 F. 2d 112 (3rd Cir. 1991).

[13] *Watt Electric Co.*, 273 NLRB 655 (1984).

[14] 406 U.S. 272 (1972).

[15] 209 NLRB 194 (1974), enf'd. on other grounds 529 F. 2d 516 (4th Cir. 1975).

14                              DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

their wages, hours or conditions of employment, or at least to circumstances where the new employer . . . has failed to clearly announce its intent to establish a new set of conditions prior to inviting former employees to accept employment. [footnote omitted]

Thereafter, in *Canteen Company*,[16] a Board plurality found that where a successor employer expressed to the union its desire to have the predecessor employees serve a probationary period, without indication of any changes in employment terms, the new employer "effectively and clearly communicated to the union its plan to retain the predecessor employees" and, since, as of that date it was perfectly clear that the successor planned to keep those employees, it "was not entitled to unilaterally implement new wage rates thereafter." Chairman Gould, concurring, expressed the view that the *Spruce Up* restrictions should be eliminated entirely. On the other hand, the dissenters urged that:

> . . . the perfectly clear exception should be limited to situations in which the employees have been tendered unconditional offers of hire, with no indication that the predecessor's terms will be changed. The 'perfectly clear' exception should not apply if the employer indicates a change prior to or simultaneously with its offer to employ the predecessor's work force . . .

DDE argues that, here, however the facts and the law are construed, it was not obligated to bargain with the Unions at all, until a majority of the predecessor's elastomers employees, at each location, "accepted" offers of employment with the venture. I reject, outright, this contention, as, under any view of the case law, the focus of the "perfectly clear" inquiry is not the acceptance of the offers by the predecessor employees, but, rather, the announced intent to offer them employment, and the terms of the offer.

Nonetheless, I conclude that, in the circumstances of this case, DDE did not violate Section 8(a)(5) of the Act by failing to bargain about initial terms and conditions of employment. At Louisville, and at Chambers Works, NCU, and CWA, respectively, were told in the early to mid-November, 1995, period, of DDE's decision to offer employment to the Dupont elastomers employees. Shortly thereafter, by the end of November, and many weeks before the start of the offer processes, the Unions were advised of the initial terms, that is, a carryover of the prior employment conditions, augmented by "success sharing." The November 1995, announcements to the Unions, of the intent to hire and of the terms to be offered, were roughly contemporaneous, and both announcements preceded by many months the start-up of venture operations. The offer processes, clearly including "success sharing," did not begin until January 1996.[17] In February, still substantially before DDE commenced business on April 1, it extended recognition to the Unions and offered to bargain concerning all employment terms. The offers, which were without prejudice to the Unions' alter ego claims, were rejected by both unions.

As, in these cases, the announcements to the Unions concerning the intent to offer employment to the elastomers employees, and the announcements concerning initial terms, including "success sharing," were, essentially, contemporaneous, part of a long and well advertised formation process, and as those announcements occurred long before commencement of the offer processes, and many months before start-up, I conclude that DDE never did effectively communicate an intent to retain the Dupont employees without changes in employment terms. This is not a case in which the new employer has failed clearly to state that it will set new conditions of employment prior to offering jobs to the predecessor employees, thereby misleading them into believing that they will be retained without changes in wages, hours and conditions of employment. Here, both the Unions and the employees knew, long before the offer processes began, that "success sharing" would be part of the employment package. Thus, the requirements of the "perfectly clear" caveat have not been met and, accordingly, the General Counsel has failed to show that DDE was obligated to bargain with the Unions concerning initial employment terms, at Louisville and at Chambers Works. I note, too, that, as neither union interposed objection to the implementation of "success sharing" despite ample time to do so, and as both unions refused to bargain about contractual terms when offered the opportunity to engage in such negotiations long before venture start-up, the Unions, by their total insistence that DDE assume its predecessor's contracts, and their refusal to consider anything else, effectively waived statutory bargaining rights concerning "success sharing" and other terms and conditions of employment to prevail at start-up.

### 3. Request for Information

NCU's January 7, 1996, request, that it be furnished a copy of the venture agreement entered into by Dow and Dupont, in order to assess what "this thing" was all about, sought information which was clearly relevant to its statutory responsibility to represent the Louisville bargaining unit employees.[18] However, when the Union learned, 10 days later, by the terms of the reply, that Dupont and DDE interpreted the request as one for a signed agreement between the parents, which was not yet in existence, it made no clarifying demand to see a copy of any existent unsigned draft agreement. Ultimately, the document sought was signed in March, and a copy of it was delivered to the Union in April.

While, as urged by the General Counsel, information requested by the bargaining representative which is relevant and necessary to performance of its statutory duties must be produced without unreasonable delay, here the delay which occurred was attributable, apparently, to a good-faith misunderstanding concerning precisely what was sought. As Respondents otherwise satisfied their obligations to produce relevant information, and, as NCU, after receiving Respondents' answer to its request for this particular piece of information failed to supply the needed clarification, I am unwilling to conclude that production of the formation agreement was unreasonably delayed, in violation of the Act.

### CONCLUSIONS OF LAW

1. E.I. Dupont De Nemours and Company and Dupont Dow Elastomers L.L.C. are employers engaged in commerce, and in operations affecting commerce, within the meaning of Section 2(2), (6), and (7) of the Act.

---

[16] 317 NLRB 1052 (1995), enfd. 103 F. 3d 1355 (7th Cir. 1997).

[17] As noted, at Chambers Works, shortly after the offer process had begun, DDE announced certain additional, less significant, changes to existing Dupont terms and conditions of employment.

[18] See *Roman Catholic Diocese of Brooklyn*, 222 NLRB 1052 (1976), enf. denied on other grounds sub. nom. *Nazareth Regional High School v. NLRB*, 549 F. 2d 873 (2nd Cir. 1977).

