IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEBRA-ANN WELLMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 05-278-SLR |
| | ) | |
| DUPONT DOW ELASTOMERS L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| DEBRA-ANN WELLMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 05-279-SLR |
| | ) | |
| THE DUPONT COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Bruce E. Jameson of Prickett, Jones & Elliott, P.A., Wilmington, Delaware. Attorney for Plaintiff.

Barry M. Willoughby of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware. Attorney for Defendant Dupont Dow Elastomers L.L.C..

Kathleen Furey McDonough of Potter Anderson & Corroon, LLP, Wilmington, Delaware. Attorney for Defendant The DuPont Company.

**MEMORANDUM OPINION**

Dated: September 14, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Debra-Ann Wellman ("plaintiff"), filed two actions pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, one against DuPont Dow Elastomers, LLC ("DDE") and the second against DuPont Company/E.I. du Pont de Nemours and Company ("DuPont") (collectively, "defendants"). Plaintiff asserts that defendants discriminated and retaliated against her and harassed her because of her gender and disability. Presently before the court are defendants' motions for summary judgment. The court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5. For the reasons set forth below, the court will grant defendants' motions for summary judgment.

## II. BACKGROUND

### A. Plaintiff's Employment

DDE was formed on April 1, 1996 pursuant to the Delaware Limited Liability Company Act as a joint venture between DuPont and the Dow Chemical Company ("Dow").[1] (05-279, D.I. 37 at A9-A22) Upon its formation, DDE had its own employees and its own Human Resources Department; was responsible for its own labor relations; owned separate offices, buildings, plants, and facilities; and produced its own products. *Wellman v. Dow Chemical Co.*, Civ. No. 05-280-SLR, 2007 WL 842084, at *1 (D. Del. Mar. 20, 2007). The formation agreement specifically provided that DDE was to control the services or functions unique to the elastomer business and be responsible for the salary and benefits of the transferred employees after the closing date. (05-279, D.I. 37

---

[1] On July 1, 2005, DuPont purchased Dow's share in the joint venture and renamed DDE to Dupont Performance Elastomers, LLC, an independently owned subsidiary of DuPont. (05-278, D.I. 54 at A268)

at A9-A22)

Plaintiff was employed as an administrative assistant by DuPont from 1978 to 1988 and again from 1992 to 1996 before accepting an offer of employment with DDE. (05-278, D.I. 89 at 5) Effective April 1, 1996, plaintiff became an employee of DDE, was paid by DDE, and was supervised by DDE employees. (*Id.*)

In July 2001, plaintiff began working under the supervision of Paul Graves ("Graves"). (*Id.*) Plaintiff claims that Graves and an administrative assistant, Mary Ann Price ("Price"), harassed her until she left DDE on February 11, 2002. (05-278, D.I. 1) She alleges that the "hostile environment" caused by their harassment forced her to leave and go on disability. (*Id.*)

DDE's Human Resources investigated plaintiff's allegations of harassment by interviewing plaintiff, Graves, Price, and numerous DDE and DuPont employees. (05-278, D.I. 54 at A50) Human Resources determined that plaintiff had not been subject to "harassment and abuse or the creation of a 'toxic' work environment." (*Id.*) They, however, did warn Graves to avoid showing any favoritism toward Price and to "closely monitor [his] remarks." (*Id.* at A51)

### B. Plaintiff's Medical Evaluations

Plaintiff was first examined by Dr. Mary Louise Whitehill, a clinical psychologist, on February 11, 2002. (*Id.* at A44) Dr. Whitehill diagnosed plaintiff with adjustment disorder and attributed her stress to work. (*Id.*) She indicated that plaintiff was capable of returning to work, but recommended she be relocated and have a different supervisor. (*Id.*) Plaintiff continued to see Dr. Whitehill weekly or bi-weekly until