D00513

DUPONT DOW ELASTOMERS LLC                                              15

2.   Chemical Workers Association, Inc. and Neoprene Craftsmen Union Local 788 are labor organizations within the meaning of Section 2(5) of the Act.

3.   Respondents have not violated the Act as alleged in the Complaint.

Upon the foregoing findings of fact, and conclusions of law, and pursuant to Section 10(c) of the Act, I hereby issue the following recommended:[19]

[19] In the event no exceptions are filed as provided in Section 102.46 of the Rules and Regulations of the National Labor Relations Board,

ORDER

The Complaint is dismissed.

Dated, Washington, DC  December 17, 1997

the findings, conclusions and recommended Order herein shall, as provided in Section 102.48 of the Rules and Regulations, be adopted by the Board and become its findings, conclusions and Order, and all objections thereto shall be deemed waived for all purposes.

D00514

## JOB PROFILE

| **JOB PROFILE:** Sales & Marketing Assistant |
|---|
| **SGL** P2 – P3 (1 – 1A) │ **APPROVED BY:** S. Metaxas/K. Cronin/B. Bedder (5/1/01) |
| **INCUMBENT:** D. Wellman |
| **ROLE STATEMENT:** The primary role of this individual is to support sales and marketing activities/programs related to such activities as distributor incentive and award programs, marketing communications; industry trade shows, business events coordination, customer lead/inquiry handling, and issuing quarterly distributor reports. |

| | |
|---|---|
| **R** | Events Planner<br>- Annual Distributor Incentive Program<br>- Distributor Training Programs<br>- Industry Trade Shows<br>- Annual Sales meetings<br><br>Distributor Short Awards Program – maintain and distribute quarterly sales reports to distributors.<br><br>Market Link Coordinator  - Receive and enter customer leads from a variety of sources (i.e. bingo cards, trade shows, etc...).  Run zip code/distributor locator reports, cross reference with current customer list, and send leads to distributors, direct sales, management, etc.  Make follow-up calls to inquire if there is additional information required and/or to schedule Application Engineers or Sales Development Managers<br><br>Sales / Marketing Literature Coordinator – routes all new/revised literature for internal approvals within the Kalrez business.<br>- New literature – works with Global Marketing Managers, MC assistant and graphics center to insure timely receipt of initial stocking requirements<br>- Literature Revisions – after approval, works with Area Sales Managers, Applications Engineers, MC assistant and graphics center to insure timely receipt of initial stocking requirements and remove obsolete literature from literature room.<br>- Responsible for keeping literature request form up to date and notifying internal personnel and distributor contacts of new or revised literature.<br>- Work with graphics center to fulfill distributor literature requests in a timely fashion.<br>- Keep DTP literature room organized and stocked.<br>- Work with MCD coordinator to publish Kalrez® business newsletters (i.e. Semiconductor News).<br>- Maintains and updates Distributor Directory.<br><br>Trademark Protection Administrator  - Review trademark infringement reports and send letters as appropriate to violators.<br><br>Distributor Contract Administrator – maintains all corporate legal agreements and their applicable schedules for regional, segment, consignments, and OEM/Fab Line contracts.<br><br>Back-up office professional during periods of vacation, illness or work overflow. |
| **A** | Direct accountability to the Kalrez® North American Sales Manager and indirectly to Area Sales Managers, Sales Engineers, MCD professional and Marketing Managers in support of marketing and sales activities |
| **C** | Effectively networks and communicates with Marketing and Sales employees and distributors. |
| **I** | Provides program updates and information on distributor issues in a timely fashion to insure sales/marketing force is well informed |

D34

A38

**MINIMUM REQUIREMENTS FOR ROLE**

| FORMAL ACADEMIC/ PROFESSIONAL ATTAINMENT | GENERAL WORK EXPERIENCE |
|---|---|
| High School Graduate – AAS degree preferred | • At least five years experience in an office support role – preferably in a sales office. <br> • Experience coordinating large meetings or events |

| SPECIFIC SKILLS/KNOWLEDGE/ BEHAVIORS | KEY TARGETED DEVELOPMENT DIMENSIONS |
|---|---|
| • Willing to travel overnight as needed <br> • Effective interpersonal and communication skills - on the telephone and in person. <br> • Demonstrated self-starter and ability to work independently. <br> • Demonstrated proficiency with standard computer applications and ability to learn new applications | • Planning & Organizing <br> • Customer Focus <br> • Personal Motivation and Initiative <br> • Communication <br> • Interpersonal Sensitivity and Skill |

**DuPont Dow Elastomers**
**Confidential**

**D35**

**A39**



Debra A Wellman
01/23/2002 11:02 AM

To:      Karen Cronin/DDE/DuPont@DuPont
cc:      Julia Shaw/DDE/DuPont@DuPont, Theo G Krapels/DDE/DuPont@DuPont
Subject:  Human Resource Assistance

Karen, I know we have been playing phone tag and I would have appreciated to meet with you to discuss this situation one-on-one, but the likelihood of that and with my need to reply to this attached DOC with your assistance is why I placed the original call to you. I request that you do not share this e-mail information with Paul Graves and Mary Ann Price, because of how they've been treating me here at Delaware Technology Park, as you will see, as you read on. I need to have a safe harbor at my work place, and you are very far away to resolve this "never-ending" conflict.