November 18, 2002. (*Id.* at A154)  She also was treated by Michael Glacken, M.D. who diagnosed that plaintiff had an adjustment disorder with depressed and anxious mood. (*Id.*)  He prescribed Ambien and Klonopin for her conditions.  (*Id.*)  During their last session on November 6, 2002, Dr. Glacken reported that plaintiff was "feeling great." (*Id.*)

At the request of plaintiff's Employee Assistance Counselor ("EAC"), Michael Sherman, plaintiff underwent an independent psychological and psychiatric evaluation with Daniel Kadish, Ph.D., J.D., and Sol Kadish, D.O., on May 9, 2002.  (*Id.* at A62) Their evaluation concluded that plaintiff exhibited "traits of borderline, hysterical, and narcissistic personality," but that she was "not psychologically disabled." (*Id.* A68-69) Furthermore, Dr. Kadish "recommend[ed] that she should not be returned to her previous position at [DDE]." (*Id.* at A69)

On referral from Dr. Whitehill, plaintiff also underwent a neuropsychological evaluation with James Langan, Psy.D., in July 2002. (*Id.* at A151)  Dr. Langan's evaluation found "no evidence of any neuropsychological impairment." (*Id.* at A154) He concluded that plaintiff did not have a "psychiatric disability and . . . could return to work." (*Id.*)

### C. Plaintiff's Termination

Once plaintiff was medically cleared to resume employment, a meeting was scheduled with DDE's Human Resources on August 13, 2002.  At that meeting, plaintiff was informed that she could continue her current position with DDE or apply for an incapability pension.  (*Id.* at A109)  DDE extended plaintiff's short-term disability

3

benefits by a week to allow her to consult her attorney and make a decision.[2]  (*Id.*)  On August 16, 2002, plaintiff faxed a request for an additional extension "until on or about August 23, 2002." (*Id.* at A101)  Human Resources responded that a return-to-work meeting would be scheduled for August 23, 2002, but indicated that plaintiff's paid leave had expired and would not be extended further. (*Id.* at A109)

When plaintiff failed to attend the August 23 meeting without providing any cancellation notice, Human Resources rescheduled it for August 26, 2002. (*Id.* at A112)  On August 24, 2002, plaintiff left a voicemail stating "[her] unwillingness to return to work." (*Id.* at A113)  She did not attend the August 26 meeting. (*Id.*)  On August 26, 2002, DDE terminated plaintiff's employment "for job abandonment effective immediately."[3]  (*Id.*)

### D. EEOC Filings

On August 15, 2002, plaintiff filed a Charge of Discrimination ("COD") with the Equal Employment Opportunity Commission ("EEOC") against DDE, DuPont, and Dow alleging discrimination based on retaliation, gender, and disability. (*Id.* at A102)  In her charge, plaintiff provides a chronological list of alleged instances of harassment while employed with DDE. (*Id.*)  She later amended the COD in October 2002 to extend the time of the alleged discrimination through August 26, 2002, the date of her termination. (*Id.* at A121)  The EEOC ultimately dismissed the charges on February 22, 2005 and sent plaintiff a notice of right to sue. (*Id.* at A127)

---

[2] Plaintiff's attorney was provided a copy of DDE's offer and an accurate pension calculation on July 19, 2002, a month before the meeting. (*Id.* at A109)

[3] The termination letter was on DDE letterhead and listed its Human Resources department's numerous attempts to contact plaintiff and resolve the situation. (*Id.* at A113-A114)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231,236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.

5

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. The DuPont Company

DuPont contends that plaintiff has not offered any evidence that would suggest it had control over her workplace at DDE or was in any way responsible for any conduct that allegedly occurred at that company. Notably, plaintiff concedes that DDE was her employer and that her allegations stem from the actions of DDE employees. Plaintiff argues, however, that a parent entity may still be liable to the employees of its subsidiaries, relying on *Johnson v. Cook Composites and Polymers, Inc.*, No. Civ.A.99-4916, 2000 WL 249251 (D.N.J. Mar. 3, 2000). Specifically, she claims the two companies were not strictly independent of each other and DuPont, through the EAC, initiated the conduct resulting in plaintiff's discharge.