As background: Paul R. Graves gave me my DOC on Wednesday - January 16, 2002 8:00 AM - 10:10 AM and as it turned out it was not a DOC, but an interrogation/flogging with Paul Graves asking me about Stephen M. Metaxas and Mary Ann Price. My DOC time frame of 2 hours and 10 minutes, two-thirds of the time was spent in constantly repetitive inquiries about Stephen M. Metaxas and Mary Ann Price. Paul Graves had this same conversation with me on Friday - August 3, 2001 9:00 AM - 10:15 AM with the same type of aggressive treatment and interrogation questioning toward me as referenced above this meeting was where I was led to believe this meeting to be a one-on-one to let Paul Graves to know what my job tasks were, we never got to that point at that meeting either. Paul Graves needs to ask either Theo Krapels or Don Faught about Stephen M. Metaxas not me. I never responded to his interrogation questions, and asked if that would be all and I did not understand what he was talking about, and exited his office on 08/03/01. On 01/16/02, this was not a Discussion of Contribution meeting it was Flogging of Contribution. Where cold-hearted statements were made to me by Paul Graves, and about me for instance that "...no one in the group knows what I do for them at Kalrez®." And I responded that "that was very odd because everyone still comes to me for work to this day". The list goes on and on from Paul Graves about me. He would not give me dates, times nor instances, because he stated "...you would reply to those accusations". Well I thought that is what DOC was a Discussion of Contribution, not just an individual blurting out nebulous, fuzzy, harmful statements where there was no permitted reply from the employee. There are many more statements that Paul Graves said to me to totally demoralize and to start a confrontational type of atmosphere in his office on both of the above dates. Karen, I am not ill-bred nor am I a reactionary, so I said "no, no, no, no, no" to all of his hostile accusatory statements until my lips bled and stayed calm, because of his obvious display of anger for both of these meetings that Paul Graves requested. My last DOC with Stephen M. Metaxas in February 2001 was outstanding, how from Paul Graves arrival at Kalrez® in mid-July '01 until now, I receive this type of DOC. No the reality of this situation is that Paul R. Graves, Stephen M. Metaxas and Mary Ann Price are carrying someone else's baggage, and are flogging me.

Now since Mary Ann Price and Paul Graves arrived at Delaware Technology Park there has been a tag team effort from them "every chance" they get to be abusive, condescending, angry and hostile to me and others at Delaware Technology Park on several fronts that I will put in writing to you. I would describe their behavior as putting the "FEAR OF GOD" in an employee. I know when this happened to me, and it stemmed around a conversation that Mary Ann Price initiated and came into my office and proceeded to tell me how the Joint Venture was falling apart and going downhill and how it would have been a success if Chris Pappas was the Joint Venture President and proceeded to tell me how great the Dow personnel were, the ones still here and the other's that have gone, and how the DuPont personnel were not anywhere near the Dow personnel caliber and then she became very specific against Theo Krapels. I told her that the fact was that Chris Pappas left the JV and moved onto another career, and Theo Krapels at least stood by us. When Mary Ann Price attacked Theo Krapels business style, I denied that I knew of this poor business behavior from Theo Krapels, and told her I didn't share in her opinion of Theo Krapels

*[handwritten note in top right margin]* "I have been that I dont believe are cup value no me much TX holster

and left it at that. Well, it has been all downhill since then, because Mary Ann Price shared this information with Paul Graves and the abusive treatment that was already there now became escalated since that conversation. I guess I am not entitled to an opinion of a situation when someone is having a conversation with me.

Karen, I have worked very hard for the Kalrez® group over the years, and greatly enjoy my job, the employees and distributors and customers thoroughly and do a good/dependable job on a consistant daily basis for everyone, and I was looking forward to being able to do my job real job as we've discussed, and not do the dual roles where I do all of Administrative Assistant roles still. Well that has not yet happened here at DTP, I still have dual roles. But this type of angry aggressive behavior toward me is demoralizing and abusive. Some how Paul Graves and Mary Ann Price need to channel their anger and aggressive style or take a course and have them learn how to deal with co-workers / women.

Karen, my desk is far too busy here at Kalrez® for me to be constantly distracted by these individuals in a hurtful style, and the Kalrez® Distributors and Kalrez® employees need me to be at my desk in my normal upbeat friendly-lively style to provided assistance for them. I do not come to work to fight with peopel. Also note "other" Kalrez® employees were given their DOC information back to them via e-mail from Paul Graves. I was with much hesitation from Paul Graves permitted to take the original that he wrote all over, and I am submitting this as an "unaltered PDF file" to you within this document, Paul Graves has a copy of this original document. I made the copy and gave it directly back to Paul Graves. So again, no standard procedure for me during this supposed DOC procedure for me, only the sly maneuver's of personal attacks against me to make me come out of my comfort zone at work and feel bad about myself.

Karen, the typing/writing in "RED" is from Paul R. Graves the black print was my original input to him via e-mail. In closing, in my opinion that first paragraph in red that Paul Graves wrote , is loaded with hate and anger against me. Karen, I thought management by "FEAR" went out in the 1960's, Mary Ann Price and Paul R. Graves needs to learn to work along with people. What a sadness here at DTP....

Karen, as you can see we need to talk, hopefully we can talk about this the week of 01/28/02. I am in a meeting Thursday 01/24/02 all afternoon, and a vacation day on Friday 01/25/02.



DWDOC_5.jpDWDOC_2.jpDWDOC_3.jpDWDOC_4.jpDWDOC_1.jp

Sincerely,
Deb Wellman

D42

A41



Debra A Wellman
01/23/2002 11:02 AM

To:      Karen Cronin/DDE/DuPont@DuPont
cc:      Julia Shaw/DDE/DuPont@DuPont, Theo G Krapels/DDE/DuPont@DuPont
Subject: Human Resource Assistance

Karen, I know we have been playing phone tag and I would have appreciated to meet with you to discuss this situation one-on-one, but the likelihood of that and with my need to reply to this attached DOC with your assistance is why I placed the original call to you.  I request that you do not share this e-mail information with Paul Graves and Mary Ann Price, because of how they've been treating me here at Delaware Technology Park, as you will see, as you read on.  I need to have a safe harbor at my work place, and you are very far away to resolve this "never-ending" conflict.