Delaware courts have consistently held that, "[i]n the absence of fraud, the separate entity of a corporation is to be recognized." *Stauffer v. Standard Brands Inc.*, 178 A.2d 311, 316 (Del. Ch. 1962). In an employment discrimination matter, a parent corporation will not be held accountable as an employer except in "extraordinary circumstances." *Marzano v. Computer Sci. Corp.*, 91 F.3d 497, 513 (3d Cir. 1996) (citing *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 981 (4th Cir. 1987)). The court must determine whether "the subsidiary is the 'alter ego' of the parent, or a 'mere instrumentality of the parent corporation.'" *Johnson*, 2000 WL 249351, at *3 (citing *Marzano*, 91 F.3d at 513). Courts have applied a four-factor "integrated enterprise" test which considers "(1) the interrelationship of operations, (2) common management, (3)

6

centralized control of labor relations, and (4) common ownership or financial controls."
*Johnson*, 2000 WL 249351, at *4 (citing *McNeal v. Maritank Philadelphia, Inc.*, No. 97-
0890, 1999 WL 80268, at *7 (E.D. Pa. Jan. 29, 1999)).

Plaintiff must present some evidence to support piercing the corporate veil and
holding DuPont accountable.  Plaintiff states that the EAC, who was a DuPont
employee, "played a central role" in plaintiff's termination by instructing her to leave
work and obtain an attorney.  (05-279, D.I. 66 at 21)  She also suggests that the ability
of a former DDE employee to secure temporary and then permanent employment at
DuPont raises an issue of fact regarding DuPont's control over DDE.  (*Id.*)  These
allegations, even if true, do not satisfy the integrated enterprise test.  Plaintiff does not
claim that DuPont and DDE shared common management or common ownership or
common financial controls.  In fact, her wages were paid solely by DDE and all the
individuals she alleges discriminated or harassed her were employees of DDE.  (05-
279, D.I. 37 at A118-A120)  In addition, plaintiff was unable to apply for certain
positions within DuPont because she was considered a non-DuPont employee.  (05-
278, D.I. 54 at A93)  When plaintiff was terminated by DDE, DuPont was not consulted
or informed about the decision.  (05-279, D.I. 37 at A3)  Furthermore, in 2002, the
National Labor Relations Board determined that DuPont and DDE were not alter egos
of each other.  *Dupont Dow Elastomers L.L.C.*, 332 N.L.R.B. No. 98 (Oct. 31, 2000).
The board found that there was no evidence to show "sufficient commonality of
ownership, and, or, control" or "that DDE was formed for other than legitimate business
reasons."  *Id.*  Without any evidence showing that DuPont and DDE's operations were
interrelated, the court will grant DuPont's motion for summary judgment.

7

## B. DuPont Dow Elastomers

Plaintiff asserts three claims in her complaint against DDE:  (1) that she was terminated in retaliation for filing harassment complaints; (2) that she suffered a hostile work environment in violation of Title VII of the Civil Rights Act of 1964; and (3) that she was discriminated under the Americans with Disabilities Act ("ADA").  DDE contends that plaintiff is unable to establish a genuine issue for trial because she has failed to establish all essential elements and uses "mere allegations, general denials, or vague statements" for support.  *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991).  Plaintiff counters that she has offered sufficient evidence for a fact finder to conclude that an invidious discriminatory reason was more likely than not a motivating or determinative cause of DDE's termination of her.  The court will address each of plaintiff's claims in turn.