**As background:** Paul R. Graves gave me my DOC on Wednesday - January 16, 2002 8:00 AM - 10:10 AM and as it turned out it was not a DOC, but an interrogation/flogging with Paul Graves asking me about Stephen M. Metaxas and Mary Ann Price. My DOC time frame of 2 hours and 10 minutes, two-thirds of the time was spent in constantly repetitive inquiries about Stephen M. Metaxas and Mary Ann Price. Paul Graves had this same conversation with me on Friday - August 3, 2001 9:00 AM - 10:15 AM with the same type of aggressive treatment and interrogation questioning toward me as referenced above this meeting was where I was led to believe this meeting to be a one-on-one to let Paul Graves to know what my job tasks were, we never got to that point at that meeting either. Paul Graves needs to ask either Theo Krapels or Don Faught about Stephen M. Metaxas not me. I never responded to his interrogation questions, and asked if that would be all and I did not understand what he was talking about, and exited his office on 08/03/01. On 01/16/02, this was not a Discussion of Contribution meeting it was Flogging of Contribution. Where cold-hearted statements were made to me by Paul Graves, and about me for instance that "...no one in the group knows what I do for them at Kalrez®."  And I responded that "that was very odd because everyone still comes to me for work to this day". The list goes on and on from Paul Graves about me. He would not give me dates, times nor instances, because he stated "...you would reply to those accusations". Well I thought that is what DOC was a Discussion of Contribution, not just an individual blurting out nebulous, fuzzy, harmful statements where there was no permitted reply from the employee.  There are many more statements that Paul Graves said to me to totally demoralize and to start a confrontational type of atmosphere in his office on both of the above dates.  Karen, I am not ill-bred nor am I a reactionary, so I said "no, no, no, no" to all of his hostile accusatory statements until my lips bled and stayed calm, because of his obvious display of anger for both of these meetings that Paul Graves requested. My last DOC with Stephen M. Metaxas in February 2001 was outstanding, how from Paul Graves arrival at Kalrez® in mid-July '01 until now, I receive this type of DOC. No the reality of this situation is that Paul R. Graves, Stephen M. Metaxas and Mary Ann Price are carrying someone else's baggage, and are flogging me.

Now since Mary Ann Price and Paul Graves arrived at Delaware Technology Park there has been a tag team effort from them "every chance" they get to be abusive, condescending, angry and hostile to me and others at Delaware Technology Park on several fronts that I will put in writing to you. I would describe their behavior as putting the "FEAR OF GOD" in an employee. I know when this happened to me, and it stemmed around a conversation that Mary Ann Price initiated and came into my office and proceeded to tell me how the Joint Venture was falling apart and going downhill and how it would have been a success if Chris Pappas was the Joint Venture President and proceeded to tell me how great the Dow personnel were, the ones still here and the other's that have gone, and how the DuPont personnel were not anywhere near the Dow personnel caliber and then she became very specific against Theo Krapels. I told her that the fact was that Chris Pappas left the JV and moved onto another career,  and Theo Krapels at least stood by us. When Mary Ann Price attacked Theo Krapels business style, I denied that I knew of this poor business behavior from Theo Krapels, and told her I didn't share in her opinion of Theo Krapels and left it at that. Well, it has been all downhill since then, because Mary Ann Price shared this information with Paul Graves and the abusive treatment that was already there now became

P00002

escalated since that conversation. I guess I am not entitled to an opinion of a situation when someone is having a conversation with me.

Karen, I have worked very hard for the Kalrez® group over the years, and greatly enjoy my job, the employees and distributors and customers thoroughly and do a good/dependable job on a consistant daily basis for everyone, and I was looking forward to being able to do my job real job as we've discussed, and not do the dual roles where I do all of Administrative Assistant roles still. Well that has not yet happened here at DTP, I still have dual roles. But this type of angry aggressive behavior toward me is demoralizing and abusive. Some how Paul Graves and Mary Ann Price need to channel their anger and aggressive style or take a course and have them learn how to deal with co-workers / women.

Karen, my desk is far too busy here at Kalrez® for me to be constantly distracted by these individuals in a hurtful style, and the Kalrez® Distributors and Kalrez® employees need me to be at my desk in my normal upbeat friendly-lively style to provided assistance for them. I do not come to work to fight with peopel. Also note "other" Kalrez® employees were given their DOC information back to them via e-mail from Paul Graves. I was with much hesitation from Paul Graves permitted to take the original that he wrote all over, and I am submitting this as an "unaltered PDF file" to you within this document, Paul Graves has a copy of this original document. I made the copy and gave it directly back to Paul Graves. So again, no standard procedure for me during this supposed DOC procedure for me, only the sly maneuver's of personal attacks against me to make me come out of my comfort zone at work and feel bad about myself.

Karen, the typing/writing in "RED" is from Paul R. Graves the black print was my original input to him via e-mail. In closing, in my opinion that first paragraph in red that Paul Graves wrote , is loaded with hate and anger against me. Karen, I thought management by "FEAR" went out in the 1960's, Mary Ann Price and Paul R. Graves needs to learn to work along with people. What a sadness here at DTP...

Karen, as you can see we need to talk, hopefully we can talk about this the week of 01/28/02. I am in a meeting Thursday 01/24/02 all afternoon, and a vacation day on Friday 01/25/02.

   

DWDOC_5.jpg DWDOC_2.jpg DWDOC_3.jpg DWDOC_4.jpg DWDOC_1.jpg

Sincerely,
Deb Wellman

# A44
# REDACTED

# ENTIRETY OF DOCUMENT
# CONFIDENTIAL

Date: February 20. 2002
To: Julia Shaw, General Counsel
From: Catherine LaPenta, Director Human Resources
Re: Conversation with Deb Wellman regarding DuPont Hotline charge

PRIVILEGED AND CONFIDENTIAL:

This memorandum will document my conversation with Deb Wellman (DW) on Monday 18, 2001. Deb was crying and the conversation stopped and started several times. Often she would lose the thread of the conversation; repeating things she had already told me or failing to finish the preceding story.