### 1. Retaliation

In order to satisfy a retaliation claim, plaintiff must show that "(1) [s]he engaged in protected activity; (2) [s]he was discharged subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the discharge." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989).  Once plaintiff makes a prima facie case of retaliation, DDE has the burden to "articulate some legitimate, nondiscriminatory reason" for terminating plaintiff. *Woodson*, 109 F.3d at 920.  The burden then shifts back to plaintiff to establish that there is sufficient evidence for a reasonable factfinder to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an

8

invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

DDE first argues that it was unaware of plaintiff's allegations because she did not file an internal charge of sexual harassment and it had not yet received notice of her EEOC charge which was filed only eleven days before she was dismissed. (05-278, D.I. 53 at 21-22)  Plaintiff claims her complaints to Human Resources in January 2002 constituted protected activity and DDE took adverse action against her by not offering an alternative position and ultimately terminating her. (05-278, D.I. 89 at 11)  She maintains that, even if DDE did not have notice of her EEOC charge, she expressed to Human Resources her concerns of harassment by Graves and Price before her termination. (*Id.*)  Courts have considered such actions to be lawfully protected activity. *See Ferguson v. E.I. duPont de Nemours and Co.*, 560 F. Supp. 1172 (D. Del. 1983).

However, plaintiff has failed to show a causal connection between the adverse action and the protected activity.  A week after allegedly expressing her concerns to Human Resources in February 2002, plaintiff stopped working on February 11, 2002 and went on short-term disability. (05-278, D.I. 54 at A82)  From February 2002 through August 2002, DDE continued to pay her disability benefits. (*Id.* at A109)  When plaintiff was cleared to return to work, she attended a meeting with Human Resources and the EAC on August 13, 2002.  At the meeting, plaintiff was offered her previous position or, alternatively, to apply for an incapability pension. (*Id.*)  Plaintiff admits that the possibility of her working under a different supervisor was also discussed, but that she would continue working with Graves for a couple of months until the request was

9

finalized. (*Id.* at A119)  DDE extended her benefits an additional week, thus, providing

her more time to decide. (*Id.* at A109)  After weeks had passed without plaintiff

informing DDE of her decision, she was terminated for job abandonment. (*Id.* at A113-

A114)  Plaintiff was terminated only when she refused to attend return-to-work meetings

or to exercise any of the options offered to her. (*Id.*)

Prior to her meeting with Human Resources in August 2002, plaintiff was aware

that she could be terminated for job abandonment.  During an examination with Dr.

Langan on July 9, 2002, plaintiff related that if asked, she would refuse to return to her

former job. (05-278, D.I. 93 at C11)  She further commented that by refusing to return

to work, she expected to be terminated. (*Id.*)

Earlier in May 2002, plaintiff requested that DDE assist her in obtaining a

position with her former employer, DuPont. (05-278, D.I. 54 at A96)  In response,

Human Resources contacted DuPont on numerous occasions advising that DDE did

not object to plaintiff applying for positions within DuPont. (*Id.* at A93, A95-A96, A100)[4]

Such evidence suggests, contrary to plaintiff's contention of retaliation, that she did not

want to return to work if that meant working for DDE.  Further, rather than impeding her

ability to pursue potential job opportunities with DuPont, DDE took steps to improve

them, which conduct refutes her claim of retaliation.

In the months prior to her termination, DDE continued paying plaintiff's disability,

contacted DuPont on her behalf, discussed alternatives with her, extended her disability

benefits to allow her more time to make a decision, and attempted to arrange return-to-

---

[4] Plaintiff was advised by both DuPont and DDE that the two companies were
separate legal entities and that she was ineligible to apply for positions open only to
DuPont employees. (05-278, D.I. 54 at A55-58, A100)

work meetings to address her employment options.  It was only after plaintiff failed to attend the return-to-work meetings and refused to communicate with DDE that she was terminated for job abandonment.