I stated that my purpose for calling was to understand more fully her concerns regarding Karen Cronin (KC), HR Consultant as reported by Jane McManus (JM) from the DuPont Hotline. According to the JM, DW claimed KC was not following up on claims DW had made about her supervisor and another colleague. She also implied that KC had harassed her regarding DW's absence on Monday February 11th.

DW expressed some surprise at my question regarding interactions with KC, saying that her original reason for calling the hotline was to complain about her treatment from Paul Graves (PG), Sales Manager, North America, and Mary Ann Price (MP), Administrative Assistant. She stated JM had called her several times seeking clarifying information and it was during one of those calls that DW mentioned her issues with KC. I asked if we could first address her (DW) statements regarding KC to connect information that I had with her information. She agreed but immediately began talking about her Discussion of Contribution (DOC) with PG.

She made several comments that PG was negative about DuPont (for example, "Enron reminds me an awful lot of DuPont and how they are treating this joint-venture" and "DuPont is forcing us to pick up their benefits—it will force the company under) DW claimed PG disliked her because she wouldn't speak negatively about DuPont. She stated PG accused her of being a 'spy'. Also stated Steve Metaxas, (SM) former Sales Manager, accused her of being a 'mole'. Stated "These Dow people think I'm someone I'm not". "I'm just a marketing person and PG thinks I had SM transferred"

I asked her to hold these thoughts and let us close the conversation regarding KC. She said that she had concerns about KC because, when she told her this, KC said, "Well, you do know a lot of DuPont people". DW said she was uncomfortable that there might be a "coup against her because KC has reputation for sticking up for Dow people" DW felt it necessary to send e-mail note regarding PG/MP behavior to others. I asked if this was the note copied to Theo Krapels; she stated yes. (Aside: E-mail note was sent to KC with cc to Krapels on 1/23/02; her interview with KC was2/4/02)

She continued to speak about PG saying he and Mary Ann were very hostile, abusive, and that she needed a 'safe harbor'. Stated that "...this is more harassment than one person can take" She said that "Graves is more of a loudmouth than Metaxas" but she

**D48**

A45

noted that SM also treated her 'shitty'. She said he had a 'fetish' about where she lived because she always used a PO Box. Asked her 'dozens of times' where she lived. Again I asked if we could examine the two issues I felt she had regarding KC. I asked if one was the timeliness of the investigation and the other was harassment—she stated yes.

Re: timeliness with KC: We reviewed the timeline of the investigation including DW agreement to meet after Leadership Conference, KC's cancellation of a scheduled meeting (1/31) and the KC/DW meeting on the 2/4/00. I stated that KC and I had a status meeting on 2/7 and, during that meeting, KC indicated she was awaiting 'cleaned up notes" from DW regarding her interactions with PG/MP and the names of two outside vendors, who she alleged had issues with MP.

DW became belligerent at that point. Stated she was very clear with KC that she was not going to submit her notes. She told me that "I don't have to give you my notes and my attorney knows this". I stated that I was okay with her not providing the notes. What I was trying to resolve was DW's complaint that KC wad not conducting a timely investigation. I stated that KC had documented an audix by DW on 2/8/02 stating DW would be giving her notes and names and that she had been waiting to receive those notes before finishing the investigation. Again, DW become angry and said, "There was no audix". She said KC told her not to type her notes but to sign each page and asked, "Why would she do that?" I said that I hadn't spoken with KC about that but, since KC's understanding was that DW would be reviewing her notes to 'clean-up', perhaps KC didn't want DW to do extra work to type. DW implied that KC was trying to get her to give her the notes. She said, "I said I would write some phrases down but you can't see my handwritten notes. I told her I can't submit them."

Re: UPS/FED-EX vendors. DW said she only had chance to speak with one of them and stated she told KC to '...pop-in and speak with one of them around the time they would deliver". She did not provide names and it was obvious she was not intending to do so. I did not pursue anything further on this.

Re: Harrassment: I told DW that KC had called her at my request on Monday and Tuesday  because we had received call from Dr. Cameron on 2/11/02 stating that DW had been sent home for heart palpitations, that she was to see her doctor and return to see Cameron in a week. When she did not report to work or call, we initiated the same procedures we would for any other employee. She said that KC called "every hour on the hour". I asked if she had turned off her answering machine and she said 'Yes, I want the least amount of confusion in my life". She said Cameron told her that "He would call and tell them you're on total disability". I told her that KC informed me of Cameron's call shortly after it occurred and that there was no mention of 'total disability". I said that had we been aware that she was totally disabled, we would have initiated the necessary paperwork required in such matters. I said I would personally call Dr. Cameron to better understand his message.

DW spent the majority of time discussing PG and MP, saying "How would you like it if someone told you "Nobody knows what you do", "I have no value for you". She claimed

PG said in the DOC that DW should invite MP over to dinner to make-up". She stated "When PG walked through the door, I didn't have a chance" States PG constantly questioned Russ Schnell with "Why do we need Deb, Deb is of no value". States she asked PG what she could do to change—claimed he said "Nothing, I don't find you of any value". Said situation is caustic and she will walk away with her head held high. Stated he used the reduction in incentive trips to say "This is a big portion of your job, don't know what I'll do with you after this" DW made other claims regarding MP and having to pick up work for her.

I ended conversation by stating we would complete the investigation with an interview with RS. I affirmed her understanding of the certified letter sent by KJC and the actions DW needed to take. She was very emotional at this point and I did feel it apprpriate to continue the conversation. I told her that I felt we should delay any further interviewing until we had a clearer picture from her physician as to her condition and she was more calm. She agreed.