Even if plaintiff were able to establish a prima facie case of retaliation, DDE offered a legitimate, non-discriminatory reason for its decision:  namely, plaintiff refused to attend return-to-work meetings after receiving medical clearance.  An employer is not required to prove that its actions were actually motivated by the non-discriminatory reason since "the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Plaintiff now has the burden to prove that DDE's explanation is a pretext for retaliation by either "discrediting the proffered reason" or pointing to evidence that indicates "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 764.  Plaintiff was paid by DDE throughout her disability leave.  She does not contest that, after receiving medical clearance, she refused to return to work or cooperate with Human Resources.  The court in *Teymer v. Kraft Foods North America, Inc.*, No. 01-2018, 2002 WL 1022024, at *6-7 (7th Cir. May 20, 2002), found that an employer may terminate an employee for refusal to return to work.  The plaintiff in *Teymer* went on disability leave after claiming sexual discrimination by her supervisor. *Id.* at *3.  She refused to return to work after being cleared by her physician because "she could not emotionally tolerate coming into contact with certain people . . . ." *Id.* at *5.  The court determined that an employee's refusal to return to work "is a noninvidious reason for termination" and that "the

11

payment of disability leave severs the connection between the alleged discrimination and the termination." *Id.* at *7.

Similar to the facts in *Teymer*, in the instant matter, plaintiff cannot rebut DDE's legitimate, non-discriminatory reason for her termination since she admits receiving disability benefits for almost seven months and failing to attend scheduled meetings with Human Resources. There are no genuine issues of material fact in this regard; therefore, DDE's motion for summary judgment is granted as to this claim.

### 2. Hostile work environment

Plaintiff alleges that she suffered a hostile work environment while employed at DDE. To prevail on her claim, plaintiff must demonstrate that the harassment was both objectively and subjectively "severe or pervasive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). A severe or pervasive environment is one that a reasonable person would perceive as hostile or abusive in light of all the circumstances and one which the claimant did in fact find to be so. *Id.* at 787. The court will consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "Teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory" behavior. *Faragher*, 524 U.S. at 787-88. The United States Court of Appeals for the Third Circuit has recognized five factors that must be proven in a hostile environment claim under Title VII: "(1) plaintiff suffered intentional discrimination because of her gender; (2) the discrimination was severe or pervasive;

12

(3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same gender in that position; and (5) the existence of respondeat superior liability." *Duffy v. Dep't of State*, 598 F. Supp. 2d 621, 628 (D. Del. 2009).

Plaintiff contends that, during the period she worked with Graves, she was subject to physical threats and abuse. In her complaint, she identifies certain misconduct by Graves. (05-278, D.I. 1) According to the various medical reports, plaintiff suffers from an adjustment disorder and exhibits personality issues, but does not have any significant mental health problems. (05-278, D.I. 54 at A44, A62-A69) Both her psychologist and the Independent Medical Examiners, based on plaintiff's expressed concerns, recommended that she not return to her position with DDE. (*Id.*) In light of this evidence, a reasonable jury could conclude that plaintiff found her work environment to be hostile and abusive.

When viewed objectively, however, plaintiff's allegations do not give rise to a hostile work environment claim based on her gender. Her complaint lists sporadic incidences that occurred during the six months that she worked under the supervision of Graves. (05-278, D.I. 1) In her first allegation, plaintiff claims that, during a celebratory lunch for a co-worker in July 2001, Graves asked numerous "personal questions" about her family and her previous employment at DuPont. (*Id.*) Later that month, Graves requested that plaintiff keep her cabinets and desk unlocked. (*Id.*) Plaintiff contends that in August 2001, Graves accused her of being a gossip and threatened to "knock [her] back so hard." (*Id.*) She also mentions two instances where

13

Graves attempted to look up her skirt as she stood on a three-step ladder. (*Id.*) At a meeting on January 3, 2002, plaintiff found Graves' conduct disgusting because he adjusted his pants and grabbed his belt while he was speaking to her. (*Id.*) She alleges that during their discussion of contribution on January 16, 2002, Graves made her feel intimidated and gave her an unfavorable performance review which upset her. (*Id.*) Plaintiff claims that when she attempted to leave the meeting, Graves' elbow rubbed across her chest while he reached to grab the side of her chair. (*Id.*) Before she left, Grave purportedly accused her of being a spy for DuPont. (*Id.*)