**D50**

A47

DuPont Dow Elastomers L.L.C.
300 Bellevue Parkway
Wilmington, DE  19809



## DuPont Dow elastomers

March 6, 2002

Ms. Debra-Ann Wellman
P. O. Box 4395
Wilmington, DE  19807

Dear Debra,

This letter is to advise you that you are currently on leave under DuPont Dow Elastomers short-term disability benefit.  This leave will be credited toward your entitlement to leave under the Family Medical Leave Act (FMLA).  Your current leave began on February 11, 2002.

A copy of the company's short-term disability plan (including coordination with the FMLA) is enclosed.  If you have any questions, please feel free to contact me at 302-792-4210.

Sincerely,

Catherine A. LaPenta
Director, Human Resources

CAL/smc

**D55**

A48

Short-Term Disability Plan

## WHO IS COVERED

You are covered under the Short-Term Disability Plan on your first day of employment as a full-service employee.

## COST OF THE PLAN

Your coverage is paid entirely by DuPont Dow.

## YOUR BENEFIT

If you're disabled by a non-occupational illness or injury, the plan continues 100% of your normal pay (not including casual overtime or extra compensation) for up to six months.

If your rate of pay changes while you are out on disability, your benefit is adjusted accordingly.

## DISABILITIES NOT COVERED

To qualify for **Short-Term Disability Plan** benefits, your disability must:

- not be due to injury or illness that is job-related;
- not be caused by use of intoxicants or illegal drugs;
- not have occurred as a result of participation in willful acts contrary to law;
- not have occurred while serving in the armed forces.

## IF YOU ARE ON LEAVE

**Short-Term Disability Plan** coverage does not apply if you're on a leave of absence without pay.

## HOW TO APPLY FOR BENEFITS

To claim benefits under the plan, you must show satisfactory proof of your disability. You also must cooperate with your supervision and site medical staff when they request information related to your disability.

## COORDINATION WITH FAMILY AND MEDICAL LEAVE ACT

The Family & Medical Leave Act (FMLA) provides for federally mandated leave to assist employees in balancing the needs of families with the requirements of the workplace. The Act entitles eligible employees to take up to 12 weeks of unpaid leave in a 12-month period for the purposes of caring for a child, recovering from a serious health condition or caring for a family member with a serious health condition. To be eligible, you must have worked 1,250 hours in the last 12 months.

The Act allows employers to require an employee who takes leave for the birth or placement of a child to substitute paid vacation, personal leave or family leave for any part of a mandated leave.

During the leave period, the employer is required to maintain health care benefits of the employee at the same level as prior to the leave; and, at the end of the leave, the employer is required to restore an employee to the same or equivalent job.

The DuPont Short-Term Disability/Family Leave Policy complies with the provisions of the Act and exceeds the requirements of the Act in many respects. DuPont Dow reserves the right to designate disability leave under the federal leave program and you can elect to designate disability leave under the federal program. Further questions should be directed to your immediate supervisor.

**D56**

A49

DuPont Dow Elastomers L.L.C.
300 Bellevue Parkway
Wilmington, DE 19809



# DuPont Dow elastomers

To: Paul Graves, North America Sales Manager
From: Catherine LaPenta, Director of Human Resources
Subj: Debra Wellman Allegations

This will summarize the discussion among you, Karen Cronin, the Human Resources Consultant, and me on Friday February 22, 2002. I had explained that follow-up documentation would be forthcoming and am providing that with this memorandum.

Interviews were conducted during the months of January and February regarding allegations by Debra Wellman of "hostile and harassing treatment" by you and by Mary Ann Price, Administrative Assistant. Debra Wellman claimed specific remarks made by you during her Discussion of Contribution were "abusive, condescending, angry and hostile." She claimed that continual interrogation by you on several matters created a "toxic work environment". She also stated that you are seeking to eliminate her role at Delaware Technology Park.

As you know, Karen Cronin conducted interviews with both DuPont and DuPont Dow employees to determine the veracity of these statements. An interview was also conducted with a Rosenbluth Travel employee regarding charges of abusive behavior by Mary Ann Price.

We can find no evidence to corroborate the serious charges of harassment and abuse or the creation of a 'toxic' work environment.

We confirmed that you solicited feedback from several sources regarding Debra Wellman's performance, including feedback from those whose relationships with Debra Wellman were satisfactory.

Interviews conducted by Human Resources surfaced a mixed view of Debra Wellman's performance and ability to develop and maintain working relationships. You stated the following key messages regarding performance improvement were reviewed with Debra Wellman:

- ***Improve working relationship with Mary Ann Price.*** You stated that other employees are telling you that Debra Wellman is purposefully causing problems for Mary Ann Price.

**D57**

A50

Karen and I spoke with you about the need to include similar expectations for a professional working relationship in Mary Ann Price's Discussion of Contribution. We cautioned you about appearances of favoritism and noted that you should be as open to varying feedback regarding Mary Ann Price's performance, as you are Debra Wellman's. Finally, your statements to Debra Wellman regarding possible changes to reporting relationships, i.e. Debra Wellman reporting to Mary Ann Price or vice-versa, (in order to address the disruptions in the workplace) are ill-advised and should not be made again.

- *Develop closer relationships with the ASM's.* You stated that you offered help in this area to Debra Wellman consisting of an offer to include her in meetings with the ASM's to improve her effectiveness with distribution managers. Please include this in the final Discussion of Contribution.

- *Increase SAP expertise.* You stated that you offered to provide assistance with this, either personally or through Ruby Payne. Please formally document this offer in the final Discussion of Contribution.

- *Listen more carefully before acting.* It will be important for you to specifically inform Debra Wellman of those incidents/behaviors where she is not meeting this expectation.