The conduct described above has no support in the record beyond plaintiff's conclusory allegations and her deposition testimony. Even if true, however, such conduct[5] does not objectively constitute "severe and pervasive" harassment such that it would "alter the condition of [a reasonable woman's] employment and create an abusive working environment." *Duffy*, 598 F. Supp. 2d at 631 (quoting *Harris*, 510 U.S. at 21). The alleged instances of conduct are sporadic in time, isolated by their nature (i.e., there is no ongoing pattern of conduct that has been alleged), and not consistently related to plaintiff's gender. For these reasons, there are no genuine issues of material fact relating to whether plaintiff's allegations are objectively adequate to support a hostile work environment claim.

### 3. ADA

In order to bring a discrimination claim under the ADA, plaintiff must first show that she is a member of a protected class. The ADA provides three categories of

---

[5]Plaintiff has identified eleven instances of alleged misconduct on Graves' part over the course of six months; of these, only four appear related specifically to plaintiff's gender.

14

protection: (1) having a physical or mental impairment that substantially limits one or more major life activities; (2) having a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. 12102(1). Based on the available medical records, plaintiff's condition does not support a finding of disability under the first two categories. Most persuasive in this regard is the conclusion by her treating psychologist that "[plaintiff] does not meet the criteria for any Axis I or Axis II major mental illness and does not appear to have any history of significant mental health problems." (05-278, D.I. 54 at A44) Nor is there any indication that plaintiff's condition limits a major life activity.

As to the third category, the court must determine whether DDE treated plaintiff as having an impairment, and whether the decision to terminate her was based largely or entirely upon that perception. *See* 29 C.F.R. § 1630.2(l) (defining "regarded as having such an impairment"); *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 522 (1999) ("a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities"). Months prior to her termination, Human Resources was informed that plaintiff would be out on short term disability due to her anxiety disorder. Merely having knowledge of the impairment, however, is insufficient to suggest that the employer considered or perceived the employee as disabled. *Reeves v. Johnston Controls World Serv., Inc.*, 140 F.3d 144, 153 (2d Cir. 1998). When plaintiff was medically cleared to return to work, she was offered her former position as an administrative assistant. (05-278, D.I. 54 at A54) Further, DDE attempted to discuss with plaintiff her return to work on numerous occasions. (*Id.* at A113-A114) Moreover, DDE did not object or prevent plaintiff from

15

applying for positions with DuPont.  In fact, upon learning that she preferred working for DuPont, it took steps to assist her in that regard.[6]  (*Id.* at A95, A100)  Such facts suggest that DDE believed plaintiff was capable of working and did not perceive her as disabled.  Since plaintiff cannot prove on this record that she is a member of a protected class by qualifying under any category of the ADA, her claim for disability discrimination fails.

## V. CONCLUSION

For the foregoing reasons, the court will grant DuPont's motion for summary judgment (05-279, D.I. 64) and grant DDE's motion for summary judgment (05-278, D.I. 87).  An appropriate order shall issue.

---

[6] Plaintiff applied for a communications administrator position with DuPont on April 22, 2002, but was told that she was ineligible because she was an employee of a DuPont subsidiary or joint venture. (05-278, D.I. 54 at A55-A58)  Plaintiff was again informed on May 30, 2002 that she was ineligible for a secretarial position with DuPont, since she was not a DuPont employee. (*Id.* at A93)  On June 3, 2002, DDE's Human Resources contacted DuPont advising that it did not object to plaintiff applying for positions with DuPont. (*Id.* at A95-A96)  It forwarded plaintiff a letter telling her the same. (*Id.*)