While several people stated that Debra Wellman could be 'difficult', Karen and I cautioned you to more closely monitor your remarks. People hold Leaders to a higher standard regarding perceived 'petty' behavior than they do themselves. Negative statements, however infrequent or informal —such as "Well, that's what you can expect from Deb"—can be perceived as more antagonistic than you intend. Please limit remarks regarding any performance concerns you might have to appropriate settings.

Upon Debra Wellman's return from disability leave, it will be very important for you to avoid any appearance of retaliatory behavior. This does not mean that she cannot be held accountable for the performance expectations that you have outlined in her Discussion of Contribution. You should provide a transition period for Debra in the same manner you would provide transition for anyone returning from an extended leave of absence. I am recommending that you make arrangements to meet with her during her second week of return. In this meeting you should include a clear statement of priorities, review communications which occurred during her absence that impact her role, and determine communication to others as appropriate regarding her return and re-assignment of duties back to Debra. I, or a member of my staff should be present, during this re-entry meeting.

If you or Debra request it, a member of the Human Resources staff will be present during any performance management discussions. Note this offer is extended to both parties. In the event she does request the presence of Human Resources, please be sure either I, or a member of my staff, is present before beginning the performance management discussion.

Finally, please be sure that any changes to her role are fully supported and documented as business decisions. For example, I am aware that the incentive program for distributors

**D58**

A51

may be changed. This type of business decision will impact Debra's role so please formalize any revisions to her responsibilities with documentation.

These types of investigations are difficult for all involved parties and I thank you for speaking with Karen Cronin and me.

Cc: Rick Bond, Global Business Director

**D59**

Reviewed and given to
Paul Spares Good 18 2002 @
3:00 p.m.

**D60**

**PAUL R**
**GRAVES**
04/18/2002 05:05 PM



To:     John M Legare/DDE/DuPont@DuPont, Russell W Schnell/DDE/DuPont@DuPont, Mark J
        Heller/DDE/DuPont@DuPont, Nesha R MacMurdo/DDE/DuPont@DuPont, John C
        Huber/DDE/DuPont@DuPont, Brian T Hoffman/DDE/DuPont@DuPont, Paul A
        Franco/AE/DuPont@DuPont, Christopher C Griffin/DDE/DuPont@DuPont, James B
        Francart/DDE/DuPont@DuPont, Edward W Klaric/DDE/DuPont@DuPont, Fred
        Pourmirzaie/DDE/DuPont@DuPont, Tracie M Harris/DDE/DuPont@DuPont, Dale R
        Kane/DDE/DuPont@DuPont, Tony G Dorta/DDE/DuPont@DuPont, A Keith
        Hamilton/DDE/DuPont@DuPont, Gayron Scurlock/DDE/DuPont@DuPont, Krishnan R
        Thondukolam/DDE/DuPont@DuPont, Ronald M Smith/DDE/DuPont@DuPont, Mary Ann
        Price/DDE/DuPont@DuPont, Debra A Wellman/DDE/DuPont@DuPont, Kathleen M
        Ursitti/DDE/DuPont@DuPont, Linda K Simpson/DDE/DuPont@DuPont, Margaret A
        Scott/DDE/DuPont@DuPont, Deanna M Bradley/DDE/DuPont@DuPont, Susan C
        Mensinger/DDE/DuPont@DuPont, Marie C LeVan/DDE/DuPont@DuPont, Richard J
        Bond/DDE/DuPont@DuPont
cc:     (bcc: Catherine A LaPenta/DDE/DuPont)
Subject:  Deb Wellman's return

Deb Wellman will return to work on Monday, April 22.  Please join me in welcoming her back!
In order to allow her to ramp back up to full steam in an effective way, I will work with Deb to prioritize the
needs in the short term.  I know there are many things you will want Deb's help and support on
immediately, however, until May 13, please see me before requesting her support on any projects.  After
May 13, I anticipate her being up to speed and operating as normal.


Regards,
Paul


*[handwritten note]*
04/19/02
Received voice-mail from Michael
Sterman (EAP) (451-0808). Stated received
letter from Wellman psychiatrist stating
anxiety re: returning to work has exacerbated
symptoms and therefore extend'g leave. No
RTW date noted. Gave Sterman permission, via voice-mail, to
request Independent Medical Evaluation.

D61

A54



HRPOSTING2 HR

 04/23/2002 11:37 AM

Sent by: Naeema A Whatley

To:      Debra A Wellman/DDE/DuPont@DuPont
cc:
Subject:  Re: Career Connection Self Nomination - GSB2002047

Thank you for your recent self-nomination through Career Connection.  Unfortunately, this job advertising system will only accept self-nominations from DuPont U.S. Region full-service employees.

Those employed by a DuPont subsidiary, joint venture or contractor, or who work outside of the U.S. Region, may not self-nominate via Career Connection.

You may want to visit the DuPont internet site **www.dupont.com** for information on available positions that are advertised externally.


Naeema Whatley
Ducom 774-2927

CarConn HR/Mail-in/DuPont@DuPont on 04/23/2002 09:14:29

CarConn HR/Mail-in/DuPont@DuPont on 04/23/2002 09:14:29

To:       HRPOSTING2 HR/Mail-in/DuPont@DuPont
cc:       <>
Subject:  Career Connection Self Nomination - GSB2002047

Career Connection - Self Nomination Form

Job Number   : GSB2002047
Job Title    : Communicat'ns Administrator, US Field PA
------------------------------------------------------------------------

Information About Yourself
Name         : Debra-Ann Wellman
SSN          : ██████████
Job Title    : Kalrez Sales & Marketing Distributor Administrator
Site         : Delaware Technology Park
City         : Newark
State        : DE
Phone        : 302 575-1565
SBU          : DUPONT DOW ELASTOMERS - SCT
Email Address: debra.a.wellman@dupont-dow.com
------------------------------------------------------------------------

Information About Your Superviser

**D66**

A55

```
Name          : Kitty LaPenta
Phone         : 302 792-4210
Email Address: catherina.a.lapenta@dupont-dow.com
--------------------------------------------------------------------------
```

Are you currently in an excess position : No
Describe skills that are related to the job requirements:
NAME:          Debra-Ann Wellman

SOCIAL SECURITY #:          ████████████

CITY, STATE:          Wilmington, DE

TELEPHONE #:          (████████████

CURRENT JOB TITLE:     Kalrez® Sales & Marketing Distributor Administrator

SBU:          DuPont Dow Elastomers

JOB #:          GSB2002047

JOB TITLE:     Communication s Administrator, US Field PA

SUPERVISOR:     Kitty LaPenta    (302) 792-4210

---

Kindly accept my submission for Communication s Administrator, US
Field PA.  I have demonstrated strong abilities to handle multiple
tasks by performing the following employment related duties.  I have
16 years of employment with the DuPont Company an am well known as
a caring/reliable/high-producing/loyal employee.  Here is a brief
summary of my accountabilities and responsibilities that I ve carried
out recently.

KALREZ® DISTRIBUTOR INCENTIVE PROGRAM MANAGER

-     Global travel for site inspections/selection/contract
negotiations/planning
for this entire annual event.  I.e., hotel, travel arrangements,
group activities/events planning, video creations, guest speakers,
etc.  Accountability for annual budget of $500M+ for this incentive
program.
-     Managed Quarterly Distributor Awards Program - $150M - $200M annual
budget.
-     Distributor Training Programs National Meetings   Prepare all training
manuals with guidance/input for all Kalrez® Global Marketing Managers
and Application Engineers.  Design/co-ordinate all transportation/hotel
accommodations and team building events.
-     Responsible for all external communications/policy updates for
distributor s/direct accounts/end users.
-     Industry Trade Shows   National Sites   Select booth space, purchase
trade show booth space, literature co-ordination for trade show distribution,

**D67**

**A56**

purchase give away s for trade show attendees, convention housing
hotel co-ordination, customer entertainment.

OFFICE MANAGER    DELAWARE TECHNOLOGY PARK    KALREZù SALES & MARKETING


-    Administrative Support
-    Correspondence    External/Internal
-    Phone Coverage
-    Managed Calendars
-    Co-ordinate/Set-up Meetings
-    Sales Meeting    Internal
-    Presentations
-    Proficient In The Following Software:  MS Word, MS Excel, MS Power
Point, MS Publisher, Adobe Page Make, Adobe Illustrator, Adobe Photoshop

-    XMS Proficiency
-    SAP Sales Report Generation



MARKET LINK ADMINISTRATOR

-    Receive and enter all customer leads from a variety of sources
(i.e., bingo cards, trade show leads, call reports, technical and
sales calls interest cards.
-    Manage leads, update/assign leads, create monthly reports for
distributors.


SALES/MARKETING LITERATURE ADMINSTRATOR

-    New literature development efforts taking direction from the Global
Marketing Manager, Marketing Communications Manager, Applications
Engineers, Area Sales Manager and Product Managers.  Renew previously
produced literature, create/manage/update Kalrezù Literature Reference
Guide Manual.  Work with Digital Direct in Honey Brook, PA to manage
inventory and fulfillment orders for all distributors/direct accounts/end
users.  Create/publish business newsletters for Semiconductor Industry,
 Kalrezù Kapsule  a distributor newsletter, and the Kalrezù Ergonomics
Times on a quarterly basis.

In closing I would like to state that I am a high-energy, self-motivated
individual without any time constraints to perform necessary employment
duties.  Team player interaction is one of my strong suits along
with solid self-managing attributes on complex projects and enjoys
working effectively with people to meet their business needs.  Attached
you will find my most recent DOC for your confidential review.  It
would be my pleasure to meet with you to further discuss my employment
interest.

Sincerely,
Deb Wellman

:daw
Attachments
04/22/02

--------------------------------------------------------------------------------

**D69**

# A59
# REDACTED

# ENTIRETY OF DOCUMENT
# CONFIDENTIAL

DuPont Dow Elastomers L.L.C.
300 Bellevue Parkway
Wilmington, DE 19809



## DuPont Dow elastomers

Debra-Ann Wellman
PO Box 4395
Wilmington, Delaware
19807-0395

Dear Debra:

Thank you for speaking with me last week. As we discussed, I've summarized our conversation below:

<u>American Express</u>

In that your return-to-work date has been postponed, we agreed that DuPont Dow would cancel your American Express card effective May 3, 2002. This will assure that the Company does not incur any more late charges during your leave of absence. The card will be reinstated upon your return to work.

You will need to reconcile the account upon your return to work. In particular, you stated that you provided a $1500 personal payment (posted April 18th) in order to try to stop any late charges. You stated this was not a payment for personal expenses. The account does show several cash advances, which I am unable to differentiate as business-related. We agreed that the account needs to be properly reconciled so that you receive all monies owed to you by the Company and DuPont Dow receives any reimbursements from you for personal expenses already paid by the company in order to close out the account.

You stated that your only personal expenses were the New York Times subscription and the Verizon cell phone charges. Since we have closed the account, American Express will not accept these charges so you should have these billings directed to your personal accounts.

<u>DuPont Career Connections</u>

I informed you that I had sent electronic mail to Naeema A. Whatley and Kelli H. Kukura at the DuPont Company informing them that you had permission from DuPont Dow to apply for jobs within DuPont.

If you need to discuss this further, please don't hesitate to contact me at 302-792-4210.

Sincerely,

*[signature]*

5/08/02

**D73**

**A60**

# A61
# REDACTED


# ENTIRETY OF DOCUMENT
# CONFIDENTIAL

# A62-69
# REDACTED


# ENTIRETY OF DOCUMENT
# CONFIDENTIAL